```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
ANDREW DELANCEY,

                            Plaintiff,

             -against-                              23 Civ. 10357 (AT)

JUSTIN WELLS, FOX CORPORATION, and                  ORDER
FOX NEWS NETWORK, LLC,

                            Defendants.
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __2/21/2025__

ANALISA TORRES, District Judge:

Plaintiff, Andrew Delancey, brings this action against Defendants, Justin Wells, Fox Corporation, and Fox News Network, LLC, alleging that Wells sexually assaulted Delancey while both were employed as Fox producers, and that Fox is liable for the harassment Delancey experienced. *See generally* Am. Compl., ECF No. 24. Fox Corporation and Fox News Network, LLC (collectively, "Fox") move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). ECF No. 36. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

I.    Factual Background[1]

Andrew Delancey was an employee of Fox 13 in Tampa Bay when, in 2007, he was contacted over Facebook by Justin Wells, whom he did not know. Am. Compl. ¶¶ 17–18. Wells said that he had noticed Delancey in Facebook's "Fox TV Group" and that Delancey had "caught [his] eye." *Id.* ¶ 18. Wells mentioned that he was a producer at Fox 5 NYC and had previously worked at Fox 13 in Tampa Bay. *Id.* He also mentioned that he knew the Assistant News

---

[1] The following facts are taken from the amended complaint, which the Court must accept as true for the purposes of this motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Director of Fox 13, suggesting to Delancey that Wells had connections in the Fox world. *See id.* ¶ 19. In February 2008, Wells, who was based in New York, again messaged Delancey on Facebook, encouraging him to move to New York. *Id.* ¶ 21. Delancey sent his resume to Wells. *Id.*

In September 2008, Mykel McCarthy, Assistant News Director at Fox News Edge, a Fox division, hired Delancey to work as a Fox News Edge producer in New York City. *Id.* ¶¶ 13, 22–23. Delancey was directly supervised by McCarthy and was tasked with creating Fox content for the West Coast market and coordinating afternoon and evening news coverage. *Id.* ¶¶ 23–24. In October 2008, Wells, became a field producer for Greta Van Susteren's Fox news program. *Id.* ¶ 14.

Within one week of Delancey's arrival at Fox headquarters in New York, Wells began showering Delancey with gifts, including a large box of Fox News Edge merchandise and personally monogrammed office materials. *Id.* ¶ 24. Although Delancey did not work on the same show or team as Wells, Delancey was required to complete tasks at Wells' direction. *Id.* ¶¶ 25, 46–47. For example, Delancey was obligated to respond to Wells' requests to produce content for Van Susteren's show, and Wells would oversee Delancey on that work. *Id.* ¶¶ 25, 46–47. Wells was not Delancey's direct supervisor, but he had the authority to cause Delancey to be fired and could bring about or prevent a promotion of Delancey, in large part due to Fox's hierarchical structure and Delancey's lower status. *Id.* ¶¶ 47–48.

Wells also made comments that led Delancey to believe that Wells could significantly impact his career. *Id.* ¶ 26. For example, Wells told Delancey that he would help him "learn the ropes" at Fox, made it clear that he had the ear of Fox's top executives, and stressed to Delancey that Wells' status at Fox could be used to further Delancey's professional aspirations. *Id.* ¶¶ 26,

2

28. When Delancey confided in Wells that he was hoping to find a higher paying job, Wells told him that he could put in a "good word" for Delancey with others at Fox. *Id.* ¶ 27. Wells also arranged for Delancey to be interviewed for a producer position at another TV station. *Id.*

Within approximately one month after Delancey's arrival in New York, Wells assaulted Delancey at Wells' home. *Id.* ¶¶ 30–38. Wells had encouraged Delancey to meet with him and other co-workers outside of the workplace, stressing to Delancey that Wells' influence and connections could benefit Delancey's career. *Id.* ¶ 28. At Wells' invitation, Delancey agreed to stop by Wells' home for a cocktail with other co-workers before the group would head on to a bar. *Id.* ¶¶ 28–29. When Delancey arrived at Wells' apartment, no other co-workers were present—and none ever arrived. *Id.* ¶ 29. Wells made Delancey a drink, but before Delancey could finish it, Wells physically and sexually assaulted Delancey. *Id.* ¶¶ 30–33. Wells pushed Delancey over, forced his tongue into Delancey's mouth, and grabbed Delancey's genitals, causing him severe pain. *Id.* ¶¶ 31–32. Delancey yelled "no!" and tried to persuade Wells to get off of him. *Id.* ¶¶ 33–34. Eventually, Delancey was able to convince Wells that they should leave his apartment. *Id.* ¶ 34. Wells insisted, however, that Delancey see the apartment rooftop before they leave. *Id.* ¶ 35. Delancey agreed, believing he would be safer outside of the apartment. *Id.* While Delancey climbed the stairs to the rooftop, Wells reached around Delancey and forced his hands down the front of Delancey's pants. *Id.* ¶ 37. Delancey quickly pulled away and pleaded with Wells to stop. *Id.* ¶ 38. Angered and annoyed by Delancey's refusal to acquiesce to his sexual demands, Wells told Delancey to leave. *See id.* ¶¶ 39, 56. During both assaults, Delancey made it clear that he did not consent, and that Wells was hurting him. *See id.* ¶¶ 31–39.

A week after the incident at Wells' home, Wells told his contact at the other TV station where Delancey was interviewing not to hire Delancey. *Id.* ¶ 50. Although he was qualified for the position, Delancey was not offered the role. *Id.* ¶ 51. Shortly thereafter, Wells told Delancey that Delancey was "not thinking straight" and "screwing [himself] over"—statements which Delancey understood to be threats that Wells could further harm his career if he did not give in to Wells' sexual demands. *Id.* ¶ 52.

At work, Wells continued to assign Delancey tasks and oversee his performance. *Id.* ¶¶ 46, 53. Delancey told two co-workers about the assault at Wells' apartment, sharing that he was distressed and scared to report Wells' behavior. *Id.* ¶¶ 40–41. One of the co-workers told Delancey that Wells had sexually harassed her in the past and that her then-supervisor, Wells' then-supervisor, and Fox's human resources department had all been informed of the harassment, which Wells later admitted to in a letter provided to Fox. *Id.* ¶ 41.

Delancey's direct supervisor, McCarthy, also had a known history of misconduct at Fox. *Id.* ¶ 44. McCarthy made Delancey and other subordinates promise to not inform upper management of anything untoward, and specifically directed Delancey to not report any concerns to human resources, telling Delancey that he could not trust them. *Id.* ¶¶ 42–43. Because of McCarthy's statements and the position of authority that Wells held relative to Delancey, Delancey felt that he lacked a safe avenue to complain about Wells' misconduct. *Id.* ¶¶ 40, 53.

Delancey also began to perceive that his career at Fox had stalled following Wells' threats to hinder Delancey's advancement. *Id.* ¶ 54. As a result, Delancey left his position in New York and returned to the local Fox station in Florida. *Id.*

II.     Procedural History

Delancey commenced this action in Supreme Court, New York County, in November 2023.  *See* ECF No. 1.  Fox removed the action on the basis of diversity jurisdiction.  *See id.*  Delancey filed his complaint in this Court in December 2023, ECF No. 8, and amended it in February 2024, *see* Am. Compl.  In his amended complaint, Delancey brings claims against Wells for assault and battery under New York law, and against Fox for discrimination on the basis of gender under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 296(1)(a), 297(9), and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-502(a).  *Id.* ¶¶ 64–90.

Wells filed his answer on February 16, 2024.  ECF No. 29.  On April 2, 2024, Fox moved to dismiss Delancey's NYSHRL and NYCHRL claims under Federal Rule of Civil Procedure 12(b)(6).  ECF No. 36; *see also* Def. Mem., ECF No. 36-1; Pl. Mem., ECF No. 43; Def. Reply, ECF No. 45.

**DISCUSSION**

I.      Legal Standard

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*. (quoting *Twombly*, 550 U.S. at 556).  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a

5

presumption of truth.  *Id*.  On a motion to dismiss, the Court must draw all reasonable inferences in the non-movant's favor.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

   II.   NYSHRL Claims

Delancey contends that Fox is liable under the NYSHRL for the hostile work environment and *quid pro quo* harassment he experienced while at Fox News Edge.  When a plaintiff makes a hostile work environment or *quid pro quo* harassment claim under the NYSHRL, courts apply "the same standards as federal claims under Title VII."  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006); *see also Quintero v. Angels of the World, Inc.*, No. 19 Civ. 6126, 2021 WL 4464123, at *8 (E.D.N.Y. Sept. 10, 2021), *report and recommendation adopted sub nom. Quintero v. Stoupas*, No. 19 Civ. 6126, 2021 WL 4463488 (E.D.N.Y. Sept. 29, 2021).  Applying those standards, the Court finds that Delancey has stated a plausible sexual harassment claim against Fox under both legal theories.

   A.  Hostile Work Environment

To state a hostile work environment claim, Delancey must establish "(1) that the harassment [he experienced] was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment[,] and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to [his] employer."[2]  *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)).

---

[2] A plaintiff must also plead that he subjectively viewed his work environment as hostile or abusive.  *Girardi v. Ferrari Express, Inc.*, No. 20 Civ. 4298, 2023 WL 2744027, at *4 (S.D.N.Y. Mar. 31, 2023).  The Court finds that the allegations of the complaint easily satisfy the subjective prong, and Fox does not argue otherwise.

1. Severse or Pervasive Harassment

For the first prong of a hostile work environment claim, "a plaintiff need only 'plead facts sufficient to support the conclusion that [he] was faced with harassment . . . of such quality or quantity that a reasonable employee would find the conditions of [his] employment altered for the worse.'" *McKinney v. New York*, No. 19 Civ. 3920, 2022 WL 602970, at *5 (S.D.N.Y. Mar. 1, 2022) (quoting *Donahue v. Asia TV USA Ltd.*, 208 F. Supp. 3d 505, 514 (S.D.N.Y. 2016)). "The kinds of workplace conduct that may be actionable under Title VII . . . include 'unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'" *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (alterations adopted) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

Fox does not dispute that the sexual assaults alleged by Delancey constitute unwelcome sexual contact of the sort regularly found to constitute severe harassment under Title VII. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995) ("[E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability."). Fox argues, instead, that Delancey's claim fails because the conduct occurred outside of work with no "link" to the workplace. Def. Mem. at 9.

The Court disagrees. The relevant question under Title VII is not whether the conduct occurred within or outside of the workplace, but whether it had "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor*, 477 U.S. at 65. When a hostile work environment claim includes evidence of harassment or assault outside the workplace, the question, then, is whether the conduct had a sufficient impact on, and nexus to, the plaintiff's

work environment as to trigger the employer's duty to respond. *Parrish v. Sollecito*, 249 F. Supp. 2d 342, 351–53 (S.D.N.Y. 2003); *see also Echevarria v. Utitec, Inc.*, No. 15 Civ. 1840, 2017 WL 4316390, at *7 (D. Conn. Sept. 28, 2017) ("[T]he court is aware of no settled law that, in gauging the severity or pervasiveness and effects of sexual harassment, allows the offender to . . . to pick and choose the venue for his assaults so as to not account for those that occur physically outside the workplace.") (quoting *Parrish*, 249 F. Supp. 2d at 350–51)); *Okonowsky v. Garland*, 109 F.4th 1166, 1181 (9th Cir. 2024) ("[E]ven if discriminatory or intimidating conduct occurs wholly offsite, it remains relevant to the extent it affects the employee's working environment."). If sexual abuse by a superior "reflects similar behavior to that which also occurred and was tolerated or not effectively remedied in the actual workplace," or if such abuse impacts the plaintiff's "ability to perform work duties," or causes the plaintiff "mortification aroused by encountering the offender on the job on a regular basis," or "constant apprehension as to whether . . . the employee's response, or lack of it, ultimately will transform into a . . . demotion [or] denial of promotion," the offending conduct may fall within the scope of Title VII's protections even if some of the harassment occurred offsite. *Parrish*, 249 F. Supp. 2d at 351–52; *cf. Tomka*, 66 F.3d at 1305 (finding that rapes by coworkers during the same evening outside of the workplace could "sufficiently alter[] the conditions of the victim's employment [to] clearly create[] an abusive work environment for purposes of Title VII liability").

Delancey's complaint satisfies this standard. He alleges that he was sexually assaulted twice in one evening by a superior, Wells, who directly oversaw his work. *See* Am. Compl. ¶¶ 25, 28, 30–38, 46–47. These incidents took place at Wells' home, where Delancey went at Wells' invitation based on the pretense that Wells was hosting a gathering of coworkers, and the promise that it would benefit Delancey's career to attend. *Id.* ¶¶ 28–29. After the assault, Wells

made threatening comments to Delancey at work, suggesting that Delancey's failure to give in to Wells' sexual demands would harm Delancey's career. *Id.* ¶¶ 52, 54. Wells acted on those threats: He told a producer at another TV station to not hire Delancey, and he apparently took actions within Fox that stalled Delancey's advancement there. *Id.* ¶ 50; *see id.* ¶ 54.

Delancey alleges that the sexual assault and Wells' threatening comments caused Delancey distress in the workplace, where he continued to be supervised by Wells. *Id.* ¶¶ 40–41, 46, 53. Delancey states that it was difficult to be "forced to encounter his harasser in the workplace throughout his time at Fox," *id.* ¶ 53, that he still had to take requests from Wells, who continued to contact Delancey through company email, phone calls, and internal messaging systems, *id.* ¶¶ 45–46, that he was "scared," and that he felt he had no outlet to raise his concerns because of McCarthy's order to not talk to upper management or human resources, *id.* ¶ 40; *see id.* ¶¶ 42–43, 45. A former colleague of Delancey's in whom Delancey confided shortly after the sexual assault told Delancey years later that his assault was still "stuck in [her] memory all these years . . . as an example of how even smart, capable people can be intimidated into staying silent when they were wronged." *Id.* ¶ 59.

Additionally, Delancey alleges that Wells' behavior was not isolated at Fox: He claims that Fox was aware of, promoted, or failed to remedy a culture of sexual assault and harassment that pervaded the company while Delancey was there. *Id.* ¶¶ 1–3. He claims that Fox should have been especially wary of Wells and McCarthy, both of whom Fox knew had sexually harassed other employees at the company in the past. *See id.* ¶¶ 41, 44.

Taken together, Delancey's allegations suffice to show that the out-of-workplace assault, combined with Wells' threatening comments at work and Delancey's understanding that he could not report the misconduct to upper management, negatively impacted Delancey's "ability

9

to perform work duties," caused him "mortification aroused by encountering [Wells] on the job on a regular basis," and placed him in "constant apprehension" and fear that rebuffing Wells' sexual demands would negatively impact Delancey's career. *Parrish*, 249 F. Supp. 2d at 351–52. Ultimately, the sexual harassment that Delancey experienced, and his inability to report it, resulted in tangible employment consequences: His career at Fox stalled and, as a result, he left his job. *Id.* ¶ 54. The allegations are, therefore, sufficient to support the conclusion that Delancey faced sexual misconduct "of such quality . . . that a reasonable employee would find the conditions of [his] employment altered for the worse." *McKinney*, 2022 WL 602970, at *5 (citation omitted).

2. Employer Liability

The second prong of a hostile work environment claim provides for employer liability "in negligence" if the employer knew about or reasonably should have known about the misconduct but "fail[ed] to take appropriate[] remedial action." *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998)). If an employer fails to exercise reasonable diligence to prevent sexual misconduct of which it should have been aware, it will be held liable under the theory that it "condon[ed] the improper conduct." *Doe v. State*, 89 A.D.3d 787, 788 (N.Y. App. Div. 2011) (citation omitted).

Delancey alleges that Fox had actual notice of prior sexual misconduct by Wells (against a female employee) and McCarthy, and it also should have been aware of a heightened risk of sexual misconduct toward subordinates like Delancey given Wells and McCarthy's histories and the culture of harassment that pervaded the company at the time. *See* Am. Compl. ¶¶ 1–3, 5, 41, 44. Delancey suggests, for example, that McCarthy and others at Fox should have investigated Wells' conduct when he began to shower Delancey, a low-level producer on a different show,

10

with out-of-the-ordinary gifts only days after Delancey started his new position. *Id.* ¶ 24. And he alleges that Fox failed to exercise reasonable diligence when it actively suppressed reports of harassment by directing Delancey—through McCarthy—to not complain about misconduct to human resources or upper management. *See id.* ¶¶ 7, 43, 45.

Fox contends that any knowledge it had regarding allegations that Wells had previously harassed a female employee would not suffice to show that it should have been aware of the risk that Wells would sexually assault a male subordinate. Def. Mem. at 2–3, 15. Such a narrow and heteronormative construction of Title VII liability is incompatible with the statute. *Cf. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998) ("A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."). Delancey's allegations, taken as true, establish that Fox failed to undertake reasonable precautionary measures to protect him—an employee working under the direction of not one, but two, superiors with known histories of intra-office sexual misconduct. Am. Compl. ¶¶ 41, 44. The complaint further alleges that Fox would have learned of Wells' misconduct toward Delancey had McCarthy not discouraged Delancey and other employees from complaining to upper management and human resources. *See id.* ¶¶ 7, 40–43. Such allegations suffice to satisfy the second prong of a hostile work environment claim at the pleadings stage. *See Quintero*, 2021 WL 4464123, at *10.

The second prong of a hostile work environment claim may also be satisfied, and an employer held strictly liable, in instances where the plaintiff faced sexual misconduct at the hands of "someone with supervisory (or successively higher) authority over the plaintiff." *Redd*, 678 F.3d at 182. The Supreme Court has explained that a "supervisor" for Title VII purposes is an employee who is "empowered . . . to take tangible employment actions against the victim, *i.e.*,

11

to effect a significant change in [the victim's] employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (citation omitted). The standard is not satisfied by a showing that the harasser merely "ha[d] the ability to direct a co-worker's labor to some ill-defined degree." *Id.* at 432. A plaintiff must show more than that the harasser had the "ability to direct [his] tasks" or "control . . . [his] daily work." *Id.* at 439; *see also Girardi v. Ferrari Express, Inc.*, No. 20 Civ. 4298, 2023 WL 2744027, at *4 (S.D.N.Y. Mar. 31, 2023) (explaining that the prong is not met if "the harasser is merely a co-worker with no supervisory power over the plaintiff").

Delancey has sufficiently alleged that Wells was his "supervisor" for Title VII purposes. On the one hand, the complaint recognizes that Wells was not Delancey's direct supervisor. *See* Am. Compl. ¶ 24 (alleging that McCarthy was Delancey's direct supervisor). Delancey does not allege that Wells hired Delancey or influenced his hiring. *See id.* ¶ 23. Nor does he allege that Wells had "successively higher" authority over McCarthy. *Redd*, 678 F.3d at 182. On the other hand, the complaint alleges that "Wells assigned . . . Delancey work tasks that . . . Delancey was required to perform" under Wells' oversight. Am. Compl. ¶ 46. And, most importantly, it alleges that "Wells had the ability to cause the termination of . . . Delancey's employment," and that Wells "had enough influence to bring about or prevent a promotion" of Delancey because "the recommendations of an employee at . . . Well[s'] level concerning the terms and conditions of an employee" like Delancey "would be followed." Am. Compl. ¶¶ 47–48.

Fox contends that these allegations are conclusory and unsupported by facts in the complaint. Def. Mem. at 6–7. Not so. The complaint alleges that Wells implied that he would prevent Delancey from advancing in his career if he "did not give in to Well[s'] sexual

12

demands," and soon thereafter Delancey became aware that his "career progression at Fox [had been] obviously halted." Am. Compl. ¶¶ 52, 54. It may reasonably be inferred, therefore, that Wells had actual authority to act on his threats. The complaint further alleges that the "hierarchical structure at Fox" was designed such that an employee in Wells' position was empowered to effect tangible employment actions against an employee like Delancey. *Id.* ¶ 47. Undoubtedly, evidence obtained in discovery will clarify the nature and extent of Wells' authority over Delancey. At the pleading stage, however, Delancey has alleged sufficient facts, accepted as true, to survive Fox's motion to dismiss.

Accordingly, the Court finds that Delancey has pleaded a NYSHRL hostile work environment claim under theories of both negligence and strict liability.

### B. *Quid Pro Quo* Harassment

A plaintiff may also establish NYSHRL liability for gender discrimination under a theory of *quid pro quo* harassment. *Quintero*, 2021 WL 4464123, at *8 (citation omitted). "*Quid pro quo* sexual harassment occurs when submission to or rejection of improper or unwelcome sexual conduct by an individual is used as the basis for employment decisions affecting such individual." *Id.* at *9 (citation omitted). For Delancey to state a *quid pro quo* sexual harassment claim, he must allege "(1) that he was subject to unwelcome sexual conduct, and (2) that his reaction to that conduct was then used as the basis for decisions affecting compensation, terms, conditions, or privileges of employment." *Id.* (quoting *Figueroa v. Johnson*, 648 F. App'x 130, 135 (2d Cir. 2016)). Because a *quid pro quo* harassment claim requires a showing that the harasser wielded or threatened to wield the employer's actual or apparent authority to alter the plaintiff's terms and conditions of employment, the plaintiff must establish that the harasser was a "supervisor" for Title VII purposes—*i.e.*, an employee with ability to take tangible

employment actions against the victim. *See Karibian v. Columbia Univ.*, 14 F.3d 773, 777–78 (2d Cir. 1994); *Vance*, 570 U.S. at 431.

"The relevant inquiry in a *quid pro quo* case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances." *Id.* at 778. For reasons already stated, the Court finds that Delancey has plausibly alleged that Wells meets the definition of a "supervisor" for Title VII purposes. *See supra* Section II.A.2. The Court also finds that Wells linked Delancey's acceptance or rejection of sexual advances to tangible job benefits. From the moment Wells first communicated with Delancey, Wells tied his sexual interest in Delancey to the promise of enhancing Delancey's career prospects. *See* Am. Compl. ¶¶ 18–19. After Delancey joined Fox News Edge, Wells regularly reminded Delancey that Wells' higher position at the network could affect Delancey's career trajectory. *Id.* ¶ 26. When Wells invited Delancey to his apartment for a purported gathering of coworkers, Wells "stressed his status at Fox [w]as something that could be used to benefit [] Delancey's career." *Id.* ¶ 28. And, after Delancey resisted Wells' sexual advances, Wells told another TV outlet not to hire Delancey, suggested to Delancey that Wells would hinder Delancey's career because he did not give into Wells' sexual demands, and ultimately took steps to undermine Delancey's progress at Fox, resulting in Delancey's departure. *Id.* ¶¶ 50–54; *see also id.* ¶ 43 (alleging that McCarthy, another supervisor at Fox, also linked career advancement with not speaking up about sexual misconduct).

These allegations suffice to demonstrate that (1) Delancey was subject to unwelcome sexual conduct by a supervisor, and that (2) his reaction to the misconduct was used as the basis for decisions affecting the terms, conditions, and privileges of his employment. *See Figueroa*, 658 F. App'x at 135. Accordingly, Delancey's NYSHRL gender discrimination claim based on a theory of *quid pro quo* harassment survives Fox's motion to dismiss.

III.  NYCHRL Claim

The NYCHRL encompasses a broader array of misconduct than Title VII and its New York state counterpart, the NYSHRL. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108–10, 113 (2d Cir. 2013). Courts therefore "analyze NYCHRL claims separately and independently from any federal and state law claims." *Id.* at 109. A plaintiff states a claim under the NYCHRL if he demonstrates that he has experienced "'unwanted gender-based conduct' [that] impose[d] a different term or condition of employment on [him], even if the harassing conduct d[id] not rise to the level of being 'severe or pervasive,'" and even if the challenged impact on employment was not "tangible (like hiring or firing)." *Id.* at 110 (citations omitted).

Because Title VII and the NYSHRL provide a liability "floor below which the [NYCHRL] cannot fall," a cause of action stated under the NYSHRL will generally suffice to state a claim under the NYCHRL. *Id.* at 109 (emphasis omitted) (citation omitted). Here, Delancey alleges that he was sexually abused by a supervisor, in a manner that tied the abuse to the workplace and materially impacted his working conditions, resulting in both tangible and intangible negative employment consequences. *See supra* Section II. Accordingly, Delancey's claim under the NYCHRL survives Fox's motion to dismiss.

IV.  Claims Against Fox Corporation

Fox Corporation, one of the two Fox entities named as defendants in this matter, moves to dismiss Delancey's claims against it for failure to plead an employer-employee relationship. Def. Mem. at 18. To state a claim against a defendant under the NYSHRL or the NYCHRL, the plaintiff must demonstrate "the existence of an 'employer-employee relationship.'" *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 80 (S.D.N.Y. 2020) (quoting *Brown v. Daikin Am.*

15

*Inc.*, 756 F.3d 219, 226 (2d Cir. 2014)). Delancey refers to Fox Corporation and Fox News Network, LLC, collectively as "Fox" in his complaint, and he alleges that he was Fox's "employee" during the events described by the complaint. Am. Compl. at 1, ¶¶ 4, 13; *see also id.* ¶ 15 (alleging that Fox Corporation is Fox News Network, LLC's "parent company"). Fox contends that Delancey's claim that he was employed by Fox Corporation in 2008 is implausible because the entity was not formed until 2018. Def. Mem. at 19. Delancey concedes this fact, but he argues that Fox Corporation may still be held liable for violations of the NYSHRL and NYCHRL under theories of single-employer and successor liability. *See* Pl. Mem. at 25–26.

### A. Single-Employer Liability

"The Second Circuit has adopted a widely used four-part test to determine whether a parent and subsidiary constitute a single employer. It examines evidence of '(1) interrelation of operations; (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.'" *McHenry*, 510 F. Supp. 3d at 81 (quoting *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)). "Often, whether a parent entity exercises sufficient control over a subsidiary such that the two are a single entity is a question of fact not suitable to resolution on a motion to dismiss." *Id.* (citation omitted). But "[a] complaint must still plead 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* at 81–82 (quoting *Iqbal*, 556 U.S. at 678). In *McHenry*, the court dismissed claims brought against Fox Corporation under the NYSHRL and NYCHRL because the plaintiff's "scant" allegations of the relationship between Fox Corporation and Fox News did not support the reasonable inference "that Fox Corp[oration] exercised control over Fox News's labor relations." *Id.* at 82.

The same result is required here. Delancey alleges in his complaint that he was employed by Fox Corporation in 2008, Am. Compl. ¶ 13, but he also concedes that the entity was not formed until 2018, long after he left his role at the company, *see* Pl. Mem. at 26; Am. Compl. ¶ 54; *see also McHenry*, 510 F. Supp. 3d at 82 (explaining that "the naked assertion that an employee . . . worked for the parent as well as the subsidiary [does not] suffice" to support a theory of single-employer liability (citation omitted)). Accordingly, Delancey cannot be heard to say that Fox Corporation exercised control over the employment actions that impacted him—the factor most central to the single-employer liability analysis. *See Brown*, 756 F.3d at 228.

B. Successor Liability

Under a common law theory of successor liability, a plaintiff wronged by a predecessor company may hold its successor entity liable if: "(1) [the successor] expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction [was] entered into fraudulently to escape such obligations." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) (citation omitted). A "*de facto* merger" may be found "when a transaction, although not in form a merger, is in substance a consolidation or merger of seller and purchaser." *Id.* (citation omitted). "[T]he hallmarks of a *de facto* merger include: (1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation." *Id*.

Delancey contends that Fox Corporation is at least a *de facto* successor to Twenty-First Century Fox, Inc. ("21CF") and News Corporation ("News Corp"). In support of that assertion, Delancey asks the Court to take judicial notice of 21CF, News Corp, and Fox Corporation filings before the Securities and Exchange Commission (the "SEC"). Pl. Mem. at 26. Read together, the filings indicate that in 2013, News Corp, which owned Fox's cable news network, split into two companies—News Corp and 21CF—the latter of which retained the original News Corp's interests in cable news. *See* ECF No. 44-1 at 4.[3] In 2019, Fox Corporation was formed from a distribution of Fox Corporation common stock to 21CF stockholders, by which Fox Corporation obtained 21CF's interests in Fox's news programs. *See* ECF No. 44-2 at 4.

Fox argues that even if News Corp, through 21CF, were a legal predecessor to Fox Corporation, neither the complaint nor the SEC filings show that News Corp and Delancey had an employer-employee relationship in 2008. *See* Def. Reply at 15. Therefore, Delancey has not demonstrated that any liability News Corp owed to him based on actions occurring in 2008 would have been passed on to 21CF and, later, to Fox Corporation. *Id.* The Court agrees. The complaint and the documents submitted by Delancey do not establish that News Corp employed him at the time of the alleged conduct, nor that News Corp had a single-entity relationship with Delancey's employer. *See* Am. Compl. ¶ 3 (noting only that 21CF was Fox's parent company in 2017, long after Delancey left Fox); *id.* ¶¶ 13–14 (suggesting that Delancey was employed by Fox News Network, LLC); *see generally* Compl. (making no mention of News Corp or its relationship to Fox News Network, LLC). The SEC filings indicate that News Corp held interests in Fox's cable news programming in 2013 prior to splitting into News Corp and 21CF, but the filings do not state when or how News Corp obtained those interests. The Court,

---

[3] Citations to the SEC filings attached as exhibits to ECF No. 44 are to the CM/ECF page number.

therefore, need not analyze whether News Corp qualifies as a *de facto* predecessor to Fox Corporation because Delancey has not met his minimal burden to allege that he was employed by News Corp.

Accordingly, the Court dismisses Delancey's NYSHRL and NYCHRL claims against Defendant Fox Corporation. Because Delancey has requested leave to amend the complaint to add further allegations concerning Fox Corporation's liability, *see* Pl. Mem. at 29–30, and the filings attached to Delancey's opposition suggest that facts may be available that could cure the deficiencies described above, the Court's dismissal is without prejudice, *see In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220–21 (2d Cir. 2006) (explaining that dismissal with prejudice on futility grounds is appropriate only if it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim).

## CONCLUSION

For the reasons stated above, Fox's motion is GRANTED IN PART and DENIED IN PART. Delancey's claims against Fox Corporation are dismissed without prejudice. In all other respects, Fox's motion is denied.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 36.

SO ORDERED.

Dated: February 21, 2025
New York, New York

_____
ANALISA TORRES
United States District Judge