UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------:

ANDREW DELANCEY,                : Civil Action No.:

                               : 23-cv-10357

            Plaintiff,         :

      v.                       :

FOX CORPORATION, et al.,       : New York, New York

                               : March 27, 2025

            Defendants.   :

----------------------------:


       TRANSCRIPT AND STATUS CONFERENCE HEARING

      BEFORE THE HONORABLE KATHARINE H. PARKER

          UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:        FILIPPATOS PLLC
                      BY:  Alfredo J. Pelicci, Esq.
                      425 Madison Avenue - Suite 1502
                      New York, New York 10017

For Defendant:        PAUL HASTINGS LLP
FOX                   BY:  Krissy A. Katzenstein, Esq.
                           Sara Hoult, Esq.
                      200 Park Avenue
                      New York, New York 10166

For Defendant:        LINER FREEDMAN TAITELMAN & COOLEY
Wells                 BY:  Jason Sunshine, Esq.
                      1801 Century Park West - 5th Fl.
                      Los Angeles, CA 90067



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

    AMM TRANSCRIPTION SERVICE - 631.334.1445

1          THE DEPUTY CLERK:  Calling Case

2   23-cv-10357; Delancey v. Fox Corporation.  The

3   Honorable Katharine H. Parker presiding.

4          Beginning with counsel for the plaintiff,

5   please make your appearance for the record.

6          MR. PELICCI:  Hi.  Alfredo Pelicci, here

7   with Filippatos PLLC, on behalf of plaintiff, Andrew

8   Delancey.

9          THE DEPUTY CLERK:  And starting with

10  counsel for the defendant, Fox Corporation, please

11  make your appearance for the record.

12         MS. KATZENSTEIN:  Hi.  Good afternoon.

13  This is Krissy Katzenstein with Paul Hastings, on

14  behalf of Fox Network, LLC.  And I'm joined by my

15  colleague, Sara Hoult.

16         THE DEPUTY CLERK:  And counsel for the

17  Wells defendant, please make your appearance for the

18  record.

19         MR. SUNSHINE:  Good afternoon.  This is

20  Jason Sunshine from the law firm Liner Freedman

21  Taitelman & Cooley, appearing for defendant, Justin

22  Wells.

23         THE COURT:  All right.  Good afternoon,

24  counsel.  Thank you for calling in.

25         Before we get started, I ask that you keep

your phones on mute unless you are speaking, to eliminate background noise. I also ask that you state your name before speaking for clarity of the record. The Court is making a recording of this conference so that you can order a transcript if you want.

I also advise you that the Court's conference line is open to the press and public on a listen-only basis, and that Court rules prohibit others from recording and rebroadcasting court proceedings. Violations of this rule may result in sanctions.

Today we're going to talk about a couple things: An extension of the discovery schedule, the discovery disputes, and the letter that was filed today from plaintiff about amending the complaint.

I have only set aside an hour, and this is the first time that I'm talking with you all, so I just want everybody to budget -- I want to just be mindful of the time allocated for today.

I guess first I want to hear from plaintiff about the outstanding discovery issues, not the substance of the disputes on the document requests and interrogatories, but what remains outstanding, in a broad sense, from plaintiff's perspective, and

1  then I'll hear from defense counsel.

2          MR. PELICCI:  Good afternoon, Your Honor.

3  Alfredo Pelicci here, representing plaintiff.

4          So to give you a general overview of what

5  remains outstanding, as outlined in the letter in

6  the motions to the Court, there's very specific

7  discovery requests that are the subject of the

8  motions and defendants moving for the protective

9  order.  In addition, as noted in our opposition,

10  there are several other discovery disputes that

11  aren't part of that motion.

12          We initially moved for leave to compel

13  discovery.  At the same time that -- or shortly

14  after defendants moved for the protective order, the

15  Court granted leave on the protective order and not

16  the motion to compel discovery.  So the protective

17  order motions have only dealt with some of the

18  outstanding disputes.  There are several other

19  outstanding disputes primarily related to FOX

20  defendant's liability right now, FOX News Network,

21  LLC's liability pertaining to the harasser being a

22  supervisor, and other means to show corporate

23  liability with respect to harassment claims.

24          In addition, as we noted in the opposition,

25  the position that the individual defendant has taken

1    with respect to many of the same corresponding

2    requests has been the same position as FOX, that

3    such requests are not within the scope of discovery.

4    And they have not produced any of those documents to

5    the extent they have them.

6              So, you know, we expect today's discussion

7    on the protective order to give us guidance on, you

8    know, how the Court would rule on even the requests

9    that remain unaddressed or not part of the motion.

10   As I've noted in the opposition, there's no disputes

11   concerning what plaintiff has produced.  And all of

12   the disputes concern what defendants -- both FOX and

13   the individual defendants -- have not produced.

14             THE COURT:  Okay.  So let me just drill

15   down a little bit more because what I understand you

16   to be saying is that there are other document

17   requests and interrogatories that plaintiff wants to

18   move to compel on, that aren't the subject of the

19   current motion for a protective order.

20             MR. PELICCI:  Correct, Your Honor.

21             THE COURT:  What documents have you

22   received and produced and what depositions have been

23   taken thus far?

24             MR. PELICCI:  To date, no depositions have

25   been taken.  We've received a limited amount of

1  documents, mainly concerning the plaintiff's

2  personnel file and personnel documents at FOX.

3          Individual defendant has produced some

4  communications and social media posts.  Plaintiff

5  has produced relevant communications, social media

6  posts as well.

7          THE COURT:  And why is it that no

8  depositions have been scheduled?  I mean, this case

9  has been pending for some time.  Why are the parties

10  only this far at this point?

11          MR. PELICCI:  So in terms of scheduling

12  depositions, I reached out to at least individual

13  defendant on his position with respect to scheduling

14  a deposition, and they maintained that the Court

15  needed to resolve these discovery disputes prior to

16  the deposition.

17          I also noticed a 30(b)(6) witness of the

18  corporate defendant.  And the disputes regarding the

19  scope of the 30(b)(6) witness are pretty much

20  aligned with the document discovery disputes.  So,

21  like I said, I imagine that, you know, whatever

22  position the Court takes with respect to those

23  document disputes will guide the parties on the

24  appropriateness of the objections to the 30(b)(6)

25  witness as well.  Besides that, we intend to have an

1    additional deposition of a nonparty witness, but the

2    documents we're seeking are necessary for this

3    deposition to occur.

4         THE COURT:  So you are anticipating three

5    depositions?  Or two?

6         MR. PELICCI:  Currently, three.  Three.

7    Currently three depositions, Your Honor, correct.

8         THE COURT:  And are you contemplating any

9    expert discovery?

10        MR. PELICCI:  Yes, Your Honor.

11        THE COURT:  What is that going to consist

12   of?

13        MR. PELICCI:  It's primarily going to

14   consist of an expert relating to my client's

15   emotional distress damages.

16        THE COURT:  Okay.  And as I understand the

17   claim, it is an alleged sexual harassment/sexual

18   assault that occurred in the apartment of Wells, and

19   it occurred in 2008.  Are there other instances of

20   harassment that are part of the complaint?

21        MR. PELICCI:  Yes, Your Honor.  So as we

22   identify and was subject of the motion to dismiss,

23   we allege that there was subsequent interference

24   with my client's career, and then interactions with

25   his harasser at FOX.  And then, in addition to that,

1    his supervisor suppressing complaints and also
2    creating a hostile work environment at FOX that
3    ultimately, you know, fueled the hostile work
4    environment that was also a product of the sexual
5    assault that my client experienced at the hands of
6    another employee that supervised him, who is the
7    individual defendant in this matter.
8            THE COURT:  Okay.  And when your client
9    left FOX, did he then resume -- did he start
10   employment someplace else?  Has he been employed
11   since he left FOX?
12           MR. PELICCI:  Yes, Your Honor.
13           THE COURT:  Okay.  So the damages in the
14   case concern primarily emotional distress?
15           MR. PELICCI:  Yes, Your Honor.  And to the
16   extent we establish projected career earnings with
17   the expert as well, I should put that out there,
18   that the expert will be primarily for emotional
19   distress.  But we will explore, to the extent
20   possible, any type of argument we can make regarding
21   projected earnings and how this harassment has
22   impacted such.
23           THE COURT:  What was your client's -- what
24   were his duties when he was employed at FOX?
25           MR. PELICCI:  He was part of a team that

1  supported multiple other teams, and they provided
2  research and support to multiple shows and employees
3  at FOX.  So it was called FOX NewsEdge team, and
4  basically they were a support team that was
5  underneath, for all intents and purposes, all of the
6  network shows.
7        THE COURT:  So FOX NewsEdge was a
8  department; a unit?  How would you --
9        MR. PELICCI:  I would classify it as a
10  department or team.
11        THE COURT:  And how many people were in the
12  FOX NewsEdge team?
13        MR. PELICCI:  I'm not aware of that
14  information, Your Honor.
15        THE COURT:  Oh, your client hasn't told you
16  that?
17        MR. PELICCI:  He doesn't know the number,
18  and so we've asked for more broad discovery on that
19  as well and have not received it.
20        THE COURT:  And you believe that the FOX
21  NewsEdge team was -- it was within FOX News Network?
22        MR. PELICCI:  Correct, Your Honor.
23        THE COURT:  And the shows that it supported
24  were news shows, I assume?
25        MR. PELICCI:  Primarily.

1          THE COURT:  Well, if not news shows, what

2     other shows?  I mean, was it entertainment shows,

3     like sitcoms, or what?

4          MR. PELICCI:  Oh, I see what you're asking,

5     Your Honor.

6          I believe they would also have supported

7     some of the affiliate programs.  So not only the

8     main news network, but my understanding is that

9     their research or administrative tasks would also

10    support over, I believe, 175 newsrooms.

11         THE COURT:  And your client was doing news

12    research or what?

13         MR. PELICCI:  He was doing news research

14    and numerous other administrative tasks.

15         THE COURT:  Okay.

16         MR. PELICCI:  He was a regional producer.

17         THE COURT:  His title was regional

18    producer?

19         MR. PELICCI:  Yes, Your Honor.

20         THE COURT:  Okay.  So producers aren't

21    assigned to particular shows or ...

22         MR. PELICCI:  Not on this FOX Edge team.

23    There are other producers that are assigned to

24    specific shows.

25         THE COURT:  I see.  Okay.  All right.  So

1    he was a regional producer.

2            And then when he left FOX, did his

3    subsequent jobs involve TV production or something

4    else?

5            MR. PELICCI:  Yes, Your Honor, and they do

6    to date as well.

7            THE COURT:  They involve production?

8            MR. PELICCI:  Yes.

9            THE COURT:  Okay.

10           Okay.  And he reported to -- not Wells, but

11   somebody else when he was working; is that right?

12           MR. PELICCI:  So he officially reported to

13   Mr. McCarthy, but he was directed by Mr. Wells and

14   others to perform tasks, who would oversee his tasks

15   and, you know, assign him tasks and judge his

16   performance.  And, you know, at least by my client's

17   belief, had the ability to impact his employment at

18   the company.

19           THE COURT:  Well, who hired him?  Did he

20   interview with Wells or McCarthy or somebody else?

21           MR. PELICCI:  McCarthy.

22           THE COURT:  And he was fired or he

23   resigned?

24           MR. PELICCI:  He resigned after his career

25   went stagnant at FOX.

1    THE COURT:  So he resigned.  And he
2  tendered his resignation to McCarthy or somebody
3  else?
4    MR. PELICCI:  I believe he tendered his
5  resignation to McCarthy and pursued a different
6  opportunity.
7    THE COURT:  Okay.  And McCarthy is the
8  person who filled out his performance evaluations,
9  if there was one?
10    MR. PELICCI:  Correct, Your Honor.
11    THE COURT:  Okay.  And Wells had a job
12  on -- what was Wells doing?
13    MR. PELICCI:  He was on, I believe, during
14  my client's employment there, on two different
15  shows.  Ultimately, I believe he was on Greta Van
16  Susteren's show.
17    THE COURT:  So he was, like, an on-air
18  talent?
19    MR. PELICCI:  No.  He was a producer as
20  well.
21    THE COURT:  Oh, also a producer.  Okay.
22    MR. PELICCI:  Yes.
23    THE COURT:  So he was a producer assigned
24  to a specific show.
25    MR. PELICCI:  Yes.  A higher level --

1          THE COURT:  Okay.  Whereas your client was,

2     sort of, a producer floating among shows.

3          MR. PELICCI:  Yeah, so I think it's best to

4     think of my client as more of a support role for the

5     shows.  And then as you go up the chain, you're on a

6     specific show, and you would rely on someone in my

7     client's department and assign them tasks to

8     perform.

9          THE COURT:  I see.  Okay.  Okay.  Good.

10          So you have to take depositions, you have

11     to take expert discovery, and you have to take --

12     you have to resolve these document requests.  And it

13     looks like there's an issue with the scope of the

14     30(b)(6) deposition notice.

15          Have I summarized it accurately from your

16     perspective?

17          MR. PELICCI:  Yes, Your Honor.

18          THE COURT:  Okay.

19          Now, I'd like to hear from defense counsel

20     for FOX.  What do you believe is outstanding from

21     your perspective?

22          MS. KATZENSTEIN:  Thank you, Your Honor.

23     This is Krissy Katzenstein on behalf of FOX News.

24          I think it may be helpful just to clarify a

25     bit Mr. Delancey's role and what FOX NewsEdge is, if

1   that is permissible from Your Honor's perspective.

2           THE COURT:  Yeah, sure.  You can describe

3   the facts and/or defenses in broad-brush.

4           MS. KATZENSTEIN:  Yeah, so Mr. Delancey

5   worked as a regional producer, eventually promoted

6   to national producer, on what's called FOX NewsEdge.

7   It would be described as, most accurately, I would

8   say, an affiliate of FOX News.  So it's under the

9   FOX News umbrella.  But what FOX NewsEdge really

10  does is they are supporting the local newsroom.  So

11  that's your local FOX station in New York, in D.C.;

12  wherever you might be.

13          And in Mr. Delancey's case, he was

14  initially assigned to the west region, so he would

15  be monitoring what's being reported by local

16  stations in the west region, repackaging that, and

17  shooting it out to all of the other stations in the

18  west region who may be interested in also

19  broadcasting that information to their local

20  audiences.  So it is a support role, but it is

21  focused on local news networks.  It's not focused on

22  the FOX News Channel that is the cable station.

23          Mr. Wells, on the other hand, was a

24  producer on the Greta Van Susteren show, which is a

25  FOX Channel production.  So they're very distinct in

1    that FOX Edge is primarily supporting the news

2    stations, whereas Mr. Wells worked on FOX Channel.

3          So primary issue is that there really is no

4    interaction between the two and certainly not

5    supervisory authority.  And we see that we have

6    produced to plaintiff the e-mail communications we

7    still have from that 2008 time period between

8    Mr. Wells and Mr. Delancey.  And what those show is,

9    you know, two individuals who were friendly,

10   chatting about going out on the weekend, seeing how

11   Mr. Delancey's transition was going as he moved to

12   New York, but not e-mails assigning any sorts of

13   tasks or any sorts of job responsibilities.

14         Likewise, we've searched for e-mails

15   between Mr. Wells and other FOX Edge producers and

16   have not found any that are assigning tasks or

17   otherwise interacting with FOX Edge producers.

18         So I think for clarity, there is a very

19   distinct wall between what FOX Edge is doing versus

20   what somebody who's a producer on FOX News Channel

21   would be doing.  And that primarily leads to the

22   issue of Mr. Wells not being a supervisor.

23         There's the secondary issue that would

24   relate to the claim of sexual harassment that has

25   been asserted by Mr. Delancey, which is, you know,

1  given that Mr. Wells was at best a coworker, could

2  FOX News nevertheless be liable, which would require

3  that FOX News knew or should have known that

4  Mr. Wells would engage in this type of conduct as

5  alleged in the complaint.

6         And, certainly, you know, we've produced

7  information that we had no knowledge of prior

8  complaints involving Mr. Wells, no disciplinary

9  history.  So all of that discovery has been

10  produced.

11         From our perspective, what remains is

12  Mr. Delancey's deposition, possibly one other

13  nonparty deposition of a witness, which will likely

14  be determined after we sit down with Mr. Delancey.

15  And so that's, from our perspective, what remains,

16  and, obviously, addressing the discovery disputes

17  we've brought to the Court's attention.

18         It's not clear as we're talking, what

19  plaintiff may be seeking to compel.  There's been

20  back and forth on other requests, and we've produced

21  some supplemental responses to effectuate

22  compromises we have proposed, but I don't know what

23  that looks like from plaintiff's perspective in

24  terms of what would be further compelled.

25         THE COURT:  Okay.  All right.

1          And now I'll hear from Mr. Wells' counsel.

2          I assume you also have a position on what

3    your client was doing and where discovery stands

4    from your point, your standpoint.

5          MR. SUNSHINE:  Yes, Your Honor.  This is

6    Jason Sunshine, on behalf of defendant Wells.

7          I would echo what counsel for FOX just

8    said.  Mr. Wells adamantly denies the allegations

9    against him in his individual capacity and also

10   denies that he was ever Mr. Delancey's supervisor.

11   No evidence has surfaced to support that allegation,

12   and they didn't work on the same show.  And

13   Mr. Wells was not nearly as senior as the plaintiff

14   tries to convey.  This is almost 20 years ago.

15   Mr. Wells is in his early 40s, and he was not senior

16   at this time.

17          From a discovery perspective, we have

18   produced everything we have.  Obviously, this was a

19   long time ago.  My client was cut off from his work

20   system very suddenly a few years ago for reasons

21   entirely unrelated to this, even in -- even

22   thematically.  And so we've produced what we have.

23   And our understanding is that the plaintiff has

24   produced what he has as well.  And so from our

25   perspective, what remains is, obviously, the

1   resolution of this discovery dispute between the FOX

2   defendants and the plaintiff, and then also taking

3   the plaintiff's deposition, and presumably the

4   plaintiff taking my client's deposition.

5         I don't have anything more to add beyond

6   that.

7         THE COURT:  Okay.  Thank you.

8         Okay.  So let's talk about the -- just very

9   briefly -- this idea that plaintiff has to amend the

10   complaint.

11         Why do you need to amend the complaint at

12   this point in time?

13         MR. PELICCI:  Hi, Your Honor.  This is

14   Alfredo Pelicci again, on behalf of plaintiff.

15         So, initially, FOX Corporation was in this

16   litigation as a defendant, and we had substantial

17   motion practice on that in the context of the motion

18   to dismiss.  We proceeded with discovery concerning

19   FOX Corporation's liability.  There was no stay in

20   discovery concerning that issue and still defendants

21   refuse to produce documents that were clearly

22   relevant to FOX Corporation's liability.

23         We allege that FOX Corporation --

24         THE COURT:  Let me just stop you for a

25   second.

1    Why does FOX Corporation need -- do you

2 think FOX News can't cover judgment?  I mean, what's

3 the point?  How does that advance the case?  Why are

4 we doing that at this point in time?

5    Why didn't you do this -- since it was

6 dismissed without prejudice, why didn't you bring

7 this sooner?

8    MR. PELICCI:  It was dismissed without

9 prejudice approximately a month ago, Your Honor.

10 And so the reason FOX Corporation should be a

11 defendant in this matter is because they are an

12 appropriate defendant in this matter, and they've

13 exercised control over FOX News in a way that has

14 been covered widely in the press.

15    So it's a distinction without a difference

16 in the sense that they are an appropriate employer

17 here that is liable.  And the Court observed that

18 include -- SEC filings that we attach in the motion

19 to dismiss, you know, may include the facts

20 necessary for that to be the case.

21    And so even if they weren't a defendant

22 throughout this stretch of discovery, we should --

23 defendants should have been honoring their discovery

24 obligations to produce relevant documents

25 concerning --

1          THE COURT:  But that's not answering my

2    question.  Forget about the discovery for a second.

3    Forget about the discovery because even if they're

4    not a party, you might be able to get third-party

5    discovery that's relevant from them.

6          Why are they needed?  Because, as I

7    understand it, FOX Corporation came into being well

8    after the events in this case.  And FOX News is not

9    saying it can't pay any judgment or that it wasn't

10   the employer, as I understand it.

11         So why is it -- I get the point that maybe

12   FOX Corp could also be liable, but at this stage in

13   the game, is it really necessary to get the relief

14   that you're seeking?

15         This is just a practical question, right.

16   Why do you really need this?

17         MR. PELICCI:  Yes, Your Honor.  So the

18   correct analysis from our perspective isn't whether

19   or not they're necessary to cover a judgment; it's

20   whether they're appropriate.  So we have the right

21   to include any appropriate defendant in this matter,

22   and they happen to be one of them.

23         You know, we don't know who can cover what

24   or what they would argue down the road when it comes

25   time should we prevail in this litigation.  But in

the meantime, they're an appropriate defendant here
for the reasons we've outlined in the motion to
dismiss papers and then now in the motion to amend
papers.

So I would just say to the Court that the
appropriate analysis isn't are they necessary; it
is, are they appropriate?  And we maintain that they
are.

THE COURT:  Okay.  I'd like to hear from
FOX News now on this issue.

MS. KATZENSTEIN:  Thank you, Your Honor.
Krissy Katzenstein on behalf of FOX News.

So, as Your Honor noted, this just came in
relatively recently, so we haven't had a chance to
fully review all of the revisions.  But in this
instance, this would be a motion that would require
good cause.  Under Rule 16, there was an initial
deadline by which to amend the pleadings.  That was
approximately a year ago.

And I would note that at the time that we
filed the motion to dismiss, Judge Torres has a
process where we first exchanged letters with
plaintiffs not filed with the Court setting forth
the position.  We then filed pre-motion letters with
the Court, setting forth the position.

1    The Court gave plaintiff notice at that

2  point that if there was an amendment to be made,

3  that was the time to do it, and Mr. Delancey chose

4  to proceed with his amended complaint as drafted.

5  He had available to him all of the SEC filings that

6  are now attached and included in this amended

7  complaint that he has proposed.

8    So now, a year later, we're dealing with an

9  amendment that could have been made a year ago.  And

10  there's no reason I've heard as to why it didn't

11  happen a year ago, when Judge Torres gave him that

12  opportunity.  So I do think there is a practical

13  reality that we're now a year in and potentially

14  dealing with further motion practice where it would

15  be unnecessarily given that this amendment could

16  have been made back in March of 2024.  And really no

17  reason to cause further delay by now having to go

18  through potential briefing on a motion to amend

19  followed by a potential motion to dismiss as to

20  FOX Corp.

21    THE COURT:  Well, I would like to avoid

22  additional briefing on this issue, but I guess my

23  question to FOX News is, does it -- I mean, could

24  you consent to the amendment?  Because you could

25  be -- the corporation could be subject to discovery

1    anyway, whether it's in or it's not, depending on --

2    and what's the difference, really?

3         Again, the claim has to do with the conduct

4    of Mr. Wells vis-à-vis the plaintiff.  And so I'm

5    not -- whether it's by subpoena or this dispute, in

6    terms of any documents that might be under the

7    control of FOX Corp and not within the control of

8    FOX News, if there are any such documents, it can be

9    subject to that discovery regardless.

10        MS. KATZENSTEIN:  Yeah, so I think in this

11   instance, as Your Honor noted, we have an entity

12   that was created in 2018.  There's an issue of

13   both -- successor liability.  But I think as a

14   threshold issue, it's a question of whether News

15   Corp, which would be the predecessor parent, could

16   be liable under an integrated enterprise theory.

17        Again, haven't had a chance to fully digest

18   this proposed amended complaint, but I think it

19   still falls short with respect to whether News Corp

20   and FOX News were an integrated enterprise back in

21   2008.  And if plaintiff is capable of articulating

22   even those basic facts to survive at the pleading

23   stage, it seems like FOX should not be forced to

24   undergo this discovery.  And what plaintiff has

25   proposed here is, I think, probably northwards of a

dozen requests going at all sorts of information

regarding corporate transactions, the formation of

corporate entities.

So there's a very real, I think, discovery

consequence that flows from the fact that FOX Corp

is a party as opposed to a circumstance where

we've -- now, we would have to brief the motion to

dismiss a second time, but the Court has already

once ruled that there's not enough even pled to

bring FOX Corp into this.  You know, we would want

that finding again because that would put us in a

position to say that discovery as to FOX Corp's

transactions or the formation of FOX Corp in 2018

really shouldn't be relevant when plaintiff hasn't

sufficiently pled the most basic showing that FOX

Corp could be liable.

THE COURT:  So what I'm hearing you say is

there was a predecessor corporation at the time that

the plaintiff was employed at the FOX News Network,

and that predecessor corporation was then -- then

became FOX Corp.  It was FOX News Corp, and then it

became FOX Corp in 2018.

Is that what you're saying?

MS. KATZENSTEIN:  It was News Corp.  In

2008 when plaintiff worked there, there was an

1   additional transaction where FOX News fell under the
2   umbrella of 21st Century Fox.

3          In 2018, there was a portion of 21st
4   Century Fox that was sold to Disney, a portion of it
5   that wasn't.  That portion that wasn't included, FOX
6   News Network, and that became FOX Corp.

7          So a lot of corporate transactions occurred
8   between 2008 and 2018 that really -- discovery as to
9   whether FOX News can be liable for the allegations
10  in the complaint, it really shouldn't be necessary
11  to fundamentally address what's been alleged in this
12  complaint.

13         THE COURT:  Right.  Okay.

14         So then this leads me to the question to
15  you all.  If you just consent to FOX Corp being a
16  defendant, there doesn't need to be any discovery in
17  all of these corporate transactions at all because
18  you've consented to be a defendant.  And then the
19  parties can just focus on what happened back in
20  2008, and it's between the FOX Corp and FOX News
21  Network whoever pays any judgment, if it ever comes
22  to that.

23         MS. KATZENSTEIN:  If I may, Your Honor --

24         MR. PELICCI:  Your Honor, if I may, Alfredo
25  Pelicci.

1          THE COURT:  I mean, you can shortcut a lot

2    of discovery altogether, potentially.

3          MR. PELICCI:  Your Honor, if I may, Alfredo

4    Pelicci here.

5          MS. KATZENSTEIN:  Your Honor, this is

6    Krissy Katzenstein.

7          THE COURT:  Hang on a second.  Hang on.  I

8    want to hear from FOX.

9          MS. KATZENSTEIN:  Yeah, I think that what

10   would still be at issue, even if there was consent

11   that FOX Corp is a defendant, there would be the

12   issue of was News Corp an integrated enterprise?

13   And from that, is there successor liability as to

14   FOX News, which would -- you know, from plaintiff's

15   perspective, I presume he's still seeking the

16   discovery he's originally sought throughout this

17   case.

18         THE COURT:  Right.  But I'm saying if you

19   consented, if FOX Corp said, okay, we don't agree

20   that we have liability, but -- I mean, I'm just

21   trying to avoid all of the motion practice because

22   what this issue is bringing up is a lot of motion

23   practice and a lot of discovery, and to what end?

24   To what end?  I really haven't heard that from

25   plaintiff's counsel.

1          MR. PELICCI:  If I may, Your Honor, so just

2     a few points of clarification on this issue.  This

3     is Alfredo Pelicci, on behalf of plaintiff.

4          So first off, defendant Wells has consented

5     to this amendment, so the FOX defendants are the

6     only one who have not.

7          There's a bit of a misleading presentation

8     of the timeline of when this should have been

9     brought.  You know, we moved within a month of FOX

10    Corporation being dismissed out of the litigation.

11    It would not have made sense to move for it when we

12    were maintaining that the complaint, as originally

13    pled, and what was subject to the motion to dismiss

14    was appropriate.

15         The Court, in its ruling, was very clear in

16    dismissing Fox Corporation.  It was -- we missed it

17    by a hair.  I mean, the Court dismissed it without

18    prejudice, but basically said what we were alleging

19    with what we attached to the motion to dismiss

20    seemed to provide facts that may be appropriate to

21    include FOX Corporation.

22         So in terms of motion practice, I think the

23    more complicated motion practice would be from not

24    allowing FOX Corporation -- the amendment concerning

25    FOX Corporation because, as you wisely observed, we

1   would then be moving with third-party subpoenas, and

2   there would be motions to quash subpoenas and all

3   kinds of motion practice around that.  That would

4   probably be more complicated and time consuming

5   where we've already briefed this issue in a motion

6   to dismiss.

7           I've cured the slight deficiency that the

8   Court identified and am appropriately moving to

9   amend the complaint based off that.  And the Court

10  dismissed without prejudice, even this far into the

11  litigation, because of the fact that there are facts

12  available to appropriately include FOX Corporation.

13          And one thing I'll just want to put on the

14  record is News Corp still exists and is owned by the

15  same people, the Murdochs.  And so the same people

16  have been involved with controlling FOX News since

17  the very beginning, when my client worked there.

18  And, you know, they can use different corporations

19  to try to shield themselves from liability, but

20  they're liable.  And the FOX Corporation has been

21  admonished by courts, as I've included in my amended

22  complaint, for being -- a lack of transparency

23  around this very issue.  And so this is a very

24  important issue in this litigation in terms of how

25  FOX as a corporation can shield themselves from

1    liability by being misleading about what's going on
2    in their corporations.
3              THE COURT:  Well, I haven't heard from FOX
4    News that it's saying it's not an employer that
5    could be held liable.
6              Is FOX News disputing that if plaintiff
7    were to prove his case, it's not an employer?
8              MS. KATZENSTEIN:  We are not taking that
9    position, Your Honor.
10             MR. PELICCI:  FOX News -- this is Alfredo
11   Pelicci.
12             No, FOX News is not taking that position,
13   but FOX Corporation is.
14             THE COURT:  Right.  But you have -- okay.
15             All right.  I'm going to allow you to make
16   the motion to amend, but my view is that it doesn't
17   really make much sense to do this because your
18   client can get the same relief whether FOX Corp is
19   in or not.  Get the same relief.  So what is the
20   point?  Apart from making a point that it could
21   potentially be a proper defendant.  So what.
22             So, you know, if you want to spend all that
23   time and money with the briefing, but I just don't
24   see how it really assists your client's case, as
25   opposed to focusing on the issue of whether the

1 alleged harassment occurred and getting to that

2 issue as quickly as possible, and relief as quickly

3 as possible.  I would think that's what your client

4 wants.

5    MR. PELICCI:  Alfredo Pelicci here, Your

6 Honor.

7    We appreciate that the Court will permit

8 the briefing, and we'll take the Court's point under

9 advisement before we proceed with any motion.

10    THE COURT:  Okay.  So the briefing on the

11 motion to amend -- if you're going to do it, it has

12 to be filed by April 10th, and the opposition April

13 24th, and the reply May 1st.

14    And if you're going to amend, I want to

15 understand why you think it is -- how long you think

16 the discovery will take with respect to adding FOX

17 Corporation and how that impacts the discovery

18 deadline.

19    MR. PELICCI:  Alfredo Pelicci here, Your

20 Honor.

21    Thank you.  I think, as you observed, we

22 would be moving for that discovery even if FOX

23 Corporation isn't a defendant.  So from our

24 perspective, the question would just be how long it

25 would take FOX to produce that discovery because

1    it's within the scope of litigation.

2              THE COURT:  Okay.  So we have only 20

3    minutes, so let's talk next about these document

4    requests and interrogatories.

5              I guess, before we go into this, since this

6    case has been referred to me for general pretrial,

7    and since this is your first time appearing before

8    me, going forward in this case, my procedure is you

9    write a letter of no more than three pages with any

10   proposed motion, and I'm going to try to resolve it

11   without extensive briefing, okay?

12             MS. KATZENSTEIN:  Yes, Your Honor.

13             MR. PELICCI:  Yes, Your Honor.

14             THE COURT:  Okay.  And it's not a joint

15   letter either.  You're expected to have met and

16   conferred before filing such a letter.

17             Okay.  So I've got a number of issues.  FOX

18   has categorized these, categorized the interrogs and

19   document requests into some discrete categories, I

20   guess, because I guess a lot are overlapping.

21             Let's take the first one that the -- in

22   item A, plaintiff is seeking information about

23   current harassment complaints or retaliation,

24   assault and battery complaints over an eight-year

25   period just made generally.

1          Have I summed up plaintiff's request, what
2     it's seeking?
3          MR. PELICCI:  Hi.  Alfredo Pelicci here, on
4     behalf of plaintiff.
5          Yes.  We requested relevant complaints to
6     the specific types of alleged unlawful conduct or
7     relevant unlawful conduct for the period of 2004 to
8     2012.
9          We initially said the state of New York,
10    but then we changed it to plaintiff's place of
11    employment because of what we discussed earlier with
12    respect to the unorthodox nature of the departments
13    and how they support each other.
14         THE COURT:  Okay.  And why is this targeted
15    to more people than just complaints against Wells
16    and your client's supervisor, McCarthy?
17         MR. PELICCI:  So Alfredo Pelicci again
18    here.
19         So the reason we believe that these
20    requests are appropriately within the scope is
21    because, you know, courts have ruled on this very
22    issue that when you allege a widespread pattern of
23    retaliation or discrimination or suppressing of
24    complaints, that this type of discovery is
25    warranted.  And even when you don't, you can use

such discovery to support an individualized

discrimination, harassment, retaliation claim.  And

in our complaint, and as widely known around the

world, FOX News has an environment that's plagued

with this kind of conduct.

        And so my client's position throughout the

litigation has been that that widespread environment

has been what's facilitated the harassment that he

faced.  And ruling on this very issue, the court

found that that could actually be an avenue of

liability for FOX News.  So for us to explore those

complaints is a necessary component of us proving a

potential avenue of liability against FOX News.

        THE COURT:  But his --

        MS. KATZENSTEIN:  Your Honor --

        THE COURT:  His world was -- hang on.  I'll

hear from FOX in a minute.

        His world was this FOX Edge and interacting

with the FOX News affiliates.  Why isn't that the

appropriate universe?

        MR. PELICCI:  Because that's just not a

correct representation.  That's defendant's

self-serving representation of what occurred.

        I don't want to, you know, demean my

client's role at FOX, but he was a pretty low-level

1   employee there.  So he basically did what anyone
2   asked him to do who was above him.  And so if
3   somebody from a show on FOX News comes to him with a
4   task, like Wells did, according to him, he did it.

5           And so, of course, FOX would like to say,
6   oh, no, he only supported the affiliates, and lean
7   into that organizational structure to try to
8   minimize our discovery in this matter, but that's
9   just not the case.  He was at FOX News headquarters.
10  That's where he worked.  And when someone from a
11  show came to him for tasks, he completed them.  And
12  he says that that's what Mr. Wells did in this
13  litigation.

14          And so, because of the widespread
15  environment, the suppressing of complaints being a
16  valid avenue to hold FOX News liable, we've tendered
17  this request in accordance with the case law in this
18  circuit that says if you limit it to the same type
19  of complaints for a limited period of time and you
20  limit the location, that that's appropriately within
21  the scope of discovery, and that's what we've done
22  here.

23          THE COURT:  Why is your --
24          MR. PELICCI:  And so just --
25          THE COURT:  Why are your requests

AMM TRANSCRIPTION SERVICE - 631.334.1445

1   proportional to the needs of the case insofar as

2   they're requesting formal, informal, things that are

3   public records such as lawsuits, internal

4   communications and ESI?

5           How is all that proportional to the needs

6   of the case?

7           MR. PELICCI:  In the very least, the

8   complaints themselves are proportional to the needs

9   of this case.  And so, you know, the distinction of

10  formal versus informal is an important one because

11  often defendants will -- that puts the power in

12  their hands to decide on their own what's formal or

13  informal, and then they're sitting on the other

14  side, determining what they turn over in this

15  matter.

16          So in the very least here, I think a first

17  step in resolving this dispute would be defendants

18  at least producing the formal and informal

19  complaints that they have concerning these

20  specifically tailored types of discrimination,

21  retaliation, et cetera, for that limited period of

22  time.  And then if further discovery is warranted

23  based off some of those complaints being highly

24  relevant and dealing with similar issues or similar

25  people, then we can explore that.

1    But, you know, in the very least, these

2  requests for complaints are within the scope.  And

3  last Wednesday, I was in front of Judge Cronan on

4  this very issue in 23-cv-08701, and it came out in

5  my favor, in the exact same way.  And this was a

6  case where we were even alleging the same level of

7  widespread and notorious discrimination, harassment,

8  and suppressing of complaints as we allege in this

9  matter.

10    THE COURT:  Okay.  I'll hear from FOX.

11    MS. KATZENSTEIN:  Thank you, Your Honor.

12  Just a couple of points that I want to hit on.  And

13  I don't know anything about the case that

14  Mr. Pelicci just referenced, but I think one issue

15  to start with is Mr. Pelicci has pointed to pattern

16  in practice --

17    (Excerpt missing due to audio technical

18  difficulties.)

19    -- that's often asserted in class --

20    THE COURT:  Ms. Katzenstein, I didn't hear

21  some of it because you --

22    MS. KATZENSTEIN:  Are you able to hear me

23  all right?

24    THE COURT:  Yeah, because you dropped.  You

25  dropped for some seconds.

1              MS. KATZENSTEIN:  Okay.  I apologize.

2              I was just talking about the pattern and

3     practice theory more generally as a theory that's

4     typically asserted in class-action cases.  It's not

5     a theory available in the Second Circuit to

6     individual plaintiffs.

7              And this is certainly not a pattern and

8     practice case.  When we look at what's being alleged

9     in the complaint, it's about an isolated incident

10    involving Mr. Wells, potentially allegations around

11    how Mr. McCarthy did or did not conduct himself.

12    But at its core, the claim is about one incident

13    involving Mr. Wells.

14             And I think ultimately when we look at the

15    cases that are cited by plaintiff, the cases that

16    we've cited in terms of time frame, the actual cases

17    show that typically courts would set a period that's

18    perhaps a year or two prior to the start of the

19    plaintiff's employment through the end of

20    employment, and look at, you know, what is a group

21    of people who worked in the same department.

22             In this instance, there's obviously some

23    disagreement around what FOX NewsEdge did or didn't

24    do, but nobody disputes that that's where

25    Mr. Delancey worked.  And, at most, what I've heard

1    plaintiff say is he got assigned tasks, which we

2    obviously dispute, but from Mr. Wells.

3         Mr. Wells worked on one show.  Mr. Delancey

4    worked in one department.  There really is -- other

5    than Mr. Pelicci's assertion that, you know, there's

6    some sort of behavior more broadly, but none of that

7    has to do with Mr. Delancey.  So, in this instance,

8    it really is about one isolated incident for an

9    employee who worked in one department and allegedly

10   interacted with Mr. Wells, who worked on one show.

11        THE COURT:  Okay.  How do you maintain --

12   how does the company maintain its complaints --

13        MS. KATZENSTEIN:  I believe --

14        THE COURT:  -- in the database?

15        MS. KATZENSTEIN:  So this is complicated

16   because this dates back quite some time, right.

17        2004 is the start of what Mr. Delancey has

18   asked for through 2012.  Some of this is going

19   through old records to identify where there were

20   complaints because for that period there is not a

21   centralized HRIS system like we more commonly see

22   today.

23        THE COURT:  Okay.  So this goes --

24        MR. PELICCI:  Your Honor, if I just may --

25        THE COURT:  Hang on a second.

1      So this goes to proportionality and burden.

2  So there's not a centralized HRIS system.  There was

3  an HR person assigned to --

4          MS. KATZENSTEIN:  Correct.

5          THE COURT:  -- to the Edge group, I assume.

6          MS. KATZENSTEIN:  There was -- and I will

7  have to go back, Your Honor.  I don't know how their

8  HR BPs, or business partners, were organized at that

9  point in time, but there was an HR department,

10  certainly.

11          THE COURT:  Was it a shared services model?

12          MS. KATZENSTEIN:  It was a FOX News HR

13  department.  So FOX Edge lived within FOX News,

14  supporting the stations as I described, but there

15  was a FOX News HR department.

16          THE COURT:  I see.

17          So presumably the FOX News HR department

18  had records on what was happening at FOX News, and

19  that would include the news --

20          MS. KATZENSTEIN:  Correct.

21          THE COURT:  -- the news affiliates.

22          MS. KATZENSTEIN:  That would include FOX

23  NewsEdge.  It would not include the television

24  stations, which are not part of FOX News.

25          THE COURT:  I see.

1          So what is comprised -- what comprises FOX

2     News at that time?

3          MS. KATZENSTEIN:  So FOX News Network would

4     have been the channel itself -- the cable channel,

5     that is.  And then FOX Edge would have fallen within

6     FOX News, and still does.

7          THE COURT:  Okay.  All right.  I'll take

8     this under advisement.

9          The next item is information -- all

10     complaints relating to Mr. Wells and Mr. McCarthy.

11          As I understand it, on this one, the

12     company has taken a look and has said "there's no

13     formal complaints against either from the beginning

14     of their respective hires through September 2010."

15          When you say "formal," is that a written

16     or -- what does "formal complaint" mean in the

17     context of your answer?

18          MS. KATZENSTEIN:  So that would be anything

19     that was raised to HR or otherwise would appear in a

20     personnel file, whether it's written, verbal.

21          You know, what is an informal complaint is,

22     I think, the challenge with this request.  If, in

23     1998, somebody said that Mr. McCarthy wasn't doing

24     X, Y and Z, that is hard for me to know one way or

25     the other on.  But to the extent that there was a

AMM TRANSCRIPTION SERVICE - 631.334.1445

reported complaint is, perhaps, a better way of

thinking about it. We have not identified any.

    THE COURT: And to identify such

complaints, you went to the HR for the new --

    MS. KATZENSTEIN: Correct. Correct.

    THE COURT: Was there any kind of complaint

log or hotline that logged calls and categorized

them at that time?

    MS. KATZENSTEIN: Not to my knowledge, Your

Honor, but I can double-check. But I am not aware

of that.

    THE COURT: Well, I think you ought to

check that because sometimes, even back then,

companies --

    MS. KATZENSTEIN: We've checked. Yeah, I'm

sorry. I, perhaps, wasn't clear.

    HR has done a full review of any systems --

and I say that loosely, but of their personnel

files, of the files that they separately kept on

complaints at that period of time, and they've not

identified anything. So there has been a search

through where files would have been kept during that

period.

    THE COURT: Okay. And you're stopping at

September 2010 because that's when the plaintiff

1    left.

2             MS. KATZENSTEIN:  Correct.

3             THE COURT:  Okay.  So why is this not

4    sufficient for plaintiff?

5             MR. PELICCI:  Your Honor, so I think, as

6    you observed, there has to be a footnote on "we

7    haven't identified any."

8             They haven't identified any at the date of

9    plaintiff's termination.  It would be highly

10   relevant if the individual wrongdoers continued on

11   at FOX News and engaged in similar type of conduct.

12   And so we're seeking --

13            THE COURT:  How is that relevant?  How

14   would you use that in evidence?

15            MR. PELICCI:  Well, if --

16            THE COURT:  How would that be admissible?

17            MR. PELICCI:  If they similarly harassed

18   other employees or suppressed complaints and there

19   was a pattern of them doing so to others, this is

20   something I should be able to explore in discovery.

21   Admissibility is a separate threshold that's --

22            THE COURT:  You're not answering my

23   question.  How is it relevant to elements of your

24   cause of action?

25            MR. PELICCI:  Because it means -- it

1    helps --

2            THE COURT:  After your client left --

3    assume there was a complaint made in 2016.  Let's

4    just assume that.

5            MR. PELICCI:  Say there was --

6            THE COURT:  Let's say a woman accuses Wells

7    of harassment in 2016 that occurred in 2016,

8    hypothetically.  How is that --

9            MR. PELICCI:  So in --

10           THE COURT:  How would you use that in a

11   proof of your case against FOX News?

12           MR. PELICCI:  Yes.  So, as Judge Torres

13   observed in her order denying FOX News' motion to

14   dismiss, one avenue that we have to prove

15   liability -- and she says this at page 11 -- is that

16   FOX failed to exercise reasonable diligence when it

17   suppresses complaints.

18           She goes on also, on page 9, to say that

19   because Wells' behavior was not isolated at FOX --

20   we claim that FOX was aware of, promoted, failed to

21   remedy a culture of sexual harassment that pervaded

22   the company.  This goes to those very issues.  And

23   Judge Torres did not dismiss the claims against FOX

24   News for those very reasons under the State and

25   City's discrimination and harassment analysis.

1           And so this type of evidence goes to the

2   fact that we allege that they had a pattern of

3   failing to exercise reasonable diligence, that this

4   was a culture at FOX that my client was a victim of.

5   And to the extent that these two individual

6   wrongdoers -- it's not a proportionality issue here.

7   This may lead to relevant evidence.  And

8   proportionality-wise --

9           THE COURT:  That's not the standard.  "May

10  lead to discoverable evidence" is not the standard

11  under Rule 26.

12          MR. PELICCI:  This may lead to relevant

13  evidence and it's proportional.

14          THE COURT:  The standard is it is relevant

15  and proportional.  The standard is not that it may

16  lead to discoverable evidence.

17          MR. PELICCI:  And this would be relevant in

18  the sense.  And I just would direct the Court, if

19  they're taking it under advisement, to also see

20  23-cv-08701; *Ferrera v. Icahn School of Medicine*.

21  Last week, the same exact issue.  Individual

22  defendants' personnel files, disciplinary records,

23  and complaints against them, four of them, being

24  produced in a litigation where, unlike this one,

25  we're not even coming close to alleging the same

1   type of pattern that Judge Torres observed in her

2   order denying FOX News' motion to dismiss.

3           And so these are two individual -- an

4   individual defendant and one alleged wrongdoer that

5   were looking for their disciplinary records,

6   complaints against them, and, you know, this is

7   within the scope of discovery.

8           THE COURT:  Okay.  Thank you.  Can you give

9   me the site again.

10          MR. PELICCI:  Yes.  It's *Ferrera v. Icahn*

11  *School of Medicine at Mount Sinai*, and it is

12  23-cv-08701.

13          In that matter, the Court ordered the

14  production of full personnel files and disciplinary

15  records for the individual defendants, subject to a

16  protective order, put no limitation on the time

17  frame.  They ordered the production of complaints of

18  the same type of discrimination as well.

19          THE COURT:  Okay.  Thank you.

20          MS. KATZENSTEIN:  Your Honor, if I may

21  just -- I know we're running out of time, Your

22  Honor, but just two quick points on this one?

23          THE COURT:  Okay.

24          MS. KATZENSTEIN:  And just one is a note

25  there.  I know plaintiff has cited a case now

1  relating to personnel files, but as it relates to
2  what plaintiff has requested, which is complaints
3  regarding any misconduct of any type whatsoever, he
4  has not cited any cases that allow such broad
5  discovery.  In fact, every case that is cited in the
6  response is a case involving police misconduct or
7  malicious prosecution, 1983 claims, very different
8  context than what we're dealing with here.
9          And I think there's also one other unique
10 aspect of this case which is brought under the Adult
11 Survivors Act, which revived claims for a one-year
12 period that were otherwise time-barred.  What that
13 statute was intended to do was give folks an
14 opportunity to assert claims as if they had while
15 those claims were timely.
16         I think that's important because what
17 plaintiff is seeking is discovery that never would
18 have existed if the claim was timely brought.  So,
19 certainly, Mr. Delancey has a right under the ASA to
20 pursue this claim, but what plaintiff is asking for
21 is information that never would have existed had
22 Mr. Delancey timely pursued the claim.
23         THE COURT:  Okay.  Thank you.
24         We don't have time to go through the other
25 items.  I will take them under advisement.

1          And to the extent that plaintiff wants to

2     move to compel, what I would ask is that you and

3     defense counsel meet and confer, and if you -- on

4     the outstanding ones, including the Rule 30(b)(6)

5     deposition topics.  And if in the next two weeks you

6     cannot agree, then I want you to write a letter with

7     a proposed briefing schedule and submit that in two

8     weeks.  And I'm going to set another conference in

9     this case.

10          Chris, do we have a date in late April or

11     early May?

12          THE DEPUTY CLERK:  Sure, Judge.  We have

13     April 24th at 3:00 p.m.

14          THE COURT:  Okay.

15          THE DEPUTY CLERK:  We've got a block of

16     time there.

17          THE COURT:  That will be --

18          MS. KATZENSTEIN:  Your Honor, my --

19          THE COURT:  Go ahead.

20          MS. KATZENSTEIN:  Oh, I'm sorry.  I

21     apologize for interrupting, Your Honor.

22          My husband is actually having significant

23     surgery on the 24th, so I will be out the 24th and

24     25th.

25          THE DEPUTY CLERK:  Judge, how about May 6th

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    at 2:00 p.m.?

2         THE COURT:  May 6th, 2:00 p.m., in person.

3         MR. PELICCI:  That works for plaintiff's

4    counsel, Your Honor.

5         And just one thing, Your Honor, if I may.

6    I believe Your Honor's ruling on these issues will

7    significantly impact the other discovery disputes,

8    so if we may be permitted to receive your ruling and

9    then have two weeks following your ruling, it will

10   largely shape --

11        THE COURT:  No, I'm not going to -- I hear

12   you, but I'm going to extend the discovery by four

13   months.  I want to keep discovery going.  So I want

14   you to try to meet and confer.

15        Neither side did a good job on discussing

16   proportionality.  And over the next two weeks, I

17   want you to talk about proportionality.  And you're

18   going to just write the letter with the proposed

19   briefing schedule.  I may have ruled on these issues

20   before then anyway, okay?

21        MR. PELICCI:  Thank you, Your Honor.

22        MR. SUNSHINE:  Your Honor?  Your Honor, I

23   just wanted to clarify, the May 6th hearing is going

24   to be in person, correct?

25        THE COURT:  Correct.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MR. SUNSHINE:  Okay.  Thank you, Your

2    Honor.

3          THE COURT:  Okay.  Thank you, everybody.

4    See you May 6th.  Bye-bye.

5          MS. KATZENSTEIN:  Thank you.  Bye-bye.

6          MR. PELICCI:  Great.  Bye-bye.

7

8                        oOo

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4        I, Adrienne M. Mignano, certify that the

5    foregoing transcript of proceedings in the case of

6    Delancey v. FOX Corporation, et al.;

7    Docket #23CV10357 was prepared using digital

8    transcription software and is a true and accurate

9    record of the proceedings.

10

11

12   Signature    _Adrienne M. Mignano_____

13                ADRIENNE M. MIGNANO, RPR

14

15   Date:        March 30, 2025

16

17

18

19

20

21

22

23

24

25

            AMM TRANSCRIPTION SERVICE - 631.334.1445