EXHIBIT 6

Page 1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   _____
3   ANDREW DELANCEY,
4                          Plaintiff,
5              -against-
6   JUSTIN WELLS, FOX CORPORATION, and FOX
    NEWS NETWORK, LLC,
7
                         Defendants.
8
    Case No.: 1:23-cv-10357(AT)
9   _____
10
                         June 23, 2025
11                       10:15 a.m.
12
13
14
15          DEPOSITION of ANDREW
16  DELANCEY, taken by Defendants, pursuant
17  to Notice, held at the offices of PAUL
18  HASTINGS LLP, 200 Park Avenue, New
19  York, New York before Wayne Hock, a
20  Notary Public of the State of New York.
21
22
23
24
25   Job No. CS7430447

Page 2

```
 1   A P P E A R A N C E S:
 2
         FILIPPATOS PLLC
 3       Attorneys for Plaintiff
                 199 Main Street
 4               White Plains, New York 10601
 5       BY:     TANVIR H. RAHMAN, ESQ.
                 trahman@filippatoslaw.com
 6               CHASE GREENBERG, ESQ.
                 cgreenberg@filippatoslaw.com
 7
 8
         LINER FREEDMAN TAITELMAN + COOLEY LLP
 9       Attorneys for Defendant
         JUSTIN WELLS
10               1801 Century Park West
                 Los Angeles, California 90067
11
         BY:     JASON SUNSHINE, ESQ.
12               JSunshine@lftcllp.com
13
         PAUL HASTINGS LLP
14       Attorneys for Defendants
         FOX CORPORATION
15       FOX NEWS NETWORK, LLC
                 200 Park Avenue
16               New York, New York 10166
17       BY:     KRISSY A. KATZENSTEIN, ESQ.
                 krissykatzenstein@paulhastings.com
18               SARA HOULT, ESQ.
                 sarahoult@paulhastings.com
19
20       ALSO PRESENT:
21               DAN ACOSTA, Videographer
22                      *      *      *
23
24
25
```

Page 3

1          THE VIDEOGRAPHER: Good

2    morning.  We are going on the

3    record at 10:15 a.m. on June 23,

4    2025.

5          Please note that the

6    microphones are sensitive and may

7    pick up whispering and private

8    conversations.

9          Please mute your phones at

10   this time.

11         Audio and video recording

12   will continue to take place, unless

13   all parties agree to go off the

14   record.

15         This is media unit one of the

16   video recorded deposition of Andrew

17   Delancey taken in the matter of

18   Andrew Delancey versus Justin

19   Wells, Fox Corporation, and Fox

20   News LLC, filed in the United

21   States District Court for the

22   Southern District of New York, case

23   number 1:23-cv-10357(AT).

24         We're currently located at

25   the offices of Paul Hastings LLC at

Page 4

1       200 Park Avenue, New York, New York

2       10166.

3               My name is Dan Acosta.  I am

4       the videographer.  The court

5       reporter is Wayne Hock. And we are

6       from the firm Veritext Legal

7       Solutions.

8               I'm not authorized to

9       administer an oath, I am not

10      related to any party in this

11      action, nor am I financially

12      interested in the outcome.

13              If there are any objections

14      to the proceeding, please state

15      them at the time of your

16      appearance.

17              Counsel and all present will

18      now state their appearances and

19      affiliations for the record,

20      beginning with the noticing

21      attorney.

22              MR. SUNSHINE: I'm Jason

23      Sunshine from the law firm Liner

24      Freedman Taitelman and Cooley on

25      behalf of Defendant Justin Wells.

Page 5

1          MS. KATZENSTEIN: I'm Krissy

2      Katzenstein of the law firm Paul

3      Hastings on behalf of Defendant Fox

4      News Network LLC.  My colleague

5      Sara Hoult is also joining me.

6          MR. RAHMAN: I'm Tanvir

7      Rahman, Filippatos PLLC, counsel

8      for Plaintiff Andrew Delancey.  I'm

9      here with my colleague, Chase

10     Greenberg.

11         THE VIDEOGRAPHER: Will the

12     court reporter please now swear in

13     the witness, and then counsel may

14     proceed.

15  A N D R E W   D E L A N C E Y, having

16        been first duly sworn by a

17        Notary Public of the State of

18        New York, upon being examined,

19        testified as follows:

20  EXAMINATION BY

21  MR. SUNSHINE:

22      Q.    Good morning.

23      A.    Good morning.

24      Q.    I'm going to start by going

25  over a few ground rules for this

Page 6

1    deposition.

2            Do you know what a deposition

3    is?

4        A.    Yes.

5        Q.    Okay.

6            Basically, I'm going to ask

7    you a series of questions about issues

8    regarding this case and get your

9    testimony about these issues under

10   penalty of perjury.

11           Do you know what perjury is?

12       A.    Yes.

13       Q.    What is it?

14       A.    When you lie under oath.

15       Q.    So you're going to tell the

16   truth --

17       A.    Yes.

18       Q.    -- in other words?

19       A.    Yes.

20       Q.    The court reporter is here

21   transcribing everything we say.  You

22   will get a transcript after these

23   proceedings.  You will have the

24   opportunity to review the transcript

25   and to make changes as you see fit.

Page 7

1   But you should be aware that any

2   changes you make as to the substance of

3   your testimony will be held against you

4   at trial.  We can question you about

5   those changes and why they were made.

6             Is there any reason that you

7   can't give your best testimony today?

8       A.    No.

9       Q.    Medications, alcohol, any

10  reason?

11      A.    No.

12      Q.    So you're ready to go,

13  basically?

14      A.    Yes.

15      Q.    All right.

16            One of the most important

17  things we're going to do is not talk

18  over each other.  I'm going to ask you

19  questions, your attorney may object,

20  you can answer, but we all have to do

21  so separately because the court

22  reporter is going to be transcribing

23  everything we say, and if we are

24  talking over each other, he will not be

25  able to do so.

1          If you have a question about

2    any of my questions, just ask.  If you

3    don't ask, I'll assume that you

4    understand what I'm saying.

5          If you need a break, just of

6    let me know.  It's not a race, it's a

7    marathon, so if you need a break for

8    any reason, just let me know.

9          The one time that you should

10    not ask for a break is while a question

11    is pending.  So if you do need a break

12    while a question is pending, you can

13    answer the question and then take a

14    break.

15          Your responses should be

16    audible, meaning don't nod your head,

17    don't say uh-huh, say yes or no so that

18    the court reporter can properly

19    transcribe your answer.

20          Do not guess, but you should

21    estimate.

22          Do you know the difference

23    between a guess and an estimate?

24    A.    Yes.

25    Q.    What is the difference?

1      A.    An estimate is -- a guess is

2   you don't really know, you're just

3   guessing.  An estimate is you have some

4   idea and you are -- and you are

5   estimating.

6      Q.    You could estimate the width

7   of this table but you'd be guessing if

8   you were to posit about the width of my

9   table at home?

10     A.    Sure, yes.

11     Q.    All right.

12           Have you ever had your

13  deposition taken before?

14     A.    Yes.

15     Q.    When was that?

16     A.    About two or three weeks ago.

17     Q.    In what case?

18     A.    This was a case -- I was

19  working for Scripps, EW Scripps.  There

20  was a wrongful termination suit brought

21  about by an anchor that I work with.

22  She was suing for age discrimination.

23     Q.    And you were deposed as a

24  nonparty witness?

25     A.    I was a manager at the time

Page 10

```
 1    and I was assistant news director at
 2    WCPO and I was giving witness to what I
 3    saw while I was there.
 4         Q.    That was two or three weeks
 5    ago?
 6         A.    Yes.
 7         Q.    And you said were assistant
 8    news director at WCPO?
 9         A.    Correct.
10         Q.    Has your employment changed?
11         A.    Yes.
12         Q.    Have you been a defendant in
13    a lawsuit before?
14         A.    No.
15         Q.    Have you been a plaintiff in
16    a lawsuit before?
17         A.    Not before now.
18         Q.    Have you ever testified at
19    trial?
20         A.    No.
21         Q.    How did you prepare for
22    today's deposition?
23         A.    I spoke with my lawyers, I
24    went through the discovery, yeah, and
25    we just prepared with my lawyers.
```

1          MR. SUNSHINE: I'm going to

2     take out a document and mark it as

3     Exhibit 1.

4          (Whereupon, a document entitled

5     Amended Complaint was marked

6     Defendants' Exhibit 1

7     for identification.)

8          MR. SUNSHINE: I can give you

9     guys all copies separately.

10     Q.    Do you recognize this

11 document?

12     A.    Yes.

13     Q.    What is the document?

14     A.    This is the lawsuit that was

15 filed, the complaint.

16     Q.    And did you re-read this

17 lawsuit to prepare for this deposition?

18     A.    Yes, I did.

19     Q.    You read it closely, reviewed

20 all of the allegations?

21     A.    Yes.

22     Q.    Did you review the original

23 version before it was filed?

24     A.    I believe so, yes.

25     Q.    And do you stand by all of

```
                                    Page 12
1    the allegations in the lawsuit?
2         A.    Yes.
3         Q.    Is there anything about it
4    that you would change if you could?
5         A.    No.
6         Q.    So all of the allegations are
7    true and correct, to the best of your
8    knowledge sitting here today?
9         A.    Yes.
10        Q.    What is your full name?
11        A.    Andrew David Delancey.
12        Q.    And your date of birth?
13        A.    June 6, 1983.
14        Q.    Your address, your current
15   address?  City and state is fine.
16        A.    City of Philadelphia,
17   Pennsylvania.
18        Q.    City of Philadelphia,
19   Pennsylvania.
20              Turning to your educational
21   history, what's the highest degree that
22   you have?
23        A.    I actually do not have a
24   degree.
25        Q.    Did you spend any time in
```

```
                                          Page 13
 1   college?
 2        A.    I did.
 3        Q.    Where?
 4        A.    Brown Institute in Mendota
 5   Heights, Minnesota.
 6        Q.    What were you studying?
 7        A.    Radio broadcasting.
 8        Q.    And why didn't you get a
 9   degree?
10        A.    I moved up -- I've been a --
11   I started as an intern at high school
12   as a TV station and I just worked my
13   way up from there.
14        Q.    Where do you work now?
15        A.    WPHL 17 in Philadelphia,
16   Pennsylvania.
17        Q.    And what's your title?
18        A.    News director.
19        Q.    How long ago did you start
20   the job?
21        A.    About three months ago.
22   April 1.
23        Q.    Did you relocate?
24        A.    Yes.
25        Q.    From where?
```

Page 14

1      A.     Minneapolis, Minnesota.

2      Q.     What was your job in

3   Minneapolis?

4      A.     Assistant news director.

5      Q.     At what company?

6      A.     WCCO.

7      Q.     How long did you work there?

8      A.     About a year and three

9   months.

10      Q.     What about before that?

11      A.     I was at WCPO in Cincinnati.

12      Q.     And what was your title at

13   WCPO?

14      A.     Assistant news director.

15      Q.     How long did you work there?

16      A.     For Scripps total, I was

17   about ten years.  But at WCPO

18   specifically, about a year and a half.

19      Q.     And where did you work before

20   WCPO?

21      A.     WPTV in West Palm Beach.

22      Q.     What was your title there?

23      A.     Executive producer.

24      Q.     That was in West Palm Beach,

25   Florida?

1      A.    Yes.

2      Q.    And what was the name of the

3   publication?

4      A.    WPTV.

5      Q.    WPTV?

6      A.    Yes.

7      Q.    What about before that?

8      A.    I was at a show called The

9   List.  That was also in West Palm Beach

10  and owned by Scripps.

11     Q.    That was another Scripps

12  property?

13     A.    Yes.

14     Q.    And what was your title?

15     A.    Managing producer.

16     Q.    How long did you work at The

17  List?

18     A.    About a year and a half.

19     Q.    What about before that?

20     A.    WTVT in Tampa.

21     Q.    And what was your title

22  there?

23     A.    Producer.

24     Q.    And you worked there from

25  when to when?

Page 16

```
 1      A.    I had two stints there.  One
 2   was 2005 to 2007 and the other was 2009
 3   to '13.
 4      Q.    So now we get back to Fox?
 5      A.    Yes.
 6      Q.    When were you hired by Fox?
 7      A.    In 2008.
 8      Q.    As what?
 9      A.    Producer, a west coast
10   regional producer for News Edge.
11           MR. SUNSHINE: I'm going to
12      mark a document as Exhibit 2.
13           (Whereupon, a document entitled
14      New Hire Employee Record
15      was marked Defendants' Exhibit 2
16      for identification.)
17      Q.    Do you have it?
18      A.    I do.
19      Q.    Do you recognize this
20   document?
21      A.    I don't recall it
22   specifically.
23      Q.    Can you describe the document
24   as you see it now?
25      A.    Yes, it is the new employee
```

Page 17

```
 1   hire record at Fox News.
 2        Q.    And when is it dated?
 3        A.    It is dated it looks like
 4   9/7/08.
 5        Q.    What's the significance of
 6   9/7/08?
 7        A.    That's when I was hired, the
 8   day I was hired.
 9        Q.    If you look down to the
10   section that says "human resources
11   only", it says that you're a re-hire.
12             Why would that be?
13        A.    Fox 13 in Tampa, WTVT, is a
14   Fox owned and operated property.
15        Q.    And it says that your title
16   was --
17        A.    It says that my title was
18   regional producer.
19        Q.    And your salary?
20        A.    Forty-five thousand a year.
21        Q.    Can you describe your role as
22   a regional producer on Edge?
23        A.    Sure.
24             I my job was to contact all
25   of the west coast TV stations Denver
```

Page 18

```
 1    westward.  I worked a 5:00 p.m. until
 2    1:00 a.m. gathering all the --
 3    gathering the content that other
 4    affiliates and/or Fox News Channel
 5    would like to news, bringing in that --
 6    bringing in those feeds, and then
 7    disseminating them to either Fox News
 8    or to the local affiliates.
 9         Q.    Was that typical of an Edge
10    producer?
11         A.    Yes.
12         Q.    That type of role?
13         A.    Yes.
14         Q.    Would it be fair to say that
15    Edge works largely with the affiliates?
16         A.    Yes.
17         Q.    And what specifically on a
18    day-to-day basis would a regional
19    producer Edge do for those clippings?
20         A.    I'd call a station up
21    individually, I'd ask what stories they
22    were working on.  I would then send an
23    e-mail out once I had gathered that
24    information to all the affiliates
25    letting them know what the -- what each
```

Page 19

```
 1    station was working on, take requests
 2    from different stations and get what we
 3    wanted.  I also worked with Fox News
 4    Channel, if there's anything that they
 5    wanted as well, any of those shows,
 6    take in those feeds, produce or rewrite
 7    them if necessary, reformat them, and
 8    then send out that content to whoever
 9    needed it.
10        Q.    How would you fulfill a
11    request made by an affiliate?  Just
12    mechanically, what would the process
13    involve?
14        A.    We would take in a satellite
15    feed or they would send it to us via
16    WeTransfer.  I would typically talk to
17    the assignment desk at that station.
18    They would send me the script.  They
19    would send me the video.  And then from
20    there I would -- we have the system at
21    the time called iPump.  And then I
22    would put that -- whatever they were
23    looking for on that platform.
24        Q.    And if you were -- did you
25    also do work in the main network?
```

Page 20

```
 1      A.    Yes.
 2      Q.    As the Edge producer?
 3            What did that involve?
 4      A.    That was when there was
 5  anything that -- any show wanted that
 6  came from the west coast, I would then,
 7  on their behalf, call and try my best
 8  to gather that content.
 9      Q.    The call would be to a
10  reporter on the ground on the west
11  coast or --
12      A.    Typically the assignment
13  desk.  That's who I would call.  They
14  were kind of the Grand Central Station
15  of -- or airport traffic control.
16      Q.    And where would you field the
17  request from within the main network?
18      A.    What do you mean?
19      Q.    If a show on the main network
20  wanted something from you, who would
21  relay that to you?
22      A.    That would be the individual
23  producers of that show.
24      Q.    Was that an assignment desk
25  in the main network?
```

Page 21

1      A.    Yes, there was.

2      Q.    And what was their function?

3      A.    Their function was a bit like

4   mine.  We'd work in tandem together and

5   also gather content.

6      Q.    But you would skip over them

7   if you wanted to field a request from a

8   show?

9      A.    Yes, if the request came to

10  me, then I would fulfill it, yeah.

11     Q.    How would you personally

12  field the request?  Would it come from

13  someone above you within Edge or would

14  it come -- how would it get transmitted

15  to you?

16     A.    It could come from somebody

17  above me at Edge.  It also could come

18  from the individual producer or

19  executive producer of whatever show

20  that was.

21     Q.    Who was your supervisor at

22  Edge?

23     A.    Direct supervisor was Mykel

24  McCarthy.

25     Q.    And was he working with you

Page 22

```
1    on a day-to-day basis?
2         A.    Yes.
3         Q.    Would he field requests and
4    distribute them to you and your
5    colleagues?
6         A.    Yes.
7         Q.    How often did you have direct
8    contact with producers on the main
9    network?
10        A.    Daily, I would say.
11        Q.    Would it be typical for you
12   to be in direct touch with them as
13   opposed to the assignment desk or as
14   opposed to your supervisor?
15        A.    Yeah, it's typical, yeah.
16        Q.    How did you perform at Fox
17   Edge?
18        A.    Good, as far as I know, yeah.
19             MR. SUNSHINE: I'm going to
20        mark a document as Exhibit 3.
21             (Whereupon, a document entitled
22        Performance Evaluation was marked
23        Defendants' Exhibit 3
24        for identification.)
25        Q.    Do you recognize this
```

Page 23

1  document?

2      A.    I recognize what it is.  I

3  don't remember it though.

4      Q.    Can you describe it?

5      A.    It is my performance

6  evaluation.

7      Q.    From what date?

8      A.    From it -- it appears from

9  9/7/08 to 7/1/09.

10     Q.    And can you turn to page two

11 of the document.

12          Do you see the notation on

13 the right-hand side written in blue or

14 what looks to be blue?

15     A.    Yes.

16     Q.    Can you read it for me?

17     A.    Sure.

18          It says, "based on his

19 performance, Andy is being promoted to

20 national producer.  Salary will be

21 fifty".

22     Q.    And what did that signify?

23     A.    At the time I got a

24 promotion.

25     Q.    You got a promotion from

Page 24

1   regional producer to national producer?

2        A.    Correct.

3        Q.    And a pay raise?

4        A.    Yes.

5        Q.    From?

6        A.    From forty-five to fifty

7   thousand.

8        Q.    And you got this promotion

9   and this raise on what date again?

10       A.    It appears 7/1/09.

11       Q.    So less than a year into your

12  tenure at Fox Edge?

13       A.    Correct.

14       Q.    A significant promotion;

15  isn't it?

16            MR. RAHMAN: Objection to

17       form.

18            You can answer.

19            THE WITNESS:  At the time, it

20       didn't seem like it really.  But,

21       you know, no, it seemed more of --

22       the money was a little bit more,

23       but it's more of a lateral move at

24       News Edge.

25       Q.    Did your role change as a

```
 1   result of that promotion?
 2        A.    Yes.
 3        Q.    How?
 4        A.    I was now looking over
 5   national scripts and getting big --
 6   more of the national stories that were
 7   coming in.  My job was the same
 8   essentially in terms of what I was
 9   doing with gathering the content and
10   then putting that out on iPump for all
11   of the stations.
12        Q.    And was it -- did the pay
13   raise make it easier for you to live in
14   New York City?
15        A.    Not really, no.
16              MR. SUNSHINE: I am going to
17        mark another document as Exhibit 4.
18              (Whereupon, a document entitled
19        Performance Evaluation was marked
20        Defendants' Exhibit 4
21        for identification.)
22        Q.    Do you recognize this
23   document?
24        A.    It appears to be my
25   performance evaluation from July, '10,
```

```
                                        Page 26
1   1st of July, 2010.
2        Q.    So a little bit less than a
3   year after the previous performance
4   evaluation?
5        A.    Yes.
6        Q.    And can you flip to the
7   second page.
8             Do you see where it says "new
9   salary"?
10       A.    Yes.
11       Q.    What was your new salary?
12       A.    Fifty-three thousand.
13       Q.    From what?
14       A.    From fifty thousand.
15       Q.    So at this point you had been
16  at Fox News for about a little bit less
17  than two years?
18       A.    Yes.
19       Q.    And you had been promoted
20  from regional producer to national
21  producer?
22       A.    Correct.
23       Q.    And you had gotten two pay
24  raises?
25       A.    Yes.
```

Page 27

1     Q.    Were you fired from Fox News?

2     A.    No.

3           MR. SUNSHINE: I am going to

4     mark an additional document as

5     Exhibit 5.

6           (Whereupon, a document entitled

7     Plaintiff's Response to Fox

8     Defendants' First Set of

9     Interrogatories was marked Defendants'

10    Exhibit 5 for identification.)

11    Q.    Do you recognize this

12 document?

13    A.    Yes.

14    Q.    What is it?

15    A.    It is a document that my

16 lawyers basically have responded to

17 some objections from Fox.

18    Q.    Objections?

19    A.    And the defendants.

20    Q.    What is the document called?

21    A.    It is the plaintiff's

22 response to Fox Defendants' first set

23 of interrogatories.

24    Q.    Do you know what

25 interrogatories are?

Page 28

1      A.     I do not.

2      Q.     Questions.

3             Can you flip to the last page

4   of that document.

5      A.     Yes.

6      Q.     And what do you understand

7   that -- what's called a certification

8   to mean?

9      A.     That I am agreeing with the

10  responses here.

11     Q.     Are what?

12     A.     Accurate.

13     Q.     Are accurate to the best of

14  your knowledge and belief?

15     A.     Yes.

16     Q.     Can you flip to your response

17  to interrogatory number eight.

18     A.     Yes.

19     Q.     On page six.

20     A.     Yes.

21     Q.     I'm sorry, can you flip to

22  page five and just read what the

23  interrogatory is asking.

24     A.     You said -- I'm sorry, say

25  that again?

Page 29

```
 1      Q.     Interrogatory number eight.
 2      A.     "Describe in detail every
 3   effort you have made to find employment
 4   or work since your employment with Fox
 5   News ended, including full and/or
 6   part-time employment, work as an
 7   independent contractor, consultant, or
 8   outside assistant and/or freelance
 9   work.  Identify" --
10      Q.     You can stop there.
11             Flip to the next page, and do
12   you see your response where it says,
13   "subject to"?  I believe it's the
14   second sentence.
15      A.     Okay.
16      Q.     Can you read from there.
17      A.     "Subject to and without
18   waving these or any other applicable
19   objections, Plaintiff responds that he
20   will produce responsive documents to
21   demonstrate income earned and benefits
22   received following his termination from
23   Fox News".
24      Q.     You can stop there.
25             You just told me that you
```

Page 30

1    weren't terminated from Fox News?

2        A.    I was not.

3        Q.    Why do your interrogatory

4    responses say that you were?

5        A.    I took termination to mean

6    when I left Fox News, not that I was

7    fired from Fox News.

8        Q.    But you understood what I

9    meant when I asked if you were

10   terminated?

11       A.    Yes.

12       Q.    But not when you were

13   responding to the interrogatories?

14       A.    I took that as when I left

15   Fox News, the termination of my

16   employment at Fox News.

17       Q.    So do you maintain that the

18   answer is true and correct?

19       A.    Based on how I understood it,

20   yes.

21       Q.    Let's talk more about your

22   departure from Fox News.

23             Why did you leave from Fox

24   News?

25       A.    I felt that my career had

Page 31

1    been essentially stifled and I felt

2    that there was no upward mobility

3    beyond what I already had achieved.

4        Q.    I asked you before about your

5    promotions and raises and you told me

6    you had been promoted and gotten two

7    raises in the two years; correct?

8        A.    That's correct.

9        Q.    And you felt your employment

10   was stagnant?

11       A.    Yes.

12             MR. SUNSHINE: I'm going to

13       mark a document as Exhibit 6.

14             (Whereupon, a document entitled

15       Fox News Network Exit Interview

16       was marked Defendants' Exhibit 6

17       for identification.)

18       Q.    Do you recognize this

19   document?

20       A.    I see what it is.  It's not

21   something that I remember.

22       Q.    Can you describe it?

23       A.    It is my Fox News Network

24   exit interview.

25       Q.    And it's dated when?

Page 32

```
 1      A.    What is it dated?  9/26/2010.
 2      Q.    And under the reason for
 3   resignation, it says what?
 4      A.    "Voluntary.  Moving back to
 5   Tampa, Florida.  Got a job at WTVT.
 6   Lived there previously.  Warm weather.
 7   Friends are there".
 8      Q.    You just told me that you
 9   left because you felt your career had
10   stagnated.
11      A.    Yes.
12      Q.    During your interview, did
13   you give these other reasons?
14      A.    Yes.
15      Q.    Were you not truthful?
16      A.    I did not feel comfortable
17   giving them how I was really feeling at
18   the time.
19      Q.    But the reasons you gave seem
20   plausible; don't they?
21      A.    Yes.
22            MR. SUNSHINE: The weather was
23       warmer, friends were back there,
24       and you had lived there previously.
25            And I'm going to introduce
```

1       another document as Exhibit 7.

2               (Whereupon, an e-mail dated

3       September 8, 2010 was marked

4       Defendants' Exhibit 7

5       for identification.)

6       Q.    Do you recognize this

7    document?

8       A.    Yes.

9       Q.    What is it?

10      A.    It is me giving my written

11   resignation.

12      Q.    On what date?

13      A.    September 8, 2010.

14      Q.    Who did you give your

15   resignation to?

16      A.    Liza Cohen.

17      Q.    Can you read your e-mail?

18      A.    Yes.

19              "Hi, Liza.  I am submitting

20   my resignation as national producer of

21   Fox News Edge to take a job as producer

22   at WTVT, the Fox O and O in Tampa.  My

23   last day will be Sunday, September 26,

24   2010.  Thank you for two great years of

25   employment at Fox.  Best wishes, Andy".

Page 34

```
 1       Q.     Were you not truthful to her
 2   about your experience during those two
 3   years?
 4       A.     It was a mixed bag, I would
 5   say, but, yeah, I did not feel
 6   comfortable at the time to -- I still
 7   wanted -- I was still going to be
 8   working within the company, so I wanted
 9   to leave on a good note.
10       Q.     Can you elaborate on what you
11   mean by you were still going to be
12   working within the company?
13       A.     WTVT in Tampa is also owned
14   by Fox, so I would be still working
15   with a lot of the same people that I
16   was working with at Fox News.
17       Q.     And that didn't make you
18   uncomfortable staying within Fox?
19       A.     I felt much more comfortable
20   back in Tampa.
21       Q.     Because of friends, warm
22   weather?
23       A.     Friends, warm weather, but
24   also just to get out of the situation I
25   was in at Fox News, and I had a much
```

Page 35

```
 1   better support system in Tampa.
 2        Q.    How did you get that job in
 3   Tampa the second time?
 4        A.    The second time was threw
 5   having worked there previously and
 6   going back to my news director and
 7   telling him that I wanted to come back
 8   to Tampa.
 9        Q.    How long were you unemployed
10   before you started again at WTVT?
11        A.    Not at all.  It was seamless,
12   from what I recall.
13        Q.    You were making how much?
14        A.    Fifty-three thousand.
15        Q.    And you were making what when
16   you went back to TVT?
17        A.    I think I actually took a pay
18   cut at the time.  I don't recall
19   exactly how much, but I believe it was
20   a pay cut.
21        Q.    You believe it was a pay cut.
22              Would it be a significant pay
23   cut, in the same ballpark?
24        A.    I believe a few thousand
25   less, but I don't recall.
```

Page 36

1      Q.    In the 50s?

2      A.    I can't say.

3      Q.    The cost of living is cheaper

4  in Tampa than New York City?

5      A.    Yes.

6      Q.    Would it be fair to say?

7      A.    Yes.

8      Q.    So the money you were making

9  would go a lot further; would that be

10  fair to say?

11      A.    Yes.

12      Q.    Let's talk about Justin

13  Wells.

14            How did you meet Justin

15  Wells?

16      A.    He reached out to me on a

17  Facebook group, Fox Employees, in 2007.

18      Q.    Fox employees.

19            Were you -- I thought you

20  were working at WTVT?

21      A.    Yes, which is owned by Fox.

22      Q.    So this Facebook group had

23  people from Fox affiliates around the

24  country?

25      A.    Yes.

1    Q.    Including Justin Wells?

2    A.    Yes.

3    Q.    And you hadn't met him prior

4  to communicating through this group?

5    A.    No.

6         MR. SUNSHINE: I am going to

7    mark a document as Exhibit 8.

8        (Whereupon, copies of text

9    messages were marked Defendants'

10    Exhibit 8 for identification.)

11    Q.    Do you recognize this

12  document?

13    A.    Yes.

14    Q.    What is it?

15    A.    This is the chat when Justin

16  reached out to me for the first time

17  via Facebook.

18    Q.    Via Facebook.

19        And what is the date of the

20  first message?

21    A.    August 3, 2007.

22    Q.    Can you flip through the

23  first two and a half pages and describe

24  the nature of the conversation?

25    A.    Sure.

Page 38

```
 1            Introducing ourselves,
 2    talking about where I had been before,
 3    and that I was looking to possibly move
 4    to New York City or Chicago.
 5        Q.    Were you surprised to have
 6    heard from him when he reached out?
 7        A.    It was unexpected.
 8        Q.    Did you know at the time that
 9    Justin was gay?
10        A.    Yes.
11        Q.    How?
12        A.    He also worked at Fox 13 in
13    Tampa and asking around, you know, just
14    other people had known of him.  He had
15    worked there before.
16        Q.    Was his outreach welcome,
17    unwelcome, neutral?
18        A.    Welcome at the time.
19        Q.    And did you want to move to
20    New York City at the time?
21        A.    Yes.
22        Q.    Had you applied to jobs in
23    New York City?
24        A.    I had not at that point.
25        Q.    Sort of a vague plan, dream?
```

1      A.    Correct.

2      Q.    And when did you actually

3 move forward with that plan?

4      A.    I believe a few months later.

5      Q.    Can I direct you to about

6 half down page two, your second series

7 of communications.

8            What is the date?

9      A.    You said page two?

10      Q.    Two -- three.

11      A.    Page three.

12            That date is February 26,

13 2008.

14      Q.    So about six months later or

15 so?

16      A.    Uh-huh.  Yes.

17      Q.    And what's the context of

18 that conversation?

19      A.    This is me saying that I sent

20 him my resumé and that I would be

21 excited to live there.

22      Q.    And who is the friend that he

23 was talking about in that

24 communication?

25      A.    I have no idea.

Page 40

```
 1        Q.    So you were very excited to
 2   live there?
 3        A.    It sounded promising, yes.
 4        Q.    Was there any particular
 5   reason why you were excited?
 6        A.    It would be living in New
 7   York City, working for a network.
 8   That's a big goal of a lot of people at
 9   local affiliates.
10        Q.    And living with Matty?
11        A.    I did not ever plan to live
12   with Matty.
13        Q.    Who is Scott Jones?
14        A.    He is the assistant news
15   director at WTVT in Tampa, Fox 13.
16        Q.    That is the title that you
17   held until a few months ago?
18        A.    No, I was executive -- he is
19   the assistant news director.  At the
20   time he was executive producer, so yes,
21   yes, I was the assistant news director
22   until the end of March of this year.
23        Q.    Were you powerful?
24        A.    In terms of what do you mean
25   by that?
```

Page 41

1      Q.    Well, you described Scott
2   Jones as powerful because of his
3   position as assistant news director.
4          Do you consider yourself
5   powerful?
6      A.    It depends how you mean that.
7          Within the organization,
8   within the newsroom, yes.
9      Q.    Why did you tell Justin that,
10  quote, you have horrible pictures on
11  Facebook?
12     A.    I must have not looked my
13  pictures on Facebook.  I'm not sure why
14  I said that.
15     Q.    Did you interview with
16  Justin --
17     A.    No.
18     Q.    -- for your position at Fox
19  Edge?
20     A.    No.
21     Q.    Did you speak to just din
22  about your plan to join Fox Edge?
23     A.    I'm sure I did, yes.
24     Q.    Through what platform; do you
25  recall?

Page 42

1      A.    I do not recall.

2      Q.    Did you ever speak on the

3   phone?

4      A.    I do not recall.

5      Q.    Did you ever meet in person?

6      A.    I don't believe so, no.

7      Q.    Did you meet in person at all

8   prior to starting at Fox Edge?

9      A.    No, I do not believe so.

10      Q.    So how did he learn that you

11   had begun a job in the city?

12      A.    I did not know how he got

13   that information.  I could have told

14   him.  I'm not sure.

15      Q.    In the amended complaint, you

16   describe Justin as having showered you

17   with gifts.

18      A.    Yes.

19      Q.    Can you clarify what you mean

20   by that?

21      A.    Sure.

22          When I first -- within a

23   first of me starting at Fox News Edge,

24   I got a large box with Fox News Edge

25   like material.  There was pencils and

Page 43

```
1    stationery with my name on it with the
2    Fox News Edge logo, and just other
3    you'd call them swag.
4         Q.    It was just swag?
5         A.    It was --
6         Q.    No real flowers, no --
7         A.    No, it was Fox News Edge
8    branded things.
9         Q.    So Fox News company swag?
10        A.    Correct.
11        Q.    And what did you think?
12        A.    I thought it was odd since I
13   did not really know Justin at the time.
14        Q.    How did you know it was from
15   Justin?
16        A.    I believe he told me that.
17        Q.    Through what platform?
18        A.    I do not remember the
19   platform.  But it was clear that it
20   came from Justin.
21        Q.    Would it have been uncommon
22   in the workplace to see Fox branded
23   pens, notebooks, swag?
24        A.    No.
25        Q.    Would it have been uncommon
```

Page 44

1    in any of your subsequent workplaces to

2    see co-workers using company branded

3    pens and notebooks?

4        A.    It's unusual to have swag

5    with your name monogrammed on it, I

6    would say.

7        Q.    Wonders from a multinational

8    corporation; right?

9            Was it your understanding

10   that Justin had to pull strings to

11   obtain the custom notebooks?

12       A.    I assume so, yes.

13       Q.    So you weren't aware of the

14   portal?

15       A.    No, I do not.

16       Q.    You know what I'm talking

17   right now when I describe a portal?

18       A.    No, I do not.

19       Q.    Would it surprise you if you

20   were equally able to order that stuff?

21       A.    Yes.

22       Q.    But your co-workers didn't

23   know that?

24       A.    No, they all found it odd as

25   well.

Page 45

```
 1        Q.    But it was common to see
 2    people in the swag?
 3        A.    What do you mean in the swag?
 4        Q.    Like using pens, notebooks
 5    that were branded with Fox's --
 6        A.    Sure.
 7        Q.    But you didn't know how they
 8    got it?
 9        A.    Like I said, regular swag is
10    different than your own monogrammed
11    swag.
12        Q.    Did you find it weird?
13        A.    Yes.
14        Q.    It seems benign; doesn't it?
15              MR. RAHMAN: Objection to
16        form.
17        Q.    Not nice?
18              MR. RAHMAN: Objection to
19        form.
20              You can answer if you can.
21              MR. SUNSHINE: Sorry, can you
22        speak up, counsel?
23              MR. RAHMAN: Objection to
24        form.
25              You can answer if you can.
```

Page 46

1              MR. SUNSHINE: Can you speak

2      up when you make your objections?

3              THE WITNESS:  Can you repeat

4      the question, please?

5      Q.    Sure.

6              I'm saying you had just moved

7   to New York at this time?

8      A.    Yes.

9      Q.    Did you know a lot of people?

10     A.    No.

11     Q.    This is your first week?

12     A.    Yes.

13     Q.    And you came to work and

14   found company branded notebooks and

15   pens and hats?

16     A.    Yes.

17     Q.    Things along those lines?

18     A.    Yes.

19     Q.    And you found it odd?

20     A.    I did, to have my name on it,

21   yes.

22     Q.    But your colleagues had

23   similar stuff?

24     A.    No.

25     Q.    No.  Okay.

```
 1          You thought you said that it
 2   wasn't uncommon to see people using Fox
 3   branded stuff?
 4       A.    Again, the monogrammed,
 5   having your name on it.  The swag,
 6   absolutely.  Monogrammed, having your
 7   name on it, I never saw anyone else
 8   with that.
 9       Q.    You said that your supervisor
10   at the time was Mykel McCarthy?
11       A.    Yes.
12       Q.    Did you ever work with Justin
13   Wells in the workplace?
14       A.    In terms, no, but yes.
15       Q.    Were you based in the same
16   building?
17       A.    Yes.
18       Q.    Were you on different floors?
19       A.    Yes.
20       Q.    Did you ever see him in
21   person even for social reasons?
22       A.    Yes.  That's part of the
23   complaint, yes.
24       Q.    I'm talking about in the
25   workplace, like lunch, coffee,
```

Page 48

1    chatting.

2        A.    Not that I recall.

3        Q.    He was one of the only people

4    you knew at the company at the time;

5    right?

6        A.    Yes.

7        Q.    And he was based in the same

8    building?

9        A.    Yes.

10       Q.    Did you ever work together?

11            MR. RAHMAN: Objection to

12       form.  Asked and answered.

13            You can answer it again.

14            THE WITNESS:  Yes, we did

15       work together.

16       Q.    In what capacity?

17       A.    He was a producer on Greta

18   Van Susteren's show and would reach out

19   to me when he needed things that I

20   could possible get from other

21   affiliates or elsewhere.

22       Q.    Would those requests have

23   come through the assignment desk, the

24   national assignment desk?

25       A.    They could have, but often he

Page 49

1    would come directly to me.

2        Q.    Would that be unique to west

3    coast requests or --

4        A.    No.

5        Q.    Because you were saying that

6    much of your job had to do with

7    fielding requests from affiliates;

8    right?

9        A.    Yes.

10       Q.    Not from the main network?

11       A.    There was both.

12       Q.    There was both.

13             And would it have been odd to

14   skip over the assignment desk and

15   communicate directly with producers in

16   the main network?

17       A.    Not really.  It was whoever

18   could answer at the time.

19       Q.    And how many other people --

20   how many other of your colleagues would

21   have been eligible to answer?

22       A.    It depends -- it depends on

23   the region.  I was the west coast

24   producer and there was only one of us

25   on the shift at any given time, so it

Page 50

1    would be me for a west coast issue, but

2    we also had northeast, southeast, that

3    sort of thing, regions.

4        Q.    So would he have worked with

5    your colleagues as well?

6        A.    Yes.

7        Q.    Just as much as he would have

8    worked with you?

9        A.    He would have worked with me

10   more because of the hours of what time

11   Greta Van Susteren's show is and

12   getting stories from the west coast.  I

13   believe Greta's show was on at 10:00 at

14   that point, I think, so at that point

15   it's more likely that he'd be wanting

16   something from the west coast.

17       Q.    What kinds of things did you

18   do for him?

19       A.    If there was a piece of video

20   that he wanted, if there was a package

21   from a local affiliate that Greta

22   planned to use or that they wanted, my

23   job would be to reach out to them and

24   reach out to the station and get

25   whatever they needed.

Page 51

```
 1      Q.    How often would things like
 2   that happen?
 3      A.    I'd say a couple of times a
 4   week.
 5      Q.    So a lot, would you say?
 6            Can you remember anything
 7   more specific about a particular
 8   assignment he gave you or something you
 9   did for Greta's show?
10      A.    No.  I got a lot of requests
11   all the time, so I don't remember
12   anything specific.
13      Q.    Nothing?
14      A.    I don't remember any specific
15   piece of video that they wanted.
16      Q.    Did you look in your old
17   files, e-mails to jog your memory?
18      A.    I don't have access to that
19   anymore.
20      Q.    And you have no recollection
21   of any particular assignment?
22      A.    I do not.  I had dozens a
23   day.
24      Q.    Was he ever your supervisor?
25      A.    Not directly.
```

Page 52

1        Q.    Would your colleagues have
2    thought of him as your supervisor?
3        A.    They would not have thought
4    of him as my supervisor directly, no.
5        Q.    And was he in the same chain
6    of command as McCarthy or --
7        A.    I would say he was above
8    McCarthy at that time.
9        Q.    In a direct chain of command?
10       A.    No.
11       Q.    A separate chain of command?
12       A.    He worked for Fox News
13    Channel and I worked for Fox News Edge.
14       Q.    Which are different how?
15       A.    Fox News Channel is the
16    actual news channel with all the shows
17    that they do and Fox News Edge is more
18    of an affiliate feed service that's the
19    primary is how I would describe it.
20       Q.    And you were looking to leave
21    pretty quickly?
22       A.    Yes.
23       Q.    Why is that?
24       A.    I quickly found that I could
25    not afford to live in New York City on

Page 53

1    $45,000 a year.

2         Q.    How quickly?

3         A.    Very quickly.  As soon as I

4    moved there.

5         Q.    Did you ask Justin for help?

6         A.    Yes.

7         Q.    Why?

8         A.    Because he knew a lot of

9    other people within the company and at

10   other places and I thought he could be

11   helpful in terms of securing an

12   interview or possibly a job somewhere

13   else.

14        Q.    And was he?

15        A.    He helped get me an interview

16   at WNBC and then also was going to put

17   in a word at Fox Radio.

18        Q.    So can you tell me more about

19   the NBC interview?

20        A.    Yes.

21             So I interviewed.  This was

22   after the assault happened.  He -- I

23   went over to WNBC.  It was supposed to

24   be an interview within the newsroom of

25   WNBC, but it ended up taking place at

Page 54

```
 1   the Starbucks on the ground floor.  I
 2   never got to go see the newsroom.  And
 3   it was clear that the people
 4   interviewing me was just humoring me at
 5   the time.  It was not a great
 6   interview.
 7        Q.    Why did you think that?
 8        A.    Body language, not being able
 9   to go see the newsroom, and just they
10   just seemed closed off.
11        Q.    What was the position you
12   were interviewing for?
13        A.    Producer.
14        Q.    So similar to the position
15   you held at Fox at the time?
16        A.    It would have paid
17   significantly more.  And it would also
18   have been -- no, because it would have
19   been a local producer, so I would be
20   producing local content that would be
21   going out on a local TV station as
22   opposed -- and putting together a show
23   versus just taking in pieces of video
24   and sending them out.
25        Q.    Did you feel weird
```

1    interviewing at another company in the

2    first month?

3         A.    Yes.

4         Q.    Did Justin find it weird that

5    you were looking for new jobs within a

6    month?

7         A.    I don't remember him acting

8    like that, no.

9         Q.    He agreed to pass your resumé

10   along?

11        A.    Yes.

12        Q.    You did have an interview?

13        A.    Yes.

14        Q.    You make allegations about

15   why you didn't get the job.

16            Do you have any evidence to

17   support those allegations?

18        A.    I only know what happened

19   there.

20        Q.    You just told me that the

21   interview did not go well.

22        A.    It did not.

23        Q.    And you don't think that

24   played a role in why you didn't get the

25   job?

Page 56

```
 1        A.    I don't think that the
 2   interview went badly because of me.
 3        Q.    Why do you think the
 4   interview went badly?
 5        A.    I believe that Justin said
 6   something to put a chill on hiring me
 7   at the station.
 8        Q.    Why would they interview you
 9   then?
10        A.    I think they were to humor me
11   there.  They had already set up the
12   interview and they were going to check
13   a box and say they did it.
14        Q.    Why would they have any
15   incentive to do that?
16        A.    I can't speak to their
17   quotas.
18        Q.    But you, by your own account,
19   didn't have a good interview?
20        A.    I would say they were closed
21   off to me.  I don't feel like I had a
22   chance.
23        Q.    Did you have to address the
24   fact that you were in your first month
25   of a new job and already looking for a
```

Page 57

1    new one?
2        A.    I do not remember talking to
3    them about that.
4        Q.    That would have seemed like
5    maybe an elephant in the room; would
6    you agree?
7        A.    It would make sense to come
8    up in a conversation, but I do not
9    remember that.
10       Q.    What would be your thoughts
11   if a relatively junior employee were
12   interviewing with you in their first
13   month at a job of a competitor?
14       A.    I would want to know why they
15   want to leave.
16       Q.    Did Mr. Martinez want to know
17   why you wanted to leave?
18       A.    Who is Mr. Martinez?
19       Q.    Oswaldo Martinez.  You listed
20   him in your disclosures in your
21   discovery responses as the person who
22   you interviewed with at the NBC
23   affiliate.
24       A.    I do not recall that.
25       Q.    Let's talk about the alleged

Page 58

```
 1    assault.
 2            In the amended complaint, you
 3    said it took place about a month after
 4    you joined Fox?
 5       A.    Yes.
 6       Q.    So that would have been in
 7    when?
 8       A.    Like October of 2008,
 9    something like that.
10       Q.    October of 2008.
11            Can you walk me through the
12    sequence of events?
13       A.    Sure.
14            Justin invited me to go out
15    to Barracuda, a bar in Chelsea, and
16    said that there would be other people
17    from Fox News there, that it would be a
18    good thing for me to get to know them,
19    and that it would, you know, it would
20    benefit me to go.  I knew nobody --
21    hardly anybody at the station or at Fox
22    News, so I agreed.  And so I met him
23    outside of his apartment in Chelsea.
24            He invited me up for a
25    pre-drink, a pregame cocktail and said
```

Page 59

1    other people were on their way.

2              I get up to his apartment.  I

3    agreed.  Get up to his apartment.  He

4    made me a vodka cranberry.  And then

5    shortly after that, I think I had

6    gotten not even halfway done with my

7    drink, he threw me onto the bed.  He

8    had a studio apartment, and so the bed

9    was part of the living room.  Threw me

10   onto the bed, started trying -- I was

11   on my back.  He was -- he put his

12   tongue down my throat.

13             He tried to take off -- he

14   started unbuttoning my jeans and trying

15   to -- tried to take my pants off.  I

16   stopped him and I said I thought we

17   were going to Barracuda, plus you have

18   a boyfriend.

19             And he stopped at the time

20   but then said okay, we can go out, but

21   I would like to show you the rooftop

22   because it has spectacular views.  I

23   agreed, thinking that it would be good

24   to get out of the apartment, plus --

25   and continue on with the night.

Page 60

```
 1              And so as we were going up
 2     the stairwell, I'm in front of him,
 3     he's behind me.  All of a sudden he
 4     grabs me again and tries to take --
 5     pull down my pants again and tries
 6     again to make out with me and I at that
 7     point was very firm and said I did not
 8     want to do that and that I had no
 9     interest in that.  And that's when his
10     mood changed and he said he didn't want
11     to go out anymore.  And then at that
12     point then he basically said I just
13     want to stay in now, I don't want to do
14     anything, and that's when I left.
15         Q.    I want to drill down into the
16     details a little bit.
17              Do you remember exactly where
18     he lived at the time?
19         A.    I do not know, no.
20         Q.    Do you remember where the
21     Barracuda Lounge was located?
22         A.    A few blocks from where he
23     lives.  I don't know exactly.
24         Q.    And what is the Barracuda
25     Lounge?
```

Page 61

1      A.    It was a gay bar.

2      Q.    So what is the group you were

3  meeting up with gay men?

4      A.    As far as I knew, yes, that

5  is what I would have assumed.

6      Q.    Do you remember what day of

7  the week this was?

8      A.    I do not.

9      Q.    A work night, a weekend?

10     A.    I remember I went to work the

11 next day, but I do not remember exactly

12 what day it was.

13     Q.    And who did you think you

14 were meeting?

15     A.    I didn't know who I was

16 meeting.  We were supposed to be

17 meeting Fox News colleagues, people

18 within the network who are also gay.

19     Q.    Just Fox?

20     A.    As far as I knew.  Maybe

21 other people from other local media

22 outlets.

23     Q.    Did you do things like that

24 regularly, go to bars, gay bars with

25 colleagues?

Page 62

```
 1       A.    Yes and no.  In Tampa, I did.
 2   In New York, I had not -- I didn't
 3   really nobody yet, so this was my first
 4   chance to go out with people that I
 5   would make friends with.
 6       Q.    And did you subsequently go
 7   to these types of events and meet-ups
 8   in New York City?
 9       A.    No, not like this, no.
10       Q.    Do you remember whether the
11   building, Justin's building, had a
12   doorman?
13       A.    I do not remember.
14       Q.    And do you remember how tall
15   it was?
16       A.    I do not, no.
17       Q.    Do you remember what the
18   floor looked like?
19       A.    Yes, I remember the layout of
20   the apartment.  Yes.
21       Q.    And you're saying it's a
22   studio apartment?
23       A.    A studio apartment, yes.
24       Q.    Do you remember what the
25   bedspread looked like?
```

1      A.    I do not remember what the
2  bedspread looked like.  But I can tell
3  you the basic layout.
4      Q.    And what is the basic layout?
5      A.    You walk in.  There is a --
6  as you walk in, there's the kitchen.
7  And then it was just a room after that
8  with a bed on the right-hand side and
9  then there was a TV on the left-hand
10 side.
11     Q.    Would it surprise you to
12 learn that the -- that Justin didn't
13 live in a studio apartment at the time?
14     A.    Yes.
15     Q.    Are you sure that you
16 remember a studio apartment?
17     A.    Yes, because there was a bed
18 in the living room.
19     Q.    So there was no separate
20 bedroom?
21     A.    Not that I'm aware of.
22     Q.    And it would surprise you if
23 the floor plan says otherwise?
24     A.    Yes.
25     Q.    Do you remember if the door

Page 64

1    to the bedroom was open or closed?

2        A.    I didn't think there was a

3    bedroom.

4        Q.    Were -- you said you were

5    drinking vodka and cranberry juice.

6        A.    Yes.

7        Q.    You brought them to the bed,

8    on the bed?

9        A.    It was on a table next to the

10   bed.

11       Q.    And you then said that Justin

12   pushed you onto the bed?

13       A.    Yes.

14       Q.    Were you sitting on the bed

15   first?

16       A.    No, we were standing.

17       Q.    And you fell forward,

18   backward?

19       A.    Backward.

20       Q.    Backward.

21             And then he kissed you?

22       A.    I would describe it more as

23   put his tongue down my throat.

24       Q.    And reached for --

25       A.    Reached for my crotch and

Page 65

1    started unbuttoning my pants.

2         Q.    And you said?

3         A.    I said no.  I was very

4    surprised by what was going on.

5         Q.    And then he stopped?

6         A.    He did.

7         Q.    After you said no?

8         A.    Yes.

9         Q.    And then you left with him?

10        A.    Yes.

11        Q.    To go to --

12        A.    Barracuda.

13        Q.    Not the roof deck?

14        A.    Well, the end goal was

15   Barracuda.  But the roof deck was next,

16   yes.

17        Q.    Why were you in a stairwell?

18        A.    Because that's how you got up

19   to the rooftop.  There was a stairwell.

20        Q.    Why did you agree to go to

21   the rooftop with him?

22        A.    I wanted to get out of the

23   situation and be in a more public

24   place.

25        Q.    And did you ever make it to

Page 66

1    the rooftop?

2        A.    I briefly stood on it, but

3    the second assault happened on the

4    stairwell.

5        Q.    On the way up or on the way

6    down?

7        A.    On the way up.

8        Q.    And you were walking and he

9    grabbed you?

10       A.    Yes.  I was in front of him,

11   he was behind me, and he pulled me and

12   grabbed again my front crotch area and

13   started trying to take down --

14   aggressively take down my pants again.

15       Q.    In the stairwell?

16       A.    Yes.

17       Q.    Did he kiss you again?

18       A.    He tried to, yes.

19       Q.    Did you spin?

20       A.    It was an awkward -- it was a

21   very awkward angle.  Yes, I spun

22   around, and that is when I was very

23   forceful and I was mad at that point.

24       Q.    And you said no?

25       A.    I said no, that's not what I

Page 67

```
 1   want to do.  I want to go out to
 2   Barracuda tonight.
 3        Q.    And then he stopped?
 4        A.    And then he said he didn't
 5   want to go out anymore, and that's how
 6   the night ended.
 7        Q.    And then you left?
 8        A.    And then I left, yes.
 9        Q.    And did you go to the
10   Barracuda without him?
11        A.    No.  I went home.
12        Q.    You went home?
13        A.    Uh-huh.
14        Q.    Did he walk you down the
15   stairs?
16        A.    I do not remember if it was
17   an elevator, if it was a stairs.  I do
18   not recall.
19        Q.    And that was about one month
20   into your time at Fox?
21        A.    Approximately, yes.
22        Q.    So what happened after that?
23   Did he continue to give you
24   assignments?
25        A.    Yeah, from that point we kind
```

Page 68

```
 1    of -- he still -- we still had the
 2    same.  If he needed something, he was
 3    still going to come to me.  If there
 4    was a piece of video he wanted, I still
 5    had to do that.
 6        Q.    So he didn't avoid you, you
 7    didn't avoid him?
 8        A.    There wasn't the same level
 9    of communication at that point.  It was
10    more just more business at that point.
11        Q.    Where were these
12    communications taking place, in any
13    event?
14        A.    The majority were on Top Line
15    through iNews which is an interoffice
16    messaging system.
17        Q.    Not typically in person?
18        A.    No, we worked on different
19    floors.
20        Q.    So he never swung by your
21    office before or after?
22        A.    No.
23        Q.    And you then got promoted to
24    national producer?
25        A.    Yes.
```

Page 69

1      Q.    How long was that after the
2   events?
3      A.    I have to go back and look,
4   but a few months afterwards.
5      Q.    And you got a pay raise?
6      A.    Yes.
7      Q.    And then another pay raise?
8      A.    Yes.  That was my yearly pay
9   raise, the second one.
10          MR. SUNSHINE: I'm going to
11      mark a document as Exhibit 9.
12          (Whereupon, copies of text
13      messages were marked Defendants'
14      Exhibit 9 for identification.)
15      Q.    Do you recognize this
16   document?
17      A.    I don't remember having done
18   it, but yes, I see what this is.
19      Q.    What is it?
20      A.    It's a social media post with
21   Justin saying he got a new Fox
22   emergency kit and pouch and my comment
23   that says, "pretty that's less of an
24   emergency pouch and more of a fanny
25   pack".

Page 70

1      Q.    When was the comment made?

2      A.    That was it looks like

3   thirteen years ago, so 2012.

4      Q.    And that would have been

5   before or after the alleged assault?

6      A.    After.

7      Q.    So you were still

8   communicating?

9      A.    As far as I know, that's the

10  only communication that we had via

11  social media.

12     Q.    Why did you comment on his

13  post?

14     A.    I do not remember why.

15     Q.    Were you mad at him?

16     A.    I was not happy.  But I was

17  able to compartmentalize it.

18     Q.    For what reason?

19     A.    We were still colleagues and

20  have co-workers and mutual friends and

21  all of that sort of thing.

22     Q.    You were colleagues in

23  September -- September of 2011?

24     A.    I worked at Fox 13 in Tampa,

25  which is still owned by Fox, so we

Page 71

1    still had a lot of mutual friends and

2    former co-workers and that sort of

3    thing.

4        Q.    I'm going to go back to

5    Exhibit 8 which is the messages between

6    you and Justin.

7            Can you go to page four.

8        A.    I'm there.

9        Q.    What is the date on these

10   messages?

11       A.    October 4, 2013.

12       Q.    Where were you at the time

13   professionally?

14       A.    I was at -- let me see.  I

15   was at WPTV working for The List.

16       Q.    And where is that?

17       A.    West Palm Beach, Florida.

18       Q.    And what is the context of

19   this conversation?

20       A.    He saw that I worked at WPTV,

21   which is a place that he started at, so

22   he reached out to me and asked me that

23   I'm at WPTV now and I spoke and I

24   talked to him.

25       Q.    You had just started; right?

Page 72

1      A.    Yes.

2      Q.    What was your job at the

3  time?

4      A.    I'm sorry?

5      Q.    Your title.

6      A.    My title?  It was

7  coordinating producer.  It was my first

8  step into management.  I oversaw two

9  people.

10      Q.    And you were making more

11  money than you had been making?

12      A.    Yes.

13      Q.    Much more money?

14      A.    I believe I made sixty

15  thousand a year.

16      Q.    And you had been making

17  fifty-three thousand when you left Fox?

18      A.    Correct.

19      Q.    And something thereabouts in

20  between?

21      A.    Yes, yes.

22      Q.    It's fairly cordial; isn't

23  it?

24      A.    Yeah, I kept it pleasant.

25      Q.    Was that your mindset,

Page 73

1    keeping it pleasant?

2       A.    Yeah.  I wanted to stay

3    cordial.

4       Q.    It's a pretty long

5    conversation.

6             Can you flip to the numbers

7    are small but it's Wells 00010 is the

8    Bates in the bottom right.  It's

9    October 4, 2013 at 3:47 p.m.

10      A.    Okay. I'm there.

11      Q.    And what does he say in the

12   second message from the top?

13      A.    "I lived at this place" --

14      Q.    I think we're not on the same

15   page.

16      A.    We're not?  Okay.

17      Q.    3:47 p.m.

18      A.    Yes, I'm at 3:47, October 4,

19   2013.

20      Q.    "Trying to hire a good

21   producer"?

22      A.    Oh, so there's one more.  All

23   right.

24             "Trying to hire a producer.

25   We lost one of our strongest.

Page 74

```
 1    Interviewing lots of peeps, et cetera".
 2         Q.    And you floated yourself?
 3         A.    It looks like I did, yep.
 4         Q.    Why?
 5         A.    I think it was -- I don't
 6    know why.
 7         Q.    It would have been a good
 8    opportunity; right?
 9         A.    It depends on what the money
10    would have been.
11         Q.    Right.
12               But you had just started a
13    new job?
14         A.    At The List in West Palm,
15    yes.
16         Q.    And if that were not the
17    case, you would have considered it?
18         A.    I don't remember what my
19    mindset was at the time.
20         Q.    And you talk about making
21    forty-five thousand?
22         A.    Yes.
23         Q.    But you weren't making
24    forty-five thousand when you left Fox;
25    right?
```

Page 75

1     A.    No.

2     Q.    You were making fifty-three

3   thousand?

4     A.    Fifty-three, yes.

5     Q.    With a bonus?

6     A.    I don't remember a bonus.

7     Q.    Was your job at WPTV

8   fundamentally different from your job

9   at Edge?

10     A.    Yes.

11     Q.    In what way?

12     A.    I was producing a daily news

13   package for the local affiliate for a

14   show called The List, which was an

15   entertainment news magazine show.

16     Q.    And what city were you living

17   in again, remind me?

18     A.    West Palm Beach, Florida.

19     Q.    And you like living in West

20   Palm Beach?

21     A.    I really like West Palm

22   Beach.

23     Q.    The weather?

24     A.    The weather is good.

25     Q.    Did you know people there?

Page 76

1      A.    No.  I knew the reporter and
2   that was it.
3      Q.    A couple of pages later you
4   talk about a gay reporter Mafia.
5           What do you mean by that?
6      A.    It was a term to say that a
7   group of gay guys who worked for Fox or
8   were producers and just kind of all
9   looked out for each other a little bit.
10     Q.    Were you a social group, a
11  professional group, both?
12     A.    I think it was just a term
13  that -- it was a little bit of both.
14     Q.    From all within the company,
15  in and out?
16     A.    I think -- where is this?
17     Q.    I'll give you the Bates
18  number.  It's 12, it looks like,
19  Wells 12.  It's a very, very small
20  font.
21     A.    For that I'm talking about
22  WPTV.  There were several gay reporters
23  there.
24     Q.    Were they mutual friends with
25  Justin?

Page 77

1      A.    I do not believe so.

2      Q.    And you socialized with them

3   in and out of the workplace?

4      A.    I had actually just learned

5   that there was a group of gay reporters

6   there.  I was not friends with them at

7   that point.  I said I'm just learning

8   who the new people are.

9      Q.    And did you become friends

10  with them?

11     A.    A couple of them, yes.

12     Q.    Is there something similar in

13  New York when you were working at Fox,

14  a gay Mafia, so to speak?

15     A.    Not that -- I'm sure there

16  was.  Not to the same extent that I

17  knew it there.

18     Q.    So you didn't have a group

19  that you considered the gay Mafia in

20  New York City?

21     A.    Not necessarily, no.

22     Q.    Is that a common term?

23     A.    No, not that I'm aware of.

24     Q.    And then he asks if there are

25  cuties.

Page 78

```
 1            What did you think he meant
 2   by that?
 3        A.    Are any of the reporters
 4   good-looking.
 5        Q.    And you said?
 6        A.    I said yeah, they're
 7   good-looking.  They aren't ugly, is
 8   what I said.
 9        Q.    But these are your
10   colleagues?
11        A.    No, they were -- I worked for
12   The List.  They were reporters in the
13   news station.
14        Q.    Were those in the same
15   building?
16        A.    In the same building, yes.
17        Q.    Different floors?
18        A.    Different floors.
19        Q.    Same owner?
20        A.    Same owner.
21        Q.    So similar to you and Justin?
22        A.    I would not say that because
23   there was no overlapping between The
24   List and news.
25        Q.    Why did you say you hope they
```

Page 79

1    are bottoms?

2         A.    I didn't say that, he said

3    that.

4         Q.    You said, "ha, ha.  Me too".

5         A.    Oh, okay.  He said,

6    "hopefully they're bottoms".  I said,

7    "okay, me too, especially now that I'm

8    single again".

9         Q.    Which you meant what?

10        A.    That possibly if I'm single

11   and were able, if one of them wanted to

12   go on a date, I would be open to it.

13        Q.    Even though they were

14   colleagues?

15        A.    I wouldn't call them that.

16   They worked in a completely separate

17   part of the building and completely

18   different everything.

19        Q.    Would you have considered

20   that inappropriate in general?

21        A.    Not necessarily, if I'm not

22   their superior and we don't work in the

23   same department.

24        Q.    Where would you draw the line

25   between what's appropriate and what's

Page 80

1    not with respect to colleagues?

2        A.    Sure.  If you're in a

3    position of power, if you have a

4    different relationship, I think any

5    power differential is where I draw the

6    line.

7        Q.    And what was your title

8    there?

9        A.    Supervising -- I think it was

10   supervising producer.

11       Q.    So you were a supervisor?

12       A.    Of two people, yes.

13       Q.    And what were the titles of

14   the people that you were talking about?

15       A.    Sure.  There was a List

16   reporter and List photographer.

17       Q.    So they were photographers

18   and reporters, you were the supervising

19   producer?

20       A.    I would have found it

21   inappropriate to be dating one of those

22   two people, yes.

23       Q.    Can we flip -- sorry, no

24   flipping.

25             Down the page just a little

Page 81

1    bit there is the next set of

2    communications.

3            What is the date of those

4    communications?

5        A.    February 11, 2015.

6        Q.    2015?

7        A.    Yes.

8        Q.    And Justin asks for your

9    e-mail address?

10        A.    Yes.

11        Q.    Had you been speaking through

12    another medium?

13        A.    Not that I recall.

14        Q.    Phone?  Did you have his

15    phone number?

16        A.    I don't remember if I did or

17    not.

18        Q.    And what's the context of

19    that conversation?

20        A.    I had just -- they had folded

21    The List, it was being cancelled, and I

22    was looking for another job and he must

23    have seen me post about that on social

24    media and reached out to me.

25        Q.    And you received that how?

Page 82

```
 1        A.    I was looking for another
 2    job.  I needed to find a place to work.
 3        Q.    So you would have been
 4    interested?
 5        A.    In depends.  I think he was
 6    trying to set me up with somebody in
 7    Orlando and, yeah, I would have been
 8    possibly.
 9        Q.    You were living in Tampa or
10    West Palm?
11        A.    West Palm Beach.
12        Q.    And you would have moved to
13    Orlando for this opportunity?
14        A.    It depends on what it was.
15        Q.    Did you end up interviewing
16    for that position?
17        A.    No.
18        Q.    Did he pass along your
19    resumé?
20        A.    I don't know.
21        Q.    Did you feel weird talking to
22    him?
23        A.    Yes.
24        Q.    But not enough to not
25    respond?
```

Page 83

```
1        A.    I was keeping it cordial.
2   Again, I needed a job.
3        Q.    And you knew Jorgé, the
4   person.
5              This was a mutual friend of
6   yours?
7        A.    I believe he worked at a
8   Miami station, either Miami or Orlando,
9   and honest, I don't remember exactly
10  where he worked, but I believe he was
11  somebody that was -- I'd be able to get
12  a job with.
13             MR. SUNSHINE: Can we go off
14      the record.
15             THE VIDEOGRAPHER: We are now
16      going off the record.
17             Time is 11:32 a.m., and this
18      ends media unit one.
19             (Whereupon a break was taken)
20             THE VIDEOGRAPHER: We are now
21      going back on the record.
22             The time is 11:47 a.m., and
23      this is the beginning of media unit
24      two.
25             MR. SUNSHINE: I'm holing a
```

Page 84

```
 1       document that I'm going to mark as
 2       Exhibit 10.
 3              (Whereupon, copies of text
 4       messages were marked Defendants'
 5       Exhibit 10 for identification.)
 6       Q.    Do you recognize this
 7  document?
 8       A.    Yes.
 9       Q.    What is it?
10       A.    That is a Facebook post that
11  I made where I talked about what
12  happened to me when I was assaulted.
13       Q.    What is the date of the post?
14       A.    October 22, 2017.
15       Q.    What caused you to make this
16  post on this day?
17       A.    I had just seen the movie
18  Bombshell, which is about impropriety
19  at Fox News.  I had been thinking about
20  it for a long time, for years about
21  saying something.  And I thought why --
22  at this point why would I not say -- I
23  have nothing to be ashamed of, so I'm
24  going to publicly most it.  Plus Me Too
25  was all, that was the big thing that
```

Page 85

```
 1   was going on at the time.
 2       Q.    At the beginning you say,
 3   "it's taken me until today that I
 4   realized that I've had a Me Too".
 5            What did you mean by that?
 6       A.    To the full extent of what
 7   happened when I put together the pieces
 8   of what had happened and retaliation
 9   afterwards and things that had
10   happened, you know, after seeing that
11   movie, it really kind of fell into
12   place for me.
13       Q.    What do you mean by
14   retaliation?
15       A.    Retaliation in terms of what
16   had happened at WNBC, after I had not
17   -- after I had not given in to his
18   demands and also feeling like, you
19   know, my career had been stifled at Fox
20   News.  Yeah.
21       Q.    In spite of the promotion and
22   the raises?
23       A.    Yes.
24       Q.    On page three -- sorry, it
25   goes into page four.  Why don't we read
```

Page 86

1    on page four.
2           Can you read the comment by
3    Lindsay Hare Johnson?
4        A.    You said page three?
5        Q.    Four is the full message.
6        A.    It says, "you're so brave for
7    speaking up", exclamation point,
8    exclamation point.  "I wish I had
9    known, Sweetie.  I'd have loved to kick
10   him in the balls for you", and I think
11   she meant hugged.
12       Q.    Who is Ms. Johnson?
13       A.    She was a national producer
14   at Fox News Edge at the time.
15       Q.    And at what time?
16       A.    At the time of the assault.
17   She's also the person that I had told
18   that something had happened the day
19   after the Justin Wells assault.
20       Q.    Is she the senior female
21   co-worker?
22       A.    Yes.
23       Q.    On paragraph forty of your
24   amended complaint?
25       A.    Yes.

1    Q.    And her title was?

2    A.    She was a national producer.

3    Q.    So she had the same title

4  that you had?

5    A.    Not at the time.  I was a

6  regional producer and she was a

7  national producer.

8    Q.    You considered that a senior

9  level role?

10   A.    Higher than me, yes.

11   Q.    And did you identify Mr.

12  Wells to her at the time?

13   A.    I did not.

14   Q.    Did you give any specifics to

15  her at the time?

16   A.    I told her that I had been

17  sexually assaulted by somebody higher

18  up within Fox News.

19   Q.    And did she report that up

20  the chain?

21   A.    No, she did not.

22   Q.    Did you?

23   A.    I did not.

24   Q.    Did you report it to HR?

25   A.    No, I did not.

Page 88

1      Q.    Did you report it to the
2  police?
3      A.    I did not.
4      Q.    What about your supervisor?
5      A.    No, I did not.
6      Q.    What about Mr. Wells'
7  supervisor?
8      A.    Nope.
9      Q.    Why do you think Ms. Johnson
10  didn't report it?
11      A.    I think the culture within
12  Fox was such that I think going to HR
13  was pretty widely discouraged in the
14  company.  I don't think that she
15  thought -- I can't put words into her
16  mouth, but I believe she thought that
17  it was not worth doing.
18      Q.    Why do you think she wrote
19  that she wished she had known if she
20  did know?
21      A.    She did know.  I think she
22  means of who -- of exactly who it was.
23  "I'd have loved to kick him in the
24  balls for you to know who that him
25  was".

Page 89

1      Q.    But you didn't disclose who

2    it was in this post?

3      A.    I did not.

4            MR. SUNSHINE: I'm going to

5      mark a document as Exhibit 11.

6            (Whereupon, copies of text

7      messages were marked Defendants'

8      Exhibit 11 for identification.)

9      Q.    Do you recognize this

10   document?

11     A.    I do.

12     Q.    What is it?

13     A.    It's a conversation between

14   me and Lindsay when I was considering

15   or I had contacted a lawyer and I was

16   wondering what she had remembered about

17   my conversation the next day after

18   Justin Wells' assault.

19     Q.    So this was in what year?

20     A.    This was -- I believe it was

21   2023.  It was shortly after I had

22   contacted a lawyer, so it must have

23   been 2023.

24     Q.    You hadn't identified Mr.

25   Wells to Ms. Johnson; right?

1    A.    I do think that I had talked

2    to her about that since, which is why

3    she said in the previous document that

4    I wish I had known, because I believe

5    she asked me afterwards who it was and

6    then I told her who it was.  Many

7    people after I made that post privately

8    reached out to me and asked me who I

9    was talking about and I told them.

10    Q.    So were you speaking with her

11    on the phone?

12    A.    I do not remember how we had

13    that conversation.  Most likely through

14    text or Messenger.

15    Q.    Did you produce those text

16    messages?

17    A.    I don't know if I have them.

18    Q.    But you think they were text

19    messages?

20    A.    It's possible.

21    Q.    Did you delete them?

22    A.    I wouldn't have deleted them,

23    no.

24    Q.    Did you have an iPhone at the

25    time?

Page 91

1       A.    Yes.

2       Q.    Do you still have an iPhone?

3       A.    Yes.

4       Q.    But you don't have the texts?

5       A.    I do not believe so.

6       Q.    Were you speaking on the

7    phone or through some other means

8    immediately prior to these messages?

9       A.    I do not know.

10      Q.    You say, "what do you

11   remember about me and Justin Wells",

12   and then she regurgitates your entire

13   story.

14            But you had not told her who

15   it was?

16      A.    I did not.

17      Q.    She knew exactly who you were

18   talking about, what you were talking

19   about?

20      A.    Yes.

21      Q.    You don't remember if you had

22   spoken on the phone prior to this?

23      A.    I do not.

24            MR. SUNSHINE: I am going to

25      mark a document as Exhibit 12.

```
 1          (Whereupon, copies of text
 2     messages were marked Defendants'
 3     Exhibit 12 for identification.)
 4     Q.    Do you have the document?
 5     A.    Yes.
 6     Q.    Okay.
 7           Who is Greg Lackowitz?
 8     A.    Greg Lackowitz was a producer
 9  at Fox News Edge.
10     Q.    A colleague of yours?
11     A.    Yes.
12     Q.    What was his title, if you
13  recall?
14     A.    I believe national producer.
15     Q.    Can you read your second
16  message to Greg?
17     A.    I say, "nope, but it's
18  someone you know.  I wasn't sure but it
19  was.  I'm just now unpacking it and
20  saying oh, well, you can't just strip
21  someone naked and threaten their
22  livelihood".
23     Q.    What did you mean by that?
24     A.    I meant that you cannot
25  attempt to take somebody's clothes off
```

Page 93

1    and assault them and then make --
2    retaliate afterwards when you don't get
3    what you want.
4         Q.    Was the implication that Mr.
5    Wells had stripped you naked?
6         A.    It was a figure of speech.
7         Q.    You think they're more or
8    less equivalent?
9         A.    I think there's trying to
10   strip someone naked.  That is what I
11   meant by that.
12        Q.    If someone told you that they
13   had been stripped naked and then they
14   found out that you hadn't been stripped
15   naked, would you find that to be a
16   material difference?
17        A.    Yes, but I had not said that
18   in my original account.
19        Q.    What did you mean by threaten
20   their livelihood?
21        A.    In terms of try to not get
22   someone hired for an interview and make
23   it so they weren't able to have a job.
24        Q.    And you believe Mr. Wells did
25   that to you?

Page 94

1      A.     I believe at WNBC, yes.

2      Q.     But you had been promoted at

3   Fox subsequently?

4      A.     Yes.

5      Q.     You got a couple of raises?

6      A.     Yes.

7      Q.     You corresponded with him

8   about further job opportunities in

9   multiple different conversations over a

10  course of years?

11     A.     I would say when I was

12  speaking to him about those, I was not

13  speaking -- I was not really serious

14  about taking any of those jobs.

15     Q.     Why did you describe the

16  incident in the way you did to Mr.

17  Lackowitz?

18     A.     Because that's how I felt

19  that -- that's how I felt what

20  happened.  He tried to strip me naked.

21     Q.     That's not what you allege in

22  your lawsuit; is it?

23     A.     He tried to unbutton my pants

24  and take down my pants and physically

25  grope my genitals.

Page 95

1      Q.    Were you having trouble
2   recalling it at the time back in 2017?
3      A.    Recalling what?
4      Q.    The event.
5      A.    No.  I have a pretty clear
6   remembrance of what happened.
7            MR. SUNSHINE: I am going to
8      mark a document as Exhibit 13.
9            (Whereupon, copies of text
10     messages were marked Defendants'
11     Exhibit 13 for identification.)
12     Q.    Do you have the exhibit in
13  front of you?
14     A.    I do.
15     Q.    Do you recognize this
16  document?
17     A.    It is a conversation between
18  me and Marie Lissaim.
19     Q.    Who is Marie Lissaim?
20     A.    She was a producer at Fox
21  News Edge.
22     Q.    Alongside of you?
23     A.    I don't remember what her
24  exact title was, but yes, we worked
25  together.

Page 96

1      Q.    And did you tell her about

2  the incident at the time?

3      A.    At the time, no.  But I was

4  not sure, actually.  I believe I was

5  reaching out to her to remember who I

6  had -- if I had talked to her.

7      Q.    Do you remember when this

8  conversation took place?

9      A.    I believe this was 2023 as

10  well.

11      Q.    Let's turn to page four.

12      A.    I'm there.

13      Q.    You say, "I do remember what

14  happened well"?

15      A.    Yes.

16      Q.    What did you mean by that?

17      A.    It was long ago, but I

18  remember what happened.  I remember the

19  details of what happened.

20      Q.    Why were you telling Mr.

21  Lackowitz such a different story?

22           MR. RAHMAN: Objection to

23      form.

24           You can answer if you can.

25           THE WITNESS:  I think we're

Page 97

```
 1        talking about two separate things.
 2        I remember what had happened, the
 3        incident, to then put two and two
 4        together to say this is like a Me
 5        Too type thing.  That is what I had
 6        been thinking about for a long time
 7        and that's why it took me as -- one
 8        of the reasons it took me as long
 9        to say anything.
10        Q.    You told Mr. Lackowitz that
11   you had been stripped naked?
12        A.    Yes.
13        Q.    But that's not your current
14   recollection?
15        A.    Again, it was a figure of
16   speech that he was trying to strip me
17   naked.
18        Q.    Are there any other
19   allegations in the amended complaint
20   that are figures of speech?
21        A.    No.
22        Q.    Do you see why that might be
23   misleading?
24        A.    Not the way I meant it, no.
25        Q.    Did you tell anyone else that
```

Page 98

1    you had been stripped naked?

2         A.     I do not recall doing that.

3              MR. SUNSHINE: I am going to

4         mark an exhibit as -- a document as

5         Exhibit 14.

6              (Whereupon, copies of text

7         messages were marked Defendants'

8         Exhibit 14 for identification.)

9         Q.     Do you recognize this

10   document?

11        A.     Yes.

12        Q.     Who is Jason Goodwin?

13        A.     Jason Goodwin was my

14   co-worker at Fox 13 in Tampa.  He got a

15   job as a producer at Fox News Edge and

16   we worked together at both locations.

17        Q.     And this is your Facebook

18   messages with him?

19        A.     Yes.

20        Q.     What is the date of these

21   messages?

22        A.     October 23, 2017.

23        Q.     Can you read your first

24   message?

25        A.     It says, "I think I told you

Page 99

1   Justin Wells -- don't tell him -- he
2   messaged me for the first time in ten
3   years to ask who it is.  He knows damn
4   well it's him".
5        Q.    Why did you tell Mr. Goodwin
6   that Mr. Wells' messaged you for the
7   first time in ten years?
8        A.    Because he messaged me for
9   the first time in quite a while, maybe
10  not exactly ten years, to talk about --
11  after I had made that post for him to
12  ask me who it was.
13       Q.    But it hadn't been ten years;
14  had it?
15       A.    But it had not been ten
16  years, no.
17       Q.    How many years had it been?
18       A.    I don't know.  Possibly -- I
19  don't know.
20       Q.    Two?
21       A.    Possibly.
22       Q.    Two to ten, that's a big
23  difference; isn't it?
24            Do you recall in your
25  messages with Mr. Wells that you were

Page 100

1    inquiring about a job opportunity in

2    Orlando?

3        A.    I remember we talked about

4    that earlier, yes.

5        Q.    And what was in what year?

6        A.    I don't recall.  I'd have to

7    go look.

8        Q.    2015; does that sound right?

9        A.    Yes.

10        Q.    And this is in 2017?

11        A.    Yes.

12        Q.    And you're saying he messaged

13    you for the first time in ten years?

14        A.    Yes.

15        Q.    And there was another

16    conversation you had in 2013, right,

17    about a different job opportunity?

18        A.    Yes.

19        Q.    Why were you telling Mr.

20    Goodwin that you hadn't spoken to Mr.

21    Wells for so many years when you had?

22        A.    I believe I did not remember

23    having talked to him.  I don't know.

24        Q.    You didn't review your

25    messages before you made your post?

1      A.    I must not have, no.

2      Q.    So that's inaccurate what you

3   told him?

4      A.    It had not been ten years, it

5   had been less than that, yes.

6      Q.    Were you communicating with

7   Mr. Wells through any other means

8   during this period?  We might have

9   touched on this before but I want to go

10  back there.

11     A.    No.

12     Q.    By phone?

13     A.    No.

14     Q.    By e-mail?

15     A.    No.  Not that I'm aware of.

16     Q.    By text?

17     A.    Not that I'm aware of, no.

18     Q.    Did you have Mr. Wells' phone

19  number?

20     A.    I did not believe I do.

21     Q.    Did you in the past?

22     A.    I must have for us to

23  communicate to learn where to meet him

24  and that sort of thing.

25     Q.    If you were to check right

1   now, would Mr. Wells' number be in your

2   phone?

3       A.    I do not believe so.

4       Q.    Do you mind if we see?

5       A.    Sure.

6             Yeah, he's not in my phone.

7       Q.    But you have no recollection

8   of deleting his number or deleting your

9   texts?

10      A.    No, I probably just changed

11  phones.

12      Q.    Did you change numbers?

13      A.    I've had the same number for

14  quite a long time.

15      Q.    Since 2008?

16      A.    I do not know exactly when,

17  but I've had the same number for ten

18  plus years, at least.

19      Q.    Have you searched all

20  possible locations of stored

21  communications?

22      A.    Yes.

23      Q.    Do you text regularly?

24      A.    Yes.

25      Q.    But most of your

1    conversations in this case have been

2    through Facebook Messenger?

3        A.    Yes.

4        Q.    Why is that?

5        A.    Some people I talk to through

6    Facebook Messenger, some people I text,

7    and his conversation was one that we

8    mostly talked through Facebook

9    Messenger.

10            MR. SUNSHINE: I am going to

11       mark a document as Exhibit 15.

12            (Whereupon, copies of text

13       messages were marked Defendants'

14       Exhibit 15 for identification.)

15       Q.    Do you have it in front of

16    you?

17       A.    Yes.

18       Q.    Do you recognize this

19    document?

20       A.    Yes.

21       Q.    What is it?

22       A.    It is a Facebook conversation

23    Messenger that I had with Allison

24    Browne, also a producer at Fox News

25    Edge.

Page 104

1      Q.    At the time you were there?

2      A.    Yes.

3      Q.    And what are the date of

4    these messages?

5      A.    April 28, 2023.

6      Q.    Had you met her recently in

7    person or spoken on the phone?

8      A.    I believe I had spoken with

9    her on the phone.

10     Q.    And told her your story?

11     A.    Yes.

12     Q.    So she knew?

13     A.    When I told her, she knew.

14   Before that, no.

15     Q.    Why do you regurgitate the

16   story if you had just spoken about it?

17     A.    What do you mean?

18     Q.    I mean, it seems like you

19   walk through the whole sequence of

20   events in detail, but she from the very

21   beginning seems to know exactly what

22   you're talking about.

23     A.    Yeah, because I had talked to

24   her on the phone about it because I'm

25   still -- am still processing it.  I was

Page 105

1    just talking to her.

2        Q.    Why write it down though if

3    you had just spoken about it and she

4    knew?

5        A.    I still wanted to talk to her

6    about it as a friend.  I was still

7    going through it.

8        Q.    Were you talking at her or to

9    her?

10       A.    I'm talking to her.  I

11   trusted her advice and opinion and I

12   was talking -- I wanted to tell her

13   more about what was going on.  I don't

14   recall that I said -- told her exactly

15   what I said.  I was going back through

16   what we had talked on the phone about.

17       Q.    Were you considering legal

18   action at this time?

19       A.    Yes, I was.

20       Q.    Were you creating a paper

21   trail?

22       A.    No.

23       Q.    No?

24       A.    No.

25       Q.    She knew the story from the

Page 106

```
 1    phone call and then you regurgitate it?
 2         A.    Yeah.
 3         Q.    But did that cross your mind,
 4    the idea that it might help to have it
 5    in writing?
 6         A.    Absolutely not, no.  That's
 7    not why I did it.
 8         Q.    Why did you do it?
 9         A.    Because I was still talking
10    to her as a friend and wanted her to
11    know more about what I was talking
12    about and I trusted her opinion.
13         Q.    I want to turn to your
14    allegation that there was a previous
15    instance of harassment.
16               Can you describe what you
17    mean by that in your complaint?
18         A.    With Kathleen Wells?
19         Q.    You tell me.
20         A.    Yes, Kathleen Wells, who was
21    on the assignment desk at Fox News, she
22    -- when I made that post on Facebook,
23    she reached to me and asked who it was
24    and I told her and she said she had her
25    own experience with Justin Wells when
```

Page 107

1    she -- I believe they worked together

2    at WNYW in New York and he called her a

3    -- excuse my language -- a fucking

4    bitch and had to apologize to her and

5    she was just telling me about how she

6    never liked him or trusted him ever

7    since then and just was -- we were

8    talking about how we both had negative

9    experiences with him.

10        Q.    And is she the individual in

11   your complaint who you've told

12   purported to tell after the fact and

13   said that she had the experience,

14   that's what you're describing; right?

15        A.    Say the question again,

16   sorry?

17        Q.    In your complaint, you

18   describe telling a second co-worker.

19        A.    Yes, that's a second

20   co-worker.

21        Q.    And so the disclosure, that

22   was in 2017?

23        A.    Yes.

24        Q.    So it wasn't in the weeks or

25   months or years after?

Page 108

1      A.    No.

2      Q.    And you describe what

3  happened with Ms. Wells as sexual

4  harassment.

5          Do you stand by that

6  characterization?

7      A.    I do.

8          MR. SUNSHINE: I am going to

9      mark a document as Exhibit 16.

10          (Whereupon, copies of text

11      messages were marked Defendants'

12      Exhibit 16 for identification.)

13      Q.    Do you recognize this

14  document?

15      A.    Yes.

16      Q.    What is it?

17      A.    It is a conversation that I

18  had with Kathleen Wells in 2017.

19      Q.    And this is the conversation

20  you were referring to just now?

21      A.    Yes.

22      Q.    Can you turn to page three.

23      A.    Yes.

24      Q.    There's a long block of text

25  starting with, "oh, that's right".

1      A.     Yes.

2      Q.     Can you read the sentence --

3  the second sentence starting with "I"?

4      A.     Yes.

5             "I do remember you telling me

6  that story".

7      Q.     Continue.

8      A.     "He was such an fucking ass

9  to me when he worked at WNYW.  I had a

10  huge fight with him and he called me a

11  fucking bitch, et cetera, because I

12  wouldn't do a live shot for him.  I

13  wasn't doing live shots for any

14  affiliate after 8:00 p.m. but my boss

15  made me do it".

16      Q.     That's okay.  You can stop.

17             Is that the incident that

18  you're talking about?

19      A.     Yes.

20      Q.     The sexual harassment?

21      A.     Yes.

22      Q.     He called her what?

23      A.     A fucking bitch.

24      Q.     And did she describe it as

25  sexual harassment?

1      A.    I do not remember her saying

2  that specifically.

3      Q.    Did you think that it was

4  sexual harassment when she told you

5  this?

6      A.    It sounds like it to me, yes.

7      Q.    Calling her a bitch?

8      A.    Possibly, yes.

9      Q.    Do you remember what the

10  context of their little tiff was?

11      A.    That he would -- she would

12  not do a -- she was on the assignment

13  desk.  He wanted a live shot booked.

14  She was refusing and he called her a

15  fucking bitch.

16      Q.    And that's sexual harassment?

17      A.    I think it could be construed

18  as such, yes.

19      Q.    Would you construe it as such

20  if you saw it in the workplace?

21      A.    Yes, definitely inappropriate

22  behavior.

23      Q.    Is all coarse language sexual

24  harassment?

25      A.    Not necessarily.

Page 111

1      Q.    But in this case, it was?

2      A.    I think so for her gender,

3   yes.

4      Q.    Did she say that she was

5   sexually harassed?

6      A.    Not that I remember, no.

7      Q.    Did she think that she was

8   sexually harassed?

9           MR. RAHMAN: Objection to

10      form.

11           THE WITNESS:  I can't speak

12      to her.  I don't know what she was

13      thinking.

14      Q.    Well, she tells you; right?

15      A.    Yeah, I don't know what she

16   was thinking though.  I did not ask her

17   that specific question.

18      Q.    And she didn't offer it; did

19   she?

20      A.    No.

21      Q.    So who is the first person to

22   call it sexual harassment?  Was that

23   you?

24      A.    Yes.  I mean, I don't know.

25      Q.    You don't tell her that you

Page 112

1   think it was sexual harassment; do you?

2       A.    No.

3       Q.    Was there anything more to

4   the story beyond the little tussle and

5   the coarse language, to your knowledge?

6       A.    Not to my knowledge.

7       Q.    And so this is the extent of

8   the prior instance of sexual

9   harassment?

10      A.    As far as I'm aware.

11      Q.    And you say he admitted to

12  it.

13            What do you mean by that?

14      A.    Where do I say that?

15      Q.    In your lawsuit.

16      A.    Say it again?

17      Q.    In your lawsuit, you say that

18  he admitted to it, Mr. Wells, he

19  admitted to sexually harassing Ms.

20  Wells.

21      A.    Yes, because he had wrote a

22  letter apologizing for it and then had

23  to go apologize.

24      Q.    And the letter admitted to

25  sexual harassment?

Page 113

1          A.    I didn't see the letter
2     myself.  I do not know.
3               MR. SUNSHINE: I'm going to
4          mark a document as Exhibit 17.
5               (Whereupon, a document entitled
6          Plaintiff Andrew Delancey's Responses
7          was marked Defendants' Exhibit 17
8          for identification.)
9          Q.    Do you recognize this
10    document?
11         A.    Yes.
12         Q.    What is it?
13         A.    It is my lawyer's responses
14    to different questions that Justin
15    Wells is asking.
16         Q.    Can you read request number
17    eleven?
18         A.    "Admit you have no evidence
19    to support your allegation in paragraph
20    forty-one of your complaint that
21    Wells sexually harassed a female
22    employee of the Fox Defendants."
23         Q.    And what's your response?
24         A.    Deny.
25         Q.    Meaning that you have

Page 114

1    evidence?

2        A.    I believe, yes.

3        Q.    And number twelve, can you

4    read number twelve?

5        A.    "Admit you have no evidence

6    to support your allegation in paragraph

7    forty-one of your complaint that

8    Wells admitted in writing to having

9    sexually harassed a female employee of

10   Fox Defendants".

11       Q.    And your response was?

12       A.    Deny.

13       Q.    Meaning you have evidence?

14       A.    Yes.

15       Q.    What is the evidence in

16   response to eleven and twelve?

17       A.    I believe it is the Facebook

18   conversation that I had with Kathleen

19   Wells, that I believe that to be.

20       Q.    This is the evidence you're

21   talking about of sexual harassment?

22       A.    Yes.

23       Q.    Her saying that he called her

24   a bitch?

25       A.    Yes.

Page 115

```
1        Q.    And describing apologizing
2    for being coarse with her?
3        A.    Yes.
4        Q.    Do you think you are
5    mischaracterizing what she says in your
6    lawsuit?
7        A.    I do not.
8        Q.    Do you stand by that
9    something sexual harassment?
10       A.    I do.
11       Q.    Okay.
12       A.    I think if she weren't a
13   woman, he wouldn't have used those
14   words, used that language.
15       Q.    Mr. Wells is gay; right?
16       A.    To my knowledge, yes.
17       Q.    And they weren't co-workers
18   at the time; were they?
19       A.    Yes, they were.
20       Q.    They were?
21       A.    Yes.  In the same way that I
22   am co-workers of people when I worked
23   at Fox News, the people at Fox 13 in
24   Tampa were the same, they were also
25   co-workers with me, yeah, we all work
```

Page 116

```
 1    for the same company doing the same --
 2    same mission.
 3         Q.    The lens you're applying to
 4    this, of describing this as sexual
 5    harassment, is that the same lens that
 6    you're applying to the incident with
 7    Mr. Wells?
 8         A.    No, I think the incident with
 9    Mr. Wells was much more severe.  This
10    was physical, not words.
11              MR. SUNSHINE: I'm going to
12         mark a document as Exhibit 18.
13              (Whereupon, copies of text
14         messages were marked Defendants'
15         Exhibit 18 for identification.)
16         Q.    You have it in front of you?
17         A.    Yeah.
18         Q.    Do you recognize this
19    document?
20         A.    Yes.
21         Q.    What is it?
22         A.    It is a conversation between
23    Josh Danzig and I in 2017.  He is also
24    a producer -- was a producer at Fox
25    News Edge.
```

1     Q.    And he was a colleague of

2     yours?

3     A.    Yes.

4     Q.    Can you turn to page two.

5     A.    Yes.

6     Q.    And read your first message.

7     A.    Yes.

8           "Yeah, I mean, I have texts

9     and e-mails to back it all up.  People

10    remember how special he treated me".

11    Q.    And you produced these texts

12    and e-mails in this litigation?

13    A.    What I have, yes.

14    Q.    Did you have different

15    documents back then?

16    A.    I did but I do not have now,

17    because I don't have access to those

18    e-mails anymore.

19    Q.    When did you lose access to

20    those e-mails?

21    A.    When I left Fox News.

22    Q.    When you left Fox News?

23    A.    Or Fox Corporation, WTVT,

24    Fox 13 in Tampa.

25    Q.    Is that what you were

Page 118

1    referring to when you said e-mails?

2         A.    I assume so, yes.

3         Q.    And what about texts?

4         A.    I don't know what I meant

5    about texts.

6         Q.    Were there additional

7    documents to support your allegations

8    that you didn't produce, don't have, or

9    are you referring to the universe of

10   information that we're talking about

11   right now?

12        A.    The information that we're

13   talking about now, and I don't have any

14   of the e-mails when I left Fox.

15        Q.    And so the text and e-mails

16   backing it up are the Facebook messages

17   from 2017?

18        A.    That is what I believe by

19   that, I believe.

20        Q.    How many years later was

21   that?

22        A.    From the time of what to

23   what?

24        Q.    The time of the events in

25   question and the backup.

Page 119

1    A.    Nine years.

2    Q.    Nine years.

3          So you weren't referring to

4    anything contemporaneous?

5    A.    No.

6    Q.    Nine years.

7          I want to turn to the

8    incident and talk a little bit about

9    the damages you're claiming.

10         Were you physically injured?

11   A.    Yes.

12   Q.    In what way?

13   A.    When he grabbed me, he

14   grabbed my genitals, he specifically --

15   he was very rough.  He grabbed my

16   testicles and was squeezing them and it

17   hurt.

18   Q.    Did you seek medical

19   attention?

20   A.    I did not.

21   Q.    After the fact, later on?

22   A.    I did not.

23   Q.    Did -- is there pain that

24   lasted?  Did you recover, in other

25   words?

Page 120

```
 1      A.    I recovered.  I was sore for
 2   a few days.
 3      Q.    But no medical treatment?
 4      A.    No.
 5      Q.    What about psychological
 6   treatment?
 7      A.    I have recently gone to
 8   therapy.  Besides that, no.
 9      Q.    What do you mean by recently?
10      A.    As of May of this year.
11      Q.    May of this year, 2025?
12      A.    Yes.
13      Q.    So you didn't seek
14   psychological treatment --
15      A.    I did not.
16      Q.    -- for the intervening years?
17      A.    No.
18      Q.    Why not?
19      A.    I come from a family that
20   really does not -- very conservative
21   family, not big into therapy, it's
22   never been anything that I've thought
23   would be helpful.  It's taken me a long
24   time to get to the point where I
25   thought that it would benefit me to
```

Page 121

1    actually speak with someone about this.

2    And it has been helpful, frankly.

3        Q.    Is that why you got a

4    therapist, to talk about this?

5        A.    Yeah, this, anxiety over, you

6    know, this case in general, other

7    things I've been feeling.  I thought it

8    would benefit me to go to a therapist.

9        Q.    How many sessions have you

10   had with the therapist?

11       A.    So far I believe three.

12       Q.    Can you identify the

13   therapist?

14       A.    Sure.  Her name is Danielle

15   Hootman.

16       Q.    What caused you to decide

17   that you were going to seek therapy?

18            MR. RAHMAN: Objection to

19       form.

20            You can answer.

21            THE WITNESS:  I just felt

22       that it would be useful for me to

23       have tools to deal with some issues

24       that I had been having

25       psychologically, and she has been

Page 122

1      helpful and has given me some.

2          Q.    Did your lawyers advise you

3   you to see a therapist?

4              MR. RAHMAN: Objection to

5      form.

6              You can't answer that.  It's

7      privileged.

8          Q.    Did you believe it would be

9   helpful to your case to see a

10  therapist?

11         A.    I didn't think it would hurt.

12         Q.    You recognized that it might

13  help?

14         A.    It could possibly.  I was

15  interested to see what she had to say

16  about it.

17         Q.    And you are seeking damages

18  in relation to the therapy, the cost of

19  therapy, et cetera?

20         A.    I believe that's included in

21  that, yes.

22         Q.    You had previously said that

23  you hadn't sought any psychological

24  treatment.

25              Do you recognize the

1  significant span of time and how that

2  might look?

3          MR. RAHMAN: Objection to

4      form.

5          You can answer.

6          THE WITNESS:  I can

7      understand.  I understand what

8      you're saying.  I also couldn't

9      really be thinking about what

10     people were going to think about

11     it.  I had to do it for me.

12     Q.    How much is each session?

13     A.    I want to say $95.

14     Q.    And you've had three

15  sessions?

16     A.    Yes.

17     Q.    So you didn't seek medical

18  treatment.  You had three $95 sessions

19  of psychological treatment.

20          Are there any other

21  categories of damages you're seeking in

22  this case?

23     A.    I think whatever the court

24  finds is reasonable.

25     Q.    Do you recall seeking back

1    pay and front pay?

2        A.    Define that?  Say that again?

3        Q.    Job-related compensation.

4        A.    I do not recall.

5        Q.    So what other economic

6    damages are you seeking?

7        A.    Really whatever the court

8    would find to be appropriate.

9        Q.    Do you believe there were

10   professional economic repercussions?

11       A.    I do.

12       Q.    Remind me how long it took

13   you to find a job after you left Fox.

14       A.    I went within the company --

15   I left the company.  I had been looking

16   for quite a while.  But then I didn't

17   really -- there's not much of a gap.

18   I've worked my entire life since I was

19   fourteen, I've never had a week off.

20       Q.    And how much are you earning

21   now?

22       A.    Currently one hundred forty

23   thousand a year.

24       Q.    So you're making more than

25   double what you were making at Fox?

Page 125

```
1        A.    Yes.
2        Q.    And you have been rising in
3    your field?
4        A.    Yes.
5        Q.    Would you say that's fair?
6        A.    I would say that's fair.
7        Q.    Your current position is news
8    director?
9        A.    It is.
10       Q.    How many people sit above you
11   in your organization?
12       A.    I do not know the answer to
13   that.
14       Q.    How about in the newsroom?
15       A.    Newsroom, no one.
16       Q.    You're the head of the
17   newsroom?
18       A.    Yes.
19       Q.    So that's pretty senior?
20       A.    What's that?
21       Q.    That's pretty senior?
22       A.    Yes, there's the general
23   manager and then me.
24             I will say it took me leaving
25   Fox to get -- seeing those things
```

Page 126

1    happen, yes.

2              MR. SUNSHINE: I'm going to,

3         per stipulation of counsel, hold

4         this open to potentially further

5         discuss your psychological damages

6         once we're table to obtain the

7         therapy records.  But for the

8         moment, I have no further

9         questions, so I'm going to pass it

10        along to my colleagues on behalf of

11        Fox.

12              MS. KATZENSTEIN: Let's go off

13        the record for a moment, please.

14              THE VIDEOGRAPHER: We are

15        going off the record.

16              The time is 12:32 p.m.

17              This ends media unit two.

18              (Lunch recess taken at

19        p.m.)

20

21

22

23

24

25

```
 1        A F T E R N O O N   S E S S I O N

 2                    June 23, 2025

 3                     1:25 p.m.

 4              THE VIDEOGRAPHER: We are

 5        going back on the record.

 6              The time is 1:25 p.m., and

 7        this is the beginning of media unit

 8        three.

 9   A N D R E W   D E L A N C E Y, having

10        been previously duly sworn by a

11        Notary Public of the State of

12        New York, upon being examined,

13        testified as follows:

14   EXAMINATION BY

15   MS. KATZENSTEIN:

16        Q.    Good afternoon, Mr. Delancey.

17   We are back on the record.

18              You understand that you are

19   still under oath?

20        A.    Yes.

21        Q.    All right.  Excellent.

22              So I am counsel for Fox News,

23   separate from Mr. Sunshine who is

24   counsel for Mr. Wells.

25              I am going to be going --
```

Page 128

1    I'll try not to ask you the same

2    questions again, but we'll be going

3    over some of the same topics a second

4    time and referring to some of the

5    documents that have already been marked

6    as exhibits in this matter.

7            I just want to go back though

8    to your deposition preparation.

9            And I believe you said you

10   met with your counsel; is that correct?

11       A.    Yes.

12       Q.    I don't want you to tell me

13   anything about your conversations with

14   counsel, but how many meetings did you

15   have with your counsel?

16       A.    One, I believe.

17       Q.    When was that?

18       A.    Friday, this past Friday.

19       Q.    And do you recall how long

20   that meeting was?

21       A.    About two or three hours.

22       Q.    And how talked to anybody

23   else about your deposition today?

24       A.    Today, I've told my fiancé

25   about it.  And then my boss knows that

Page 129

1    I'm here.  And my parents as well.

2        Q.    And when I said today, I

3    meant the deposition today.

4            But have you had

5    conversations at any point with others

6    about your deposition?

7        A.    Yes, in terms of like my boss

8    and people that needed to know, yeah.

9        Q.    In addition to your boss,

10   your fiancé, and your family, is there

11   anybody else you spoke to?

12       A.    Not really, no.

13       Q.    And did you have any

14   conversations with your boss about the

15   substance of your testimony?

16       A.    Yes.

17       Q.    And what did you tell your

18   boss?

19       A.    I just explained the basics

20   of the case, what it was, that it's

21   from the time that I worked at Fox, and

22   that I would be needing to -- it was

23   mostly to tell him that I needed a

24   couple days off for this.

25       Q.    Anything else in terms of

Page 130

1    what you would testify to?

2        A.    No.

3        Q.    And what did you discuss with

4    your fiancé about your deposition?

5        A.    Just what the case was,

6    nerves that I was having about going to

7    this and doing it, and yeah.

8        Q.    Did you discuss anything

9    about the substance of your testimony?

10        A.    Yeah, we talked about what it

11    is.  We didn't say what I'm going to

12    testify about today, but he knows what

13    the case is about, he knows about the

14    allegations that I'm making and all

15    those things.

16        Q.    And with respect to your

17    family, I believe you said it was your

18    parents; is that correct?

19        A.    Yes.

20        Q.    What did you discuss with

21    your parents?

22        A.    The same type of thing, just

23    what the accusations are and the fact

24    that I would be having to do a

25    deposition and all that.

1      Q.    And am I correct there was

2    nobody else you spoke to about your

3    deposition today?

4      A.    Not today, no.

5            MS. KATZENSTEIN: I'm going to

6        ask the court reporter to mark this

7        as Exhibit 19, please.

8            (Whereupon, a resumé of Andy

9        Delancey was marked Defendants'

10       Exhibit 19 for identification.)

11     Q.    The court reporter has handed

12   you what is marked as Exhibit 19.

13           Do you recognize this

14   document?

15     A.    Yes.

16     Q.    What is this?

17     A.    That is my resumé.

18     Q.    And does this accurately

19   reflect your employment history at

20   least through July, 2022?

21     A.    Yes.

22     Q.    And I understood from your

23   earlier testimony that you left WCPO in

24   Cincinnati and went to Minneapolis; is

25   that correct?

Page 132

1      A.    That's correct.

2      Q.    And what were your dates of

3  employment at Minneapolis?

4      A.    It was December of 2023 to

5  March of this year.

6      Q.    And since March, you've been

7  in Philadelphia; is that correct?

8      A.    Yes.

9      Q.    Do you have a more recent

10 resumé than what we're looking at here

11 as Exhibit 19?

12     A.    I don't actually think I do.

13 I might have one that includes WCCO,

14 but I don't think so.

15     Q.    I believe I understood from

16 your testimony earlier today that

17 you've had continuous employment since

18 the age of fourteen; is that correct?

19     A.    That's correct.

20     Q.    So you've always had a next

21 job when you've left a job; is that

22 fair?

23     A.    Yes.

24     Q.    And you've never taken a

25 vacation since the age of fourteen?

Page 133

1      A.     The longest I've ever gone, I
2    went to Vietnam for two weeks, and
3    that's the longest I've ever not
4    worked.
5      Q.     So I want to turn to your
6    employment with Fox News and
7    particularly Fox News Edge that began
8    in September, 2008; correct?
9      A.     Yes.
10     Q.     And you were hired as a
11   regional producer?
12     A.     Yes.
13     Q.     And do you recall who
14   interviewed you for that role?
15     A.     Mykel McCarthy.
16     Q.     Do you recall whether anybody
17   else interview you for that role?
18     A.     I believe Matt Cantor as
19   well, but Mykel McCarthy was the
20   primary.
21     Q.     Did you understand him to be
22   the hiring manager?
23     A.     Yes.
24     Q.     And is it fair to say that
25   Fox Edge is -- affiliate services is

Page 134

1   the purpose of Fox News Edge?

2        A.    Yeah, I think that's the main

3   purpose, yes.

4        Q.    And that is to service

5   affiliates in terms of having content

6   accessible to the affiliates around the

7   world?

8        A.    Yes.

9        Q.    And when I say content, that

10  is packages that are created and placed

11  on a platform essentially for access by

12  affiliates around the world?

13       A.    Yes, both Fox News created

14  and also from the local affiliates

15  providing us that to send out to

16  everybody else.

17       Q.    And we had talked earlier

18  about an assignment desk, also.

19             What was the purpose of the

20  assignment desk?

21       A.    The assignment desk is to

22  work more with Fox News Channel in

23  terms of getting feeds of other things

24  going on.  We kind of work tandem with

25  each other where the assignment desk

Page 135

1    would sometimes alert us to things,

2    we'd alert the assignment desk of

3    things, we would work together to

4    gather content.

5        Q.    Is it fair to say that if a

6    news channel show needed content,

7    typically that would be routed through

8    the assignment desk?

9        A.    It would either be one or the

10   other.  I don't know -- no, I think it

11   could be either Fox News Edge or the

12   assignment desk.

13       Q.    But Fox News Edge is

14   primarily affiliate services; correct?

15       A.    Primarily.

16       Q.    And news channel is not

17   considered an affiliate; correct?

18       A.    No, but we all -- not an

19   affiliate, but we definitely all shared

20   the same content and gathered it for

21   each other.

22       Q.    And when you say shared the

23   same content, the content would be

24   accessible to both affiliates and the

25   news channel?

Page 136

1      A.    Yes, we disseminated it a
2    different way.  It would be placed on a
3    platform if Fox News Channel wanted it.
4    We would already have the system, I
5    think it was called Argo, where we
6    would then place it and it was
7    accessible to -- for the news channel
8    to have.
9      Q.    And primarily though the news
10   channel should be going to the
11   assignment desk; correct?
12     A.    I don't know that there was a
13   -- no, not necessarily.  It depends on
14   what we needed.  As a west coast
15   producer, I was sometimes the only
16   person that was working for the west
17   coast that night, so they would come to
18   me if they needed something.
19     Q.    Did anybody ever tell you
20   that the news channel should be going
21   through the assignment desk?
22     A.    No.
23     Q.    And do you recall at the time
24   you started as a regional producer what
25   your work hours or work schedule was?

Page 137

1       A.    I believe it was 4:00 p.m. to

2   1:00 a.m.

3       Q.    What days per week?

4       A.    I don't remember exactly.  I

5   think I had Mondays and Tuesdays off,

6   so I think Wednesday through Sunday, to

7   the best of my knowledge.

8       Q.    And I believe you testified

9   earlier that you worked here in New

10  York; correct?

11      A.    Yes.

12      Q.    And was that at the building

13  located at 1211 Avenue of the Americas?

14      A.    Yes.

15      Q.    Do you recall what floor the

16  Fox Edge team was located on?

17      A.    We were in the basement.

18      Q.    And is that the same work

19  location you held throughout your

20  entire time at Fox News Edge?

21      A.    Yes.

22      Q.    As a regional producer, did

23  you manage any other employees?

24      A.    I wouldn't say managed.

25  There was a -- there were writers that

Page 138

1    we could assign out things and have

2    them write but they had like production

3    assistants that we would ask to do

4    things, but I wouldn't say I managed

5    them.

6         Q.    So you might ask them for

7    something but you weren't managing

8    them; is that correct?

9         A.    Correct.

10        Q.    And you didn't do their

11   performance reviews, for example;

12   correct?

13        A.    No.

14        Q.    Did you have the ability to

15   fire those individuals?

16        A.    No.

17        Q.    Did you have the ability to

18   impact their career advancement at Fox

19   News?

20        A.    I suppose I could have.  If I

21   thought they were doing a terrible job,

22   I could have reported them, yeah.

23        Q.    So influence in the sense

24   that if you had a performance issue,

25   you could have alerted somebody else to

Page 139

1    that issue?

2        A.    Sure.

3        Q.    Who did those individuals

4    report to, if you recall?

5        A.    I believe the production

6    assistants were Matt Cantor and I

7    believe the writers were Mykel

8    McCarthy.

9        Q.    I believe we spoke earlier

10   that, in July, 2009, you were promoted

11   to a national producer role; is that

12   correct?

13       A.    Yes.

14       Q.    And that was -- do you know

15   who made that decision to promote you?

16       A.    I believe Mykel McCarthy.

17       Q.    Do you know whether anybody

18   else had input into the decision to

19   promote you?

20       A.    I'm not sure.  I'm not sure.

21       Q.    Fair enough.

22            Did your work hours change at

23   the time that you were promoted to

24   national producer?

25       A.    Yes, I believe so.

Page 140

1    Q.    Do you recall what your

2    schedule changed to at that point?

3    A.    At that point it changed to

4    kind of all over the place.  I was

5    sometimes day side where I would be

6    8:00 or 9:00 to 5:00 and other days it

7    would be like a 2:00 to 10:00 shift,

8    2:00 p.m. to 10:00 p.m.

9    Q.    And as a national producer,

10   did you manage any employees?

11   A.    No.

12   Q.    Is it fair to say that that

13   was an individual contributor position?

14   A.    What do you mean by that?

15   Q.    That it's a nonmanagement

16   position.

17   A.    Yes.

18   Q.    Was that true for all

19   national producers at Fox News Edge?

20   A.    Yes.

21   Q.    And I believe you testified

22   earlier that you would receive dozens

23   of assignments every day; is that

24   accurate?

25   A.    Yeah, absolutely.

Page 141

```
 1       Q.    And do you recall who
 2   assigned those to you?
 3       A.    I assigned them -- a lot of
 4   times it would depend if it was
 5   somebody from the national network or
 6   the assignment desk asking for
 7   something, I would do it on their
 8   behalf.  A lot of times I was seeking
 9   them out myself where I was making
10   calls to the stations and getting
11   whatever the stations either they
12   requested through me or I thought it
13   was something that the rest either the
14   company, Fox News, or the affiliates
15   would want.  I also could decide how
16   many assignments I had that day.
17       Q.    So you had the ability to
18   affirmatively solicit assignments?
19       A.    What do you mean by that?
20   Sorry.
21       Q.    That's okay, let me clarify.
22             You would initiate the
23   assignment by reaching out,
24   effectively?
25       A.    Yes.
```

Page 142

1      Q.    And for the period when you
2  were a regional producer, give me a
3  rough sense of how many of your
4  assignments related to affiliate work
5  versus work for a Fox Radio, Fox News
6  Channel entity.
7      A.    I would say probably, if I
8  had to estimate, I would say about
9  eighty percent was for the affiliates
10 and about twenty percent was for Fox
11 News Channel.
12     Q.    And of the twenty percent,
13 how many of those were coming through
14 the assignment desk?
15     A.    I would say about 50/50.
16     Q.    So if I'm doing the math
17 right, about two assignments a day
18 would come directly from a Fox entity
19 that was not an affiliate?
20     A.    That sounds about right.
21     Q.    Who oversaw your work?
22     A.    There was -- primarily the
23 day-to-day, his name was Peter Vanad, V
24 A N A D.
25     Q.    And what was Peter's title,

Page 143

1    if you recall?

2        A.    I think he was -- I don't a

3    hundred percent recall.  I think he was

4    supervising producer.

5        Q.    And he would review the

6    assignments you completed each day?

7        A.    He wouldn't really, but he

8    would be in charge of -- yeah, if there

9    was any question about anything, he

10   would be the person to make sure that I

11   had done it right.

12       Q.    I'm going to have you take a

13   look at the document that we previously

14   marked as Exhibit 3, please.

15           And what was your performance

16   review for the year that ended July 1,

17   2009; correct?

18       A.    Yes.

19       Q.    And if you could just flip to

20   the second page, please.

21           At the bottom do you see

22   where it says manager's name?

23       A.    Yes.

24       Q.    And it says Mykel McCarthy?

25       A.    Yes.

1      Q.    Is it your understanding that

2    Mr. McCarthy completed your performance

3    review for the year ending July, 2009?

4      A.    Yes.

5      Q.    Do you believe the content in

6    your review reflects Mr. McCarthy's

7    feedback?

8      A.    Yes.  To my knowledge, yes.

9      Q.    Do you know whether anybody

10   else had input into your performance

11   review?

12     A.    I do not know.

13     Q.    If we could now look at the

14   document previously marked as

15   Exhibit 4.

16          And this is the performance

17   -- your performance review for the year

18   that ended in July, 2010; is that

19   correct?

20     A.    Yes.

21     Q.    And if you turn to the second

22   page, we again see Mr. McCarthy as the

23   individual signing; is that correct?

24     A.    Yes.

25     Q.    Do you believe this reflects

Page 145

```
 1   Mr. McCarthy's feedback for your
 2   performance year ending 2010?
 3        A.    Yes.
 4        Q.    And do you know whether
 5   anybody else had input into your
 6   performance review for this year?
 7        A.    I do not.
 8        Q.    And I believe you testified
 9   earlier that you resigned your
10   employment in September of 2010.
11             And why -- remind me why that
12   was.
13        A.    I felt like my career had --
14   at Fox had stagnated.  I felt like
15   there was a limit to what I was going
16   to -- that I was never going to go to
17   the Fox News Channel, which is frankly
18   what everyone who works at Fox Edge
19   wants to do, and it appeared to me that
20   I reached my limit.  Yes, I had done
21   well at Fox News Edge, but it appeared
22   that me that there was no mobility to
23   get to Fox News Channel at the time and
24   I wanted to get back to where I was
25   more comfortable in Florida.
```

Page 146

1      Q.    Did you ever talk to anybody

2  about other opportunities at Fox News

3  Channel?

4      A.    I talked to Justin

5  Wells about an opportunity at Fox

6  Radio.  And then I also talked to

7  people within the pod of downstairs in

8  the basement where I worked, there were

9  other people who did work for Fox News,

10  the channel, and I was talking to them

11  about potential availabilities.

12      Q.    And you say within the pod.

13          That's the physical work

14  location you're referring --

15      A.    Yeah, yes.

16      Q.    I'm just going to remind you.

17  Let me finish my question.  I'll try to

18  let you finish.  It's harder for the

19  court reporter if we over each other.

20          So do you recall who

21  specifically you spoke with within the

22  pod about other opportunities within

23  Fox News channels?

24      A.    I don't.

25      Q.    Did anybody tell you that

Page 147

```
 1   there would be no further opportunities
 2   for you at Fox News Channel?
 3        A.    No.
 4        Q.    Did you ever apply for other
 5   opportunities at Fox News Channel?
 6        A.    I do not recall.
 7        Q.    Did you do anything at all to
 8   investigate whether there were other
 9   opportunities at Fox News Channel?
10        A.    Yes, I asked several times
11   other people who I worked with what was
12   out there and asking also, you know,
13   what they got paid compared to what Fox
14   News Edge was getting paid because I
15   thought it was very low for living in
16   New York City and I was trying to find
17   ways to make more money and improve my
18   career.
19        Q.    So was the biggest issue for
20   you that you didn't make sufficient
21   money to live in New York?
22        A.    That wasn't the only issue I
23   had.  I also had the issue of I just
24   didn't feel like I could -- I didn't
25   can feel like I was supported in terms
```

Page 148

1    of being able to go to HR if there were

2    any issues, which there weren't, and I

3    just felt that it was a toxic

4    environment that I just wanted to go

5    back to someplace where I knew that it

6    wasn't.

7        Q.    All right.

8             So you said a lot of things

9    there.

10            You said you could not go to

11   HR.

12            Why did you believe you could

13   not go to HR?

14       A.    Mykel McCarthy specifically

15   told me not to go to HR on several

16   occasions.

17       Q.    How many times did he tell

18   you that?

19       A.    I don't remember the exact

20   number.

21       Q.    Give me a ballpark.

22       A.    If I were to estimate, I

23   would say a dozen.

24       Q.    Where did he tell you this?

25       A.    Primarily at Rosie's Bar.

Page 149

1      Q.    What was the context in which
2    he made that statement?
3      A.    That he had gone through some
4    issues in the past that he had gotten
5    in trouble for and told me that it was
6    not worth going to HR because they were
7    not to be trusted.
8      Q.    What did you interpret he
9    meant when he said they were not to be
10   trusted?
11     A.    I interpreted that to mean
12   that if I went to HR, I would be
13   labeled a problem for the fact that I
14   came with a complaint.
15     Q.    If I understood your
16   testimony though, you were saying that
17   Mr. McCarthy was the subject of alleged
18   complaints?
19     A.    That is my understanding.
20     Q.    And so why would you think
21   you couldn't complain if he was
22   actually telling you that other people
23   had, in fact, complained?
24     A.    I don't think I understood
25   your question, sorry.

```
 1            You're saying -- say that
 2   again, I'm sorry?
 3       Q.    So Mr. McCarthy told you, if
 4   I understand your testimony, that
 5   people complained about him; is that
 6   correct?
 7       A.    Yes.
 8       Q.    So you understood people went
 9   to HR; correct?
10       A.    Yes.
11       Q.    And you understood people
12   could make a complaint to HR; correct?
13       A.    Yes.
14       Q.    So why did him sharing that
15   people had made complaints about him
16   lead you to believe that you couldn't
17   go to HR?
18       A.    Because he told me that he
19   had been treated unfairly, that their
20   accusations were not right, and that it
21   got turned around on him.  It just
22   seemed to me he told me many times not
23   to go to HR because there was no point
24   in doing so.
25       Q.    You understood though that
```

Page 151

1    people had, in fact, gone to HR?

2         A.    Yes.

3         Q.    And you understood you could

4    go to HR if you had any issue?

5         A.    Yes, but I did not feel

6    comfortable doing so.

7         Q.    And why was that?

8         A.    Because of what he had told

9    me about it not being -- that it would

10   get turned around on me, that I would

11   become the problem.

12        Q.    Did you see anybody who

13   complained to HR during your time at

14   Fox News who had it turned around,

15   using your words, on them?

16        A.    I do not recall.

17        Q.    You also said that the

18   environment was "toxic".

19             What do you mean by that?

20        A.    Yeah, there was favoritism in

21   the office.  Mykel specifically would

22   ask us to go to -- invite us to go to

23   Rosie's quite a lot and would buy us

24   drinks, primarily the gay guys in the

25   newsroom at Fox News Edge, and then

Page 152

```
 1   would have talked to us at Rosie's
 2   about his favorites, just conversations
 3   now that I look back and just think are
 4   wildly inappropriate between a boss and
 5   their direct report.
 6        Q.    All right.
 7             So when you said "would take
 8   us to Rosie's", who is "us"?
 9        A.    There would be me, like I
10   said, the other gay guys, producers who
11   worked at Fox News Edge, Reid McDowell
12   would be one is his name, Barrett Tryon
13   is another one.
14        Q.    Did female colleagues ever
15   go?
16        A.    Occasionally.
17        Q.    Did nongay male colleagues
18   ever go?
19        A.    I don't remember seeing them.
20        Q.    Did you view yourself as one
21   of Mr. McCarthy's favorites?
22        A.    I thought he liked me, yes.
23        Q.    And you said that Mr.
24   McCarthy would buy drinks for the team
25   while at Rosie's?
```

Page 153

1      A.    Yes.

2      Q.    How many drinks would Mr.

3  McCarthy typically buy for the team?

4      A.    I don't remember there being

5  a set limit.  I remember the bills were

6  usually large.

7      Q.    So it's your testimony that

8  Mr. McCarthy paid the entire bill every

9  time you went to Rosie's?

10     A.    Not every time but the

11  majority of the time.

12     Q.    And did you ever pay a bill

13  at Rosie's?

14     A.    Yes, I've bought drinks there

15  before, yes.

16     Q.    Did you buy drinks for your

17  co-workers there?

18     A.    No, I don't recall.

19     Q.    You don't know or you don't

20  recall?

21     A.    No, I did not.  No, I didn't

22  have enough money to do that.

23     Q.    Did you think it was nice

24  that Mr. McCarthy would cover the bill

25  for the team since some of the

Page 154

1    producers were not making a whole lot

2    of money?

3        A.    At the time, that's how I saw

4    it.  But now I realize it was not

5    appropriate.

6        Q.    So you think it's not

7    appropriate for colleagues to get

8    drinks after work?

9        A.    I did not say that.  I think

10   it's inappropriate for a boss, when

11   there's a power differential, for them

12   to buy drinks for their direct reports.

13   I'm currently a boss, a news director,

14   and I would never do that.

15       Q.    So you've never bought a

16   drink for anybody who reports up to

17   you?

18       A.    Not to my knowledge, no.

19       Q.    And you think that in every

20   scenario it would be inappropriate for

21   you to buy a drink for somebody who

22   reports into you?

23       A.    Not every single scenario,

24   but in this scenario, yes.

25       Q.    What was inappropriate about

Page 155

1   this scenario?

2       A.    Because he was picking and

3   choosing who he was inviting out for

4   drinks and picking -- and then once we

5   had had drinks, talking about other

6   employees, other people that we worked

7   with, and just having conversations

8   that, in retrospect, were just -- I

9   wouldn't want to know that they were

10  having those same conversations that

11  they were having about me.

12      Q.    Who did he talk about?

13      A.    Producers, other people

14  within Fox News Edge.  I do not know

15  specific names, but other producers

16  primarily.

17      Q.    What was the nature of the

18  discussion?

19      A.    How he thought their work

20  performance was going, other just

21  gossip with interpersonal staff

22  happening with people.  Yeah.

23      Q.    So is it fair to say that the

24  conversations largely related to the

25  performance of other Fox News employees

1  and office gossip?

2      A.    That's a lot of it, yeah.

3      Q.    Anything else?

4      A.    Not that I can recall.

5      Q.    Did you ever observe anything

6  inappropriate from a sexual perspective

7  during these bar outings?

8      A.    He would talk about

9  co-workers that he thought were

10  attractive, he would talk about other

11  people that, yeah, that he thought of

12  physically.

13      Q.    Who did he comment on

14  physically?

15      A.    I do not know specific

16  people.

17      Q.    But you know that it

18  happened?

19      A.    Yes.

20      Q.    And other than Mr. McCarthy

21  commenting that he thought somebody was

22  attractive, did you observe any other

23  sexually inappropriate behavior during

24  these outings?

25      A.    Not that I can remember.

Page 157

1      Q.    All right.

2            So going back, you testified

3      you left Fox News because you felt your

4      career was stifled; correct?

5      A.    Correct.

6      Q.    You never actually applied

7      for any other opportunity at Fox News

8      though; correct?

9      A.    Not that I recall.

10     Q.    And other than individuals

11     who worked in the pod, you never talked

12     to anybody else about another

13     opportunity at Fox News; correct?

14     A.    I believe I talked to

15     somebody at Fox Radio.

16           Beyond that, I do not recall.

17     Q.    And nobody ever told you that

18     your career at Fox News was stifled;

19     correct?

20     A.    Not explicitly.

21     Q.    And did somebody implicitly

22     tell you that?

23     A.    It very much felt like that,

24     yes.

25     Q.    Why?

Page 158

1          A.    After the assault with Justin

2     Wells, he had made a comment to me that

3     I was screwing myself over, that I was

4     not thinking straight.  After what had

5     happened with clearly to me had been

6     chilled at WNBC, it seemed to me within

7     Fox News as well that there was a chill

8     over me.  That's how I felt.

9          Q.    Okay.

10              But other than Justin Wells,

11    did anybody else lead you to believe

12    that there was a chill over you?

13         A.    Not to my knowledge.  Not

14    specifically.

15              (Whereupon, a multipage document

16         was marked Defendants' Exhibit 20

17         for identification.)

18         Q.    The court reporter has handed

19    you what has been marked Exhibit 20.

20              Could you please take a look

21    and let me know if you recognize this

22    document.

23         A.    (Reviewing).

24              I see what it is, but I don't

25    remember ever remember seeing it.

1      Q.    So you do not recall --

2            MS. KATZENSTEIN: Strike that.

3      Q.    What is this?

4      A.    This is a handbook for Fox

5   News.

6      Q.    And if I understand you

7   correctly, you do not recall ever

8   seeing the employee handbook when you

9   worked at Fox News?

10     A.    I do not remember seeing

11  this, no.

12     Q.    Do you recall ever

13  acknowledging receipt of the handbook

14  when you were at Fox News?

15     A.    No.

16     Q.    If you take a look, please,

17  at the document -- at the Bates

18  label 00014, that's the number on the

19  bottom right-hand corner.

20           Do you see a section that is

21  labeled unlawful harassment; is that

22  correct?

23     A.    Yes.

24     Q.    Were you aware, during your

25  employment with Fox News, that it

Page 160

1   prohibited harassment in the workplace?

2       A.    I assumed that it did, that

3   there was -- that they're going to say

4   that, that harassment was not allowed,

5   yes.

6       Q.    So you understood that Fox

7   News had a policy prohibiting

8   harassment?

9       A.    I assumed that they did, yes.

10      Q.    And you understood that to

11  include sexual harassment; is that

12  correct?

13      A.    Yes.

14      Q.    And if we look at page

15  fifteen, it says discrimination and

16  harassment complaints.

17            Do you see where I'm looking?

18      A.    Yes.

19      Q.    And if we look, the last

20  sentence, could you please read that

21  last sentence beginning with "an

22  employee who believes"?

23      A.    "An employee who believes

24  that he or she has experienced illegal

25  discrimination to retaliation should

Page 161

1    report that immediately to the human

2    resources department or, if that is

3    problematic, to the company's senior

4    deputy general counsel or other

5    appropriate company representative".

6        Q.    And did you understand that

7    you could report complaints of

8    harassment to the company?

9        A.    I understood that I could.

10       Q.    And I believe you testified

11   earlier that you never reported Mr.

12   Wells' conduct to HR; correct?

13       A.    I did not, no.

14       Q.    And you never reported it to

15   the senior deputy general counsel;

16   correct?

17       A.    No, I was not aware that that

18   was a possibility.

19       Q.    You never reported it to your

20   manager; correct?

21       A.    I did not.

22       Q.    And you never reported it to

23   any other manager at Fox News; correct?

24       A.    I did not, no.

25       Q.    Why did you not report it to

Page 162

1    McCarthy?

2        A.    I believe because of the

3    culture there, I did not think that it

4    would -- again, because he told me not

5    to go to HR and not to go to anyone

6    about it, about things, that the

7    company wouldn't take it seriously,

8    that I didn't think any point to doing

9    so.

10       Q.    But to be clear, you never

11   told Mr. McCarthy about the incident;

12   correct?

13       A.    I did not.

14       Q.    And so he never told you with

15   respect to the incident involving Mr.

16   Wells not to go to HR; did he?

17       A.    No.  But the issues that I

18   understood Mykel McCarthy to have were

19   similar to that.  So I did believe that

20   there would be -- if it was treated the

21   same way, there would be no point to do

22   anything.

23       Q.    What do you believe the

24   issues Mr. McCarthy had were?

25       A.    I believe, from office

Page 163

```
 1   gossip, there was -- that he had
 2   inappropriate conversations with
 3   employees and he had inappropriate
 4   interactions, that he had been -- he
 5   had founded Fox News and that he was
 6   one of the people who started up the
 7   news channel and that he got demoted to
 8   Fox News Edge because of his conduct.
 9        Q.    Do you have any personal
10   knowledge of any complaint against Mr.
11   McCarthy?
12        A.    I do not.
13        Q.    Do you have any personal
14   knowledge of the alleged interactions
15   that you just referenced Mr. McCarthy
16   having with others?
17        A.    No, it was one of those open
18   secrets in the newsroom.
19        Q.    But you have no personal
20   knowledge; correct?
21        A.    I do not.
22        Q.    Do you have any personal
23   knowledge that Mr. McCarthy was
24   demoted?
25        A.    I know his work history and
```

Page 164

```
 1   that would seem like a demotion to me.
 2        Q.    Do you know if it was a
 3   demotion from the company's
 4   perspective?
 5        A.    I do not know.
 6        Q.    If I told you it was not a
 7   demotion from Fox News' perspective,
 8   would you have any reason to dispute
 9   that?
10        A.    Yes, because no one really
11   wants to work for Fox News Edge and to
12   work for the company Fox News, yeah, I
13   think it was probably made as a -- to
14   make it feel like a promotion or
15   lateral move to him, but I think widely
16   maybe the company believes that but I
17   don't think anyone else believes that.
18        Q.    Do you have any basis for
19   that statement or is that just pure
20   speculation?
21        A.    That is how -- no one wanted
22   to work at Fox News Edge and everyone
23   was trying to get to the channel.
24        Q.    That's your opinion; correct?
25        A.    That is my opinion.
```

Page 165

1     Q.    And you have no knowledge at
2  all, do you, that Mr. McCarthy was
3  allegedly demoted?
4     A.    Just what I had heard.
5     Q.    You have no idea how that was
6  coded in Fox News' system; do you?
7     A.    I do not.
8     Q.    And it may well have been a
9  lateral move; correct?
10    A.    I do not know.
11    Q.    You do not know?
12    A.    I do not believe so.
13    Q.    But you do not know; correct?
14    A.    I do not know.
15    Q.    Do you have any personal
16 knowledge at all that Mr. McCarthy was
17 ever disciplined while at Fox News?
18    A.    I do not know.
19    Q.    Do you have any personal
20 knowledge that he was ever demoted
21 while at Fox News?
22    A.    I do not.
23    Q.    Do you have any personal
24 knowledge of the reason that Mr.
25 McCarthy's with Fox News ended?

Page 166

1     A.    I do not.

2     Q.    So everything that you've

3   alleged as to Mr. McCarthy is just

4   things you heard about, office gossip?

5     A.    Widespread office, yes.

6     Q.    Yes, it's just office gossip?

7     A.    I wouldn't necessarily

8   describe it as that.

9     Q.    How would you describe it?

10     A.    As an open secret within News

11   Edge.

12     Q.    About which you have no

13   personal knowledge; correct?

14     A.    Correct.

15     Q.    So it's just gossip and

16   hearsay; correct?

17     A.    I think when there is enough

18   -- when that comes from just about

19   everyone within the newsroom, you can

20   call it something else.

21     Q.    About which you have no

22   personal knowledge; correct?

23     A.    Correct.

24     Q.    So let's take a look at

25   Exhibit 8, please.

Page 167

1            And these are the Facebook

2    communications between you and Mr.

3    Wells; correct?

4        A.    Yes.

5        Q.    And the first one is dated

6    August 3, 2007; correct?

7        A.    Yes.

8        Q.    At that point Mr. Wells did

9    not work for Fox News; correct?

10        A.    No, he did work for Fox News

11    at that point, yes.

12        Q.    Are you sure about that?

13        A.    Yeah, in 2007, yes.

14        Q.    If I told you Mr. Wells was

15    not hired by Fox News until July, 2008,

16    would you have reason to dispute that?

17        A.    Yes, because he was talking

18    to me like he was -- yes, I believe

19    that he was working for Fox News at the

20    time.

21        Q.    What is the basis for that

22    belief?

23        A.    Because he reached out to me

24    via a Fox News group and also, as far

25    as I believe, he listed on his profile

Page 168

1    that he was working for Fox News.

2        Q.    You understood that Mr.

3    Wells previously worked for Fox in

4    Tampa; correct?

5        A.    Yes.

6        Q.    You understood that he

7    previously worked for the Fox affiliate

8    in New York; correct?

9        A.    Yes.

10        Q.    And do you have any idea when

11    his employment with the Fox affiliate

12    in New York ended?

13        A.    I do not.

14        Q.    And do you have any --

15    sitting here today, any evidence that

16    Mr. Wells worked for Fox News as of

17    August, 2007?

18        A.    I would like to say that even

19    if he did work for WNYW, that is a Fox

20    owned and operated affiliate.  So if I

21    was talking to him believing that he

22    was with Fox 5, to me that's the same

23    as working for Fox News.

24        Q.    So you believed you worked

25    for Fox News when you were at Fox in

Page 169

1   Tampa?

2       A.    Yes.

3       Q.    You believed you worked for

4   the news channel at that point?

5       A.    Yeah, we're owned by the same

6   company.  I don't think I work for the

7   channel but I work for the same

8   company.

9       Q.    Okay.

10          So if Mr. Wells worked for

11  the Fox affiliate in New York, he may

12  have worked at a company that had the

13  same owner but he did not work at Fox

14  News Channel; correct?

15      A.    Not Fox News Channel but for

16  Fox News.

17      Q.    So any reason to dispute that

18  Mr. Wells was hired by Fox News in

19  July, 2008?

20      A.    I don't know the exact

21  timeline.

22      Q.    Do you know what his title

23  was when he was hired?

24      A.    At Fox News?

25      Q.    Yes.

1          A.     I believe field producer.

2          Q.     Do you know what his job

3     functions were?

4          A.     Working for Greta Van

5     Susteren, her show.  I don't know the

6     exact specifications for his job, no.

7          Q.     Do you know to whom he

8     reported?

9          A.     I do not.

10         Q.     Do you know what his work

11    hours were?

12         A.     The show is on at 10:00, so

13    we had generally the same hours in

14    terms of late afternoon to evening.

15         Q.     Do you know what days of the

16    week he worked?

17         A.     Monday through Friday.

18         Q.     So you would have been

19    physically in the same building only

20    Wednesday, Thursday, Friday; is that

21    correct?

22         A.     During that time, yes.

23         Q.     And he did not work on the

24    same floor as you; correct?

25         A.     No.

Page 171

1      Q.    Do you know whether his role
2    was considered a management position?
3      A.    I do not believe the field
4    producer was.  When he was then
5    promoted to the executive producer,
6    then yes, he was.
7      Q.    Do you know when he was
8    promoted to executive producer?
9      A.    I do not have the exact date.
10     Q.    It was long after you left
11   Fox New; correct?
12     A.    I do not know that.  I do not
13   know the answer to that.
14     Q.    If I told you that it was
15   several years after you left Fox News,
16   would you have any reason to dispute
17   that?
18     A.    I do not know the dates.
19     Q.    If I told you that he was a
20   field producer for the entire tenure
21   that you were at Fox News, would you
22   have any reason to dispute that?
23     A.    No, but I don't think that
24   really has anything to do with
25   anything.  But yeah.

Page 172

```
 1      Q.    Okay.
 2            So you're agreeing that
 3   there's no basis -- no knowledge you
 4   have to suggest he was anything other
 5   than a field producer from 2008 to
 6   2010; correct?
 7      A.    Yes, for one of the most
 8   powerful shows on Fox News, yes.
 9      Q.    And that was an individual
10   contributor role I understood you to
11   testify?
12      A.    Yes.
13      Q.    And do you know whether there
14   were other producers on the Greta Van
15   Susteren show?
16      A.    Yes, there were.
17      Q.    And those were more senior to
18   Justin?
19      A.    I do not know.
20      Q.    So you have no idea the
21   hierarchy of producers on the Greta Van
22   Susteren show in 2008?
23      A.    I do not know the exactly
24   hierarchy of that, no.
25      Q.    I believe you testified
```

Page 173

1   earlier that Mr. Wells would reach out
2   to you two times per week.
3            Am I recalling that
4   correctly?
5       A.    Yes.
6       Q.    How would he reach out to
7   you?
8       A.    It could be via phone call,
9   it could be via Top Line which is our
10  interoffice messaging system on iNews.
11  I'd say primarily Top Line was the
12  easiest and most direct way to get
13  ahold of somebody.
14      Q.    Did he ever e-mail you?
15      A.    I think occasionally, yes.
16      Q.    If Fox News has no records of
17  him ever asking you to complete a task,
18  would you dispute that he never
19  e-mailed you to complete an assignment?
20      A.    I would say that's possible
21  because the Top Line system over iNews
22  is how we primarily talked to each
23  other.
24      Q.    Can you recall a single
25  assignment that Mr. Wells ever gave

1   you?

2           MR. RAHMAN: Objection to

3       form.

4           You can answer it again.

5           THE WITNESS:  I'm sorry?

6           MR. RAHMAN: You can answer it

7       again.

8           THE WITNESS:  Not a specific

9       assignment.  I had dozens every

10      day.  I don't remember a specific

11      one.

12      Q.    Did you ever receive an

13  assignment from a producer on Fox and

14  Friends?

15      A.    I do not recall if I have.  I

16  do not know.

17      Q.    So it's possible you never

18  received an assignment from somebody on

19  Fox and Friends?

20      A.    It's possible.  I don't

21  recall.  I don't know.

22      Q.    Did you ever receive an

23  assignment from somebody on Live Desk?

24      A.    I do not know.

25      Q.    Did you ever receive an

Page 175

```
 1    assignment from someone on Your World
 2    With Neil Cavuto?
 3         A.    I don't know.  Specific shows
 4    I don't recall.
 5         Q.    So sitting here today, can
 6    you recall any show other than On The
 7    Record that asked you to complete an
 8    assignment on their behalf?
 9         A.    I don't remember the specific
10    shows, but I was asked by more than
11    just On The Record.
12         Q.    You don't recall though
13    whether anybody from the Neil Cavuto
14    show reached out?
15         A.    I do not remember, no.  Like
16    I said, I had dozens of assignments a
17    day.
18         Q.    Do you recall whether anybody
19    from Special Report With Brit Hume ever
20    reached out for an assignment?
21         A.    I do not, no.
22         Q.    Do you recall whether anybody
23    from the Fox Report ever reached out
24    for you to complete an assignment?
25         A.    Not specifically, no.
```

Page 176

1      Q.    Do you ever recall somebody
2   from the O'Reilly Factor ever reaching
3   out to complete an assignment on their
4   behalf?
5      A.    No, that would have been more
6   rare because that's more of an opinion
7   show, so no.
8      Q.    Do you recall anybody from
9   Hannity and Colmes ever reaching out
10  for you to complete an assignment?
11     A.    No, not specifically.
12     Q.    So again, sitting here, you
13  cannot recall any show ever asking for
14  you to complete an assignment on their
15  behalf?
16     A.    I know that I did.  The
17  specific shows, I can't point back to
18  one and remember that.
19     Q.    But sitting here today, you
20  can't tell me, you have no idea what
21  shows you would have supported as of
22  2008?
23     A.    Any show that was on Fox News
24  that needed the help, I would be
25  expected to then help them.

Page 177

1      Q.    But sitting here today, you

2    can't think of a single show that you

3    supported other than On The Record;

4    correct?

5      A.    I remember On The Record

6    because of Justin.  But the rest, no.

7            (Whereupon, an e-mail dated

8       May 6, 2025 was marked Defendants'

9       Exhibit 21 for identification.)

10     Q.    The court reporter has handed

11   you what's been marked as Exhibit 21.

12   This is an e-mail from your counsel

13   Alfredo Pelicci.

14           Do you see this document from

15   Alfredo to Paul Evans and Jason

16   Sunshine?

17     A.    Yes.

18     Q.    Would you read aloud the

19   first sentence of the second bullet for

20   me.

21     A.    "Following our conference

22   today, I spoke with my client and

23   confirmed that, in his role, he

24   supported the majority of Fox shows on

25   the Fox News Channel.  He described

Page 178

1    these tasks" -- just that sentence?

2        Q.    That's fine.

3              So how is it that your lawyer

4    could confirm you supported the

5    majority of the shows on the Fox News

6    Channel if, sitting here today, you

7    can't identify even one other show

8    besides On The Record that you

9    supported?

10       A.    I'm saying that I know that I

11   supported those shows.  If there was a

12   specific story or a specific thing

13   about them, I don't recall that.  But I

14   do know that I did help any show that

15   needed it on Fox News.  I don't

16   remember the exact names at the time.

17   That was my job.

18       Q.    And you don't know how many

19   of the shows you supported?

20       A.    Anyone that would come to me

21   needing something from the west coast,

22   that would be my job to fulfill it.

23       Q.    But you can't tell me whether

24   that was one other show or every other

25   show; correct?

Page 179

1        A.    Any other show that Fox News

2    did, I would -- had on their air, I

3    would be responsible to help them get

4    content if needed.  That was my job.

5        Q.    Did you consider any producer

6    of Fox and Friends to be your

7    supervisor?

8        A.    No.

9        Q.    Did you consider any producer

10   of Live Desk to be your supervisor?

11       A.    No, not in terms of -- no.

12       Q.    Did you consider any producer

13   of Your World With Neil Cavuto to be

14   your supervisor?

15       A.    No.

16       Q.    Did you consider any producer

17   of Special Report With Brit Hume to be

18   your supervisor?

19       A.    No.

20       Q.    Did you consider any producer

21   of the Fox Report to be your

22   supervisor?

23       A.    No.

24       Q.    Did you consider any producer

25   of O'Reilly Factor to be your

Page 180

```
 1    supervisor?
 2        A.    No.
 3        Q.    Did you consider any producer
 4    of Hannity and Colmes to be your
 5    supervisor?
 6        A.    No.
 7        Q.    Did you consider Justin
 8    Wells to be your supervisor?
 9        A.    Not directly.  Indirectly.
10        Q.    What does that mean?
11        A.    It means that he was very
12    specific about not shy to tell me that
13    he had power within the company and
14    that I felt like I really needed to do
15    what needed to be done.
16        Q.    You never actually physically
17    saw Justin in the same building at
18    1211; did you?
19        A.    Not that I recall.  We were
20    on completely separate floors.
21        Q.    And how many times did he
22    tell you that he "had power"?
23        A.    I don't recall the exact
24    number of times, but several.
25        Q.    Ballpark?
```

Page 181

1      A.    Half a dozen.

2      Q.    When did he tell you this?

3      A.    In conversations that we had

4   or it would be name dropping or it

5   would be, you know, talking about Greta

6   or, you know, he made it very clear

7   that he had a lot of power in the

8   company, and he took great pride in

9   that.

10      Q.    And he was a midlevel

11   producer on Greta?

12      A.    I took him to be someone with

13   considerable power.

14      Q.    He was a field producer on

15   Greta at that point; correct?

16      A.    I believe that he had much

17   more power in the company.

18      Q.    What is the basis for that

19   belief?

20      A.    For what he would tell me.

21   The way he would carry himself.  It was

22   just of the way he would carry himself.

23      Q.    So the six or so times that

24   he said he had power, was that before

25   or after the alleged assault that you

Page 182

1    described earlier?

2        A.    I don't recall exactly when.

3    It would be probably both.

4        Q.    But you have no recollection

5    of any of these conversations?

6        A.    I remember he told me that I

7    was making a mistake when I said no to

8    him, and he would be very clear that he

9    had power within the company.

10       Q.    Okay.

11             So we'll come back to the

12   mistake.

13             But you said that there were

14   roughly six times he told you he "had

15   power"?

16       A.    Yes.

17       Q.    And he used those words, "I

18   have power within the company"?

19       A.    I don't know that those were

20   the exact words he used, but he made it

21   very clear that he was a person who had

22   significant -- what's the word I'm

23   looking for -- significant influence

24   within Fox News.  He was very, very not

25   shy about not knowing -- making you

Page 183

1    know where you stood and where he

2    stood.

3        Q.    Do you think Justin liked

4    people to think he was important?

5        A.    I don't know what was going

6    on through his head.  I'm sure he did.

7        Q.    Did you believe that Mr.

8    Wells could fire you?

9        A.    I think that he could -- I

10   thought that he could have

11   conversations with people who could

12   fire me.

13       Q.    But you did not believe that

14   he had the power to fire you?

15       A.    Directly, no.  Indirectly,

16   yes.

17       Q.    What evidence do you have to

18   support your belief that he could

19   indirectly fire you?

20       A.    Because of how Fox News is

21   above Fox News Edge, the hierarchy

22   there, Greta Van Susteren was one of

23   the top shows at the time, and being a

24   powerful producer there and me having

25   just started at Fox News and really

Page 184

1    having no power, yes, I thought he

2    could significantly influence where I

3    was there, yes.

4        Q.    And you previously just told

5    me though that you had no idea of

6    Justin's hierarchy within the Greta

7    show; correct?

8        A.    I believe he was a powerful

9    producer within the Greta Van Susteren

10   show.

11       Q.    And at the point you started,

12   Mr. Wells had worked for Fox News for

13   about two months; correct?

14       A.    I don't have that timeline.

15       Q.    And what led you -- other

16   than statements by Mr. Wells, was there

17   any basis that you had to believe that

18   he was powerful?

19       A.    From the things that he had

20   said.  That was --

21       Q.    That was your only basis?

22       A.    And the fact that he worked

23   for Greta Van Susteren, a very powerful

24   show, probably the third most watched

25   in the company, I definitely thought

Page 185

1    that he had some pull within the

2    company.

3         Q.    Did you believe that any

4    midlevel producer on a Fox television

5    show could have you fired?

6         A.    Potentially.

7         Q.    Did you believe that Mr.

8    Wells could impact your advancement

9    within the company?

10        A.    Yes.

11        Q.    And what evidence do you have

12   to support that other than statements

13   by Mr. Wells?

14        A.    Statements from Mr. Wells,

15   knowing how the power dynamic between

16   Fox News and Fox News Edge, Fox News

17   Edge is very much the low person totem

18   pole there.

19        Q.    So you believe that any

20   midlevel producer on a Fox News Channel

21   show impact your advancement at the

22   company?

23        A.    Potentially, yes.

24        Q.    Did you believe that Mr.

25   Wells could reassign you to a new role?

Page 186

1      A.    Possibly if he didn't think

2   that I was doing a very good job.

3      Q.    Do you have any basis for

4   that belief other than Mr. Wells'

5   alleged statements?

6      A.    It made sense to me at the

7   time, that would be -- the power he

8   had.  Like I said, I was very much the

9   low person on the totem pole at that

10  point.

11     Q.    That wasn't my question

12  though.

13          Other than statements by Mr.

14  Wells, did you have any basis to

15  believe that he could reassign you?

16     A.    No.

17     Q.    And did you believe that any

18  midlevel supervisor on a Fox News

19  Channel could reassign you?

20     A.    Potentially.

21     Q.    Did you believe that Mr.

22  Wells could cause a significant change

23  to your compensation?

24     A.    I guess if I didn't work

25  there anymore, yes, yes.

1          MS. KATZENSTEIN: Let me
2      rephrase my question so we're
3      perfectly clear.
4      Q.    During your employment with
5  Fox News, did you believe that Mr.
6  Wells could alter your compensation?
7      A.    I don't believe I thought
8  about it like that.
9      Q.    Did you believe that he had
10  any role in determining your
11  promotional increase?
12      A.    The promotion I got, no, I
13  didn't think that he influenced that.
14      Q.    Do you believe that he had
15  any role in determining your merit
16  increase the following year when you
17  moved to $53,000 per year?
18      A.    No, I believe Mykel McCarthy
19  did that.
20      Q.    So if I understand correctly,
21  you believe that Mr. Wells could
22  influence your position at Fox News
23  because he told you he was powerful?
24      A.    Yes, and I believed it.
25      Q.    Did you do anything to

Page 188

1    investigate the degree of power Mr.

2    Wells had within Fox News?

3         A.    No, I wouldn't even know how

4    to do that.

5         Q.    You could have asked Mr.

6    McCarthy; correct?

7         A.    That did not occur to me to

8    do so.

9         Q.    You could have asked other

10   co-workers at Fox News Edge; correct?

11        A.    I don't think that they would

12   have -- it would not occur to me to do

13   so.  I don't think that they would have

14   that answer.

15             (Whereupon, an e-mail dated

16        September 25, 2008 was marked

17        Defendants' Exhibit 22

18        for identification.)

19        Q.    The court reporter has handed

20   you what's been marked as Exhibit 22.

21             Do you recognize this

22   document?

23        A.    Yes.

24        Q.    And what is this document?

25        A.    This is an e-mail that --

Page 189

```
1    between Justin Wells and myself shortly
2    after I had started working at Fox News
3    Edge.
4        Q.    And it's dated September 25,
5    2008; correct?
6        A.    Yes.
7        Q.    Do you recall whether this
8    was before or after the alleged
9    assault?
10       A.    I do not recall.
11       Q.    It's possible it could have
12   been after?
13       A.    Based on the e-mail here, I
14   believe it was before.  I believe it
15   was before.
16       Q.    And is this what you
17   referenced earlier when you said that
18   Mr. Wells assisted you with a job for
19   Fox News Radio?
20       A.    Yes, this was part of it.
21   Yep.
22       Q.    And if you look on page
23   ending 175, do you see your response to
24   Mr. Wells where you say, "how would I
25   even go about pursuing it"?
```

Page 190

1      A.    Yes.

2      Q.    And Mr. Wells responds,

3   "casual conversation with some of the

4   people who head up Fox News Radio.

5   Then, before they proceed, a follow-up

6   conversation with Mykel or someone down

7   at Edge to tell them you have an

8   interest in this and it won't interfere

9   with your current duties".

10         Do you see that?

11     A.    Yes.

12     Q.    And am I correct that Mr.

13  Wells was letting you know that you

14  should talk to management within Fox

15  News Edge before pursuing this

16  opportunity?

17     A.    Yes.

18     Q.    And did you, in fact, pursue

19  this opportunity?

20     A.    I do not remember how it all

21  shook out.  I do not know.

22     Q.    Okay.

23         So you don't know if you did

24  anything to apply for the role?

25     A.    I do not remember, no.

Page 191

1      Q.    And one of the allegations
2  you make in the complaint is that Mr.
3  Wells promised you career advancement
4  at Fox News.
5           Do you recall any specific
6  promise that Mr. Wells made to you?
7      A.    Like in terms of just the way
8  he would talk and say, like he knew a
9  lot of people within the company, he
10  knew a lot of people that could be
11  helpful, that those were the types of
12  promises he made, the connections that
13  he could make with me for inviting me
14  to different places doing different
15  things, it was more about the people
16  that he could connect me with.
17      Q.    So he was offering to
18  introduce you to others at Fox News?
19      A.    Yes.
20      Q.    But he never promised you a
21  specific career opportunity at Fox
22  News; is that correct?
23      A.    Not a specific role.
24      Q.    He only offered to introduce
25  you to others at Fox News so that you

Page 192

```
 1   could broaden your network?
 2        A.    That's not what I believe the
 3   motivation to be now, but yes.
 4        Q.    What do you believe the
 5   motivation was now?
 6        A.    To put me the position that
 7   he put me in to assault me.
 8        Q.    So you believe that when Mr.
 9   Wells was offering to introduce you to
10   people, it was with the motive of
11   assaulting you?
12        A.    Yes.
13        Q.    Did he ever introduce you to
14   anybody at Fox News?
15        A.    Not that I recall, no.
16        Q.    When did you have these
17   conversations with Mr. Wells about him
18   introducing you to others?
19        A.    This is when I was first
20   starting before I had actually started.
21        Q.    So this was before you worked
22   for Fox News?
23        A.    When I was at Fox 13 in
24   Tampa.
25        Q.    What form did you communicate
```

Page 193

1    with Mr. Wells in at that point?

2        A.    I would assume by phone.

3        Q.    Did you ever text with Mr.

4    Wells at that point?

5        A.    I do not recall.

6        Q.    How many phone conversations

7    do you recall having with Mr.

8    Wells before you started your

9    employment at Fox News?

10        A.    A couple, one or two.

11        Q.    And during the course of

12    those conversations, Mr. Wells offered

13    to introduce you to people?

14        A.    Yes.

15        Q.    After you started with Fox

16    News, were there any conversations

17    where Mr. Wells offered to introduce

18    you to people?

19        A.    I do not remember specific

20    conversations.

21        Q.    Did you believe at the time

22    you started at Fox News that Mr.

23    Wells would help you advance through

24    the organization?

25        A.    Yes.

Page 194

1      Q.     I believe you testified
2  earlier about a position for which you
3  applied at WNBC; correct?
4      A.     Yes.
5      Q.     And did I understand
6  correctly that Mr. Wells alerted you to
7  that position?
8      A.     Yes.
9      Q.     And you, in fact, applied for
10 that position; correct?
11     A.     Yes.
12     Q.     Do you know who was
13 responsible about making the decision
14 about who to hire for that role?
15     A.     I do not know.
16     Q.     Do you know if Mr. Wells
17 actually talked to the person
18 responsible for the hiring decision?
19     A.     I believe he did.
20     Q.     What's the basis for that
21 belief?
22     A.     Because he's the one that
23 arranged the interview that I got.
24 He's the person that talked to -- I do
25 not remember who it was.  He's the

Page 195

1    person that talked to the person who

2    gave them the interview.

3        Q.    How do you know that?

4        A.    Because there's no other way

5    that he would have gotten it.  He

6    arranged it.

7        Q.    You applied for the job;

8    correct?

9        A.    I did apply for the job.

10       Q.    So you would have filled out

11   an application; correct?

12       A.    I should have, yeah.  But it

13   is possible that this was word-of-mouth

14   and that he asked -- he just arranged

15   the interview.

16       Q.    Sitting here today, you don't

17   recall whether you formally applied for

18   the job or not; is that your testimony?

19       A.    Correct.

20             I went for an interview.

21       Q.    Did Mr. Wells tell you what

22   time your interview was?

23       A.    I do not remember if he told

24   me the time.

25       Q.    Do you recall how you knew

Page 196

```
 1    when to show up for the interview?
 2        A.    I don't know exactly.  I know
 3    that he arranged the interview.
 4        Q.    Do you know who else applied
 5    for the job?
 6        A.    I do not.
 7        Q.    Do you know who got the job?
 8        A.    I do not.
 9        Q.    Do you know what the
10    qualifications were of the person who
11    got the job?
12        A.    I do not.
13        Q.    Do you know whether Mr.
14    Wells ever went back to the hiring
15    manager and had any other conversations
16    about you?
17        A.    It seemed clear that there
18    was a chill over what had happened,
19    that there was -- it was not a good
20    interview.  There was nobody -- it
21    seemed that there had been some sort of
22    conversation between him and the hiring
23    manager.
24        Q.    Do you have any actual
25    evidence to support what is your
```

Page 197

1    speculation that there was a

2    conversation, a second conversation

3    that Mr. Wells had with the hiring

4    manager?

5        A.    This is my speculation based

6    on how the interview went, where it was

7    originally supposed to be, and what

8    ended up happening.

9        Q.    But Mr. Wells never told you

10   he had a second conversation; correct?

11       A.    He did not tell me that.

12       Q.    Nobody ever told you that Mr.

13   Wells had a second conversation with

14   the hiring manager for that role;

15   correct?

16       A.    No.

17       Q.    And you applied for that role

18   before the alleged assault; correct?

19       A.    Yes.

20       Q.    If you believe that Mr. Wells

21   could advance you at Fox News, why were

22   you applying for a different job within

23   three weeks?

24       A.    Because he told me how much

25   it paid and told me it was

Page 198

1  significantly more, about double what I

2  was making, and when I moved to New

3  York, I had no money after moving and I

4  was looking for anything to survive at

5  that point.

6      Q.    So you didn't actually

7  believe that staying with Fox News

8  would be financially rewarding for you

9  based on Mr. Wells' representations?

10     A.    I was hopeful that it would,

11  but at that point I quickly learned

12  that $45,000 in New York City was not

13  enough for me to live on.

14     Q.    And you didn't believe that

15  Mr. Wells would be able to get you more

16  money at Fox News?

17     A.    I was hopeful that he could.

18  He made it seem like he could.  But at

19  that point I was looking for any

20  opportunity to make any more money.

21     Q.    But at that point Mr.

22  Wells didn't tell you he could get you

23  more money; did he?

24     A.    Not specifically.

25     Q.    And he didn't tell he could

Page 199

1  get you another role at Fox News; did

2  he?

3      A.    No, just made it clear that

4  he had considerable pull.

5      Q.    But that "pull" didn't result

6  in any further opportunities for you at

7  Fox News before the alleged assault;

8  did it?

9      A.    No.

10      Q.    You referenced earlier that

11  Mr. Wells said you were not thinking

12  straight and you were screwing

13  yourself; is that correct?

14      A.    Yes.

15      Q.    When did that conversation

16  happen?

17      A.    It happened shortly after the

18  assault.  It happened shortly after the

19  interview at WNBC.

20      Q.    So would you say that would

21  be mid October, 2008?

22      A.    That sounds right.

23      Q.    Was this conversation in

24  person?

25      A.    No, it would have been Top

Page 200

1    Line, the interoffice Top Line system.

2        Q.    So your testimony is that, by

3    Top Line, Mr. Wells said to you that

4    you were screwing yourself?

5        A.    Yes.

6        Q.    What was the surrounding

7    context of that conversation?

8        A.    Telling me that I -- the

9    interview went -- he had heard that the

10   interview went horribly at WNBC, that I

11   was not thinking straight, I was

12   screwing myself over.  I didn't fully

13   understand what he did mean by that,

14   but I took it in the context of that I

15   did not acquiesce to his -- what he

16   wanted from me and that I was screwing

17   myself over as a result.

18       Q.    So he said in that Top Line

19   conversation that he heard the

20   interview went poorly?

21       A.    Yes.

22       Q.    And you don't recall anything

23   other than him saying that and that you

24   were screwing yourself?

25       A.    That I was screwing myself

Page 201

```
 1   over, I was not thinking straight, and
 2   I took that to mean that is because of
 3   what happened with the assault and --
 4   yeah.
 5        Q.    Did Justin ever say anything
 6   else like that to you, that you were
 7   screwing yourself and not thinking
 8   straight?
 9        A.    From that point forward, we
10   didn't interact a whole lot except for
11   what we needed to at work.
12        Q.    So no other threats by Mr.
13   Wells after that conversation?
14        A.    Those are the ones I
15   remember.
16        Q.    And when you say those are
17   the ones, that's the one Top Line
18   conversation we spoke of?
19        A.    Yes, the two things he said,
20   yes.
21             (Whereupon, an e-mail dated
22        November 1, 2008 was marked
23        Defendants' Exhibit 23
24        for identification.)
25        Q.    The court reporter has hand
```

Page 202

1    you what's been marked as Exhibit 23.

2            Please take a look and let me

3    know if you recognize this document.

4        A.    Yes.

5        Q.    What is it?

6        A.    An e-mail between Justin and

7    I in November, 2008.

8        Q.    And if I understood your

9    testimony correctly, this would be

10   after the alleged assault; correct?

11       A.    Yes.

12       Q.    And this would be after your

13   interview with WNBC; correct?

14       A.    Yes.

15       Q.    And if we look at the Bates

16   number ending 187 which is the second

17   page of the document, do you see your

18   e-mail that Justin at the bottom at

19   6:02 p.m.

20       A.    Yes.

21       Q.    And do you see where you say,

22   "I'm struggling to recover after going

23   out last night"?

24       A.    Yes.

25       Q.    Why did you share with Justin

Page 203

```
 1    at that point that you had been out the
 2    prior night?
 3         A.    He had reached out to me,
 4    asked me how I'm doing, and I was
 5    talking about it.
 6         Q.    Why are did you engage about
 7    your social activities with Justin at
 8    that point?
 9         A.    He asked me how I'm doing and
10    I don't know what was going through my
11    mind at the time, but I offered that
12    information.
13         Q.    And if we turn to the first
14    page of the document, 186, you see your
15    e-mail at the top at 6:10 p.m.?
16         A.    Yes.
17         Q.    And you say, "I was drunk out
18    of my mind.  Didn't get home until
19    a.m."
20              Do you see that?
21         A.    Yes.
22         Q.    And this is talking about
23    going out in Chelsea; correct?
24         A.    Yes.
25         Q.    And is this typically how you
```

Page 204

1    would communicate with a supervisor?

2        A.    Probably not.  In retrospect,

3    no.

4        Q.    Is this how you would

5    communicate with somebody who you

6    thought had power over your career?

7        A.    I thought keeping things

8    friendly with him would be a smart

9    idea.

10       Q.    Did you still believe at that

11   point that he had power over your

12   career?

13       A.    Yes.

14       Q.    And again, the only basis for

15   that was statements by Mr. Wells?

16       A.    Yes, I took that, and I

17   believed it.

18            MS. KATZENSTEIN: Maybe we go

19       off the record and take a break.

20            THE VIDEOGRAPHER: We are now

21       going off the record.

22            The time is 2:33 p.m., and

23       this ends media unit three.

24            (Whereupon a break was taken)

25            THE VIDEOGRAPHER: We are

```
 1        going back on the record.
 2              The time is 2:47 p.m., and
 3        this is the beginning of media unit
 4        four.
 5        Q.    All right.
 6              Mr. Delancey, we're back on
 7   the record.
 8              You understand that you are
 9   still under oath; correct?
10        A.    Yes.
11        Q.    All right.
12              Earlier you testified about
13   gifts that Mr. Wells gave you when you
14   first started at Fox News.
15              Do you recall that?
16        A.    Yes.
17        Q.    And did I understand your
18   testimony correctly that you thought it
19   was unusual because the pencils and the
20   notepads were monogrammed?
21        A.    Yes, it was told to me by
22   Mykel McCarthy that he had worked there
23   for many years and never had anything
24   like that, and it seemed unusual.
25        Q.    Any other basis or reason
```

Page 206

1    that you felt the gifts were unusual?

2        A.    By the reaction from my

3    co-workers, making fun of me, saying

4    that, you know, somebody obviously

5    likes you.  So between Mykel and the

6    co-workers.

7        Q.    And was this specific to the

8    pencils and the notepads being

9    monogrammed or was it more generally

10   that you received gifts when you

11   started work?

12       A.    It was both.

13       Q.    And you were new to New York

14   at that point; right?

15       A.    Yes.

16       Q.    New to Fox News?

17       A.    I worked at Fox 13, but Fox

18   News, yes.

19       Q.    Did you know anybody besides

20   Mr. Wells at Fox News when you started?

21       A.    Jason Goodwin.

22       Q.    Do you think it was possible

23   that Mr. Wells just wanted to be nice

24   and welcome you to Fox News?

25       A.    I believed that at the time,

1   and then looking back, no.

2        Q.    What changed in terms of your

3   belief?

4        A.    To have seen what happened,

5   it seems to me like it was a clear

6   pattern of grooming, to kind of love

7   bomb me at the beginning and give me a

8   box of gifts to make me think that he

9   had power and sway at Fox News and,

10  yeah, I look back and it and to this

11  day it seems odd.

12       Q.    When did your belief change

13  from Mr. Wells is being nice to Mr.

14  Wells is grooming me?

15       A.    I don't know the exact date

16  that I changed my mind on that or

17  changed my perspective, but today it

18  seems clear.

19       Q.    Was it your belief when you

20  left Fox News that Mr. Wells was

21  intending to be nice when he gave you

22  that stuff?

23       A.    No, I would say by that point

24  I could recognize what he had been

25  doing.

Page 208

1    Q.    Did you ever have a
2    conversation with Mr. Wells about the
3    gifts?
4    A.    I do not recall.
5    Q.    Do you recall ever thanking
6    him for the gifts?
7    A.    I do not recall, but I'm sure
8    I did.
9    Q.    And you said that Mr.
10    McCarthy commented that he had been at
11    Fox News for some time and never had
12    received anything from Mr. Wells; is
13    that correct?
14    A.    Not anything from Mr. Wells,
15    that he never had stationery with his
16    name on it, that he thought it was odd.
17    Q.    Did he tell you he thought it
18    was odd?
19    A.    Yes.
20    Q.    When did he say that?
21    A.    In the same conversation he
22    said that's -- I don't know if the
23    exact words were odd, but he made it
24    clear that it was unusual for somebody
25    with my stature to be getting

1    monogrammed stationery and other

2    things, especially when they're first

3    starting.

4        Q.    Did you ever have any other

5    conversations with Mr. McCarthy about

6    the gifts?

7        A.    Not that I recall.

8        Q.    Did you use the notebook and

9    pencils?

10       A.    I honestly -- I don't know

11   what I did with them.  I don't know.

12       Q.    Okay.

13             Take a look at Exhibit 16,

14   please.

15             This is the Facebook

16   conversation between you and Kathleen

17   Wells; correct?

18       A.    Yes.

19       Q.    Other than what we see in

20   this conversation, did you have any

21   other conversations with Ms.

22   Wells about her dispute with Justin

23   Wells?

24       A.    This is the only conversation

25   I ever remember having with her about

1   it.

2        Q.    And everything you know about

3   the incident between Justin Wells and

4   Kathleen Wells is reflected in

5   Exhibit 16; is that correct?

6        A.    Yes.

7        Q.    You have no personal

8   knowledge of the dispute between Justin

9   Wells and Kathleen Wells; correct?

10       A.    Just what she told me.

11       Q.    And I believe you testified

12  you never saw the letter that Mr.

13  Wells allegedly wrote to Kathleen

14  Wells?

15       A.    I did not.

16       Q.    And am I correct that Ms.

17  Wells is deceased?

18       A.    Yes.

19       Q.    Do you know how Ms.

20  Wells passed away?

21       A.    Cancer.

22       Q.    Do you know when Ms.

23  Wells passed away?

24       A.    I could find it.  We're still

25  social media friends.  I believe a few

Page 211

1   years ago.

2              (Whereupon, copies of text

3       messages were marked Defendants'

4       Exhibit 24 for identification.)

5       Q.    The court reporter has handed

6   you what's been marked as Exhibit 24.

7              Do you recognize this

8   document?

9       A.    Yes.

10      Q.    What is it?

11      A.    A conversation with Samantha

12  Honig and I.  She was a producer at Fox

13  News Edge as well.  She may have been a

14  writer.

15      Q.    Okay.

16             Did you and work for Fox News

17  Edge statement as Samantha?

18      A.    Yes.

19      Q.    And could you please turn to

20  the page that's Bates 78.

21      A.    Yes.

22      Q.    And am I correct that what we

23  see in the blue square is a message

24  from you?

25      A.    Yes.

Page 212

```
 1      Q.    And it says, "what was it
 2   like with Justin for you?  Do you
 3   remember Kathleen Wells.  Sadly she
 4   passed away but she messaged me saying
 5   he called her a fucking cunt and HR
 6   intervened".
 7           Do you see that?
 8      A.    Yes.
 9      Q.    And I apologize for the
10   language.  I am just quoting your text.
11           That's incorrect; correct?
12   Right?
13      A.    He called her a fucking
14   bitch, not a fucking cunt.
15      Q.    And so you were inaccurately
16   stating that he had called her a
17   fucking cunt; correct?
18      A.    Yes.  I said "fucking cunt"
19   instead of "fucking bitch".
20      Q.    Do you know why you said
21   that?
22      A.    Because I didn't have the
23   conversation back exactly as I was
24   talking to her, and the sentiment
25   stands, I would say.  It was the same
```

Page 213

```
 1    sentiment.  Whether you say fucking
 2    cunt or fucking bitch, it's the same,
 3    you mean the same thing.
 4         Q.    So you use those two words
 5    interchangeably?
 6         A.    I don't, but some people do.
 7         Q.    Do you use the word "bitch"?
 8         A.    Generally, no.  Sometimes.
 9    It depends on the context.
10         Q.    Do you use the C word?
11         A.    No, I do not.
12         Q.    So you would agree with me
13    that you don't treat the C word the
14    same as bitch; correct?
15         A.    I think they're essentially
16    the same thing.
17         Q.    You do not use them equally;
18    do you?
19         A.    I personally do not, but they
20    mean the same thing.  I think one is a
21    little harsher than the other, which is
22    why I don't use it, but you mean the
23    same thing.
24         Q.    And your message to Samantha
25    is inaccurate; correct?
```

Page 214

```
 1      A.    I did not say -- she did not
 2   say fucking cunt, she said fucking
 3   bitch.
 4      Q.    Let's turn to what's been
 5   marked already as Exhibit 15, please.
 6            And this is the Facebook
 7   exchange between you and Allison
 8   Browne; correct?
 9      A.    Yes.
10      Q.    Please turn to the Bates page
11   thirty-six.
12            And if we look at the last
13   blue swear, it says, "I have messages
14   where she says he called her all sorts
15   of nasty things".
16            Do you see that?
17      A.    Yes.
18      Q.    And are you referring to the
19   message that you had with Kathleen
20   Wells?
21      A.    Yes.
22      Q.    And that message states only
23   that Mr. Wells called her a bitch;
24   correct?
25      A.    A fucking bitch.
```

1      Q.    It does not include any other

2    names that Mr. Wells allegedly called

3    Ms. Wells; correct?

4      A.    I would have to go back and

5    look at it.  No, to me that was enough.

6      Q.    You think calling somebody a

7    fucking bitch constitutes calling them

8    all sorts of nasty things?

9      A.    Yes.  Yes.

10      Q.    But he only called her one

11    thing; correct?

12      A.    One thing.

13      Q.    Have you ever called anybody

14    a bitch?

15      A.    Yes.

16      Q.    Have you ever called a

17    co-worker a bitch?

18      A.    Not -- no, I can't -- I don't

19    ever remember calling anyone a bitch.

20      Q.    Is it possible you could have

21    called a co-worker a bitch?

22      A.    It's possible.

23      Q.    Do you think that would have

24    been sexual harassment?

25      A.    It depends on the context.

1    Possibly.

2        Q.    So you believe context is

3    important in determining whether

4    something is sexual harassment?

5        A.    Yes.

6        Q.    And you would agree with me

7    that the dispute between Mr. Wells and

8    Ms. Wells centered around a live shot;

9    correct?

10       A.    It did.

11       Q.    And that Mr. Wells was asking

12   Ms. Wells to get a live shot; correct?

13       A.    Yes.

14       Q.    Ms. Wells did not want to do

15   that; correct?

16       A.    Correct.

17       Q.    And as a result of her

18   refusal, Mr. Wells called her a fucking

19   bitch; correct?

20       A.    Yes.

21       Q.    Do you have any personal

22   knowledge that HR intervened in that?

23       A.    Only from what she told me.

24       Q.    So the only information you

25   have is what would be contained in

Page 217

1  what's been marked as Exhibit 16; is

2  that correct?

3      A.    Yes.

4      Q.    When was the last time you

5  spoke to Lindsay Hare Johnson?

6      A.    I'd have to go back and check

7  my text messages.  I'm not sure.

8      Q.    Let's do that.

9            Can you check?

10     A.    Sure.

11           (Reviewing).

12           It looks like June 5.

13     Q.    Of 2025?

14     A.    Yes.

15     Q.    And what is the subject

16  matter of that text message?

17     A.    There is a co-worker that I

18  used to work with at WPTV in West Palm

19  and now works in San Francisco.  She is

20  now a producer -- she's an executive

21  producer at the NBC station in

22  Washington, D.C.  He was interested in

23  a job at the station in Washington,

24  D.C. and I was -- he asked me to put in

25  a good word with her.

```
 1        Q.    Is that common in the news
 2   industry, that producers refer one
 3   another to people in their network?
 4        A.    Yeah, absolutely.
 5        Q.    And you've referred folks for
 6   job opportunities?
 7        A.    Sure.
 8        Q.    And folks have referred you
 9   from time to time?
10        A.    Yes.
11        Q.    Have you had any
12   conversations with Lindsay about this
13   matter?
14        A.    Yes, I've talked to her about
15   when I was first considering filing the
16   lawsuit, seeing what she remembered,
17   and then I asked her if she would be
18   willing to be a part of the deposition
19   and she also said yes, she would.
20        Q.    How did you ask her about the
21   deposition?
22        A.    I -- probably text message.
23        Q.    And have you produced those
24   text messages?
25        A.    No, but I can do so.
```

Page 219

```
 1              MS. KATZENSTEIN: I'll just
 2       note for the record that there
 3       appear to be text messages between
 4       Mr. Delancey and Lindsey Hare
 5       Johnson which have not been
 6       produced.  Defendant Fox News is
 7       requesting the production of those
 8       immediately.
 9              MR. RAHMAN: Put that in
10       writing and we'll take it under
11       advisement.
12              MS. KATZENSTEIN: Your client
13       just testified to responsive
14       documents on the record.  I think
15       you should do more than take it
16       under advisement.
17              MR. RAHMAN: Put it in
18       writing, please.
19       Q.    So Ms. Hare Johnson, any
20  other conversations about this lawsuit
21  besides your initial outreach to her
22  and the communication about her
23  deposition?
24       A.    Not that I can recall.
25       Q.    Have you talked to her at all
```

Page 220

1    about the substance of her deposition?

2        A.    No.

3        Q.    Have you had any phone calls

4    with Ms. Hare Johnson about this case?

5        A.    No.

6        Q.    In your complaint, you allege

7    that Ms. Hare Johnson was a more senior

8    person to you; is that accurate?

9        A.    Yes.

10        Q.    Why did you believe that Ms.

11    Hare Johnson was more senior to you?

12        A.    She was the national

13    producer.  I was the regional producer.

14    Same reason that I had gotten a

15    promotion from regional to national

16    producer.

17        Q.    Is it possible that at that

18    time in 2008 Ms. Hare Johnson was also

19    a regional producer?

20        A.    I do not know.  I remember

21    her to be a national producer.

22        Q.    But it's possible she was a

23    regional producer?

24        A.    That is not what I remember.

25        Q.    But it's possible?

```
 1            MR. RAHMAN: Objection to
 2       form.
 3            He's already answered the
 4       question.
 5            THE WITNESS:  I don't
 6       remember her being -- I believed
 7       her to always be hired as a
 8       national producer.
 9       Q.   She was not your supervisor;
10   correct?
11       A.   Correct.
12       Q.   And she was not a management
13   level employee; correct?
14       A.   Correct.
15       Q.   And specifically what do you
16   recall telling Ms. Hare Johnson about
17   the alleged incident?
18            MR. RAHMAN: Objection to
19       form.  Asked and answered.
20            You can answer it again.
21            MS. KATZENSTEIN: I haven't
22       asked that question.
23            MR. RAHMAN: It was asked this
24       morning.
25            MS. KATZENSTEIN: It was not
```

Page 222

1     my deposition.

2         Q.    Go ahead.

3              MR. RAHMAN: It doesn't

4     matter.  You guys are defendants.

5     One party.

6              THE WITNESS: The day after

7     the assault happened, we were both

8     working the night shift and I told

9     her that I believed that I had been

10    sexually assaulted by someone

11    higher up at Fox News.

12        Q.    Did you use those words,

13    "sexually assaulted"?

14        A.    Yes.

15        Q.    I thought you didn't realize

16    you were sexually assaulted until you

17    watched Bombshell.

18        A.    I thought about it for a long

19    time and I thought I was.  I had gone

20    back and forth about it.  It became

21    pretty crystal clear after Bombshell

22    that I had.

23        Q.    So it's your testimony that

24    you told Ms. Hare Johnson that you were

25    "sexually assaulted"?

Page 223

```
 1      A.    That I thought I was.
 2            MR. RAHMAN: Do you want to
 3      clarify a time period?  I think
 4      there's some confusion about what
 5      you're talking about this
 6      conversation.
 7            MS. KATZENSTEIN: I don't
 8      believe there's any confusion.
 9      Q.    You understand me to be
10  asking about the conversation you had
11  with Ms. Hare Johnson the day after you
12  were allegedly sexually assaulted;
13  correct?
14      A.    Correct.
15      Q.    And at that point in time you
16  told Ms. Hare Johnson that you were
17  sexually assaulted; correct?
18      A.    That I believed I was, yes.
19  I was still processing a lot of stuff.
20      Q.    But you didn't know for sure
21  until you watched Bombshell; is that
22  your testimony?
23      A.    It became pretty crystal
24  clear about what was going on.
25      Q.    And I believe you told me
```

Page 224

1    earlier that Mr. Wells was a field
2    producer; correct?
3        A.    You told me that.  I learned
4    that from you.
5        Q.    I believe the record will
6    reflect that you told me that Mr.
7    Wells was a field producer at the time.
8        A.    You were telling me though
9    that he was not -- I thought he was a
10   senior producer, an executive producer.
11   He told me that it was for a longer
12   period than what I believed it was.
13       Q.    Okay.
14             But let's be clear here.
15             At the time that you started
16   at Fox News in 2008, you understood
17   that Mr. Wells was a field producer;
18   correct?
19       A.    Yes.
20       Q.    So at the time of the alleged
21   assault, you understood Mr. Wells to be
22   a field producer; correct?
23       A.    Yes.
24       Q.    You considered that a high
25   level position within Fox News?

Page 225

1        A.     I did, compared to where I

2   was, yes.

3        Q.     So relative to your role, you

4   thought he was in a higher level role?

5        A.     Much higher, yes.

6        Q.     What do you mean much higher?

7        A.     Working at the network,

8   working for one of the most popular

9   shows, most watched shows, yeah.

10       Q.     You would agree with me he

11  wasn't an executive producer though;

12  correct?

13       A.     Correct.

14       Q.     He wasn't an executive with

15  Fox News; correct?

16       A.     Correct.

17       Q.     Do you know how many field

18  producers there were across Fox News at

19  that point in time?

20       A.     I have no idea.

21       Q.     Other than Ms. Hare Johnson,

22  do you recall telling anybody at Fox

23  News about the alleged assault at the

24  time that it occurred?

25       A.     No.

1      Q.     And if I understood your

2    testimony earlier, you said that you

3    did not tell Ms. Hare Johnson who it

4    was?

5      A.     Correct.

6      Q.     Did you say what show the

7    person worked on?

8      A.     No, I don't believe so.

9      Q.     Did you say what role they

10   had at the company?

11     A.     No, I just said they were

12   somebody that was higher up, somebody

13   with heft in the company.

14     Q.     You considered a field

15   producer to have heft in the company?

16     A.     I did, yes.

17     Q.     Did you and Ms. Johnson work

18   on the same shift?

19     A.     It depends.  Sometimes.

20     Q.     Do you know how often that

21   was?

22     A.     It was all over the place.

23     Q.     You had a set schedule at

24   this point though; correct?

25     A.     Not necessarily, no.  We were

Page 227

1    all over the place.  Sometimes I was a

2    national producer for day side,

3    sometimes we needed a national producer

4    night side.  I did not have like a set

5    schedule at that point.

6        Q.    Were you a national producer

7    at the time you told Ms. --

8        A.    I see what you're saying.

9    Sorry.

10            No, I was primarily 5:00 p.m.

11   to 1:00 a.m. Wednesday through Sunday

12   at that point.

13       Q.    And you don't recall Ms.

14   Johnson's schedule at that point?

15       A.    No.

16       Q.    Do you recall whether she was

17   present every shift you worked?

18       A.    Not present every shift I

19   worked.

20       Q.    Let's take a look back at tab

21   sixteen, please.  I'm sorry,

22   Exhibit 16.  And let's turn to the page

23   ending in 57.

24       A.    Okay.

25       Q.    And I just want to be sure I

Page 228

1    have a clear understanding of your
2    prior testimony.
3              In the box at the top it
4    says, "yeah, I mean, I have evidence of
5    much of this in writing".
6              Do you see where I'm looking?
7        A.    Yes.
8        Q.    In 2017, what were you
9    referring to when you said you had much
10   of this writing?
11       A.    I meant -- I don't remember
12   what was going through my head, but I
13   remember part of it was the message
14   that Justin sent to me after I made
15   that post in 2017.  To me that was
16   evidence of guilt or a guilty
17   conscience at the very least.
18             Besides that, I don't
19   remember exactly what I meant by that.
20       Q.    Let's take a look at the
21   Facebook post.  I believe it has been
22   marked as Exhibit 8.  I'm sorry.  Ten,
23   I'm sorry.
24             So this is the post you just
25   referenced on Facebook when you posted

Page 229

```
 1   about the alleged assault in 2017;
 2   correct?
 3        A.    Correct.
 4        Q.    And it's dated October 22,
 5   2017; correct?
 6        A.    Correct.
 7        Q.    And if we look at the second
 8   line, it said, "ten years ago".
 9              Do you see that?
10        A.    Yes.
11        Q.    And ten years prior to that,
12   so October 22, 2007, you didn't work
13   for Fox News yet; did you?
14        A.    Correct.
15        Q.    And it also said, "a position
16   of great power in the media landscape
17   in New York City".
18              Do you see that?
19        A.    Yes.
20        Q.    And at that point in time in
21   2008 Mr. Wells was a field producer;
22   correct?
23        A.    Yes.  From what you're
24   telling me, yes.
25        Q.    And Mr. Wells in 2007 didn't
```

Page 230

1    actually work at Fox News yet; correct?

2        A.    Correct.

3        Q.    So is it possible that Mr.

4    Wells actually had no idea what you

5    were talking about when you were

6    referencing somebody with great heft or

7    I'm sorry, great power in 2007?

8        A.    I believe he knew exactly

9    what was going on.  Ten years ago, I

10   got a year wrong, but too many details

11   of what happened, I absolutely believed

12   that he knew who I was talking about in

13   that.  No, I do not believe that

14   there's any chance that he did not

15   know.

16       Q.    Let's go back to tab -- I'm

17   referring to my tabs, I apologize.

18   Exhibit 16.  And I'd like you to again

19   look at page Bates labeled 57.

20       A.    Okay.

21       Q.    And if we look at the second

22   blue bubble, could you please read

23   that.

24       A.    Yeah.

25            I said, "yeah, I do not want

1    to sue him or Fox News.  It's not Fox's

2    fault really".

3         Q.    So as of October, 2017, you

4    did not believe that the alleged

5    assault was Fox News' fault; is that

6    correct?

7         A.    At that time that's what I

8    told her.  And then she wrote to me,

9    "well, it is kind of Fox's fault for

10   creating such an environment where he

11   felt so free to do something like

12   this".  And then also talking to, you

13   know, going through my mind about this,

14   I changed my mind.

15        Q.    Okay.

16             But my question was at that

17   point you wrote this text message, not

18   after when Kathy responds, you didn't

19   actually believe it was Fox's fault;

20   correct?

21        A.    Yeah, I think I had a

22   misguided view at the time.

23        Q.    My question is did you

24   believe it was Fox's fault at the time?

25        A.    I do not know what was going

Page 232

1    through my head to say that.

2        Q.    You said though, if I'm

3    reading this correctly, it's not Fox's

4    fault really.

5             Do you see that?

6        A.    I do see that.

7        Q.    Do you believe you were being

8    honest at the point you wrote that?

9        A.    I believe that was what I was

10   thinking at the time.

11       Q.    Let's please look at the

12   document that had been marked as

13   Exhibit 12.

14            This is the Facebook message

15   between you and Greg Lackowitz; is that

16   correct?

17       A.    Yes.

18       Q.    And the first message you say

19   is, "it wasn't Mykel or anyone like

20   that".

21            Do you see that?

22       A.    Yes.

23       Q.    What did you mean "anyone

24   like that"?

25       A.    Anyone within the Fox News

Page 233

```
 1   Edge, anybody at Fox News Edge, any of

 2   our bosses or anything like that at Fox

 3   News Edge.

 4        Q.    And then if we look further

 5   down, you say, "part of me wants to go

 6   to Fox News if nothing else but that I

 7   can't possibly be the only one, say

 8   hey, I don't care what happens to me,

 9   but you should know if other stories

10   line up like mine, trust them.  They

11   have nothing to lose".

12             Do you see that?

13        A.    Yes.

14        Q.    At the point that you wrote

15   this in October, 2017, is it fair to

16   say you didn't believe that Fox News

17   had any reason to know about the

18   alleged assault at that point?

19        A.    I didn't know what they knew.

20   I have no idea.  I believe the reason I

21   said this was because the hotline had

22   opened after what had gone on with

23   Roger Ailes and everything and I was

24   considering calling that hotline.

25        Q.    But sitting here today,
```

```
1    there's nothing that suggested to you
2    that Fox News should have known about
3    the assault at this point in 2017; is
4    that correct?
5         A.    I think that they should have
6    known given what had happened with
7    Kathleen Wells and also with Abby
8    Grossberg that there was -- he was
9    placed in a position of power that he
10   should not have been put in.
11        Q.    Okay.
12             And when you say what
13   happened with Kathleen Wells, we've
14   already talked about that; correct?
15        A.    Yes.
16        Q.    And do you know Abby
17   Grossberg?
18        A.    I do not know her personally,
19   no.
20        Q.    And am I correct that she
21   made claims against the company in
22   2023, approximately?
23        A.    That sounds right.
24        Q.    Do you have any personal
25   knowledge at all about those
```

Page 235

1   allegations that Ms. Grossberg made?

2       A.    I personally don't.  I know

3   some of the things that are in the

4   complaint, but I do not know -- do not

5   have personal knowledge of it.

6       Q.    It's your belief though that,

7   based on what Ms. Grossberg alleged in

8   2023, Fox News should have had some

9   knowledge in 2017?

10      A.    With Kathleen Wells, I think

11  he had a history of bad behavior and

12  should not have been in that position

13  or Abby Grossberg to begin with.

14      Q.    But let's talk about you, not

15  Ms. Grossberg.

16          So at the point in time of

17  the alleged assault, 2008, other than

18  the situation with Ms. Wells which you

19  have no personal knowledge of, what

20  other "bad behavior" do you know about

21  relating to Mr. Wells?

22      A.    I do not know of any.

23      Q.    Why didn't you go to Fox in

24  2017 and make an anonymous complaint?

25      A.    Because I still -- I didn't

1    think it was matter at that point.  I

2    didn't think that anything would be

3    done and I thought an anonymous

4    complaint would just go into the ether.

5    It wouldn't even make sense.

6         Q.    But you thought it might help

7    other people; didn't you?

8         A.    Possibly.

9         Q.    So why didn't you want to do

10   that and help other people?

11        A.    To be honest, I was cowardly

12   and did not do it.

13        Q.    Did you know at this point

14   that a lawsuit against Fox News would

15   be untimely?

16        A.    No, that did not go through

17   my head at all.

18        Q.    So when Ms. Wells told you

19   that any alleged claim would have had

20   have been the last three years, you

21   didn't recall that?

22        A.    That did not factor into any

23   decision that I made, no.  That was not

24   a point that I thought about, no.

25        Q.    You're aware though that

1    there was an anonymous hotline in 2017;

2    is that correct?

3         A.    Yes.

4         Q.    And you're aware that you

5    could have reported it anonymously;

6    correct?

7         A.    Correct.

8         Q.    And you just simply chose not

9    to do that in 2017?

10        A.    I was too afraid of doing so,

11   yes.

12        Q.    Why were you afraid?

13        A.    That it would get back to me,

14   that there would be nothing that would

15   be done, point.  I just didn't do it.

16        Q.    You understood that anonymous

17   meant that you would not be connected

18   to the complaint?

19        A.    I don't know that I

20   necessarily believe that.

21        Q.    Did you have any

22   understanding of the process by which

23   Fox News investigated complaints in

24   2017?

25        A.    I did not know their process,

Page 238

1   no.

2       Q.    Did you have any

3   understanding of the corrective action

4   policy that Fox News had in 2017?

5       A.    I was not privy to that, no.

6       Q.    What is the basis for your

7   belief that Fox News wouldn't have done

8   anything with the complaint in 2017?

9       A.    Because of the history of Fox

10  News of not doing things when there are

11  complaints until it's too late because

12  then or -- my perception of the company

13  was that they let things go on for way

14  too long, whether it's Bill O'Reilly or

15  other situations that are going on,

16  that they let it happen until it's no

17  longer financially viable for them and

18  then they do something about it.  I

19  thought finances are what they really

20  care about, not the actually helping

21  people.

22      Q.    But you have no idea what the

23  practices were in 2017; did you?

24      A.    No, and I wouldn't have

25  trusted them.

Page 239

```
 1        Q.    So you mentioned Mr.
 2   O'Reilly.
 3              Did you ever see Mr. O'Reilly
 4   when you worked at Fox News?
 5        A.    No, we were on separate
 6   floors.
 7        Q.    Your complaint also mentions
 8   Roger Ailes.
 9              Did you ever see Mr. Ailes
10   when you worked at Fox News?
11        A.    Personally, no.
12        Q.    Is there any other way to see
13   somebody?
14        A.    No, there is not.
15        Q.    I just wanted to make sure I
16   wasn't missing anything there.
17              Did you ever see Mr. Carlson
18   when you worked at Fox News?
19        A.    No.
20        Q.    Did you ever see Ed Henry
21   when you worked at Fox News?
22        A.    That I don't remember.  That
23   would have been more likely because he
24   was a newsperson.
25        Q.    But nothing stands out in
```

Page 240

1    your mind?

2        A.    No.

3        Q.    Your complaint references an

4    investigation by the New York City

5    Human Rights Commission.

6            Do you have any personal

7    knowledge of the nature of that

8    investigation?

9        A.    I personally do not.

10        Q.    Your complaint also

11    references a shareholder suit against

12    Fox News.

13            Do you have any personal

14    knowledge of the nature of that matter?

15        A.    No.

16        Q.    Do you know anybody who

17    reported a complaint to the company

18    during your tenure at Fox News?

19        A.    I don't, no.

20        Q.    Did you ever observe anybody

21    experiencing sexual harassment during

22    your tenure at Fox News?

23        A.    I'd have to go rack my brain,

24    but not off the top of my head, no.

25        Q.    Did you ever hear about

Page 241

```
 1   anybody experiencing sexual harassment
 2   during your tenure at Fox News?
 3        A.    Not that I -- not that I
 4   recall.
 5        Q.    Did you ever hear about
 6   anybody being retaliated against during
 7   your tenure at Fox News?
 8        A.    Not that I recall.
 9        Q.    In connection with the
10   documents that have been requested as
11   part of this lawsuit, did you go
12   through your text messages to identify
13   potentially relevant text messages?
14        A.    Yes.
15        Q.    And you did not find any text
16   messages?
17        A.    No.
18        Q.    What is your habit for saving
19   text messages?  Do you save all text
20   messages that you have?
21        A.    Sure, yeah.
22        Q.    Did you -- and I believe you
23   testified in 2008 you had an iPhone; is
24   that correct?
25        A.    I either had that or a
```

Page 242

1    BlackBerry.

2         Q.    Do you know roughly when you

3    got an iPhone?

4         A.    I don't have the year, no.  I

5    had the BlackBerry for quite a while,

6    so I don't know.

7         Q.    You use the cloud though now

8    that you have an iPhone?

9         A.    I actually do not, no.

10        Q.    You do not use the cloud?

11        A.    No.

12        Q.    So how did you search your

13   phone for relevant text messages?

14        A.    I just went back and searched

15   Fox and Justin Wells, looked for things

16   that would make sense.

17        Q.    And you found none?

18        A.    No.

19              I've switched phones many

20   times.

21              MS. KATZENSTEIN: I'm going to

22        ask the court reporter to mark

23        this, please.

24              (Whereupon, copies of text

25        messages were marked Defendants'

Page 243

1     Exhibit 25 for identification.)

2     Q.    The court reporter has handed

3  you what's been marked as Exhibit 25.

4          Do you recognize this?

5     A.    Yes.

6     Q.    What is it?

7     A.    It's a conversation between

8  Cassandra Gauthier and myself.

9     Q.    And am I correct that you

10 provided this conversation to your

11 counsel on Friday?

12    A.    Yes.

13    Q.    And that would be this past

14 Friday, I'm sorry, just for clarity,

15 June 20?

16    A.    I believe so, yes.

17    Q.    Who is Cassandra Gauthier?

18    A.    She was also a producer at

19 Fox News Edge.

20    Q.    Do you recall if she was a

21 regional producer or a national

22 producer?

23    A.    She was a national producer.

24 Well, actually, I don't -- I think -- I

25 don't know.  I'm not sure.  Sorry.

Page 244

1      Q.    And why was this provided to
2    your counsel just this past Friday?
3      A.    Because I had just found it.
4    I just looked at it.
5      Q.    Why didn't you find it when
6    you found the other Facebook messages?
7      A.    I don't know.
8      Q.    You have no explanation for
9    why this was omitted when it expressly
10   references Justin Wells?
11     A.    I do not.  I must have missed
12   it.
13     Q.    If we turn to the last page
14   of this document ending in 641, you
15   say, "I have Abby Grossberg's
16   attorneys".
17           Do you see that?
18     A.    Yes.
19     Q.    Why did you say that?
20     A.    I was letting her know that's
21   who I have as my attorney.
22     Q.    Why did that matter?
23     A.    I went to them because they
24   have a history of success and they
25   seemed like good people to go to.

Page 245

```
 1      Q.    When you say they have a
 2  history of success, are you referring
 3  to the settlement of Ms. Grossberg's
 4  claims?
 5      A.    Yeah.
 6      Q.    Anything else?
 7      A.    No.
 8      Q.    And you say, "trying to shore
 9  up some things".
10           Do you see that?
11      A.    Uh-huh.
12      Q.    What did you mean by that?
13      A.    This is when I had just
14  started to talk to people and ask them
15  what they remember and I was trying to
16  shore up what people remembered and
17  what I remembered.
18      Q.    Were you trying to get the
19  story straight?
20      A.    No, that's not how I would
21  characterize it.
22      Q.    How would you characterize
23  it?
24      A.    I would characterize it
25  trying to see what other people
```

Page 246

1    remembered.

2        Q.    You say, "yeah, let's talk

3    some time in the next couple of days,

4    if that's okay".

5            Do you see that?

6        A.    Yes.

7        Q.    Did you connect by phone with

8    Cassandra?

9        A.    I did not, no.

10       Q.    Do you have a Signal account?

11       A.    No.

12       Q.    Have you ever had a Signal

13    account?

14       A.    No.

15       Q.    And you've produced every

16    document you have that you believe

17    supports your claims in this case?

18       A.    Yes.

19       Q.    Subject to the production of

20    your text messages with Ms. Hare

21    Johnson?

22       A.    Yes.

23       Q.    Have you texted with any of

24    the other individuals with whom you

25    worked at Fox News Edge in the past

Page 247

1   three years?

2       A.    No.  Everyone that -- this is

3   everybody, to the best of my knowledge.

4       Q.    So you've only communicated

5   with your former colleagues by Facebook

6   with the exception of Ms. Hare Johnson?

7       A.    To my, yes, the best of my

8   knowledge.

9       Q.    When you reviewed your phone

10  for your text messages, did you look

11  for other co-workers to see what you

12  had texted or not texted about with

13  them?

14      A.    I'm sure I did.

15      Q.    Do you recall that?

16      A.    Two years ago, yes.

17      Q.    Why did you look two years

18  ago?

19      A.    When the lawsuit was filed,

20  because I wanted to see who remembered

21  what.

22      Q.    The lawsuit was filed in

23  November, 2023; correct?

24      A.    Yes.

25      Q.    So you looked prior to the

Page 248

1    filing of that?

2        A.    I don't remember if it was

3    prior or it was -- it was around that

4    same time.

5        Q.    Do you understand that Fox

6    News and Mr. Wells have served document

7    requests in this matter seeking all

8    relevant communications, documentation,

9    et cetera?

10       A.    I wasn't aware of that, but

11   okay.

12       Q.    So your counsel never spoke

13   to you about requests being served by

14   Fox News?

15            MR. RAHMAN: Don't answer

16       that.

17       Q.    I'm not asking the substance

18   of the conversation.  I'm just asking

19   if you had any knowledge --

20            MR. RAHMAN: Do you have

21       knowledge that they made document

22       requests upon us?

23            MS. KATZENSTEIN: It's my turn

24       to ask the questions.

25            MR. RAHMAN: You can ask that

Page 249

1      question.  You can't ask him what I

2      told him.

3           THE WITNESS:  That would make

4      sense, yes.

5      Q.    Sitting here today though, do

6  you remember being aware that Fox News

7  has served requests for production of

8  documents?

9      A.    Yes.

10     Q.    At the time that you were

11 made aware of that, did you go back and

12 search for responsive documents?

13     A.    Yes, I did.

14     Q.    And you have a recollection

15 of that sitting here today?

16     A.    Yes.

17     Q.    We talked briefly about

18 damages earlier or Mr. Sunshine asked

19 you about damages earlier.

20          Your complaint seeks loss of

21 pay, back pay, and front pay.

22          Do you have an understanding

23 of what that means?

24     A.    Yes.

25     Q.    What is your understanding?

Page 250

```
 1      A.    Loss of back pay and front
 2   pay for what I possibly would have
 3   gotten if, you know, what I would have
 4   gotten paid if I didn't have -- if what
 5   had happened to me hadn't happened to
 6   me.
 7      Q.    You voluntarily left Fox News
 8   however to return to a Fox station in
 9   Tampa; correct?
10      A.    Yes.
11      Q.    Do you have an estimation of
12   what the back pay, front pay, and loss
13   of pay damages are?
14      A.    That is -- I do not have
15   that.
16      Q.    So you've assigned no value
17   to your potential lost wages?
18          MR. RAHMAN: Objection.
19          You can answer the question
20      if you understand it.
21          THE WITNESS:  I personally
22      have not put a value on that.  I
23      don't believe that's for me to
24      decide.
25      Q.    How do you believe you'd go
```

Page 251

1   about determining what your lost wages

2   are?

3        A.    That would be --

4              MR. RAHMAN: Objection.

5              You can answer it if you can.

6              THE WITNESS:  To me, that

7        would be what a jury would decide.

8        Q.    You have no understanding of

9   what you believe your lost wages are in

10  this case?

11       A.    It was not something that I

12  believed that I am determining.

13       Q.    You understand that you're

14  alleging that you have suffered an

15  economic loss as a result of Mr. Wells'

16  conduct; correct?

17       A.    Yes.

18       Q.    But you're telling me you

19  have no ability to estimate that

20  economic loss?

21       A.    I personally at this point,

22  no.

23       Q.    What position do you believe

24  you would have advanced to at Fox News

25  but for Mr. Wells' conduct?

Page 252

```
 1       A.    I can't speculate on what
 2   that would have been.
 3       Q.    And you believe, when you
 4   returned to the Fox station in Tampa,
 5   you were making something in the low
 6   50s in terms of base salary?
 7       A.    Upper 40s, low 50s.
 8       Q.    Would you agree that, in
 9   terms of buying power, that was at
10   least equal to the fifty-three thousand
11   you were making in New York?
12       A.    Yes, sure.
13       Q.    Did you experience any loss
14   of benefits as a result of Mr. Wells'
15   conduct?
16       A.    No, benefits-wise.
17       Q.    Do you have an estimation of
18   the amount of damages you should be
19   awarded for emotional distress?
20       A.    I do not have that, no.
21       Q.    Do you understand that you've
22   made a settlement demand in this case
23   at some point?
24       A.    Yes.
25       Q.    Do you have any understanding
```

Page 253

1  of the dollar amount of that demand?

2      A.    That's not for me to decide,

3  no.

4      Q.    You don't know what amount

5  has been demanded to settle this case

6  by your counsel?

7           MR. RAHMAN: Yes or no.

8           THE WITNESS:  I don't know.

9      Q.    If I told you that your

10  counsel demanded $1.5 million to settle

11  this case, would that surprise you?

12      A.    That's what I suspected, but

13  I did not know.

14      Q.    Do you have any basis for

15  asking for that amount of money?

16           MR. RAHMAN: Objection to

17      form.

18           You can answer.

19           THE WITNESS:  Emotional and

20      also for the loss incurred at Fox

21      News for having to leave and kind

22      of restart my career after having

23      left there.

24      Q.    I believe you told me though

25  that you have no way of knowing the

Page 254

1    lost wages to which you would be
2    entitled; correct?
3        A.    I personally do not, no.
4        Q.    And you have no way of
5    knowing the emotional distress damages
6    to which you would be entitled?
7        A.    I do not.
8        Q.    So how did you get at a
9    demand for $1.5 million?
10            MR. RAHMAN: Objection to
11       form.
12            If you know.
13            THE WITNESS:  I don't know.
14       Q.    In your interrogatory
15   responses, you identified a Dr.
16   McCullough as a medical provider.
17            Do you recall that?
18       A.    I looked but I don't know --
19   I don't know who that is, actually, Dr.
20   McCullough.  I know that I did, but I
21   don't know what that was about.
22       Q.    So your testimony is you know
23   that she was identified but you do not
24   recall why you sought medical treatment
25   from a Dr. McCullough?

Page 255

1      A.    That would have been -- I

2    believe it was for an ulcer, a peptic

3    ulcer, a stomach ulcer, I believe so,

4    at Good Samaritan Medical Center in

5    West Palm Beach.

6      Q.    Was that an emergency room?

7      A.    Yes.

8      Q.    Is that the only time that

9    you saw Dr. McCullough?

10     A.    To the best of my knowledge,

11   yes.

12     Q.    Do you recall when that was?

13     A.    I don't have it in front of

14   me now.

15     Q.    You were in living in West

16   Palm Beach, however?

17     A.    Yes.

18     Q.    So it would have been after

19   you left Tampa?

20     A.    Yes.

21     Q.    Are you contending that that

22   ulcer is related to this case?

23     A.    I do not know.

24     Q.    And I believe you testified

25   earlier that you have sought assistance

Page 256

1    from Danielle Hootman as a therapist;

2    is that correct?

3        A.    Yes.

4        Q.    And how did you find Ms.

5    Hootman?

6        A.    Through Teladoc through my

7    own insurance company.  She was

8    somebody that took my insurance.

9        Q.    And do you meet her

10   virtually?

11       A.    Yes.

12       Q.    And I believe you said you

13   had three meetings with her?

14       A.    Yes.

15       Q.    In the course of those

16   meetings, have you discussed this

17   lawsuit?

18       A.    Yes.

19       Q.    What have you told Ms.

20   Hootman about this lawsuit?

21       A.    I told her what had happened,

22   my account of what happened, and told

23   her that there was a deposition coming

24   up and talked about my nerves around it

25   and anxiety just in general about the

Page 257

1    case.

2        Q.    Is the anxiety about the

3    lawsuit or is it about the alleged

4    assault?

5        A.    Both.

6        Q.    Have you discussed any other

7    life circumstances with Ms. Hootman?

8        A.    Yes.

9        Q.    Will they be reflected in her

10   notes?

11       A.    They should be, yeah.

12            MR. SUNSHINE: Let's go ahead

13       and go off the record and take a

14       short break.

15            THE VIDEOGRAPHER: We are now

16       going off the record.

17            The time is 3:35 p.m., and

18       this ends media unit four.

19            (Whereupon a break was taken)

20            THE VIDEOGRAPHER: We are now

21       going back on the record.

22            The time is 3:47 p.m.

23            This is the beginning of

24       media unit five.

25       Q.    All right.

Page 258

1              Mr. Delancey, back on the
2    record.
3              You understand you're still
4    under oath?
5       A.    Yes.
6       Q.    Excellent.
7              Do you recall ever receiving
8    training on Fox News' harassment
9    policies during your employment with
10   Fox News?
11      A.    No.  Not specifically, no.
12      Q.    Is it possible that you
13   received training during your
14   employment on the harassment policies?
15      A.    It's possible.
16      Q.    If there was a mandatory
17   training, would you have attended a
18   required training?
19      A.    Yes.
20            MS. KATZENSTEIN: All right.
21            I have no further questions
22      at this time.
23            I would be holding open the
24      deposition pending the
25      documentation that we receive from

Page 259

1          Ms. Hootman and further discovery
2      related to the issue of emotional
3      distress.
4              MR. RAHMAN: Nothing from us.
5              THE VIDEOGRAPHER: Counsel, am
6      I safe to close out the video for
7      the day?
8              MS. KATZENSTEIN: Yes.
9              THE VIDEOGRAPHER: We are now
10     going off the record.
11             The time is 3:48 p.m.
12             This concludes today's
13     testimony given by Andrew Delancey.
14             The total number of media
15     used was five, and will be retained
16     by Veritext Legal Solutions.
17             Thank you, everyone, and have
18     a great day.
19             (TIME NOTED:  3:48 p.m.)
20     _____ (Signature of witness)
21     Subscribed and sworn to
22     before me this_____
23     day of_____,
24     2025.
25     _____

Page 260

1                          *       *       *

2

3                          I N D E X

4    WITNESS          EXAMINED BY          PAGE

5    A. Delancey      Mr. Sunshine          5

6                     Ms. Katzenstein     127

7

8                      E X H I B I T S

9    DEFENDANTS'          DESCRIPTION          PAGE

10   Exhibit 1   Document entitled

11               Amended Complaint          11

12   Exhibit 2   Document entitled

13               New Hire Employee Record   16

14   Exhibit 3   Document entitled

15               Performance Evaluation     22

16   Exhibit 4   Document entitled

17               Performance Evaluation     25

18   Exhibit 5   Document entitled

19               Plaintiff's Response to

20               Fox Defendants' First Set

21               of Interrogatories         27

22   Exhibit 6   Document entitled

23               Fox News Network Exit

24               Interview                  31

25

Page 261

```
 1              I N D E X (continued)

 2            E X H I B I T S (continued)

 3    DEFENDANTS'        DESCRIPTION        PAGE

 4    Exhibit 7   E-mail dated

 5                September 8, 2010        33

 6    Exhibit 8   Copies of text messages   37

 7    Exhibit 9   Copies of text messages   69

 8    Exhibit 10  Copies of text messages   84

 9    Exhibit 11  Copies of text messages   89

10    Exhibit 12  Copies of text messages   92

11    Exhibit 13  Copies of text messages   95

12    Exhibit 14  Copies of text messages   98

13    Exhibit 15  Copies of text messages   103

14    Exhibit 16  Copies of text messages   108

15    Exhibit 17  Document entitled

16                Plaintiff Andrew

17                Delancey's Responses     113

18    Exhibit 18  Copies of text messages   116

19    Exhibit 19  Resumé of Andy Delancey   131

20    Exhibit 20  Multipage document       158

21    Exhibit 21  E-mail dated

22                May 6, 2025              177

23    Exhibit 22  E-mail dated

24                September 25, 2008       188

25
```

Page 262

1                        I N D E X (continued)

2                      E X H I B I T S (continued)

3    DEFENDANTS'           DESCRIPTION           PAGE

4    Exhibit 23  E-mail dated

5                November 1, 2008           201

6    Exhibit 24  Copies of text messages    211

7    Exhibit 25  Copies of text messages    242

8

9                    REQUESTS

10                Page           Line

11                 219             1

12

13

14              *      *      *

15

16

17

18

19

20

21

22

23

24

25

Page 263

1                    CERTIFICATION BY REPORTER

2

3          I, Wayne Hock, a Notary Public of the

4     State of New York, do hereby certify:

5          That the testimony in the within

6     proceeding was held before me at the

7     aforesaid time and place;

8          That said witness was duly sworn

9     before the commencement of the testimony,

10    and that the testimony was taken

11    stenographically by me, then transcribed

12    under my supervision, and that the within

13    transcript is a true record of the

14    testimony of said witness.

15         I further certify that I am not

16    related to any of the parties to this

17    action by blood or marriage, that I am not

18    interested directly or indirectly in the

19    matter in controversy, nor am I in the

20    employ of any of the counsel.

21         IN WITNESS WHEREOF, I have hereunto

22    set my hand this 26th day of June, 2025.

23

24

25

Page 264

1          ERRATA SHEET
   VERITEXT/NEW YORK REPORTING, LLC
2
   CASE NAME:              DELANCEY V. FOX
3  DATE OF DEPOSITION:     June 23, 2025
   WITNESS' NAME:          ANDREW DELANCEY
4
   PAGE/LINE(S)/    CHANGE           REASON
5  ____/_____/_____/_____
   ____/_____/_____/_____
6  ____/_____/_____/_____
   ____/_____/_____/_____
7  ____/_____/_____/_____
   ____/_____/_____/_____
8  ____/_____/_____/_____
   ____/_____/_____/_____
9  ____/_____/_____/_____
   ____/_____/_____/_____
10 ____/_____/_____/_____
   ____/_____/_____/_____
11 ____/_____/_____/_____
   ____/_____/_____/_____
12 ____/_____/_____/_____
   ____/_____/_____/_____
13 ____/_____/_____/_____
   ____/_____/_____/_____
14 ____/_____/_____/_____
   ____/_____/_____/_____
15 ____/_____/_____/_____
   ____/_____/_____/_____
16 ____/_____/_____/_____
17
18
              _____
19                  WITNESS
20 SUBSCRIBED AND SWORN TO
   BEFORE ME THIS_____DAY
21 OF_____,2025.
22 _____
       NOTARY PUBLIC
23
   MY COMMISSION EXPIRES_____
24              *      *      *
25

**[00010 - 21]**

**0**

**00010**   73:7
**00014**   159:18

**1**

**1**   11:3,6 13:22
143:16 201:22
260:10 262:5
262:11
**1.5**   253:10
254:9
**10**   25:25 84:2,5
261:8
**10166**   2:16 4:2
**103**   261:13
**10357**   1:8 3:23
**10601**   2:4
**108**   261:14
**10:00**   50:13
140:7,8 170:12
**10:15**   1:11 3:3
**11**   81:5 89:5,8
260:11 261:9
**113**   261:17
**116**   261:18
**11:32**   83:17
**11:47**   83:22
**12**   76:18,19
91:25 92:3
232:13 261:10
**1211**   137:13
180:18
**127**   260:6

**12:32**   126:16
**13**   16:3 17:13
38:12 40:15
70:24 95:8,11
98:14 115:23
117:24 192:23
206:17 261:11
**131**   261:19
**14**   98:5,8
261:12
**15**   103:11,14
214:5 261:13
**158**   261:20
**16**   108:9,12
209:13 210:5
217:1 227:22
230:18 260:13
261:14
**17**   13:15 113:4
113:7 261:15
**175**   189:23
**177**   261:22
**18**   116:12,15
261:18
**1801**   2:10
**186**   203:14
**187**   202:16
**188**   261:24
**19**   131:7,10,12
132:11 261:19
**1983**   12:13
**199**   2:3
**1:00**   18:2 137:2
227:11

**1:23**   1:8 3:23
**1:25**   127:3,6
**1st**   26:1

**2**

**2**   16:12,15
260:12
**20**   158:16,19
243:15 261:20
**200**   1:18 2:15
4:1
**2005**   16:2
**2007**   16:2
36:17 37:21
167:6,13
168:17 229:12
229:25 230:7
**2008**   16:7
39:13 58:8,10
102:15 133:8
167:15 169:19
172:5,22
176:22 188:16
189:5 199:21
201:22 202:7
220:18 224:16
229:21 235:17
241:23 261:24
262:5
**2009**   16:2
139:10 143:17
144:3
**201**   262:5

**2010**   26:1 33:3
33:13,24
144:18 145:2
145:10 172:6
261:5
**2011**   70:23
**2012**   70:3
**2013**   71:11
73:9,19 100:16
**2015**   81:5,6
100:8
**2017**   84:14
95:2 98:22
100:10 107:22
108:18 116:23
118:17 228:8
228:15 229:1,5
231:3 233:15
234:3 235:9,24
237:1,9,24
238:4,8,23
**2022**   131:20
**2023**   89:21,23
96:9 104:5
132:4 234:22
235:8 247:23
**2025**   1:10 3:4
120:11 127:2
177:8 217:13
259:24 261:22
263:22 264:3
264:21
**21**   177:9,11
261:21

**[211 - achieved]**

| | | | |
|---|---|---|---|
| **211** 262:6 | **3:35** 257:17 | **6:10** 203:15 | **abby** 234:7,16 |
| **219** 262:11 | **3:47** 73:9,17,18 | **7** | 235:13 244:15 |
| **22** 84:14 | 257:22 | **7** 33:1,4 261:4 | **ability** 138:14 |
| 188:17,20 | **3:48** 259:11,19 | **7/1/09** 23:9 | 138:17 141:17 |
| 229:4,12 | **4** | 24:10 | 251:19 |
| 260:15 261:23 | **4** 25:17,20 | **78** 211:20 | **able** 7:25 44:20 |
| **23** 1:10 3:3 | 71:11 73:9,18 | **8** | 54:8 70:17 |
| 98:22 127:2 | 144:15 260:16 | **8** 33:3,13 37:7 | 79:11 83:11 |
| 201:23 202:1 | **40s** 252:7 | 37:10 71:5 | 93:23 148:1 |
| 262:4 264:3 | **45,000** 53:1 | 166:25 228:22 | 198:15 |
| **24** 211:4,6 | 198:12 | 261:5,6 | **above** 21:13,17 |
| 262:6 | **4:00** 137:1 | **84** 261:8 | 52:7 125:10 |
| **242** 262:7 | **5** | **89** 261:9 | 183:21 |
| **25** 188:16 | **5** 27:5,10 | **8:00** 109:14 | **absolutely** 47:6 |
| 189:4 243:1,3 | 168:22 217:12 | 140:6 | 106:6 140:25 |
| 260:17 261:24 | 260:5,18 | **9** | 218:4 230:11 |
| 262:7 | **50/50** 142:15 | **9** 69:11,14 | **access** 51:18 |
| **26** 33:23 39:12 | **50s** 36:1 252:6 | 261:7 | 117:17,19 |
| **26th** 263:22 | 252:7 | **9/26/2010** 32:1 | 134:11 |
| **27** 260:21 | **53,000** 187:17 | **9/7/08** 17:4,6 | **accessible** |
| **28** 104:5 | **57** 227:23 | 23:9 | 134:6 135:24 |
| **2:00** 140:7,8 | 230:19 | **90067** 2:10 | 136:7 |
| **2:33** 204:22 | **5:00** 18:1 140:6 | **92** 261:10 | **account** 56:18 |
| **2:47** 205:2 | 227:10 | **95** 123:13,18 | 93:18 246:10 |
| **3** | **6** | 261:11 | 246:13 256:22 |
| **3** 22:20,23 | **6** 12:13 31:13 | **98** 261:12 | **accurate** 28:12 |
| 37:21 143:14 | 31:16 177:8 | **9:00** 140:6 | 28:13 140:24 |
| 167:6 260:14 | 260:22 261:22 | **a** | 220:8 |
| **31** 260:24 | **641** 244:14 | **a.m.** 1:11 3:3 | **accurately** |
| **33** 261:5 | **69** 261:7 | 18:2 83:17,22 | 131:18 |
| **37** 261:6 | **6:02** 202:19 | 137:2 203:19 | **accusations** |
| **3922** 263:24 | | 227:11 | 130:23 150:20 |
| | | | **achieved** 31:3 |

**acknowledging** 159:13

**acosta** 2:21 4:3

**acquiesce** 200:15

**acting** 55:7

**action** 4:11 105:18 238:3 263:17

**activities** 203:7

**actual** 52:16 196:24

**actually** 12:23 35:17 39:2 77:4 96:4 121:1 132:12 149:22 157:6 180:16 192:20 194:17 198:6 230:1,4 231:19 238:20 242:9 243:24 254:19

**addition** 129:9

**additional** 27:4 118:6

**address** 12:14 12:15 56:23 81:9

**administer** 4:9

**admit** 113:18 114:5

**admitted** 112:11,18,19 112:24 114:8

**advance** 193:23 197:21

**advanced** 251:24

**advancement** 138:18 185:8 185:21 191:3

**advice** 105:11

**advise** 122:2

**advisement** 219:11,16

**affiliate** 19:11 50:21 52:18 57:23 75:13 109:14 133:25 135:14,17,19 142:4,19 168:7 168:11,20 169:11

**affiliates** 18:4,8 18:15,24 36:23 40:9 48:21 49:7 134:5,6 134:12,14 135:24 141:14 142:9

**affiliations** 4:19

**affirmatively** 141:18

**afford** 52:25

**aforesaid** 263:7

**afraid** 237:10 237:12

**afternoon** 127:16 170:14

**age** 9:22 132:18 132:25

**aggressively** 66:14

**ago** 9:16 10:5 13:19,21 40:17 70:3 96:17 211:1 229:8 230:9 247:16 247:18

**agree** 3:13 57:6 65:20 213:12 216:6 225:10 252:8

**agreed** 55:9 58:22 59:3,23

**agreeing** 28:9 172:2

**ahead** 222:2 257:12

**ahold** 173:13

**ailes** 233:23 239:8,9

**air** 179:2

**airport** 20:15

**alcohol** 7:9

**alert** 135:1,2

**alerted** 138:25 194:6

**alfredo** 177:13 177:15

**allegation** 106:14 113:19 114:6

**allegations** 11:20 12:1,6 55:14,17 97:19 118:7 130:14 191:1 235:1

**allege** 94:21 220:6

**alleged** 57:25 70:5 149:17 163:14 166:3 181:25 186:5 189:8 197:18 199:7 202:10 221:17 224:20 225:23 229:1 231:4 233:18 235:7,17 236:19 257:3

**allegedly** 165:3 210:13 215:2 223:12

**alleging** 251:14

**allison** 103:23 214:7

**allowed** 160:4

**alongside** 95:22

**aloud** 177:18

**alter** 187:6

**amended** 11:5 42:15 58:2 86:24 97:19

[amended - assignment]                                          Page 4

260:11
**americas**
137:13
**amount**  252:18
253:1,4,15
**anchor**  9:21
**andrew**  1:3,15
3:16,18 5:8
12:11 113:6
259:13 261:16
264:3
**andy**  23:19
33:25 131:8
261:19
**angeles**  2:10
**angle**  66:21
**anonymous**
235:24 236:3
237:1,16
**anonymously**
237:5
**answer**  7:20
8:13,19 24:18
30:18 45:20,25
48:13 49:18,21
96:24 121:20
122:6 123:5
125:12 171:13
174:4,6 188:14
221:20 248:15
250:19 251:5
253:18
**answered**
48:12 221:3,19

**anxiety**  121:5
256:25 257:2
**anybody**  58:21
128:22 129:11
133:16 136:19
139:17 144:9
145:5 146:1,25
151:12 154:16
157:12 158:11
175:13,18,22
176:8 192:14
206:19 215:13
225:22 233:1
240:16,20
241:1,6
**anymore**  51:19
60:11 67:5
117:18 186:25
**apartment**
58:23 59:2,3,8
59:24 62:20,22
62:23 63:13,16
**apologize**  107:4
112:23 212:9
230:17
**apologizing**
112:22 115:1
**appear**  219:3
**appearance**
4:16
**appearances**
4:18
**appeared**
145:19,21

**appears**  23:8
24:10 25:24
**applicable**
29:18
**application**
195:11
**applied**  38:22
157:6 194:3,9
195:7,17 196:4
197:17
**apply**  147:4
190:24 195:9
**applying**  116:3
116:6 197:22
**appropriate**
79:25 124:8
154:5,7 161:5
**approximately**
67:21 234:22
**april**  13:22
104:5
**area**  66:12
**argo**  136:5
**arranged**
194:23 195:6
195:14 196:3
**ashamed**  84:23
**asked**  30:9 31:4
48:12 71:22
90:5,8 106:23
147:10 175:7
175:10 188:5,9
195:14 203:4,9
217:24 218:17

221:19,22,23
249:18
**asking**  28:23
38:13 113:15
141:6 147:12
173:17 176:13
216:11 223:10
248:17,18
253:15
**asks**  77:24 81:8
**ass**  109:8
**assault**  53:22
58:1 66:3 70:5
86:16,19 89:18
93:1 158:1
181:25 189:9
192:7 197:18
199:7,18 201:3
202:10 222:7
224:21 225:23
229:1 231:5
233:18 234:3
235:17 257:4
**assaulted**  84:12
87:17 222:10
222:13,16,25
223:12,17
**assaulting**
192:11
**assign**  138:1
**assigned**  141:2
141:3 250:16
**assignment**
19:17 20:12,24

22:13 48:23,24
49:14 51:8,21
106:21 110:12
134:18,20,21
134:25 135:2,8
135:12 136:11
136:21 141:6
141:23 142:14
173:19,25
174:9,13,18,23
175:1,8,20,24
176:3,10,14
**assignments**
67:24 140:23
141:16,18
142:4,17 143:6
175:16
**assistance**
255:25
**assistant** 10:1,7
14:4,14 29:8
40:14,19,21
41:3
**assistants**
138:3 139:6
**assisted** 189:18
**assume** 8:3
44:12 118:2
193:2
**assumed** 61:5
160:2,9
**attempt** 92:25
**attended**
258:17

**attention**
119:19
**attorney** 4:21
7:19 244:21
**attorneys** 2:3,9
2:14 244:16
**attractive**
156:10,22
**audible** 8:16
**audio** 3:11
**august** 37:21
167:6 168:17
**authorized** 4:8
**availabilities**
146:11
**avenue** 1:18
2:15 4:1
137:13
**avoid** 68:6,7
**awarded**
252:19
**aware** 7:1
44:13 63:21
77:23 101:15
101:17 112:10
159:24 161:17
236:25 237:4
248:10 249:6
249:11
**awkward** 66:20
66:21

**b**

**b** 260:8 261:2
262:2
**back** 16:4 32:4
32:23 34:20
35:6,7,16
59:11 69:3
71:4 83:21
95:2 101:10
105:15 117:9
117:15 123:25
127:5,17 128:7
145:24 148:5
152:3 157:2
176:17 182:11
196:14 205:1,6
207:1,10
212:23 215:4
217:6 222:20
227:20 230:16
237:13 242:14
249:11,21
250:1,12
257:21 258:1
**backing** 118:16
**backup** 118:25
**backward**
64:18,19,20
**bad** 235:11,20
**badly** 56:2,4
**bag** 34:4
**ballpark** 35:23
148:21 180:25

**balls** 86:10
88:24
**bar** 58:15 61:1
148:25 156:7
**barracuda**
58:15 59:17
60:21,24 65:12
65:15 67:2,10
**barrett** 152:12
**bars** 61:24,24
**base** 252:6
**based** 23:18
30:19 47:15
48:7 189:13
197:5 198:9
235:7
**basement**
137:17 146:8
**basic** 63:3,4
**basically** 6:6
7:13 27:16
60:12
**basics** 129:19
**basis** 18:18
22:1 164:18
167:21 172:3
181:18 184:17
184:21 186:3
186:14 194:20
204:14 205:25
238:6 253:14
**bates** 73:8
76:17 159:17
202:15 211:20

[bates - blackberry]

214:10 230:19
**beach** 14:21,24
    15:9 71:17
    75:18,20,22
    82:11 255:5,16
**bed** 59:7,8,10
    63:8,17 64:7,8
    64:10,12,14
**bedroom** 63:20
    64:1,3
**bedspread**
    62:25 63:2
**began** 133:7
**beginning** 4:20
    83:23 85:2
    104:21 127:7
    160:21 205:3
    207:7 257:23
**begun** 42:11
**behalf** 4:25 5:3
    20:7 126:10
    141:8 175:8
    176:4,15
**behavior**
    110:22 156:23
    235:11,20
**belief** 28:14
    167:22 181:19
    183:18 186:4
    194:21 207:3
    207:12,19
    235:6 238:7
**believe** 11:24
    29:13 35:19,21

35:24 39:4
42:6,9 43:16
50:13 56:5
72:14 77:1
83:7,10 88:16
89:20 90:4
91:5 92:14
93:24 94:1
96:4,9 100:22
101:20 102:3
104:8 107:1
114:2,17,19
118:18,19
121:11 122:8
122:20 124:9
128:9,16
130:17 132:15
133:18 137:1,8
139:5,7,9,16,25
140:21 144:5
144:25 145:8
148:12 150:16
157:14 158:11
161:10 162:2
162:19,23,25
165:12 167:18
167:25 170:1
171:3 172:25
181:16 183:7
183:13 184:8
184:17 185:3,7
185:19,24
186:15,17,21
187:5,7,9,14,18

187:21 189:14
189:14 192:2,4
192:8 193:21
194:1,19
197:20 198:7
198:14 204:10
210:11,25
216:2 220:10
223:8,25 224:5
226:8 228:21
230:8,13 231:4
231:19,24
232:7,9 233:16
233:20 237:20
241:22 243:16
246:16 250:23
250:25 251:9
251:23 252:3
253:24 255:2,3
255:24 256:12
**believed** 168:24
    169:3 187:24
    204:17 206:25
    221:6 222:9
    223:18 224:12
    230:11 251:12
**believes** 160:22
    160:23 164:16
    164:17
**believing**
    168:21
**benefit** 58:20
    120:25 121:8

**benefits** 29:21
    252:14,16
**benign** 45:14
**best** 7:7 12:7
    20:7 28:13
    33:25 137:7
    247:3,7 255:10
**better** 35:1
**beyond** 31:3
    112:4 157:16
**big** 25:5 40:8
    84:25 99:22
    120:21
**biggest** 147:19
**bill** 153:8,12,24
    238:14
**bills** 153:5
**birth** 12:12
**bit** 21:3 24:22
    26:2,16 60:16
    76:9,13 81:1
    119:8
**bitch** 107:4
    109:11,23
    110:7,15
    114:24 212:14
    212:19 213:2,7
    213:14 214:3
    214:23,25
    215:7,14,17,19
    215:21 216:19
**blackberry**
    242:1,5

| block | | c | |
|---|---|---|---|
| block 108:24 | 47:3 | | 138:18 145:13 |
| blocks 60:22 | brave 86:6 | c 2:1 5:15 127:9 | 147:18 157:4 |
| blood 263:17 | break 8:5,7,10 | 213:10,13 | 157:18 191:3 |
| blue 23:13,14 | 8:11,14 83:19 | california 2:10 | 191:21 204:6 |
| 211:23 214:13 | 204:19,24 | call 18:20 20:7 | 204:12 253:22 |
| 230:22 | 257:14,19 | 20:9,13 43:3 | carlson 239:17 |
| body 54:8 | briefly 66:2 | 79:15 106:1 | carry 181:21 |
| bomb 207:7 | 249:17 | 111:22 166:20 | 181:22 |
| bombshell | bringing 18:5,6 | 173:8 | case 1:8 3:22 |
| 84:18 222:17 | brit 175:19 | called 15:8 | 6:8 9:17,18 |
| 222:21 223:21 | 179:17 | 19:21 27:20 | 74:17 103:1 |
| bonus 75:5,6 | broadcasting | 28:7 75:14 | 111:1 121:6 |
| booked 110:13 | 13:7 | 107:2 109:10 | 122:9 123:22 |
| boss 109:14 | broaden 192:1 | 109:22 110:14 | 129:20 130:5 |
| 128:25 129:7,9 | brought 9:20 | 114:23 136:5 | 130:13 220:4 |
| 129:14,18 | 64:7 | 212:5,13,16 | 246:17 251:10 |
| 152:4 154:10 | brown 13:4 | 214:14,23 | 252:22 253:5 |
| 154:13 | browne 103:24 | 215:2,10,13,16 | 253:11 255:22 |
| bosses 233:2 | 214:8 | 215:21 216:18 | 257:1 264:2 |
| bottom 73:8 | bubble 230:22 | calling 110:7 | cassandra |
| 143:21 159:19 | building 47:16 | 215:6,7,19 | 243:8,17 246:8 |
| 202:18 | 48:8 62:11,11 | 233:24 | casual 190:3 |
| bottoms 79:1,6 | 78:15,16 79:17 | calls 141:10 | categories |
| bought 153:14 | 137:12 170:19 | 220:3 | 123:21 |
| 154:15 | 180:17 | cancelled 81:21 | cause 186:22 |
| box 42:24 | bullet 177:19 | cancer 210:21 | caused 84:15 |
| 56:13 207:8 | business 68:10 | cantor 133:18 | 121:16 |
| 228:3 | buy 151:23 | 139:6 | cavuto 175:2 |
| boyfriend | 152:24 153:3 | capacity 48:16 | 175:13 179:13 |
| 59:18 | 153:16 154:12 | care 233:8 | center 255:4 |
| brain 240:23 | 154:21 | 238:20 | centered 216:8 |
| branded 43:8 | buying 252:9 | career 30:25 | central 20:14 |
| 43:22 44:2 | | 32:9 85:19 | century 2:10 |
| 45:5 46:14 | | | |

[certification - command]                                                      Page 8

| certification | 185:20 186:19 | 240:4 | 178:21 |
|---|---|---|---|
| 28:7 263:1 | **channels** | **claim** 236:19 | **cocktail** 58:25 |
| **certify** 263:4,15 | 146:23 | **claiming** 119:9 | **coded** 165:6 |
| **cetera** 74:1 | **characterizati...** | **claims** 234:21 | **coffee** 47:25 |
| 109:11 122:19 | 108:6 | 245:4 246:17 | **cohen** 33:16 |
| 248:9 | **characterize** | **clarify** 42:19 | **colleague** 5:4,9 |
| **cgreenberg** 2:6 | 245:21,22,24 | 141:21 223:3 | 92:10 117:1 |
| **chain** 52:5,9,11 | **charge** 143:8 | **clarity** 243:14 | **colleagues** 22:5 |
| 87:20 | **chase** 2:6 5:9 | **clear** 43:19 | 46:22 49:20 |
| **chance** 56:22 | **chat** 37:15 | 54:3 95:5 | 50:5 52:1 |
| 62:4 230:14 | **chatting** 48:1 | 162:10 181:6 | 61:17,25 70:19 |
| **change** 12:4 | **cheaper** 36:3 | 182:8,21 187:3 | 70:22 78:10 |
| 24:25 102:12 | **check** 56:12 | 196:17 199:3 | 79:14 80:1 |
| 139:22 186:22 | 101:25 217:6,9 | 207:5,18 | 126:10 152:14 |
| 207:12 264:4 | **chelsea** 58:15 | 208:24 222:21 | 152:17 154:7 |
| **changed** 10:10 | 58:23 203:23 | 223:24 224:14 | 247:5 |
| 60:10 102:10 | **chicago** 38:4 | 228:1 | **college** 13:1 |
| 140:2,3 207:2 | **chill** 56:6 158:7 | **clearly** 158:5 | **colmes** 176:9 |
| 207:16,17 | 158:12 196:18 | **client** 177:22 | 180:4 |
| 231:14 | **chilled** 158:6 | 219:12 | **come** 21:12,14 |
| **changes** 6:25 | **choosing** 155:3 | **clippings** 18:19 | 21:16,17 35:7 |
| 7:2,5 | **chose** 237:8 | **close** 259:6 | 48:23 49:1 |
| **channel** 18:4 | **cincinnati** | **closed** 54:10 | 57:7 68:3 |
| 19:4 52:13,15 | 14:11 131:24 | 56:20 64:1 | 120:19 136:17 |
| 52:16 134:22 | **circumstances** | **closely** 11:19 | 142:18 178:20 |
| 135:6,16,25 | 257:7 | **clothes** 92:25 | 182:11 |
| 136:3,7,10,20 | **city** 12:15,16 | **cloud** 242:7,10 | **comes** 166:18 |
| 142:6,11 | 12:18 25:14 | **coarse** 110:23 | **comfortable** |
| 145:17,23 | 36:4 38:4,20 | 112:5 115:2 | 32:16 34:6,19 |
| 146:3,10 147:2 | 38:23 40:7 | **coast** 16:9 | 145:25 151:6 |
| 147:5,9 163:7 | 42:11 52:25 | 17:25 20:6,11 | **coming** 25:7 |
| 164:23 169:4,7 | 62:8 75:16 | 49:3,23 50:1 | 142:13 256:23 |
| 169:14,15 | 77:20 147:16 | 50:12,16 | **command** 52:6 |
| 177:25 178:6 | 198:12 229:17 | 136:14,17 | 52:9,11 |

commencem... 263:9

comment  69:22 70:1,12 86:2 156:13 158:2

commented 208:10

commenting 156:21

commission 240:5 264:23

common  45:1 77:22 218:1

communicate 49:15 101:23 192:25 204:1,5

communicated 247:4

communicating 37:4 70:8 101:6

communication 39:24 68:9 70:10 219:22

communicati... 39:7 68:12 81:2,4 102:21 167:2 248:8

company  14:5 34:8,12 43:9 44:2 46:14 48:4 53:9 55:1 76:14 88:14 116:1 124:14

124:15 141:14 161:5,8 162:7 164:12,16 169:6,8,12 180:13 181:8 181:17 182:9 182:18 184:25 185:2,9,22 191:9 226:10 226:13,15 234:21 238:12 240:17 256:7

company's 161:3 164:3

compared 147:13 225:1

compartment... 70:17

compensation 124:3 186:23 187:6

competitor 57:13

complain 149:21

complained 149:23 150:5 151:13

complaint  11:5 11:15 42:15 47:23 58:2 86:24 97:19 106:17 107:11 107:17 113:20

114:7 149:14 150:12 163:10 191:2 220:6 235:4,24 236:4 237:18 238:8 239:7 240:3,10 240:17 249:20 260:11

complaints 149:18 150:15 160:16 161:7 237:23 238:11

complete 173:17,19 175:7,24 176:3 176:10,14

completed 143:6 144:2

completely 79:16,17 180:20

concludes 259:12

conduct  161:12 163:8 251:16 251:25 252:15

conference 177:21

confirm  178:4

confirmed 177:23

confusion 223:4,8

connect  191:16 246:7

connected 237:17

connection 241:9

connections 191:12

conscience 228:17

conservative 120:20

consider  41:4 179:5,9,12,16 179:20,24 180:3,7

considerable 181:13 199:4

considered 74:17 77:19 79:19 87:8 135:17 171:2 224:24 226:14

considering 89:14 105:17 218:15 233:24

constitutes 215:7

construe 110:19

construed 110:17

consultant  29:7

| | | | |
|---|---|---|---|
| **contact** 17:24 | **controversy** | **cooley** 2:8 4:24 | 157:8,13,19 |
| 22:8 | 263:19 | **coordinating** | 159:22 160:12 |
| **contacted** | **conversation** | 72:7 | 161:12,16,20 |
| 89:15,22 | 37:24 39:18 | **copies** 11:9 | 161:23 162:12 |
| **contained** | 57:8 71:19 | 37:8 69:12 | 163:20 164:24 |
| 216:25 | 73:5 81:19 | 84:3 89:6 92:1 | 165:9,13 |
| **contemporan...** | 89:13,17 90:13 | 95:9 98:6 | 166:13,14,16 |
| 119:4 | 95:17 96:8 | 103:12 108:10 | 166:22,23 |
| **contending** | 100:16 103:7 | 116:13 211:2 | 167:3,6,9 |
| 255:21 | 103:22 108:17 | 242:24 261:6,7 | 168:4,8 169:14 |
| **content** 18:3 | 108:19 114:18 | 261:8,9,10,11 | 170:21,24 |
| 19:8 20:8 21:5 | 116:22 190:3,6 | 261:12,13,14 | 171:11 172:6 |
| 25:9 54:20 | 196:22 197:2,2 | 261:18 262:6,7 | 177:4 178:25 |
| 134:5,9 135:4 | 197:10,13 | **cordial** 72:22 | 181:15 184:7 |
| 135:6,20,23,23 | 199:15,23 | 73:3 83:1 | 184:13 188:6 |
| 144:5 179:4 | 200:7,19 | **corner** 159:19 | 188:10 189:5 |
| **context** 39:17 | 201:13,18 | **corporation** | 190:12 191:22 |
| 71:18 81:18 | 208:2,21 | 1:6 2:14 3:19 | 194:3,10 195:8 |
| 110:10 149:1 | 209:16,20,24 | 44:8 117:23 | 195:11,19 |
| 200:7,14 213:9 | 211:11 212:23 | **correct** 10:9 | 197:10,15,18 |
| 215:25 216:2 | 223:6,10 243:7 | 12:7 24:2,13 | 199:13 202:10 |
| **continue** 3:12 | 243:10 248:18 | 26:22 30:18 | 202:13 203:23 |
| 59:25 67:23 | **conversations** | 31:7,8 39:1 | 205:9 208:13 |
| 109:7 | 3:8 94:9 103:1 | 43:10 72:18 | 209:17 210:5,9 |
| **continued** | 128:13 129:5 | 128:10 130:18 | 210:16 211:22 |
| 261:1,2 262:1 | 129:14 152:2 | 131:1,25 132:1 | 212:11,17 |
| 262:2 | 155:7,10,24 | 132:7,18,19 | 213:14,25 |
| **continuous** | 163:2 181:3 | 133:8 135:14 | 214:8,24 215:3 |
| 132:17 | 182:5 183:11 | 135:17 136:11 | 215:11 216:9 |
| **contractor** 29:7 | 192:17 193:6 | 137:10 138:8,9 | 216:12,15,16 |
| **contributor** | 193:12,16,20 | 138:12 139:12 | 216:19 217:2 |
| 140:13 172:10 | 196:15 209:5 | 143:17 144:19 | 221:10,11,13 |
| **control** 20:15 | 209:21 218:12 | 144:23 150:6,9 | 221:14 223:13 |
| | 219:20 | 150:12 157:4,5 | 223:14,17 |

224:2,18,22
225:12,13,15
225:16 226:5
226:24 229:2,3
229:5,6,14,22
230:1,2 231:6
231:20 232:16
234:4,14,20
237:2,6,7
241:24 243:9
247:23 250:9
251:16 254:2
256:2
**corrective**
238:3
**correctly** 159:7
173:4 187:20
194:6 202:9
205:18 232:3
**corresponded**
94:7
**cost** 36:3
122:18
**counsel** 4:17
5:7,13 45:22
126:3 127:22
127:24 128:10
128:14,15
161:4,15
177:12 243:11
244:2 248:12
253:6,10 259:5
263:20

**country** 36:24
**couple** 51:3
76:3 77:11
94:5 129:24
193:10 246:3
**course** 94:10
193:11 256:15
**court** 1:1 3:21
4:4 5:12 6:20
7:21 8:18
123:23 124:7
131:6,11
146:19 158:18
177:10 188:19
201:25 211:5
242:22 243:2
**cover** 153:24
**cowardly**
236:11
**cranberry** 59:4
64:5
**created** 134:10
134:13
**creating** 105:20
231:10
**cross** 106:3
**crotch** 64:25
66:12
**crystal** 222:21
223:23
**cs7430447** 1:25
**culture** 88:11
162:3

**cunt** 212:5,14
212:17,18
213:2 214:2
**current** 12:14
97:13 125:7
190:9
**currently** 3:24
124:22 154:13
**custom** 44:11
**cut** 35:18,20,21
35:23
**cuties** 77:25
**cv** 1:8 3:23

**d**

**d** 5:15,15 127:9
127:9 142:24
260:3 261:1
262:1
**d.c.** 217:22,24
**daily** 22:10
75:12
**damages** 119:9
122:17 123:21
124:6 126:5
249:18,19
250:13 252:18
254:5
**damn** 99:3
**dan** 2:21 4:3
**danielle** 121:14
256:1
**danzig** 116:23

**date** 12:12 23:7
24:9 33:12
37:19 39:8,12
71:9 79:12
81:3 84:13
98:20 104:3
171:9 207:15
264:3
**dated** 17:2,3
31:25 32:1
33:2 167:5
177:7 188:15
189:4 201:21
229:4 261:4,21
261:23 262:4
**dates** 132:2
171:18
**dating** 80:21
**david** 12:11
**day** 17:8 18:18
18:18 22:1,1
33:23 51:23
61:6,11,12
84:16 86:18
89:17 140:5,23
141:16 142:17
142:23,23
143:6 174:10
175:17 207:11
222:6 223:11
227:2 259:7,18
259:23 263:22
264:20

**days** 120:2 129:24 137:3 140:6 170:15 246:3

**deal** 121:23

**deceased** 210:17

**december** 132:4

**decide** 121:16 141:15 250:24 251:7 253:2

**decision** 139:15 139:18 194:13 194:18 236:23

**deck** 65:13,15

**defendant** 2:9 4:25 5:3 10:12 219:6

**defendants** 1:7 1:16 2:14 11:6 16:15 22:23 25:20 27:8,9 27:19,22 31:16 33:4 37:9 69:13 84:4 89:7 92:2 95:10 98:7 103:13 108:11 113:7,22 114:10 116:14 131:9 158:16 177:8 188:17 201:23 211:3

222:4 242:25 260:9,20 261:3 262:3

**define** 124:2

**definitely** 110:21 135:19 184:25

**degree** 12:21 12:24 13:9 188:1

**delancey** 1:3,16 3:17,18 5:8 12:11 127:16 131:9 205:6 219:4 258:1 259:13 260:5 261:19 264:2,3

**delancey's** 113:6 261:17

**delete** 90:21

**deleted** 90:22

**deleting** 102:8 102:8

**demand** 252:22 253:1 254:9

**demanded** 253:5,10

**demands** 85:18

**demonstrate** 29:21

**demoted** 163:7 163:24 165:3 165:20

**demotion** 164:1 164:3,7

**denver** 17:25

**deny** 113:24 114:12

**department** 79:23 161:2

**departure** 30:22

**depend** 141:4

**depends** 41:6 49:22,22 74:9 82:5,14 136:13 213:9 215:25 226:19

**deposed** 9:23

**deposition** 1:15 3:16 6:1,2 9:13 10:22 11:17 128:8,23 129:3 129:6 130:4,25 131:3 218:18 218:21 219:23 220:1 222:1 256:23 258:24 264:3

**deputy** 161:4 161:15

**describe** 16:23 17:21 23:4 29:2 31:22 37:23 42:16 44:17 52:19 64:22 94:15

106:16 107:18 108:2 109:24 166:8,9

**described** 41:1 177:25 182:1

**describing** 107:14 115:1 116:4

**description** 260:9 261:3 262:3

**desk** 19:17 20:13,24 22:13 48:23,24 49:14 106:21 110:13 134:18,20,21 134:25 135:2,8 135:12 136:11 136:21 141:6 142:14 174:23 179:10

**detail** 29:2 104:20

**details** 60:16 96:19 230:10

**determining** 187:10,15 216:3 251:1,12

**difference** 8:22 8:25 93:16 99:23

**different** 19:2 45:10 47:18 52:14 68:18

Case 1:23-cv-10357-AT-KHP    Document 124-7    Filed 10/31/25    Page 278 of 319

75:8 78:17,18
79:18 80:4
94:9 96:21
100:17 113:14
117:14 136:2
191:14,14
197:22
**differential**
80:5 154:11
**din** 41:21
**direct** 21:23
22:7,12 39:5
52:9 152:5
154:12 173:12
**directly** 49:1,15
51:25 52:4
142:18 180:9
183:15 263:18
**director** 10:1,8
13:18 14:4,14
35:6 40:15,19
40:21 41:3
125:8 154:13
**disciplined**
165:17
**disclose** 89:1
**disclosure**
107:21
**disclosures**
57:20
**discouraged**
88:13
**discovery**
10:24 57:21

259:1
**discrimination**
9:22 160:15,25
**discuss** 126:5
130:3,8,20
**discussed**
256:16 257:6
**discussion**
155:18
**dispute** 164:8
167:16 169:17
171:16,22
173:18 209:22
210:8 216:7
**disseminated**
136:1
**disseminating**
18:7
**distress** 252:19
254:5 259:3
**distribute** 22:4
**district** 1:1,1
3:21,22
**document** 11:2
11:4,11,13
16:12,13,20,23
22:20,21 23:1
23:11 25:17,18
25:23 27:4,6
27:12,15,20
28:4 31:13,14
31:19 33:1,7
37:7,12 69:11
69:16 84:1,7

89:5,10 90:3
91:25 92:4
95:8,16 98:4
98:10 103:11
103:19 108:9
108:14 113:4,5
113:10 116:12
116:19 131:14
143:13 144:14
158:15,22
159:17 177:14
188:22,24
202:3,17
203:14 211:8
232:12 244:14
246:16 248:6
248:21 260:10
260:12,14,16
260:18,22
261:15,20
**documentation**
248:8 258:25
**documents**
29:20 117:15
118:7 128:5
219:14 241:10
249:8,12
**doing** 25:9
88:17 98:2
109:13 116:1
130:7 138:21
142:16 150:24
151:6 162:8
186:2 191:14

203:4,9 207:25
237:10 238:10
**dollar** 253:1
**door** 63:25
**doorman** 62:12
**double** 124:25
198:1
**downstairs**
146:7
**dozen** 148:23
181:1
**dozens** 51:22
140:22 174:9
175:16
**dr** 254:15,19,25
255:9
**draw** 79:24
80:5
**dream** 38:25
**drill** 60:15
**drink** 58:25
59:7 154:16,21
**drinking** 64:5
**drinks** 151:24
152:24 153:2
153:14,16
154:8,12 155:4
155:5
**dropping** 181:4
**drunk** 203:17
**duly** 5:16
127:10 263:8
**duties** 190:9

**dynamic**
185:15

**e**

**e** 2:1,1 5:15,15
5:15 18:23
33:2,17 51:17
81:9 101:14
117:9,12,18,20
118:1,14,15
127:1,1,9,9,9
173:14,19
177:7,12
188:15,25
189:13 201:21
202:6,18
203:15 260:3,8
261:1,2,4,21,23
262:1,2,4
**earlier** 100:4
131:23 132:16
134:17 137:9
139:9 140:22
145:9 161:11
173:1 182:1
189:17 194:2
199:10 205:12
224:1 226:2
249:18,19
255:25
**earned** 29:21
**earning** 124:20
**easier** 25:13

**easiest** 173:12
**economic** 124:5
124:10 251:15
251:20
**ed** 239:20
**edge** 16:10
17:22 18:9,15
18:19 20:2
21:13,17,22
22:17 24:12,24
33:21 41:19,22
42:8,23,24
43:2,7 52:13
52:17 75:9
86:14 92:9
95:21 98:15
103:25 116:25
133:7,25 134:1
135:11,13
137:16,20
140:19 145:18
145:21 147:14
151:25 152:11
155:14 163:8
164:11,22
166:11 183:21
185:16,17
188:10 189:3
190:7,15
211:13,17
233:1,1,3
243:19 246:25
**educational**
12:20

**effectively**
141:24
**effort** 29:3
**eight** 28:17
29:1
**eighty** 142:9
**either** 18:7 83:8
135:9,11
141:11,13
241:25
**elaborate** 34:10
**elephant** 57:5
**elevator** 67:17
**eleven** 113:17
114:16
**eligible** 49:21
**emergency**
69:22,24 255:6
**emotional**
252:19 253:19
254:5 259:2
**employ** 263:20
**employee** 16:14
16:25 57:11
113:22 114:9
159:8 160:22
160:23 221:13
260:13
**employees**
36:17,18
137:23 140:10
155:6,25 163:3
**employment**
10:10 29:3,4,6

30:16 31:9
33:25 131:19
132:3,17 133:6
145:10 159:25
168:11 187:4
193:9 258:9,14
**ended** 29:5
53:25 67:6
143:16 144:18
165:25 168:12
197:8
**ends** 83:18
126:17 204:23
257:18
**engage** 203:6
**entertainment**
75:15
**entire** 91:12
124:18 137:20
153:8 171:20
**entitled** 11:4
16:13 22:21
25:18 27:6
31:14 113:5
254:2,6 260:10
260:12,14,16
260:18,22
261:15
**entity** 142:6,18
**environment**
148:4 151:18
231:10
**equal** 252:10

| | | | |
|---|---|---|---|
| **equally** 44:20 213:17 | **evidence** 55:16 113:18 114:1,5 114:13,15,20 168:15 183:17 185:11 196:25 228:4,16 | **exchange** 214:7 | 211:4,6 214:5 217:1 227:22 228:22 230:18 232:13 243:1,3 260:10,12,14 260:16,18,22 261:4,6,7,8,9 261:10,11,12 261:13,14,15 261:18,19,20 261:21,23 262:4,6,7 |
| **equivalent** 93:8 | | **excited** 39:21 40:1,5 | |
| **errata** 264:1 | | **exclamation** 86:7,8 | |
| **especially** 79:7 209:2 | | **excuse** 107:3 | |
| **esq** 2:5,6,11,17 2:18 | **ew** 9:19 | **executive** 14:23 21:19 40:18,20 171:5,8 217:20 224:10 225:11 225:14 | |
| **essentially** 25:8 31:1 134:11 213:15 | **exact** 95:24 148:19 169:20 170:6 171:9 178:16 180:23 182:20 207:15 208:23 | | |
| **estimate** 8:21 8:23 9:1,3,6 142:8 148:22 251:19 | | **exhibit** 11:3,6 16:12,15 22:20 22:23 25:17,20 27:5,10 31:13 31:16 33:1,4 37:7,10 69:11 69:14 71:5 84:2,5 89:5,8 91:25 92:3 95:8,11,12 98:4,5,8 103:11,14 108:9,12 113:4 113:7 116:12 116:15 131:7 131:10,12 132:11 143:14 144:15 158:16 158:19 166:25 177:9,11 188:17,20 201:23 202:1 209:13 210:5 | **exhibits** 128:6 |
| | **exactly** 35:19 60:17,23 61:11 83:9 88:22 91:17 99:10 102:16 104:21 105:14 137:4 172:23 182:2 196:2 212:23 228:19 230:8 | | **exit** 31:15,24 260:23 |
| **estimating** 9:5 | | | **expected** 176:25 |
| **estimation** 250:11 252:17 | | | **experience** 34:2 106:25 107:13 252:13 |
| **et** 74:1 109:11 122:19 248:9 | | | **experienced** 160:24 |
| **ether** 236:4 | | | **experiences** 107:9 |
| **evaluation** 22:22 23:6 25:19,25 26:4 260:15,17 | **examination** 5:20 127:14 | | **experiencing** 240:21 241:1 |
| | **examined** 5:18 127:12 260:4 | | **expires** 264:23 |
| **evans** 177:15 | **example** 138:11 | | **explained** 129:19 |
| **evening** 170:14 | **excellent** 127:21 258:6 | | **explanation** 244:8 |
| **event** 68:13 95:4 | | | **explicitly** 157:20 |
| **events** 58:12 62:7 69:2 104:20 118:24 | **except** 201:10 | | |
| | **exception** 247:6 | | |
| **everybody** 134:16 247:3 | | | |

**[expressly - first]**                                              Page 16

| | | | |
|---|---|---|---|
| **expressly** 244:9 | 130:17 | 157:3,23 158:8 | **filippatoslaw...** |
| **extent** 77:16 | **fanny** 69:24 | 180:14 206:1 | 2:5,6 |
| 85:6 112:7 | **far** 22:18 61:4 | 231:11 | **filled** 195:10 |
| **f** | 61:20 70:9 | **female** 86:20 | **finances** 238:19 |
| **f** 127:1 | 112:10 121:11 | 113:21 114:9 | **financially** 4:11 |
| **facebook** 36:17 | 167:24 | 152:14 | 198:8 238:17 |
| 36:22 37:17,18 | **fault** 231:2,5,9 | **fiancé** 128:24 | **find** 29:3 45:12 |
| 41:11,13 84:10 | 231:19,24 | 129:10 130:4 | 55:4 82:2 |
| 98:17 103:2,6 | 232:4 | **field** 20:16 21:7 | 93:15 124:8,13 |
| 103:8,22 | **favorites** 152:2 | 21:12 22:3 | 147:16 210:24 |
| 106:22 114:17 | 152:21 | 125:3 170:1 | 241:15 244:5 |
| 118:16 167:1 | **favoritism** | 171:3,20 172:5 | 256:4 |
| 209:15 214:6 | 151:20 | 181:14 224:1,7 | **finds** 123:24 |
| 228:21,25 | **february** 39:12 | 224:17,22 | **fine** 12:15 |
| 232:14 244:6 | 81:5 | 225:17 226:14 | 178:2 |
| 247:5 | **feed** 19:15 | 229:21 | **finish** 146:17 |
| **fact** 56:24 | 52:18 | **fielding** 49:7 | 146:18 |
| 107:12 119:21 | **feedback** 144:7 | **fifteen** 160:15 | **fire** 138:15 |
| 130:23 149:13 | 145:1 | **fifty** 23:21 24:6 | 183:8,12,14,19 |
| 149:23 151:1 | **feeds** 18:6 19:6 | 26:12,14 35:14 | **fired** 27:1 30:7 |
| 184:22 190:18 | 134:23 | 72:17 75:2,4 | 185:5 |
| 194:9 | **feel** 32:16 34:5 | 252:10 | **firm** 4:6,23 5:2 |
| **factor** 176:2 | 54:25 56:21 | **fight** 109:10 | 60:7 |
| 179:25 236:22 | 82:21 147:24 | **figure** 93:6 | **first** 5:16 27:8 |
| **fair** 18:14 36:6 | 147:25 151:5 | 97:15 | 27:22 37:16,20 |
| 36:10 125:5,6 | 164:14 | **figures** 97:20 | 37:23 42:22,23 |
| 132:22 133:24 | **feeling** 32:17 | **filed** 3:20 11:15 | 46:11 55:2 |
| 135:5 139:21 | 85:18 121:7 | 11:23 247:19 | 56:24 57:12 |
| 140:12 155:23 | **fell** 64:17 85:11 | 247:22 | 62:3 64:15 |
| 233:15 | **felt** 30:25 31:1 | **files** 51:17 | 72:7 98:23 |
| **fairly** 72:22 | 31:9 32:9 | **filing** 218:15 | 99:2,7,9 |
| **family** 120:19 | 34:19 94:18,19 | 248:1 | 100:13 111:21 |
| 120:21 129:10 | 121:21 145:13 | **filippatos** 2:2 | 117:6 167:5 |
| | 145:14 148:3 | 5:7 | 177:19 192:19 |

| | | | |
|---|---|---|---|
| 203:13 205:14 | 48:12 96:23 | 26:16 27:1,7 | 134:13,22 |
| 209:2 218:15 | 111:10 121:19 | 27:17,22 29:4 | 135:11,13 |
| 232:18 260:20 | 122:5 123:4 | 29:23 30:1,6,7 | 136:3 137:16 |
| **fit** 6:25 | 174:3 192:25 | 30:15,16,22,23 | 137:20 138:18 |
| **five** 17:20 24:6 | 221:2,19 | 31:15,23 33:21 | 140:19 141:14 |
| 28:22 74:21,24 | 253:17 254:11 | 33:22,25 34:14 | 142:5,5,10,18 |
| 257:24 259:15 | **formally** | 34:16,18,25 | 145:14,17,18 |
| **flip** 26:6 28:3 | 195:17 | 36:17,18,21,23 | 145:21,23 |
| 28:16,21 29:11 | **former** 71:2 | 38:12 40:15 | 146:2,5,9,23 |
| 37:22 73:6 | 247:5 | 41:18,22 42:8 | 147:2,5,9,13 |
| 80:23 143:19 | **forth** 222:20 | 42:23,24 43:2 | 151:14,25 |
| **flipping** 80:24 | **forty** 17:20 | 43:7,9,22 47:2 | 152:11 155:14 |
| **floated** 74:2 | 24:6 74:21,24 | 52:12,13,15,17 | 155:25 157:3,7 |
| **floor** 54:1 | 86:23 113:20 | 53:17 54:15 | 157:13,15,18 |
| 62:18 63:23 | 114:7 124:22 | 58:4,17,21 | 158:7 159:4,9 |
| 137:15 170:24 | **forward** 39:3 | 61:17,19 67:20 | 159:14,25 |
| **floors** 47:18 | 64:17 201:9 | 69:21 70:24,25 | 160:6 161:23 |
| 68:19 78:17,18 | **found** 44:24 | 72:17 74:24 | 163:5,8 164:7 |
| 180:20 239:6 | 46:14,19 52:24 | 76:7 77:13 | 164:11,12,22 |
| **florida** 14:25 | 80:20 93:14 | 84:19 85:19 | 165:6,17,21,25 |
| 32:5 71:17 | 242:17 244:3,6 | 86:14 87:18 | 167:9,10,15,19 |
| 75:18 145:25 | **founded** 163:5 | 88:12 92:9 | 167:24 168:1,3 |
| **flowers** 43:6 | **four** 71:7 85:25 | 94:3 95:20 | 168:7,11,16,19 |
| **folded** 81:20 | 86:1,5 96:11 | 98:14,15 | 168:22,23,25 |
| **folks** 218:5,8 | 205:4 257:18 | 103:24 106:21 | 168:25 169:11 |
| **follow** 190:5 | **fourteen** | 113:22 114:10 | 169:13,15,16 |
| **following** 29:22 | 124:19 132:18 | 115:23,23 | 169:18,24 |
| 177:21 187:16 | 132:25 | 116:24 117:21 | 171:11,15,21 |
| **follows** 5:19 | **fox** 1:6,6 2:14 | 117:22,23,24 | 172:8 173:16 |
| 127:13 | 2:15 3:19,19 | 118:14 124:13 | 174:13,19 |
| **font** 76:20 | 5:3 16:4,6 17:1 | 124:25 125:25 | 175:23 176:23 |
| **forceful** 66:23 | 17:13,14 18:4 | 126:11 127:22 | 177:24,25 |
| **form** 24:17 | 18:7 19:3 | 129:21 133:6,7 | 178:5,15 179:1 |
| 45:16,19,24 | 22:16 24:12 | 133:25 134:1 | 179:6,21 |

182:24 183:20
183:21,25
184:12 185:4
185:16,16,16
185:20 186:18
187:5,22 188:2
188:10 189:2
189:19 190:4
190:14 191:4
191:18,21,25
192:14,22,23
193:9,15,22
197:21 198:7
198:16 199:1,7
205:14 206:16
206:17,17,20
206:24 207:9
207:20 208:11
211:12,16
219:6 222:11
224:16,25
225:15,18,22
229:13 230:1
231:1,5 232:25
233:1,2,6,16
234:2 235:8,23
236:14 237:23
238:4,7,9
239:4,10,18,21
240:12,18,22
241:2,7 242:15
243:19 246:25
248:5,14 249:6
250:7,8 251:24

252:4 253:20
258:8,10
260:20,23
264:2
**fox's** 45:5
231:1,9,19,24
232:3
**francisco**
217:19
**frankly** 121:2
145:17
**free** 231:11
**freedman** 2:8
4:24
**freelance** 29:8
**friday** 128:18
128:18 170:17
170:20 243:11
243:14 244:2
**friend** 39:22
83:5 105:6
106:10
**friendly** 204:8
**friends** 32:7,23
34:21,23 62:5
70:20 71:1
76:24 77:6,9
174:14,19
179:6 210:25
**front** 60:2
66:10,12 95:13
103:15 116:16
124:1 249:21
250:1,12

255:13
**fucking** 107:3
109:8,11,23
110:15 212:5
212:13,14,17
212:18,19
213:1,2 214:2
214:2,25 215:7
216:18
**fulfill** 19:10
21:10 178:22
**full** 12:10 29:5
85:6 86:5
**fully** 200:12
**fun** 206:3
**function** 21:2,3
**functions** 170:3
**fundamentally**
75:8
**further** 36:9
94:8 126:4,8
147:1 199:6
233:4 258:21
259:1 263:15

|        g        |
| :---: |

**gap** 124:17
**gather** 20:8
21:5 135:4
**gathered** 18:23
135:20
**gathering** 18:2
18:3 25:9

**gauthier** 243:8
243:17
**gay** 38:9 61:1,3
61:18,24 76:4
76:7,22 77:5
77:14,19
115:15 151:24
152:10
**gender** 111:2
**general** 79:20
121:6 125:22
161:4,15
256:25
**generally**
170:13 206:9
213:8
**genitals** 94:25
119:14
**getting** 25:5
50:12 134:23
141:10 147:14
208:25
**gifts** 42:17
205:13 206:1
206:10 207:8
208:3,6 209:6
**give** 7:7 11:8
32:13 33:14
67:23 76:17
87:14 142:2
148:21 207:7
**given** 49:25
85:17 122:1
234:6 259:13

**[giving - h]**                                                    Page 19

**giving** 10:2
  32:17 33:10
**go** 3:13 7:12
  36:9 54:2,9
  55:21 58:14,20
  59:20 60:11
  61:24 62:4,6
  65:11,20 67:1
  67:5,9 69:3
  71:4,7 79:12
  83:13 100:7
  101:9 112:23
  121:8 126:12
  128:7 145:16
  148:1,4,10,13
  148:15 150:17
  150:23 151:4
  151:22,22
  152:15,18
  162:5,5,16
  189:25 204:18
  215:4 217:6
  222:2 230:16
  233:5 235:23
  236:4,16
  238:13 240:23
  241:11 244:25
  249:11 250:25
  257:12,13
**goal** 40:8 65:14
**goes** 85:25
**going** 3:2 5:24
  5:24 6:6,15
  7:17,18,22

11:1 16:11
  22:19 25:16
  27:3 31:12
  32:25 34:7,11
  35:6 37:6
  53:16 54:21
  56:12 59:17
  60:1 65:4 68:3
  69:10 71:4
  83:16,21 84:1
  84:24 85:1
  88:12 89:4
  91:24 95:7
  98:3 103:10
  105:7,13,15
  108:8 113:3
  116:11 121:17
  123:10 126:2,9
  126:15 127:5
  127:25,25
  128:2 130:6,11
  131:5 134:24
  136:10,20
  143:12 145:15
  145:16 146:16
  149:6 155:20
  157:2 160:3
  183:5 202:22
  203:10,23
  204:21 205:1
  223:24 228:12
  230:9 231:13
  231:25 238:15
  242:21 257:16

257:21 259:10
**good** 3:1 5:22
  5:23 22:18
  34:9 56:19
  58:18 59:23
  73:20 74:7
  75:24 78:4,7
  127:16 186:2
  196:19 217:25
  244:25 255:4
**goodwin** 98:12
  98:13 99:5
  100:20 206:21
**gossip** 155:21
  156:1 163:1
  166:4,6,15
**gotten** 26:23
  31:6 59:6
  149:4 195:5
  220:14 250:3,4
**grabbed** 66:9
  66:12 119:13
  119:14,15
**grabs** 60:4
**grand** 20:14
**great** 33:24
  54:5 181:8
  229:16 230:6,7
  259:18
**greenberg** 2:6
  5:10
**greg** 92:7,8,16
  232:15

**greta** 48:17
  50:11,21 170:4
  172:14,21
  181:5,11,15
  183:22 184:6,9
  184:23
**greta's** 50:13
  51:9
**grooming**
  207:6,14
**grope** 94:25
**grossberg**
  234:8,17 235:1
  235:7,13,15
**grossberg's**
  244:15 245:3
**ground** 5:25
  20:10 54:1
**group** 36:17,22
  37:4 61:2 76:7
  76:10,11 77:5
  77:18 167:24
**guess** 8:20,23
  9:1 186:24
**guessing** 9:3,7
**guilt** 228:16
**guilty** 228:16
**guys** 11:9 76:7
  151:24 152:10
  222:4

**h**

**h** 2:5 260:8
  261:2 262:2

ha  79:4,4
habit  241:18
half  14:18
  15:18 37:23
  39:6 181:1
halfway  59:6
hand  23:13
  63:8,9 159:19
  201:25 263:22
handbook
  159:4,8,13
handed  131:11
  158:18 177:10
  188:19 211:5
  243:2
hannity  176:9
  180:4
happen  51:2
  126:1 199:16
  238:16
happened
  53:22 55:18
  66:3 67:22
  84:12 85:7,8
  85:10,16 86:18
  94:20 95:6
  96:14,18,19
  97:2 108:3
  156:18 158:5
  196:18 199:17
  199:18 201:3
  207:4 222:7
  230:11 234:6
  234:13 250:5,5

256:21,22
happening
  155:22 197:8
happens  233:8
happy  70:16
harassed  111:5
  111:8 113:21
  114:9
harassing
  112:19
harassment
  106:15 108:4
  109:20,25
  110:4,16,24
  111:22 112:1,9
  112:25 114:21
  115:9 116:5
  159:21 160:1,4
  160:8,11,16
  161:8 215:24
  216:4 240:21
  241:1 258:8,14
harder  146:18
hare  86:3 217:5
  219:4,19 220:4
  220:7,11,18
  221:16 222:24
  223:11,16
  225:21 226:3
  246:20 247:6
harsher  213:21
hastings  1:18
  2:13 3:25 5:3

hats  46:15
head  8:16
  125:16 183:6
  190:4 228:12
  232:1 236:17
  240:24
hear  240:25
  241:5
heard  38:6
  165:4 166:4
  200:9,19
hearsay  166:16
heft  226:13,15
  230:6
heights  13:5
held  1:17 7:3
  40:17 54:15
  137:19 263:6
help  53:5 106:4
  122:13 176:24
  176:25 178:14
  179:3 193:23
  236:6,10
helped  53:15
helpful  53:11
  120:23 121:2
  122:1,9 191:11
helping  238:20
henry  239:20
hereunto
  263:21
hey  233:8
hi  33:19

hierarchy
  172:21,24
  183:21 184:6
high  13:11
  224:24
higher  87:10,17
  222:11 225:4,5
  225:6 226:12
highest  12:21
hire  16:14 17:1
  17:11 73:20,24
  194:14 260:13
hired  16:6 17:7
  17:8 93:22
  133:10 167:15
  169:18,23
  221:7
hiring  56:6
  133:22 194:18
  196:14,22
  197:3,14
history  12:21
  131:19 163:25
  235:11 238:9
  244:24 245:2
hock  1:19 4:5
  263:3
hold  126:3
holding  258:23
holing  83:25
home  9:9 67:11
  67:12 203:18
honest  83:9
  232:8 236:11

**honestly**
209:10
**honig** 211:12
**hootman**
121:15 256:1,5
256:20 257:7
259:1
**hope** 78:25
**hopeful** 198:10
198:17
**hopefully** 79:6
**horrible** 41:10
**horribly**
200:10
**hotline** 233:21
233:24 237:1
**hoult** 2:18 5:5
**hours** 50:10
128:21 136:25
139:22 170:11
170:13
**hr** 87:24 88:12
148:1,11,13,15
149:6,12 150:9
150:12,17,23
151:1,4,13
161:12 162:5
162:16 212:5
216:22
**huge** 109:10
**hugged** 86:11
**huh** 8:17 39:16
67:13 245:11

**human** 17:10
161:1 240:5
**hume** 175:19
179:17
**humor** 56:10
**humoring** 54:4
**hundred**
124:22 143:3
**hurt** 119:17
122:11

**i**

**idea** 9:4 39:25
106:4 165:5
168:10 172:20
176:20 184:5
204:9 225:20
230:4 233:20
238:22
**identification**
11:7 16:16
22:24 25:21
27:10 31:17
33:5 37:10
69:14 84:5
89:8 92:3
95:11 98:8
103:14 108:12
113:8 116:15
131:10 158:17
177:9 188:18
201:24 211:4
243:1

**identified**
89:24 254:15
254:23
**identify** 29:9
87:11 121:12
178:7 241:12
**illegal** 160:24
**immediately**
91:8 161:1
219:8
**impact** 138:18
185:8,21
**implication**
93:4
**implicitly**
157:21
**important** 7:16
183:4 216:3
**impropriety**
84:18
**improve**
147:17
**inaccurate**
101:2 213:25
**inaccurately**
212:15
**inappropriate**
79:20 80:21
110:21 152:4
154:10,20,25
156:6,23 163:2
163:3
**incentive** 56:15

**incident** 94:16
96:2 97:3
109:17 116:6,8
119:8 162:11
162:15 210:3
221:17
**include** 160:11
215:1
**included**
122:20
**includes** 132:13
**including** 29:5
37:1
**income** 29:21
**incorrect**
212:11
**increase** 187:11
187:16
**incurred**
253:20
**independent**
29:7
**indirectly**
180:9 183:15
183:19 263:18
**individual**
20:22 21:18
107:10 140:13
144:23 172:9
**individually**
18:21
**individuals**
138:15 139:3
157:10 246:24

**industry** 218:2
**inews** 68:15
  173:10,21
**influence**
  138:23 182:23
  184:2 187:22
**influenced**
  187:13
**information**
  18:24 42:13
  118:10,12
  203:12 216:24
**initial** 219:21
**initiate** 141:22
**injured** 119:10
**input** 139:18
  144:10 145:5
**inquiring** 100:1
**instance** 106:15
  112:8
**institute** 13:4
**insurance**
  256:7,8
**intending**
  207:21
**interact** 201:10
**interactions**
  163:4,14
**interchangea...**
  213:5
**interest** 60:9
  190:8
**interested** 4:12
  82:4 122:15

217:22 263:18
**interfere** 190:8
**intern** 13:11
**interoffice**
  68:15 173:10
  200:1
**interpersonal**
  155:21
**interpret** 149:8
**interpreted**
  149:11
**interrogatories**
  27:9,23,25
  30:13 260:21
**interrogatory**
  28:17,23 29:1
  30:3 254:14
**intervened**
  212:6 216:22
**intervening**
  120:16
**interview** 31:15
  31:24 32:12
  41:15 53:12,15
  53:19,24 54:6
  55:12,21 56:2
  56:4,8,12,19
  93:22 133:17
  194:23 195:2
  195:15,20,22
  196:1,3,20
  197:6 199:19
  200:9,10,20
  202:13 260:24

**interviewed**
  53:21 57:22
  133:14
**interviewing**
  54:4,12 55:1
  57:12 74:1
  82:15
**introduce**
  32:25 191:18
  191:24 192:9
  192:13 193:13
  193:17
**introducing**
  38:1 192:18
**investigate**
  147:8 188:1
**investigated**
  237:23
**investigation**
  240:4,8
**invite** 151:22
**invited** 58:14
  58:24
**inviting** 155:3
  191:13
**involve** 19:13
  20:3
**involving**
  162:15
**iphone** 90:24
  91:2 241:23
  242:3,8
**ipump** 19:21
  25:10

**issue** 50:1
  138:24 139:1
  147:19,22,23
  151:4 259:2
**issues** 6:7,9
  121:23 148:2
  149:4 162:17
  162:24

**j**

**jason** 2:11 4:22
  98:12,13
  177:15 206:21
**jeans** 59:14
**job** 1:25 13:20
  14:2 17:24
  25:7 32:5
  33:21 35:2
  42:11 49:6
  50:23 53:12
  55:15,25 56:25
  57:13 72:2
  74:13 75:7,8
  81:22 82:2
  83:2,12 93:23
  94:8 98:15
  100:1,17 124:3
  124:13 132:21
  132:21 138:21
  170:2,6 178:17
  178:22 179:4
  186:2 189:18
  195:7,9,18
  196:5,7,11

197:22 217:23
218:6
**jobs** 38:22 55:5
94:14
**jog** 51:17
**johnson** 86:3
86:12 88:9
89:25 217:5
219:5,19 220:4
220:7,11,18
221:16 222:24
223:11,16
225:21 226:3
226:17 246:21
247:6
**johnson's**
227:14
**join** 41:22
**joined** 58:4
**joining** 5:5
**jones** 40:13
41:2
**jorgé** 83:3
**josh** 116:23
**jsunshine** 2:12
**juice** 64:5
**july** 25:25 26:1
131:20 139:10
143:16 144:3
144:18 167:15
169:19
**june** 1:10 3:3
12:13 127:2
217:12 243:15

263:22 264:3
**junior** 57:11
**jury** 251:7
**justin** 1:6 2:9
3:18 4:25
36:12,14 37:1
37:15 38:9
41:9,16 42:16
43:13,15,20
44:10 47:12
53:5 55:4 56:5
58:14 63:12
64:11 69:21
71:6 76:25
78:21 81:8
86:19 89:18
91:11 99:1
106:25 113:14
146:4 158:1,10
172:18 177:6
180:7,17 183:3
189:1 201:5
202:6,18,25
203:7 209:22
210:3,8 212:2
228:14 242:15
244:10
**justin's** 62:11
184:6

**k**

**kathleen**
106:18,20
108:18 114:18

209:16 210:4,9
210:13 212:3
214:19 234:7
234:13 235:10
**kathy** 231:18
**katzenstein**
2:17 5:1,2
126:12 127:15
131:5 159:2
187:1 204:18
219:1,12
221:21,25
223:7 242:21
248:23 258:20
259:8 260:6
**keeping** 73:1
83:1 204:7
**kept** 72:24
**kick** 86:9 88:23
**kind** 20:14
67:25 76:8
85:11 134:24
140:4 207:6
231:9 253:21
**kinds** 50:17
**kiss** 66:17
**kissed** 64:21
**kit** 69:22
**kitchen** 63:6
**knew** 48:4 53:8
58:20 61:4,20
76:1 77:17
83:3 91:17
104:12,13

105:4,25 148:5
191:8,10
195:25 230:8
230:12 233:19
**know** 6:2,11
8:6,8,22 9:2
18:25 22:18
24:21 27:24
38:8,13 42:12
43:13,14 44:16
44:23 45:7
46:9 55:18
57:14,16 58:18
58:19 60:19,23
61:15 70:9
74:6 75:25
82:20 85:10,19
88:20,21,24
90:17 91:9
92:18 99:18,19
100:23 102:16
104:21 106:11
111:12,15,24
113:2 118:4
121:6 125:12
129:8 135:10
136:12 139:14
139:17 144:9
144:12 145:4
147:12 153:19
155:9,14
156:15,17
158:21 163:25
164:2,5 165:10

165:11,13,14
165:18 169:20
169:22 170:2,5
170:7,10,15
171:1,7,12,13
171:18 172:13
172:19,23
174:16,21,24
175:3 176:16
178:10,14,18
181:5,6 182:19
183:1,5 188:3
190:13,21,23
194:12,15,16
195:3 196:2,2
196:4,7,9,13
202:3 203:10
206:4,19
207:15 208:22
209:10,11
210:2,19,22
212:20 220:20
223:20 225:17
226:20 230:15
231:13,25
233:9,17,19
234:16,18
235:2,4,20,22
236:13 237:19
237:25 240:16
242:2,6 243:25
244:7,20 250:3
253:4,8,13
254:12,13,18

254:19,20,21
254:22 255:23
**knowing**
182:25 185:15
253:25 254:5
**knowledge**
12:8 28:14
112:5,6 115:16
137:7 144:8
154:18 158:13
163:10,14,20
163:23 165:1
165:16,20,24
166:13,22
172:3 210:8
216:22 234:25
235:5,9,19
240:7,14 247:3
247:8 248:19
248:21 255:10
**known** 38:14
86:9 88:19
90:4 234:2,6
**knows** 99:3
128:25 130:12
130:13
**krissy** 2:17 5:1
**krissykatzens...**
2:17

**l**

**l** 5:15 127:9
**label** 159:18

**labeled** 149:13
159:21 230:19
**lackowitz** 92:7
92:8 94:17
96:21 97:10
232:15
**landscape**
229:16
**language** 54:8
107:3 110:23
112:5 115:14
212:10
**large** 42:24
153:6
**largely** 18:15
155:24
**lasted** 119:24
**late** 170:14
238:11
**lateral** 24:23
164:15 165:9
**law** 4:23 5:2
**lawsuit** 10:13
10:16 11:14,17
12:1 94:22
112:15,17
115:6 218:16
219:20 236:14
241:11 247:19
247:22 256:17
256:20 257:3
**lawyer** 89:15
89:22 178:3

**lawyer's**
113:13
**lawyers** 10:23
10:25 27:16
122:2
**layout** 62:19
63:3,4
**lead** 150:16
158:11
**learn** 42:10
63:12 101:23
**learned** 77:4
198:11 224:3
**learning** 77:7
**leave** 30:23
34:9 52:20
57:15,17
253:21
**leaving** 125:24
**led** 184:15
**left** 30:6,14
32:9 60:14
63:9 65:9 67:7
67:8 72:17
74:24 117:21
117:22 118:14
124:13,15
131:23 132:21
157:3 171:10
171:15 207:20
250:7 253:23
255:19
**legal** 4:6
105:17 259:16

| | | | |
|---|---|---|---|
| **lens** 116:3,5 | **list** 15:9,17 | 264:1 | 207:10 209:13 |
| **letter** 112:22,24 | 71:15 74:14 | **llp** 1:18 2:8,13 | 214:12 215:5 |
| 113:1 210:12 | 75:14 78:12,24 | **local** 18:8 40:9 | 227:20 228:20 |
| **letting** 18:25 | 80:15,16 81:21 | 50:21 54:19,20 | 229:7 230:19 |
| 190:13 244:20 | **listed** 57:19 | 54:21 61:21 | 230:21 232:11 |
| **level** 68:8 87:9 | 167:25 | 75:13 134:14 | 233:4 247:10 |
| 221:13 224:25 | **litigation** | **located** 3:24 | 247:17 |
| 225:4 | 117:12 | 60:21 137:13 | **looked** 41:12 |
| **lftcllp.com** 2:12 | **little** 24:22 26:2 | 137:16 | 62:18,25 63:2 |
| **lie** 6:14 | 26:16 60:16 | **location** 137:19 | 76:9 242:15 |
| **life** 124:18 | 76:9,13 80:25 | 146:14 | 244:4 247:25 |
| 257:7 | 110:10 112:4 | **locations** 98:16 | 254:18 |
| **liked** 107:6 | 119:8 213:21 | 102:20 | **looking** 19:23 |
| 152:22 183:3 | **live** 25:13 | **logo** 43:2 | 25:4 38:3 |
| **likely** 50:15 | 39:21 40:2,11 | **long** 13:19 14:7 | 52:20 55:5 |
| 90:13 239:23 | 52:25 63:13 | 14:15 15:16 | 56:25 78:4,7 |
| **likes** 206:5 | 109:12,13 | 35:9 69:1 73:4 | 81:22 82:1 |
| **limit** 145:15,20 | 110:13 147:21 | 84:20 96:17 | 124:15 132:10 |
| 153:5 | 174:23 179:10 | 97:6,8 102:14 | 160:17 182:23 |
| **lindsay** 86:3 | 198:13 216:8 | 108:24 120:23 | 198:4,19 207:1 |
| 89:14 217:5 | 216:12 | 124:12 128:19 | 228:6 |
| 218:12 | **lived** 32:6,24 | 171:10 222:18 | **looks** 17:3 |
| **lindsey** 219:4 | 60:18 73:13 | 238:14 | 23:14 70:2 |
| **line** 68:14 | **livelihood** | **longer** 224:11 | 74:3 76:18 |
| 79:24 80:6 | 92:22 93:20 | 238:17 | 217:12 |
| 173:9,11,21 | **lives** 60:23 | **longest** 133:1,3 | **los** 2:10 |
| 200:1,1,3,18 | **living** 36:3 40:6 | **look** 17:9 51:16 | **lose** 117:19 |
| 201:17 229:8 | 40:10 59:9 | 69:3 100:7 | 233:11 |
| 233:10 262:10 | 63:18 75:16,19 | 123:2 143:13 | **loss** 249:20 |
| 264:4 | 82:9 147:15 | 144:13 152:3 | 250:1,12 |
| **liner** 2:8 4:23 | 255:15 | 158:20 159:16 | 251:15,20 |
| **lines** 46:17 | **liza** 33:16,19 | 160:14,19 | 252:13 253:20 |
| **lissaim** 95:18 | **llc** 1:6 2:15 | 166:24 189:22 | **lost** 73:25 |
| 95:19 | 3:20,25 5:4 | 202:2,15 | 250:17 251:1,9 |

254:1
**lot** 34:15 36:9
40:8 46:9 51:5
51:10 53:8
71:1 141:3,8
148:8 151:23
154:1 156:2
181:7 191:9,10
201:10 223:19
**lots** 74:1
**lounge** 60:21
60:25
**love** 207:6
**loved** 86:9
88:23
**low** 147:15
185:17 186:9
252:5,7
**lunch** 47:25
126:18

**m**

**mad** 66:23
70:15
**made** 7:5 19:11
29:3 59:4 70:1
72:14 84:11
90:7 99:11
100:25 106:22
109:15 139:15
149:2 150:15
158:2 164:13
181:6 182:20
186:6 191:6,12

198:18 199:3
208:23 228:14
234:21 235:1
236:23 248:21
249:11 252:22
**mafia** 76:4
77:14,19
**magazine**
75:15
**mail** 18:23 33:2
33:17 81:9
101:14 173:14
177:7,12
188:15,25
189:13 201:21
202:6,18
203:15 261:4
261:21,23
262:4
**mailed** 173:19
**mails** 51:17
117:9,12,18,20
118:1,14,15
**main** 2:3 19:25
20:17,19,25
22:8 49:10,16
134:2
**maintain** 30:17
**majority** 68:14
153:11 177:24
178:5
**make** 6:25 7:2
25:13 34:17
46:2 55:14

57:7 60:6 62:5
65:25 84:15
93:1,22 143:10
147:17,20
150:12 164:14
191:2,13
198:20 207:8
235:24 236:5
239:15 242:16
249:3
**making** 35:13
35:15 36:8
72:10,11,16
74:20,23 75:2
124:24,25
130:14 141:9
154:1 182:7,25
194:13 198:2
206:3 252:5,11
**male** 152:17
**manage** 137:23
140:10
**managed**
137:24 138:4
**management**
72:8 171:2
190:14 221:12
**manager** 9:25
125:23 133:22
161:20,23
196:15,23
197:4,14
**manager's**
143:22

**managing**
15:15 138:7
**mandatory**
258:16
**marathon** 8:7
**march** 40:22
132:5,6
**marie** 95:18,19
**mark** 11:2
16:12 22:20
25:17 27:4
31:13 37:7
69:11 84:1
89:5 91:25
95:8 98:4
103:11 108:9
113:4 116:12
131:6 242:22
**marked** 11:5
16:15 22:22
25:19 27:9
31:16 33:3
37:9 69:13
84:4 89:7 92:2
95:10 98:7
103:13 108:11
113:7 116:14
128:5 131:9,12
143:14 144:14
158:16,19
177:8,11
188:16,20
201:22 202:1
211:3,6 214:5

[marked - messages]                                            Page 27

| | | | |
|---|---|---|---|
| 217:1 228:22 | **mccarthy's** | 118:4 129:3 | **mentioned** |
| 232:12 242:25 | 144:6 145:1 | 149:9 228:11 | 239:1 |
| 243:3 | 152:21 165:25 | 228:19 237:17 | **mentions** 239:7 |
| **marriage** | **mccullough** | **mechanically** | **merit** 187:15 |
| 263:17 | 254:16,20,25 | 19:12 | **message** 37:20 |
| **martinez** 57:16 | 255:9 | **media** 3:15 | 73:12 86:5 |
| 57:18,19 | **mcdowell** | 61:21 69:20 | 92:16 98:24 |
| **material** 42:25 | 152:11 | 70:11 81:24 | 117:6 211:23 |
| 93:16 | **mean** 20:18 | 83:18,23 | 213:24 214:19 |
| **math** 142:16 | 28:8 30:5 | 126:17 127:7 | 214:22 217:16 |
| **matt** 133:18 | 34:11 40:24 | 204:23 205:3 | 218:22 228:13 |
| 139:6 | 41:6 42:19 | 210:25 229:16 | 231:17 232:14 |
| **matter** 3:17 | 45:3 76:5 85:5 | 257:18,24 | 232:18 |
| 128:6 217:16 | 85:13 92:23 | 259:14 | **messaged** 99:2 |
| 218:13 222:4 | 93:19 96:16 | **medical** 119:18 | 99:6,8 100:12 |
| 236:1 240:14 | 104:17,18 | 120:3 123:17 | 212:4 |
| 244:22 248:7 | 106:17 111:24 | 254:16,24 | **messages** 37:9 |
| 263:19 | 112:13 117:8 | 255:4 | 69:13 71:5,10 |
| **matty** 40:10,12 | 120:9 140:14 | **medications** | 84:4 89:7 |
| **mccarthy** 21:24 | 141:19 149:11 | 7:9 | 90:16,19 91:8 |
| 47:10 52:6,8 | 151:19 180:10 | **medium** 81:12 | 92:2 95:10 |
| 133:15,19 | 200:13 201:2 | **meet** 36:14 | 98:7,18,21 |
| 139:8,16 | 213:3,20,22 | 42:5,7 62:7 | 99:25 100:25 |
| 143:24 144:2 | 225:6 228:4 | 101:23 256:9 | 103:13 104:4 |
| 144:22 148:14 | 232:23 245:12 | **meeting** 61:3 | 108:11 116:14 |
| 149:17 150:3 | **meaning** 8:16 | 61:14,16,17 | 118:16 211:3 |
| 152:24 153:3,8 | 113:25 114:13 | 128:20 | 214:13 217:7 |
| 153:24 156:20 | **means** 88:22 | **meetings** | 218:24 219:3 |
| 162:1,11,18,24 | 91:7 101:7 | 128:14 256:13 | 241:12,13,16 |
| 163:11,15,23 | 180:11 249:23 | 256:16 | 241:19,20 |
| 165:2,16 166:3 | **meant** 30:9 | **memory** 51:17 | 242:13,25 |
| 187:18 188:6 | 78:1 79:9 | **men** 61:3 | 244:6 246:20 |
| 205:22 208:10 | 86:11 92:24 | **mendota** 13:4 | 247:10 261:6,7 |
| 209:5 | 93:11 97:24 | | 261:8,9,10,11 |

261:12,13,14
261:18 262:6,7
**messaging**
68:16 173:10
**messenger**
90:14 103:2,6
103:9,23
**met** 37:3 58:22
104:6 128:10
**miami** 83:8,8
**microphones**
3:6
**mid** 199:21
**midlevel**
181:10 185:4
185:20 186:18
**million** 253:10
254:9
**mind** 102:4
106:3 203:11
203:18 207:16
231:13,14
240:1
**mindset** 72:25
74:19
**mine** 21:4
233:10
**minneapolis**
14:1,3 131:24
132:3
**minnesota** 13:5
14:1
**mischaracteri...**
115:5

**misguided**
231:22
**misleading**
97:23
**missed** 244:11
**missing** 239:16
**mission** 116:2
**mistake** 182:7
182:12
**mixed** 34:4
**mobility** 31:2
145:22
**moment** 126:8
126:13
**monday** 170:17
**mondays** 137:5
**money** 24:22
36:8 72:11,13
74:9 147:17,21
153:22 154:2
198:3,16,20,23
253:15
**monogrammed**
44:5 45:10
47:4,6 205:20
206:9 209:1
**month** 55:2,6
56:24 57:13
58:3 67:19
**months** 13:21
14:9 39:4,14
40:17 69:4
107:25 184:13

**mood** 60:10
**morning** 3:2
5:22,23 221:24
**motivation**
192:3,5
**motive** 192:10
**mouth** 88:16
195:13
**move** 24:23
38:3,19 39:3
164:15 165:9
**moved** 13:10
46:6 53:4
82:12 187:17
198:2
**movie** 84:17
85:11
**moving** 32:4
198:3
**multinational**
44:7
**multipage**
158:15 261:20
**multiple** 94:9
**mute** 3:9
**mutual** 70:20
71:1 76:24
83:5
**mykel** 21:23
47:10 133:15
133:19 139:7
139:16 143:24
148:14 151:21
162:18 187:18

190:6 205:22
206:5 232:19

**n**

**n** 2:1 5:15,15
127:1,1,1,9,9
142:24 260:3
261:1 262:1
**naked** 92:21
93:5,10,13,15
94:20 97:11,17
98:1
**name** 4:3 12:10
15:2 43:1 44:5
46:20 47:5,7
121:14 142:23
143:22 152:12
181:4 208:16
264:2,3
**names** 155:15
178:16 215:2
**nasty** 214:15
215:8
**national** 23:20
24:1 25:5,6
26:20 33:20
48:24 68:24
86:13 87:2,7
92:14 139:11
139:24 140:9
140:19 141:5
220:12,15,21
221:8 227:2,3
227:6 243:21

| | | | |
|---|---|---|---|
| 243:23 | 61:18 141:5 | 185:25 198:2 | 135:25 136:3,7 |
| **nature** 37:24 | 192:1 218:3 | 198:12 206:13 | 136:9,20 |
| 155:17 240:7 | 225:7 260:23 | 206:13,16 | 137:20 138:19 |
| 240:14 | **neutral** 38:17 | 229:17 240:4 | 140:19 141:14 |
| **nbc** 53:19 | **never** 47:7 54:2 | 252:11 260:13 | 142:5,11 |
| 57:22 217:21 | 68:20 107:6 | 263:4 264:1 | 145:17,21,23 |
| **necessarily** | 120:22 124:19 | **news** 1:6 2:15 | 146:2,9,23 |
| 77:21 79:21 | 132:24 145:16 | 3:20 5:4 10:1,8 | 147:2,5,9,14 |
| 110:25 136:13 | 154:14,15 | 13:18 14:4,14 | 151:14,25 |
| 166:7 226:25 | 157:6,11 | 16:10 17:1 | 152:11 154:13 |
| 237:20 | 161:11,14,19 | 18:4,5,7 19:3 | 155:14,25 |
| **necessary** 19:7 | 161:22 162:10 | 24:24 26:16 | 157:3,7,13,18 |
| **need** 8:5,7,11 | 162:14 173:18 | 27:1 29:5,23 | 158:7 159:5,9 |
| **needed** 19:9 | 174:17 180:16 | 30:1,6,7,15,16 | 159:14,25 |
| 48:19 50:25 | 191:20 197:9 | 30:22,24 31:15 | 160:7 161:23 |
| 68:2 82:2 83:2 | 205:23 208:11 | 31:23 33:21 | 163:5,7,8 |
| 129:8,23 135:6 | 208:15 210:12 | 34:16,25 35:6 | 164:7,11,12,22 |
| 136:14,18 | 248:12 | 40:14,19,21 | 165:6,17,21,25 |
| 176:24 178:15 | **new** 1:1,18,19 | 41:3 42:23,24 | 166:10 167:9 |
| 179:4 180:14 | 1:20 2:4,16,16 | 43:2,7,9 52:12 | 167:10,15,19 |
| 180:15 201:11 | 3:22 4:1,1 5:18 | 52:13,15,16,17 | 167:24 168:1 |
| 227:3 | 16:14,25 25:14 | 58:17,22 61:17 | 168:16,23,25 |
| **needing** 129:22 | 26:8,11 36:4 | 75:12,15 78:13 | 169:4,14,15,16 |
| 178:21 | 38:4,20,23 | 78:24 84:19 | 169:18,24 |
| **negative** 107:8 | 40:6 46:7 | 85:20 86:14 | 171:15,21 |
| **neil** 175:2,13 | 52:25 55:5 | 87:18 92:9 | 172:8 173:16 |
| 179:13 | 56:25 57:1 | 95:21 98:15 | 176:23 177:25 |
| **nerves** 130:6 | 62:2,8 69:21 | 103:24 106:21 | 178:5,15 179:1 |
| 256:24 | 74:13 77:8,13 | 115:23 116:25 | 182:24 183:20 |
| **network** 1:6 | 77:20 107:2 | 117:21,22 | 183:21,25 |
| 2:15 5:4 19:25 | 127:12 137:9 | 125:7 127:22 | 184:12 185:16 |
| 20:17,19,25 | 147:16,21 | 133:6,7 134:1 | 185:16,16,20 |
| 22:9 31:15,23 | 168:8,12 | 134:13,22 | 186:18 187:5 |
| 40:7 49:10,16 | 169:11 171:11 | 135:6,11,13,16 | 187:22 188:2 |

188:10 189:2
189:19 190:4
190:15 191:4
191:18,22,25
192:14,22
193:9,16,22
197:21 198:7
198:16 199:1,7
205:14 206:16
206:18,20,24
207:9,20
208:11 211:13
211:16 218:1
219:6 222:11
224:16,25
225:15,18,23
229:13 230:1
231:1,5 232:25
233:1,3,6,16
234:2 235:8
236:14 237:23
238:4,7,10
239:4,10,18,21
240:12,18,22
241:2,7 243:19
246:25 248:6
248:14 249:6
250:7 251:24
253:21 258:8
258:10 260:23
**newsperson**
239:24
**newsroom** 41:8
53:24 54:2,9

125:14,15,17
151:25 163:18
166:19
**nice** 45:17
153:23 206:23
207:13,21
**night** 59:25
61:9 67:6
136:17 202:23
203:2 222:8
227:4
**nine** 119:1,2,6
**nod** 8:16
**nongay** 152:17
**nonmanagem...**
140:15
**nonparty** 9:24
**nope** 88:8
92:17
**northeast** 50:2
**notary** 1:20
5:17 127:11
263:3 264:22
**notation** 23:12
**note** 3:5 34:9
219:2
**notebook** 209:8
**notebooks**
43:23 44:3,11
45:4 46:14
**noted** 259:19
**notepads**
205:20 206:8

**notes** 257:10
**notice** 1:17
**noticing** 4:20
**november**
201:22 202:7
247:23 262:5
**number** 3:23
28:17 29:1
76:18 81:15
101:19 102:1,8
102:13,17
113:16 114:3,4
148:20 159:18
180:24 202:16
259:14
**numbers** 73:6
102:12

**o**

**o** 33:22,22
127:1,1,1
**o'reilly** 176:2
179:25 238:14
239:2,3
**oath** 4:9 6:14
127:19 205:9
258:4
**object** 7:19
**objection** 24:16
45:15,18,23
48:11 96:22
111:9 121:18
122:4 123:3
174:2 221:1,18

250:18 251:4
253:16 254:10
**objections** 4:13
27:17,18 29:19
46:2
**observe** 156:5
156:22 240:20
**obtain** 44:11
126:6
**obviously**
206:4
**occasionally**
152:16 173:15
**occasions**
148:16
**occur** 188:7,12
**occurred**
225:24
**october** 58:8,10
71:11 73:9,18
84:14 98:22
199:21 229:4
229:12 231:3
233:15
**odd** 43:12
44:24 46:19
49:13 207:11
208:16,18,23
**offer** 111:18
**offered** 191:24
193:12,17
203:11
**offering** 191:17
192:9

**office**  68:21
  151:21 156:1
  162:25 166:4,5
  166:6
**offices**  1:17
  3:25
**oh**  73:22 79:5
  92:20 108:25
**okay**  6:5 29:15
  46:25 59:20
  73:10,16 79:5
  79:7 92:6
  109:16 115:11
  141:21 158:9
  169:9 172:1
  182:10 190:22
  209:12 211:15
  224:13 227:24
  230:20 231:15
  234:11 246:4
  248:11
**old**  51:16
**omitted**  244:9
**once**  18:23
  126:6 155:4
**ones**  201:14,17
**open**  64:1
  79:12 126:4
  163:17 166:10
  258:23
**opened**  233:22
**operated**  17:14
  168:20

**opinion**  105:11
  106:12 164:24
  164:25 176:6
**opportunities**
  94:8 146:2,22
  147:1,5,9
  199:6 218:6
**opportunity**
  6:24 74:8
  82:13 100:1,17
  146:5 157:7,13
  190:16,19
  191:21 198:20
**opposed**  22:13
  22:14 54:22
**order**  44:20
**organization**
  41:7 125:11
  193:24
**original**  11:22
  93:18
**originally**
  197:7
**orlando**  82:7
  82:13 83:8
  100:2
**oswaldo**  57:19
**outcome**  4:12
**outings**  156:7
  156:24
**outlets**  61:22
**outreach**  38:16
  219:21

**outside**  29:8
  58:23
**overlapping**
  78:23
**oversaw**  72:8
  142:21
**own**  45:10
  56:18 106:25
  256:7
**owned**  15:10
  17:14 34:13
  36:21 70:25
  168:20 169:5
**owner**  78:19,20
  169:13

**p**

**p**  2:1,1
**p.m.**  18:1 73:9
  73:17 109:14
  126:16,19
  127:3,6 137:1
  140:8,8 202:19
  203:15 204:22
  205:2 227:10
  257:17,22
  259:11,19
**pack**  69:25
**package**  50:20
  75:13
**packages**
  134:10
**page**  23:10
  26:7 28:3,19

28:22 29:11
  39:6,9,11 71:7
  73:15 80:25
  85:24,25 86:1
  86:4 96:11
  108:22 117:4
  143:20 144:22
  160:14 189:22
  202:17 203:14
  211:20 214:10
  227:22 230:19
  244:13 260:4,9
  261:3 262:3,10
  264:4
**pages**  37:23
  76:3
**paid**  54:16
  147:13,14
  153:8 197:25
  250:4
**pain**  119:23
**palm**  14:21,24
  15:9 71:17
  74:14 75:18,20
  75:21 82:10,11
  217:18 255:5
  255:16
**pants**  59:15
  60:5 65:1
  66:14 94:23,24
**paper**  105:20
**paragraph**
  86:23 113:19
  114:6

parents  129:1
130:18,21
park  1:18 2:10
2:15 4:1
part  29:6 47:22
59:9 79:17
189:20 218:18
228:13 233:5
241:11
particular  40:4
51:7,21
particularly
133:7
parties  3:13
263:16
party  4:10
222:5
pass  55:9 82:18
126:9
passed  210:20
210:23 212:4
past  101:21
128:18 149:4
243:13 244:2
246:25
pattern  207:6
paul  1:17 2:13
3:25 5:2
177:15
paulhastings....
2:17,18
pay  24:3 25:12
26:23 35:17,20
35:21,22 69:5

69:7,8 124:1,1
153:12 249:21
249:21,21
250:1,2,12,12
250:13
peeps  74:1
pelicci  177:13
penalty  6:10
pencils  42:25
205:19 206:8
209:9
pending  8:11
8:12 258:24
pennsylvania
12:17,19 13:16
pens  43:23 44:3
45:4 46:15
people  34:15
36:23 38:14
40:8 45:2 46:9
47:2 48:3
49:19 53:9
54:3 58:16
59:1 61:17,21
62:4 72:9
75:25 77:8
80:12,14,22
90:7 103:5,6
115:22,23
117:9 123:10
125:10 129:8
146:7,9 147:11
149:22 150:5,8
150:11,15

151:1 155:6,13
155:22 156:11
156:16 163:6
183:4,11 190:4
191:9,10,15
192:10 193:13
193:18 213:6
218:3 236:7,10
238:21 244:25
245:14,16,25
peptic  255:2
percent  142:9
142:10,12
143:3
perception
238:12
perfectly  187:3
perform  22:16
performance
22:22 23:5,19
25:19,25 26:3
138:11,24
143:15 144:2
144:10,16,17
145:2,6 155:20
155:25 260:15
260:17
period  101:8
142:1 223:3
224:12
perjury  6:10,11
person  42:5,7
47:21 57:21
68:17 83:4

86:17 104:7
111:21 136:16
143:10 182:21
185:17 186:9
194:17,24
195:1,1 196:10
199:24 220:8
226:7
personal  163:9
163:13,19,22
165:15,19,23
166:13,22
210:7 216:21
234:24 235:5
235:19 240:6
240:13
personally
21:11 213:19
234:18 235:2
239:11 240:9
250:21 251:21
254:3
perspective
156:6 164:4,7
207:17
peter  142:23
peter's  142:25
philadelphia
12:16,18 13:15
132:7
phone  42:3
81:14,15 90:11
91:7,22 101:12
101:18 102:2,6

104:7,9,24
105:16 106:1
173:8 193:2,6
220:3 242:13
246:7 247:9
**phones**  3:9
102:11 242:19
**photographer**
80:16
**photographers**
80:17
**physical**  116:10
146:13
**physically**
94:24 119:10
156:12,14
170:19 180:16
**pick**  3:7
**picking**  155:2,4
**pictures**  41:10
41:13
**piece**  50:19
51:15 68:4
**pieces**  54:23
85:7
**place**  3:12
53:25 58:3
65:24 68:12
71:21 73:13
82:2 85:12
96:8 136:6
140:4 226:22
227:1 263:7

**placed**  134:10
136:2 234:9
**places**  53:10
191:14
**plains**  2:4
**plaintiff**  1:4 2:3
5:8 10:15
29:19 113:6
261:16
**plaintiff's**  27:7
27:21 260:19
**plan**  38:25 39:3
40:11 41:22
63:23
**planned**  50:22
**platform**  19:23
41:24 43:17,19
134:11 136:3
**plausible**  32:20
**played**  55:24
**pleasant**  72:24
73:1
**please**  3:5,9
4:14 5:12 46:4
126:13 131:7
143:14,20
158:20 159:16
160:20 166:25
202:2 209:14
211:19 214:5
214:10 219:18
227:21 230:22
232:11 242:23

**pllc**  2:2 5:7
**plus**  59:17,24
84:24 102:18
**pod**  146:7,12
146:22 157:11
**point**  26:15
38:24 50:14,14
60:7,12 66:23
67:25 68:9,10
77:7 84:22
86:7,8 120:24
129:5 140:2,3
150:23 162:8
162:21 167:8
167:11 169:4
176:17 181:15
184:11 186:10
193:1,4 198:5
198:11,19,21
201:9 203:1,8
204:11 206:14
207:23 223:15
225:19 226:24
227:5,12,14
229:20 231:17
232:8 233:14
233:18 234:3
235:16 236:1
236:13,24
237:15 251:21
252:23
**pole**  185:18
186:9

**police**  88:2
**policies**  258:9
258:14
**policy**  160:7
238:4
**poorly**  200:20
**popular**  225:8
**portal**  44:14,17
**posit**  9:8
**position**  41:3
41:18 54:11,14
80:3 82:16
125:7 140:13
140:16 171:2
187:22 192:6
194:2,7,10
224:25 229:15
234:9 235:12
251:23
**possibility**
161:18
**possible**  48:20
90:20 102:20
173:20 174:17
174:20 189:11
195:13 206:22
215:20,22
220:17,22,25
230:3 258:12
258:15
**possibly**  38:3
53:12 79:10
82:8 99:18,21
110:8 122:14

186:1 216:1
233:7 236:8
250:2
**post** 69:20
70:13 81:23
84:10,13,16
89:2 90:7
99:11 100:25
106:22 228:15
228:21,24
**posted** 228:25
**potential**
146:11 250:17
**potentially**
126:4 185:6,23
186:20 241:13
**pouch** 69:22,24
**power** 80:3,5
154:11 180:13
180:22 181:7
181:13,17,24
182:9,15,18
183:14 184:1
185:15 186:7
188:1 204:6,11
207:9 229:16
230:7 234:9
252:9
**powerful** 40:23
41:2,5 172:8
183:24 184:8
184:18,23
187:23

**practices**
238:23
**pre** 58:25
**pregame** 58:25
**preparation**
128:8
**prepare** 10:21
11:17
**prepared** 10:25
**present** 2:20
4:17 227:17,18
**pretty** 52:21
69:23 73:4
88:13 95:5
125:19,21
222:21 223:23
**previous** 26:3
90:3 106:14
**previously** 32:6
32:24 35:5
122:22 127:10
143:13 144:14
168:3,7 184:4
**pride** 181:8
**primarily**
135:14,15
136:9 142:22
148:25 151:24
155:16 173:11
173:22 227:10
**primary** 52:19
133:20
**prior** 37:3 42:8
91:8,22 112:8

203:2 228:2
229:11 247:25
248:3
**private** 3:7
**privately** 90:7
**privileged**
122:7
**privy** 238:5
**probably**
102:10 142:7
164:13 182:3
184:24 204:2
218:22
**problem**
149:13 151:11
**problematic**
161:3
**proceed** 5:14
190:5
**proceeding**
4:14 263:6
**proceedings**
6:23
**process** 19:12
237:22,25
**processing**
104:25 223:19
**produce** 19:6
29:20 90:15
118:8
**produced**
117:11 218:23
219:6 246:15

**producer** 14:23
15:15,23 16:9
16:10 17:18,22
18:10,19 20:2
21:18,19 23:20
24:1,1 26:20
26:21 33:20,21
40:20 48:17
49:24 54:13,19
68:24 72:7
73:21,24 80:10
80:19 86:13
87:2,6,7 92:8
92:14 95:20
98:15 103:24
116:24,24
133:11 136:15
136:24 137:22
139:11,24
140:9 142:2
143:4 170:1
171:4,5,8,20
172:5 174:13
179:5,9,12,16
179:20,24
180:3 181:11
181:14 183:24
184:9 185:4,20
211:12 217:20
217:21 220:13
220:13,16,19
220:21,23
221:8 224:2,7
224:10,10,17

224:22 225:11
226:15 227:2,3
227:6 229:21
243:18,21,22
243:23
**producers**
20:23 22:8
49:15 76:8
140:19 152:10
154:1 155:13
155:15 172:14
172:21 218:2
225:18
**producing**
54:20 75:12
**production**
138:2 139:5
219:7 246:19
249:7
**professional**
76:11 124:10
**professionally**
71:13
**profile** 167:25
**prohibited**
160:1
**prohibiting**
160:7
**promise** 191:6
**promised** 191:3
191:20
**promises**
191:12

**promising** 40:3
**promote**
139:15,19
**promoted**
23:19 26:19
31:6 68:23
94:2 139:10,23
171:5,8
**promotion**
23:24,25 24:8
24:14 25:1
85:21 164:14
187:12 220:15
**promotional**
187:11
**promotions**
31:5
**properly** 8:18
**property** 15:12
17:14
**provided**
243:10 244:1
**provider**
254:16
**providing**
134:15
**psychological**
120:5,14
122:23 123:19
126:5
**psychologica...**
121:25
**public** 1:20
5:17 65:23

127:11 263:3
264:22
**publication**
15:3
**publicly** 84:24
**pull** 44:10 60:5
185:1 199:4,5
**pulled** 66:11
**pure** 164:19
**purported**
107:12
**purpose** 134:1
134:3,19
**pursuant** 1:16
**pursue** 190:18
**pursuing**
189:25 190:15
**pushed** 64:12
**put** 19:22 53:16
56:6 59:11
64:23 85:7
88:15 97:3
192:6,7 217:24
219:9,17
234:10 250:22
**putting** 25:10
54:22

**q**

**qualifications**
196:10
**question** 7:4
8:1,10,12,13
46:4 107:15

111:17 118:25
143:9 146:17
149:25 186:11
187:2 221:4,22
231:16,23
249:1 250:19
**questions** 6:7
7:19 8:2 28:2
113:14 126:9
128:2 248:24
258:21
**quickly** 52:21
52:24 53:2,3
198:11
**quite** 99:9
102:14 124:16
151:23 242:5
**quotas** 56:17
**quote** 41:10
**quoting** 212:10

**r**

**r** 2:1 5:15 127:1
127:9
**race** 8:6
**rack** 240:23
**radio** 13:7
53:17 142:5
146:6 157:15
189:19 190:4
**rahman** 2:5 5:6
5:7 24:16
45:15,18,23
48:11 96:22

111:9 121:18
122:4 123:3
174:2,6 219:9
219:17 221:1
221:18,23
222:3 223:2
248:15,20,25
250:18 251:4
253:7,16
254:10 259:4
**raise** 24:3,9
25:13 69:5,7,9
**raises** 26:24
31:5,7 85:22
94:5
**rare** 176:6
**reach** 48:18
50:23,24 173:1
173:6
**reached** 36:16
37:16 38:6
64:24,25 71:22
81:24 90:8
106:23 145:20
167:23 175:14
175:20,23
203:3
**reaching** 96:5
141:23 176:2,9
**reaction** 206:2
**read** 11:16,19
23:16 28:22
29:16 33:17
85:25 86:2

92:15 98:23
109:2 113:16
114:4 117:6
160:20 177:18
230:22
**reading** 232:3
**ready** 7:12
**real** 43:6
**realize** 154:4
222:15
**realized** 85:4
**really** 9:2 24:20
25:15 32:17
43:13 49:17
62:3 75:21
85:11 94:13
120:20 123:9
124:7,17
129:12 143:7
164:10 171:24
180:14 183:25
231:2 232:4
238:19
**reason** 7:6,10
8:8 32:2 40:5
70:18 164:8
165:24 167:16
169:17 171:16
171:22 205:25
220:14 233:17
233:20 264:4
**reasonable**
123:24

**reasons** 32:13
32:19 47:21
97:8
**reassign** 185:25
186:15,19
**recall** 16:21
35:12,18,25
41:25 42:1,4
48:2 57:24
67:18 81:13
92:13 98:2
99:24 100:6
105:14 123:25
124:4 128:19
133:13,16
136:23 137:15
139:4 140:1
141:1 143:1,3
146:20 147:6
151:16 153:18
153:20 156:4
157:9,16 159:1
159:7,12
173:24 174:15
174:21 175:4,6
175:12,18,22
176:1,8,13
178:13 180:19
180:23 182:2
189:7,10 191:5
192:15 193:5,7
195:17,25
200:22 205:15
208:4,5,7

209:7 219:24
221:16 225:22
227:13,16
236:21 241:4,8
243:20 247:15
254:17,24
255:12 258:7
**recalling** 95:2,3
173:3
**receipt** 159:13
**receive** 140:22
174:12,22,25
258:25
**received** 29:22
81:25 174:18
206:10 208:12
258:13
**receiving** 258:7
**recent** 132:9
**recently** 104:6
120:7,9
**recess** 126:18
**recognize**
11:10 16:19
22:25 23:2
25:22 27:11
31:18 33:6
37:11 69:15
84:6 89:9
95:15 98:9
103:18 108:13
113:9 116:18
122:25 131:13
158:21 188:21

202:3 207:24
211:7 243:4
**recognized**
122:12
**recollection**
51:20 97:14
102:7 182:4
249:14
**record** 3:3,14
4:19 16:14
17:1 83:14,16
83:21 126:13
126:15 127:5
127:17 175:7
175:11 177:3,5
178:8 204:19
204:21 205:1,7
219:2,14 224:5
257:13,16,21
258:2 259:10
260:13 263:13
**recorded** 3:16
**recording** 3:11
**records** 126:7
173:16
**recover** 119:24
202:22
**recovered**
120:1
**refer** 218:2
**referenced**
163:15 189:17
199:10 228:25

**references**
240:3,11
244:10
**referencing**
230:6
**referred** 218:5
218:8
**referring**
108:20 118:1,9
119:3 128:4
146:14 214:18
228:9 230:17
245:2
**reflect** 131:19
224:6
**reflected** 210:4
257:9
**reflects** 144:6
144:25
**reformat** 19:7
**refusal** 216:18
**refusing** 110:14
**regarding** 6:8
**region** 49:23
**regional** 16:10
17:18,22 18:18
24:1 26:20
87:6 133:11
136:24 137:22
142:2 220:13
220:15,19,23
243:21
**regions** 50:3

**regular** 45:9
**regularly** 61:24
102:23
**regurgitate**
104:15 106:1
**regurgitates**
91:12
**reid** 152:11
**related** 4:10
124:3 142:4
155:24 255:22
259:2 263:16
**relating** 235:21
**relation** 122:18
**relationship**
80:4
**relative** 225:3
**relatively** 57:11
**relay** 20:21
**relevant** 241:13
242:13 248:8
**relocate** 13:23
**remember** 23:3
31:21 43:18
51:6,11,14
55:7 57:2,9
60:17,20 61:6
61:10,11 62:10
62:13,14,17,19
62:24 63:1,16
63:25 67:16
69:17 70:14
74:18 75:6
81:16 83:9

90:12 91:11,21
95:23 96:5,7
96:13,18,18
97:2 100:3,22
109:5 110:1,9
111:6 117:10
137:4 148:19
152:19 153:4,5
156:25 158:25
158:25 159:10
174:10 175:9
175:15 176:18
177:5 178:16
182:6 190:20
190:25 193:19
194:25 195:23
201:15 209:25
212:3 215:19
220:20,24
221:6 228:11
228:13,19
239:22 245:15
248:2 249:6
**remembered**
89:16 218:16
245:16,17
246:1 247:20
**remembrance**
95:6
**remind** 75:17
124:12 145:11
146:16
**repeat** 46:3

**repercussions**
124:10
**rephrase** 187:2
**report** 87:19,24
88:1,10 139:4
152:5 161:1,7
161:25 175:19
175:23 179:17
179:21
**reported**
138:22 161:11
161:14,19,22
170:8 237:5
240:17
**reporter** 4:5
5:12 6:20 7:22
8:18 20:10
76:1,4 80:16
131:6,11
146:19 158:18
177:10 188:19
201:25 211:5
242:22 243:2
263:1
**reporters** 76:22
77:5 78:3,12
80:18
**reporting**
264:1
**reports** 154:12
154:16,22
**representations**
198:9

**representative**
161:5
**request** 19:11
20:17 21:7,9
21:12 113:16
**requested**
141:12 241:10
**requesting**
219:7
**requests** 19:1
22:3 48:22
49:3,7 51:10
248:7,13,22
249:7 262:9
**required**
258:18
**resignation**
32:3 33:11,15
33:20
**resigned** 145:9
**resources**
17:10 161:2
**respect** 80:1
130:16 162:15
**respond** 82:25
**responded**
27:16
**responding**
30:13
**responds** 29:19
190:2 231:18
**response** 27:7
27:22 28:16
29:12 113:23

114:11,16
189:23 260:19
**responses** 8:15
28:10 30:4
57:21 113:6,13
254:15 261:17
**responsible**
179:3 194:13
194:18
**responsive**
29:20 219:13
249:12
**rest** 141:13
177:6
**restart** 253:22
**result** 25:1
199:5 200:17
216:17 251:15
252:14
**resumé** 39:20
55:9 82:19
131:8,17
132:10 261:19
**retained**
259:15
**retaliate** 93:2
**retaliated**
241:6
**retaliation** 85:8
85:14,15
160:25
**retrospect**
155:8 204:2

**return** 250:8
**returned** 252:4
**review** 6:24
11:22 100:24
143:5,16 144:3
144:6,11,17
145:6
**reviewed** 11:19
247:9
**reviewing**
158:23 217:11
**reviews** 138:11
**rewarding**
198:8
**rewrite** 19:6
**right** 7:15 9:11
23:13 44:8,17
48:5 49:8 63:8
71:25 73:8,23
74:8,11,25
89:25 100:8,16
101:25 107:14
108:25 111:14
115:15 118:11
127:21 142:17
142:20 143:11
148:7 150:20
152:6 157:1
159:19 199:22
205:5,11
206:14 212:12
234:23 257:25
258:20

[rights - see]                                                Page 39

rights  240:5
rising  125:2
roger  233:23
  239:8
role  17:21
  18:12 24:25
  55:24 87:9
  133:14,17
  139:11 171:1
  172:10 177:23
  185:25 187:10
  187:15 190:24
  191:23 194:14
  197:14,17
  199:1 225:3,4
  226:9
roof  65:13,15
rooftop  59:21
  65:19,21 66:1
room  57:5 59:9
  63:7,18 255:6
rosie's  148:25
  151:23 152:1,8
  152:25 153:9
  153:13
rough  119:15
  142:3
roughly  182:14
  242:2
routed  135:7
rules  5:25

**s**

s  2:1 127:1,1,1
  260:8 261:2
  262:2 264:4
sadly  212:3
safe  259:6
salary  17:19
  23:20 26:9,11
  252:6
samantha
  211:11,17
  213:24
samaritan
  255:4
san  217:19
sara  2:18 5:5
sarahoult  2:18
satellite  19:14
save  241:19
saving  241:18
saw  10:3 47:7
  71:20 110:20
  154:3 180:17
  210:12 255:9
saying  8:4
  39:19 46:6
  49:5 62:21
  69:21 84:21
  92:20 100:12
  110:1 114:23
  123:8 149:16
  150:1 178:10
  200:23 206:3

212:4 227:8
says  17:10,11
  17:15,17 23:18
  26:8 29:12
  32:3 63:23
  69:23 86:6
  98:25 115:5
  143:22,24
  160:15 212:1
  214:13,14
  228:4
scenario
  154:20,23,24
  155:1
schedule
  136:25 140:2
  226:23 227:5
  227:14
school  13:11
scott  40:13
  41:1
screwing  158:3
  199:12 200:4
  200:12,16,24
  200:25 201:7
scripps  9:19,19
  14:16 15:10,11
script  19:18
scripts  25:5
seamless  35:11
search  242:12
  249:12
searched
  102:19 242:14

second  26:7
  29:14 35:3,4
  39:6 66:3 69:9
  73:12 92:15
  107:18,19
  109:3 128:3
  143:20 144:21
  177:19 197:2
  197:10,13
  202:16 229:7
  230:21
secret  166:10
secrets  163:18
section  17:10
  159:20
securing  53:11
see  6:25 16:24
  23:12 26:8
  29:12 31:20
  43:22 44:2
  45:1 47:2,20
  54:2,9 69:18
  71:14 97:22
  102:4 113:1
  122:3,9,15
  143:21 144:22
  151:12 158:24
  159:20 160:17
  177:14 189:23
  190:10 202:17
  202:21 203:14
  203:20 209:19
  211:23 212:7
  214:16 227:8

228:6 229:9,18
232:5,6,21
233:12 239:3,9
239:12,17,20
244:17 245:10
245:25 246:5
247:11,20
**seeing** 85:10
125:25 152:19
158:25 159:8
159:10 218:16
**seek** 119:18
120:13 121:17
123:17
**seeking** 122:17
123:21,25
124:6 141:8
248:7
**seeks** 249:20
**seem** 24:20
32:19 164:1
198:18
**seemed** 24:21
54:10 57:4
150:22 158:6
196:17,21
205:24 244:25
**seems** 45:14
104:18,21
207:5,11,18
**seen** 81:23
84:17 207:4
**send** 18:22 19:8
19:15,18,19

134:15
**sending** 54:24
**senior** 86:20
87:8 125:19,21
161:3,15
172:17 220:7
220:11 224:10
**sense** 57:7
138:23 142:3
186:6 236:5
242:16 249:4
**sensitive** 3:6
**sent** 39:19
228:14
**sentence** 29:14
109:2,3 160:20
160:21 177:19
178:1
**sentiment**
212:24 213:1
**separate** 52:11
63:19 79:16
97:1 127:23
180:20 239:5
**separately** 7:21
11:9
**september** 33:3
33:13,23 70:23
70:23 133:8
145:10 188:16
189:4 261:5,24
**sequence** 58:12
104:19

**series** 6:7 39:6
**serious** 94:13
**seriously** 162:7
**served** 248:6,13
249:7
**service** 52:18
134:4
**services** 133:25
135:14
**session** 123:12
**sessions** 121:9
123:15,18
**set** 27:8,22
56:11 81:1
82:6 153:5
226:23 227:4
260:20 263:22
**settle** 253:5,10
**settlement**
245:3 252:22
**several** 76:22
147:10 148:15
171:15 180:24
**severe** 116:9
**sexual** 108:3
109:20,25
110:4,16,23
111:22 112:1,8
112:25 114:21
115:9 116:4
215:24 216:4
240:21 241:1

**sexually** 87:17
111:5,8 112:19
113:21 114:9
156:23 222:10
222:13,16,25
223:12,17
**share** 202:25
**shared** 135:19
135:22
**shareholder**
240:11
**sharing** 150:14
**sheet** 264:1
**shift** 49:25
140:7 222:8
226:18 227:17
227:18
**shook** 190:21
**shore** 245:8,16
**short** 257:14
**shortly** 59:5
89:21 189:1
199:17,18
**shot** 109:12
110:13 216:8
216:12
**shots** 109:13
**show** 15:8 20:5
20:19,23 21:8
21:19 48:18
50:11,13 51:9
54:22 59:21
75:14,15 135:6
170:5,12

172:15,22
175:6,14 176:7
176:13,23
177:2 178:7,14
178:24,25
179:1 184:7,10
184:24 185:5
185:21 196:1
226:6
**showered**
42:16
**shows** 19:5
52:16 172:8
175:3,10
176:17,21
177:24 178:5
178:11,19
183:23 225:9,9
**shy** 180:12
182:25
**side** 23:13 63:8
63:10 140:5
227:2,4
**signal** 246:10
246:12
**signature**
259:20 263:24
**significance**
17:5
**significant**
24:14 35:22
123:1 182:22
182:23 186:22

**significantly**
54:17 184:2
198:1
**signify** 23:22
**signing** 144:23
**similar** 46:23
54:14 77:12
78:21 162:19
**simply** 237:8
**single** 79:8,10
154:23 173:24
177:2
**sit** 125:10
**sitting** 12:8
64:14 168:15
175:5 176:12
176:19 177:1
178:6 195:16
233:25 249:5
249:15
**situation** 34:24
65:23 235:18
**situations**
238:15
**six** 28:19 39:14
181:23 182:14
214:11
**sixteen** 227:21
**sixty** 72:14
**skip** 21:6 49:14
**small** 73:7
76:19
**smart** 204:8

**social** 47:21
69:20 70:11
76:10 81:23
203:7 210:25
**socialized** 77:2
**solicit** 141:18
**solutions** 4:7
259:16
**somebody**
21:16 82:6
83:11 87:17
138:25 141:5
154:21 156:21
157:15,21
173:13 174:18
174:23 176:1
204:5 206:4
208:24 215:6
226:12,12
230:6 239:13
256:8
**somebody's**
92:25
**someplace**
148:5
**soon** 53:3
**sore** 120:1
**sorry** 28:21,24
45:21 72:4
80:23 85:24
107:16 141:20
149:25 150:2
174:5 227:9,21
228:22,23

230:7 243:14
243:25
**sort** 38:25 50:3
70:21 71:2
101:24 196:21
**sorts** 214:14
215:8
**sought** 122:23
254:24 255:25
**sound** 100:8
**sounded** 40:3
**sounds** 110:6
142:20 199:22
234:23
**southeast** 50:2
**southern** 1:1
3:22
**span** 123:1
**speak** 41:21
42:2 45:22
46:1 56:16
77:14 111:11
121:1
**speaking** 81:11
86:7 90:10
91:6 94:12,13
**special** 117:10
175:19 179:17
**specific** 51:7,12
51:14 111:17
155:15 156:15
174:8,10 175:3
175:9 176:17
178:12,12

[specific - stripped]                                              Page 42

180:12 191:5
191:21,23
193:19 206:7
**specifically**
14:18 16:22
18:17 110:2
119:14 146:21
148:14 151:21
158:14 175:25
176:11 198:24
221:15 258:11
**specifications**
170:6
**specifics**  87:14
**spectacular**
59:22
**speculate**  252:1
**speculation**
164:20 197:1,5
**speech**  93:6
97:16,20
**spend**  12:25
**spin**  66:19
**spite**  85:21
**spoke**  10:23
71:23 129:11
131:2 139:9
146:21 177:22
201:18 217:5
248:12
**spoken**  91:22
100:20 104:7,8
104:16 105:3

**spun**  66:21
**square**  211:23
**squeezing**
119:16
**staff**  155:21
**stagnant**  31:10
**stagnated**
32:10 145:14
**stairs**  67:15,17
**stairwell**  60:2
65:17,19 66:4
66:15
**stand**  11:25
108:5 115:8
**standing**  64:16
**stands**  212:25
239:25
**starbucks**  54:1
**start**  5:24
13:19
**started**  13:11
35:10 59:10,14
65:1 66:13
71:21,25 74:12
136:24 163:6
183:25 184:11
189:2 192:20
193:8,15,22
205:14 206:11
206:20 224:15
245:14
**starting**  42:8
42:23 108:25
109:3 192:20

209:3
**state**  1:20 4:14
4:18 5:17
12:15 127:11
263:4
**statement**
149:2 164:19
211:17
**statements**
184:16 185:12
185:14 186:5
186:13 204:15
**states**  1:1 3:21
214:22
**stating**  212:16
**station**  13:12
18:20 19:1,17
20:14 50:24
54:21 56:7
58:21 78:13
83:8 217:21,23
250:8 252:4
**stationery**  43:1
208:15 209:1
**stations**  17:25
19:2 25:11
141:10,11
**stature**  208:25
**stay**  60:13 73:2
**staying**  34:18
198:7
**stenographic...**
263:11

**step**  72:8
**stifled**  31:1
85:19 157:4,18
**stints**  16:1
**stipulation**
126:3
**stomach**  255:3
**stood**  66:2
183:1,2
**stop**  29:10,24
109:16
**stopped**  59:16
59:19 65:5
67:3
**stored**  102:20
**stories**  18:21
25:6 50:12
233:9
**story**  91:13
96:21 104:10
104:16 105:25
109:6 112:4
178:12 245:19
**straight**  158:4
199:12 200:11
201:1,8 245:19
**street**  2:3
**strike**  159:2
**strings**  44:10
**strip**  92:20
93:10 94:20
97:16
**stripped**  93:5
93:13,14 97:11

**[stripped - system]**                                                     Page 43

| | | | |
|---|---|---|---|
| 98:1 | **suggested** | 179:22 180:1,5 | **surprise**  44:19 |
| **strongest**  73:25 | 234:1 | 180:8 186:18 | 63:11,22 |
| **struggling** | **suing**  9:22 | 204:1 221:9 | 253:11 |
| 202:22 | **suit**  9:20 | **support**  35:1 | **surprised**  38:5 |
| **studio**  59:8 | 240:11 | 55:17 113:19 | 65:4 |
| 62:22,23 63:13 | **sunday**  33:23 | 114:6 118:7 | **surrounding** |
| 63:16 | 137:6 227:11 | 183:18 185:12 | 200:6 |
| **studying**  13:6 | **sunshine**  2:11 | 196:25 | **survive**  198:4 |
| **stuff**  44:20 | 4:22,23 5:21 | **supported** | **suspected** |
| 46:23 47:3 | 11:1,8 16:11 | 147:25 176:21 | 253:12 |
| 207:22 223:19 | 22:19 25:16 | 177:3,24 178:4 | **susteren**  170:5 |
| **subject**  29:13 | 27:3 31:12 | 178:9,11,19 | 172:15,22 |
| 29:17 149:17 | 32:22 37:6 | **supports** | 183:22 184:9 |
| 217:15 246:19 | 45:21 46:1 | 246:17 | 184:23 |
| **submitting** | 69:10 83:13,25 | **suppose**  138:20 | **susteren's** |
| 33:19 | 89:4 91:24 | **supposed**  53:23 | 48:18 50:11 |
| **subscribed** | 95:7 98:3 | 61:16 197:7 | **swag**  43:3,4,9 |
| 259:21 264:20 | 103:10 108:8 | **sure**  9:10 17:23 | 43:23 44:4 |
| **subsequent** | 113:3 116:11 | 23:17 37:25 | 45:2,3,9,11 |
| 44:1 | 126:2 127:23 | 41:13,23 42:14 | 47:5 |
| **subsequently** | 177:16 249:18 | 42:21 45:6 | **sway**  207:9 |
| 62:6 94:3 | 257:12 260:5 | 46:5 58:13 | **swear**  5:12 |
| **substance**  7:2 | **superior**  79:22 | 63:15 77:15 | 214:13 |
| 129:15 130:9 | **supervising** | 80:2,15 92:18 | **sweetie**  86:9 |
| 220:1 248:17 | 80:9,10,18 | 96:4 102:5 | **switched** |
| **success**  244:24 | 143:4 | 121:14 139:2 | 242:19 |
| 245:2 | **supervision** | 139:20,20 | **sworn**  5:16 |
| **sudden**  60:3 | 263:12 | 143:10 167:12 | 127:10 259:21 |
| **sue**  231:1 | **supervisor** | 183:6 208:7 | 263:8 264:20 |
| **suffered**  251:14 | 21:21,23 22:14 | 217:7,10 218:7 | **swung**  68:20 |
| **sufficient** | 47:9 51:24 | 223:20 227:25 | **system**  19:20 |
| 147:20 | 52:2,4 80:11 | 239:15 241:21 | 35:1 68:16 |
| **suggest**  172:4 | 88:4,7 179:7 | 243:25 247:14 | 136:4 165:6 |
| | 179:10,14,18 | 252:12 | 173:10,21 |

**[system - terms]**                                      Page 44

| | | | |
|---|---|---|---|
| 200:1 | 103:5 105:5 | 212:24 223:5 | 157:22 176:20 |
| **t** | 119:8 121:4 | 230:5,12 | 178:23 180:12 |
| | 146:1 155:12 | 231:12 | 180:22 181:2 |
| **t** 127:1 260:8 | 156:8,10 | **tall** 62:14 | 181:20 190:7 |
| 261:2 262:2 | 190:14 191:8 | **tampa** 15:20 | 195:21 197:11 |
| **tab** 227:20 | 235:14 245:14 | 17:13 32:5 | 198:22,25 |
| 230:16 | 246:2 | 33:22 34:13,20 | 208:17 226:3 |
| **table** 9:7,9 64:9 | **talked** 71:24 | 35:1,3,8 36:4 | **telling** 35:7 |
| 126:6 | 84:11 90:1 | 38:13 40:15 | 96:20 100:19 |
| **tabs** 230:17 | 96:6 100:3,23 | 62:1 70:24 | 107:5,18 109:5 |
| **taitelman** 2:8 | 103:8 104:23 | 82:9 98:14 | 149:22 200:8 |
| 4:24 | 105:16 128:22 | 115:24 117:24 | 221:16 224:8 |
| **take** 3:12 8:13 | 130:10 134:17 | 168:4 169:1 | 225:22 229:24 |
| 11:2 19:1,6,14 | 146:4,6 152:1 | 192:24 250:9 | 251:18 |
| 33:21 59:13,15 | 157:11,14 | 252:4 255:19 | **tells** 111:14 |
| 60:4 66:13,14 | 173:22 194:17 | **tandem** 21:4 | **ten** 14:17 99:2 |
| 92:25 94:24 | 194:24 195:1 | 134:24 | 99:7,10,13,15 |
| 143:12 152:7 | 218:14 219:25 | **tanvir** 2:5 5:6 | 99:22 100:13 |
| 158:20 159:16 | 234:14 249:17 | **task** 173:17 | 101:4 102:17 |
| 162:7 166:24 | 256:24 | **tasks** 178:1 | 228:22 229:8 |
| 202:2 204:19 | **talking** 7:24 | **team** 137:16 | 229:11 230:9 |
| 209:13 219:10 | 38:2 39:23 | 152:24 153:3 | **tenure** 24:12 |
| 219:15 227:20 | 44:16 47:24 | 153:25 | 171:20 240:18 |
| 228:20 257:13 | 57:2 76:21 | **teladoc** 256:6 | 240:22 241:2,7 |
| **taken** 1:16 3:17 | 80:14 82:21 | **television** 185:4 | **term** 76:6,12 |
| 9:13 83:19 | 90:9 91:18,18 | **tell** 6:15 41:9 | 77:22 |
| 85:3 120:23 | 97:1 104:22 | 53:18 63:2 | **terminated** |
| 126:18 132:24 | 105:1,8,10,12 | 96:1 97:25 | 30:1,10 |
| 204:24 257:19 | 106:9,11 107:8 | 99:1,5 105:12 | **termination** |
| 263:10 | 109:18 114:21 | 106:19 107:12 | 9:20 29:22 |
| **talk** 7:17 19:16 | 118:10,13 | 111:25 128:12 | 30:5,15 |
| 30:21 36:12 | 146:10 155:5 | 129:17,23 | **terms** 25:8 |
| 57:25 74:20 | 167:17 168:21 | 136:19 146:25 | 40:24 47:14 |
| 76:4 99:10 | 181:5 203:5,22 | 148:17,24 | 53:11 85:15 |

93:21 129:7,25
134:5,23
147:25 170:14
179:11 191:7
207:2 252:6,9
**terrible** 138:21
**testicles** 119:16
**testified** 5:19
10:18 127:13
137:8 140:21
145:8 157:2
161:10 172:25
194:1 205:12
210:11 219:13
241:23 255:24
**testify** 130:1,12
172:11
**testimony** 6:9
7:3,7 129:15
130:9 131:23
132:16 149:16
150:4 153:7
195:18 200:2
202:9 205:18
222:23 223:22
226:2 228:2
254:22 259:13
263:5,9,10,14
**text** 37:8 69:12
84:3 89:6
90:14,15,18
92:1 95:9 98:6
101:16 102:23
103:6,12

108:10,24
116:13 118:15
193:3 211:2
212:10 217:7
217:16 218:22
218:24 219:3
231:17 241:12
241:13,15,19
241:19 242:13
242:24 246:20
247:10 261:6,7
261:8,9,10,11
261:12,13,14
261:18 262:6,7
**texted** 246:23
247:12,12
**texts** 91:4
102:9 117:8,11
118:3,5
**thank** 33:24
259:17
**thanking** 208:5
**therapist** 121:4
121:8,10,13
122:3,10 256:1
**therapy** 120:8
120:21 121:17
122:18,19
126:7
**thereabouts**
72:19
**thing** 50:3
58:18 70:21
71:3 84:25

97:5 101:24
130:22 178:12
213:3,16,20,23
215:11,12
**things** 7:17
43:8 46:17
48:19 50:17
51:1 61:23
85:9 97:1
121:7 125:25
130:15 134:23
135:1,3 138:1
138:4 148:8
162:6 166:4
184:19 191:15
201:19 204:7
209:2 214:15
215:8 235:3
238:10,13
242:15 245:9
**think** 35:17
43:11 50:14
54:7 55:23
56:1,3,10 59:5
61:13 64:2
73:14 74:5
76:12,16 78:1
80:4,9 82:5
86:10 88:9,11
88:12,14,18,21
90:1,18 93:7,9
96:25 98:25
110:3,17 111:2
111:7 112:1

115:4,12 116:8
122:11 123:10
123:23 132:12
132:14 134:2
135:10 136:5
137:5,6 143:2
143:3 149:20
149:24 152:3
153:23 154:6,9
154:19 162:3,8
164:13,15,17
166:17 169:6
171:23 173:15
177:2 183:3,4
183:9 186:1
187:13 188:11
188:13 206:22
207:8 213:15
213:20 215:6
215:23 219:14
223:3 231:21
234:5 235:10
236:1,2 243:24
**thinking** 59:23
84:19 97:6
111:13,16
123:9 158:4
199:11 200:11
201:1,7 232:10
**third** 184:24
**thirteen** 70:3
**thirty** 214:11
**thought** 36:19
43:12 47:1

52:2,3 53:10
59:16 84:21
88:15,16
120:22,25
121:7 138:21
141:12 147:15
152:22 155:19
156:9,11,21
183:10 184:1
184:25 187:7
204:6,7 205:18
208:16,17
222:15,18,19
223:1 224:9
225:4 236:3,6
236:24 238:19
**thoughts**  57:10
**thousand**  17:20
24:7 26:12,14
35:14,24 72:15
72:17 74:21,24
75:3 124:23
252:10
**threaten**  92:21
93:19
**threats**  201:12
**three**  9:16 10:4
13:21 14:8
26:12 35:14
39:10,11 72:17
75:2,4 85:24
86:4 108:22
121:11 123:14
123:18 127:8

128:21 197:23
204:23 236:20
247:1 252:10
256:13
**threw**  35:4
59:7,9
**throat**  59:12
64:23
**thursday**
170:20
**tiff**  110:10
**time**  3:10 4:15
8:9 9:25 12:25
19:21 23:23
24:19 29:6
32:18 34:6
35:3,4,18
37:16 38:8,18
38:20 40:20
43:13 46:7
47:10 48:4
49:18,25 50:10
51:11 52:8
54:5,15 59:19
60:18 63:13
67:20 71:12
72:3 74:19
83:17,22 84:20
85:1 86:14,15
86:16 87:5,12
87:15 90:25
95:2 96:2,3
97:6 99:2,7,9
100:13 102:14

104:1 105:18
115:18 118:22
118:24 120:24
123:1 126:16
127:6 128:4
129:21 136:23
137:20 139:23
145:23 151:13
153:9,10,11
154:3 167:20
170:22 178:16
183:23 186:7
193:21 195:22
195:24 203:11
204:22 205:2
206:25 208:11
217:4 218:9,9
220:18 222:19
223:3,15 224:7
224:15,20
225:19,24
227:7 229:20
231:7,22,24
232:10 235:16
246:3 248:4
249:10 255:8
257:17,22
258:22 259:11
259:19 263:7
**timeline**  169:21
184:14
**times**  51:3
141:4,8 147:10
148:17 150:22

173:2 180:21
180:24 181:23
182:14 242:20
**title**  13:17
14:12,22 15:14
15:21 17:15,17
40:16 72:5,6
80:7 87:1,3
92:12 95:24
142:25 169:22
**titles**  80:13
**today**  7:7 12:8
85:3 128:23,24
129:2,3 130:12
131:3,4 132:16
168:15 175:5
176:19 177:1
177:22 178:6
195:16 207:17
233:25 249:5
249:15
**today's**  10:22
259:12
**together**  21:4
48:10,15 54:22
85:7 95:25
97:4 98:16
107:1 135:3
**told**  29:25 31:5
32:8 42:13
43:16 55:20
86:17 87:16
90:6,9 91:14
93:12 97:10

98:25 101:3
104:10,13
105:14 106:24
107:11 110:4
128:24 148:15
149:5 150:3,18
150:22 151:8
157:17 162:4
162:11,14
164:6 167:14
171:14,19
182:6,14 184:4
187:23 195:23
197:9,12,24,25
205:21 210:10
216:23 222:8
222:24 223:16
223:25 224:3,6
224:11 227:7
231:8 236:18
249:2 253:9,24
256:19,21,22
**tongue** 59:12
64:23
**tonight** 67:2
**took** 30:5,14
35:17 58:3
96:8 97:7,8
124:12 125:24
181:8,12
200:14 201:2
204:16 256:8
**tools** 121:23

**top** 68:14 73:12
173:9,11,21
183:23 199:25
200:1,3,18
201:17 203:15
228:3 240:24
**topics** 128:3
**total** 14:16
259:14
**totem** 185:17
186:9
**touch** 22:12
**touched** 101:9
**toxic** 148:3
151:18
**traffic** 20:15
**trahman** 2:5
**trail** 105:21
**training** 258:8
258:13,17,18
**transcribe** 8:19
**transcribed**
263:11
**transcribing**
6:21 7:22
**transcript** 6:22
6:24 263:13
**transmitted**
21:14
**treat** 213:13
**treated** 117:10
150:19 162:20
**treatment**
120:3,6,14

122:24 123:18
123:19 254:24
**trial** 7:4 10:19
**tried** 59:13,15
66:18 94:20,23
**tries** 60:4,5
**trouble** 95:1
149:5
**true** 12:7 30:18
140:18 263:13
**trust** 233:10
**trusted** 105:11
106:12 107:6
149:7,10
238:25
**truth** 6:16
**truthful** 32:15
34:1
**try** 20:7 93:21
128:1 146:17
**trying** 59:10,14
66:13 73:20,24
82:6 93:9
97:16 147:16
164:23 245:8
245:15,18,25
**tryon** 152:12
**tuesdays** 137:5
**turn** 23:10
96:11 106:13
108:22 117:4
119:7 133:5
144:21 203:13
211:19 214:4

214:10 227:22
244:13 248:23
**turned** 150:21
151:10,14
**turning** 12:20
**tussle** 112:4
**tv** 13:12 17:25
54:21 63:9
**tvt** 35:16
**twelve** 114:3,4
114:16
**twenty** 142:10
142:12
**two** 9:16 10:4
16:1 23:10
26:17,23 31:6
31:7 33:24
34:2 37:23
39:6,9,10 72:8
80:12,22 83:24
97:1,3,3 99:20
99:22 117:4
126:17 128:21
133:2 142:17
173:2 184:13
193:10 201:19
213:4 247:16
247:17
**type** 18:12 97:5
130:22
**types** 62:7
191:11
**typical** 18:9
22:11,15

**[typically - wages]**                                      Page 48

| | | | |
|---|---|---|---|
| **typically** 19:16 | **understanding** | **untimely** | **vanad** 142:23 |
| 20:12 68:17 | 44:9 144:1 | 236:15 | **veritext** 4:6 |
| 135:7 153:3 | 149:19 228:1 | **unusual** 44:4 | 259:16 264:1 |
| 203:25 | 237:22 238:3 | 205:19,24 | **version** 11:23 |
| **u** | 249:22,25 | 206:1 208:24 | **versus** 3:18 |
| | 251:8 252:25 | **unwelcome** | 54:23 142:5 |
| **ugly** 78:7 | **understood** | 38:17 | **viable** 238:17 |
| **uh** 8:17 39:16 | 30:8,19 131:22 | **upper** 252:7 | **video** 3:11,16 |
| 67:13 245:11 | 132:15 149:15 | **ups** 62:7 | 19:19 50:19 |
| **ulcer** 255:2,3,3 | 149:24 150:8 | **upward** 31:2 | 51:15 54:23 |
| 255:22 | 150:11,25 | **use** 50:22 209:8 | 68:4 259:6 |
| **unbutton** 94:23 | 151:3 160:6,10 | 213:4,7,10,17 | **videographer** |
| **unbuttoning** | 161:9 162:18 | 213:22 222:12 | 2:21 3:1 4:4 |
| 59:14 65:1 | 168:2,6 172:10 | 242:7,10 | 5:11 83:15,20 |
| **uncomfortable** | 202:8 224:16 | **used** 115:13,14 | 126:14 127:4 |
| 34:18 | 224:21 226:1 | 182:17,20 | 204:20,25 |
| **uncommon** | 237:16 | 217:18 259:15 | 257:15,20 |
| 43:21,25 47:2 | **unemployed** | **useful** 121:22 | 259:5,9 |
| **under** 6:9,14 | 35:9 | **using** 44:2 45:4 | **vietnam** 133:2 |
| 32:2 127:19 | **unexpected** | 47:2 151:15 | **view** 152:20 |
| 205:9 219:10 | 38:7 | **usually** 153:6 | 231:22 |
| 219:16 258:4 | **unfairly** 150:19 | **v** | **views** 59:22 |
| 263:12 | **unique** 49:2 | | **virtually** |
| **understand** 8:4 | **unit** 3:15 83:18 | **v** 142:23 264:2 | 256:10 |
| 28:6 123:7,7 | 83:23 126:17 | **vacation** | **vodka** 59:4 |
| 127:18 133:21 | 127:7 204:23 | 132:25 | 64:5 |
| 150:4 159:6 | 205:3 257:18 | **vague** 38:25 | **voluntarily** |
| 161:6 187:20 | 257:24 | **value** 250:16 | 250:7 |
| 194:5 200:13 | **united** 1:1 3:20 | 250:22 | **voluntary** 32:4 |
| 205:8,17 223:9 | **universe** 118:9 | **van** 48:18 | **w** |
| 248:5 250:20 | **unlawful** | 50:11 170:4 | |
| 251:13 252:21 | 159:21 | 172:14,21 | **w** 5:15 127:9 |
| 258:3 | **unpacking** | 183:22 184:9 | **wages** 250:17 |
| | 92:19 | 184:23 | 251:1,9 254:1 |

| | | | |
|---|---|---|---|
| **walk** 58:11 | **warmer** 32:23 | 124:19 137:3 | 183:8 184:12 |
| 63:5,6 67:14 | **washington** | 170:16 173:2 | 184:16 185:8 |
| 104:19 | 217:22,23 | **weekend** 61:9 | 185:13,14,25 |
| **walking** 66:8 | **watched** | **weeks** 9:16 | 186:4,14,22 |
| **want** 38:19 | 184:24 222:17 | 10:4 107:24 | 187:6,21 188:2 |
| 57:14,15,16 | 223:21 225:9 | 133:2 197:23 | 189:1,18,24 |
| 60:8,10,13,13 | **waving** 29:18 | **weird** 45:12 | 190:2,13 191:3 |
| 60:15 67:1,1,5 | **way** 13:13 59:1 | 54:25 55:4 | 191:6 192:9,17 |
| 93:3 101:9 | 66:5,5,7 75:11 | 82:21 | 193:1,4,8,12,17 |
| 106:13 119:7 | 94:16 97:24 | **welcome** 38:16 | 193:23 194:6 |
| 123:13 128:7 | 115:21 119:12 | 38:18 206:24 | 194:16 195:21 |
| 128:12 133:5 | 136:2 162:21 | **wells** 1:6 2:9 | 196:14 197:3,9 |
| 141:15 155:9 | 173:12 181:21 | 3:19 4:25 | 197:13,20 |
| 216:14 223:2 | 181:22 191:7 | 36:13,15 37:1 | 198:9,15,22 |
| 227:25 230:25 | 195:4 238:13 | 47:13 73:7 | 199:11 200:3 |
| 236:9 | 239:12 253:25 | 76:19 86:19 | 201:13 204:15 |
| **wanted** 19:3,5 | 254:4 | 87:12 88:6 | 205:13 206:20 |
| 20:5,20 21:7 | **wayne** 1:19 4:5 | 89:18,25 91:11 | 206:23 207:13 |
| 34:7,8 35:7 | 263:3 | 93:5,24 99:1,6 | 207:14,20 |
| 50:20,22 51:15 | **ways** 147:17 | 99:25 100:21 | 208:2,12,14 |
| 57:17 65:22 | **wcco** 14:6 | 101:7,18 102:1 | 209:17,22,23 |
| 68:4 73:2 | 132:13 | 106:18,20,25 | 210:3,4,9,9,13 |
| 79:11 105:5,12 | **wcpo** 10:2,8 | 108:3,18 | 210:14,17,20 |
| 106:10 110:13 | 14:11,13,17,20 | 112:18,20 | 210:23 212:3 |
| 136:3 145:24 | 131:23 | 113:15,21 | 214:20,23 |
| 148:4 164:21 | **we've** 234:13 | 114:8,19 | 215:2,3 216:7 |
| 200:16 206:23 | **weather** 32:6 | 115:15 116:7,9 | 216:8,11,12,14 |
| 239:15 247:20 | 32:22 34:22,23 | 127:24 146:5 | 216:18 224:1,7 |
| **wanting** 50:15 | 75:23,24 | 158:2,10 | 224:17,21 |
| **wants** 145:19 | **wednesday** | 161:12 162:16 | 229:21,25 |
| 164:11 233:5 | 137:6 170:20 | 167:3,8,14 | 230:4 234:7,13 |
| **warm** 32:6 | 227:11 | 168:3,16 | 235:10,18,21 |
| 34:21,23 | **week** 46:11 | 169:10,18 | 236:18 242:15 |
| | 51:4 61:7 | 173:1,25 180:8 | 244:10 248:6 |

| | | | |
|---|---|---|---|
| 251:15,25 | **width** 9:6,8 | 217:25 | 38:12,15 50:4 |
| 252:14 | **wildly** 152:4 | **words** 6:18 | 50:8,9 52:12 |
| **went** 10:24 | **willing** 218:18 | 88:15 115:14 | 52:13 68:18 |
| 35:16 53:23 | **wise** 252:16 | 116:10 119:25 | 70:24 71:20 |
| 56:2,4 61:10 | **wish** 86:8 90:4 | 151:15 182:17 | 76:7 78:11 |
| 67:11,12 | **wished** 88:19 | 182:20 208:23 | 79:16 83:7,10 |
| 124:14 131:24 | **wishes** 33:25 | 213:4 222:12 | 95:24 98:16 |
| 133:2 149:12 | **witness** 5:13 | **work** 9:21 | 107:1 109:9 |
| 150:8 153:9 | 9:24 10:2 | 13:14 14:7,15 | 115:22 124:18 |
| 195:20 196:14 | 24:19 46:3 | 14:19 15:16 | 129:21 133:4 |
| 197:6 200:9,10 | 48:14 96:25 | 19:25 21:4 | 137:9 146:8 |
| 200:20 242:14 | 111:11 121:21 | 29:4,6,9 46:13 | 147:11 152:11 |
| 244:23 | 123:6 174:5,8 | 47:12 48:10,15 | 155:6 157:11 |
| **west** 2:10 14:21 | 221:5 222:6 | 61:9,10 79:22 | 159:9 168:3,7 |
| 14:24 15:9 | 249:3 250:21 | 82:2 115:25 | 168:16,24 |
| 16:9 17:25 | 251:6 253:8,19 | 134:22,24 | 169:3,10,12 |
| 20:6,10 49:2 | 254:13 259:20 | 135:3 136:25 | 170:16 184:12 |
| 49:23 50:1,12 | 260:4 263:8,14 | 136:25 137:18 | 184:22 192:21 |
| 50:16 71:17 | 263:21 264:3 | 139:22 142:4,5 | 205:22 206:17 |
| 74:14 75:18,19 | 264:19 | 142:21 146:9 | 226:7 227:17 |
| 75:21 82:10,11 | **wnbc** 53:16,23 | 146:13 154:8 | 227:19 239:4 |
| 136:14,16 | 53:25 85:16 | 155:19 163:25 | 239:10,18,21 |
| 178:21 217:18 | 94:1 158:6 | 164:11,12,22 | 246:25 |
| 255:5,15 | 194:3 199:19 | 167:9,10 | **worker** 86:21 |
| **westward** 18:1 | 200:10 202:13 | 168:19 169:6,7 | 98:14 107:18 |
| **wetransfer** | **wnyw** 107:2 | 169:13 170:10 | 107:20 215:17 |
| 19:16 | 109:9 168:19 | 170:23 186:24 | 215:21 217:17 |
| **whereof** 263:21 | **woman** 115:13 | 201:11 206:11 | **workers** 44:2 |
| **whispering** 3:7 | **wondering** | 211:16 217:18 | 44:22 70:20 |
| **white** 2:4 | 89:16 | 226:17 229:12 | 71:2 115:17,22 |
| **widely** 88:13 | **wonders** 44:7 | 230:1 | 115:25 153:17 |
| 164:15 | **word** 53:17 | **worked** 13:12 | 156:9 188:10 |
| **widespread** | 182:22 195:13 | 15:24 18:1 | 206:3,6 247:11 |
| 166:5 | 213:7,10,13 | 19:3 35:5 | |

**working**  9:19
18:22 19:1
21:25 34:8,12
34:14,16 36:20
40:7 71:15
77:13 136:16
167:19 168:1
168:23 170:4
189:2 222:8
225:7,8
**workplace**
43:22 47:13,25
77:3 110:20
160:1
**workplaces**
44:1
**works**  18:15
145:18 217:19
**world**  134:7,12
175:1 179:13
**worth**  88:17
149:6
**wphl**  13:15
**wptv**  14:21
15:4,5 71:15
71:20,23 75:7
76:22 217:18
**write**  105:2
138:2
**writer**  211:14
**writers**  137:25
139:7
**writing**  106:5
114:8 219:10

219:18 228:5
228:10
**written**  23:13
33:10
**wrong**  230:10
**wrongful**  9:20
**wrote**  88:18
112:21 210:13
231:8,17 232:8
233:14
**wtvt**  15:20
17:13 32:5
33:22 34:13
35:10 36:20
40:15 117:23

**x**

**x**  260:3,8 261:1
261:2 262:1,2

**y**

**y**  5:15 127:9
**yeah**  10:24
21:10 22:15,15
22:18 34:5
67:25 72:24
73:2 78:6 82:7
85:20 102:6
104:23 106:2
111:15 115:25
116:17 117:8
121:5 129:8
130:7,10 134:2
138:22 140:25
143:8 146:15

151:20 155:22
156:2,11
164:12 167:13
169:5 171:25
195:12 201:4
207:10 218:4
225:9 228:4
230:24,25
231:21 241:21
245:5 246:2
257:11
**year**  14:8,18
15:18 17:20
24:11 26:3
40:22 53:1
72:15 89:19
100:5 120:10
120:11 124:23
132:5 143:16
144:3,17 145:2
145:6 187:16
187:17 230:10
242:4
**yearly**  69:8
**years**  14:17
26:17 31:7
33:24 34:3
70:3 84:20
94:10 99:3,7
99:10,13,16,17
100:13,21
101:4 102:18
107:25 118:20
119:1,2,6

120:16 171:15
205:23 211:1
229:8,11 230:9
236:20 247:1
247:16,17
**yep**  74:3
189:21
**york**  1:1,19,19
1:20 2:4,16,16
3:22 4:1,1 5:18
25:14 36:4
38:4,20,23
40:7 46:7
52:25 62:2,8
77:13,20 107:2
127:12 137:10
147:16,21
168:8,12
169:11 198:3
198:12 206:13
229:17 240:4
252:11 263:4
264:1

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.