**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ANDREW DELANCEY,

      *Plaintiff,*

 – against –

JUSTIN WELLS, FOX CORPORATION, and
FOX NEWS NETWORK, LLC.

      *Defendants.*

Case No.: 1:23-CV-10357 (AT) (KHP)

**<u>PLAINTIFF ANDREW DELANCEY'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT FOX NEWS NETWORK, LLC'S MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION………………………………………………………….………9

II.     FACTUAL ALLEGATIONS……………………………………......………...10

        A.  Wells Uses His Position and Status Within Fox to Target and Groom Plaintiff
            Before He Even Joins Fox News…………………………………...……………10

        B.  Wells Joins Fox News Channel and Continues to Groom Plaintiff……...………11

        C.  Wells Regularly Assigns Work to Plaintiff……………………………..……….12

        D.  The Pervasive Drinking Culture at Fox News…………………………...………14

        E.  Wells Sexually Assaults Plaintiff During a Fox News Networking Event……....14

        F.  Mr. Delancey is Discouraged from Reporting Wells' Assault to HR………..…..15

        G.  Wells Wields His Influence Over Plaintiff's Employment and Career For Refusing
            His Advances and No Longer Has Any Interest in or Acts in Furtherance
            of………………………………………………………………………...…….16

        H.  Wells' History of Workplace Harassment………………………..……………17

III.    ARGUMENT………………………………………………………...……………18

        A.  Summary Judgement Standard…………………………………..………………18

        B.  Fox News Is Strictly Liable For Wells's Sexual Harassment of Plaintiff………..19

                i.      NYCHRL and NYSHRL Standards Should Be Construed
                        Liberally………………………………………………………….....19

                ii.     Wells Exercised Managerial or Supervisory Authority Over
                        Plaintiff………………………………………………………….…20

                        1.  Wells Groomed Plaintiff and Leveraged His Connections to Gain
                            Influence Over Him…………………………………………….…20

                        2.  Wells Acted Like Plaintiff's Supervisor……………..………...…22

                        3.  The Clear Hierarchy Between FNC and Edge Further Solidified
                            Plaintiff's Belief That Wells Had Supervisory Authority Over
                            Him……………………………………………………….………24

        C.  Fox News Can, And Should, Still Be Liable Even If the Assault Happened
            Outside of the Workplace……………………………………………….……27

D.  Plaintiff Suffered Tangible, Adverse Actions……………………………..……..29

E.  Fox News Knew or Should Have Known of Wells' Discriminatory
     Conduct…………………………………………………………………..……30

     i.    Fox News Knew or Should Have Known of Wells' History of Sex-Based
           Harassment.………………………………………………………….…33

IV.  CONCLUSION………………………………………………………..…………..35

**TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,

    477 U.S. 242 (1986)...................................................................................................18


*Bentley v. AutoZoners, LLC*,

    935 F.3d 76 (2d Cir. 2019) ......................................................................................26 n.3


*Brown v. Henderson*,

    257 F.3d 246 (2d Cir. 2001) .....................................................................................18


*Cajamarca v. Regal Entm't Grp.*,

    2013 N.Y. Misc. LEXIS 4851 (Sup. Ct. N.Y. Cnty. Oct. 17, 2013).................................. 19


*Castillo v. Isakov*,

    22-cv-6888 (LJL), 2023 U.S. Dist. LEXIS 183640

    (S.D.N.Y. Oct. 12, 2023)..........................................................................................26 n.3


*DeWitt v. Lieberman*,

    48 F. Supp. 2d 280 (S.D.N.Y. 1999) .....................................................................20, 23, 25


*Distasio v. Perkin Elmer Corp.*,

    157 F.3d 55 (2d Cir. 1998) ......................................................................................32


*Dougherty v. Ferrari Express, Inc.*,

    19-CV-3961 (JMA)(ARL), 2024 U.S. Dist. LEXIS 146038

    (E.D.N.Y. Aug. 15, 2024)........................................................................................25


*Eastman Mach. Co. v. U.S.*,

    841 F.2d 469 (1988) ................................................................................................18

*Eckhart v. Fox News Network, LLC,*
 20-CV-5593 (RA), 2021 U.S. Dist. LEXIS 171219
 (S.D.N.Y. Sept. 9, 2021) ........................................................................................25

*EEOC v. Draper Dev. LLC,*
 2018 U.S. Dist. LEXIS 115124 (N.D.N.Y. July 11, 2018) ........................................20, 25

*Empire Electronics Co. v. United States,*
 311 F.2d 175 (2d Cir. 1962) .....................................................................................18

*Ferris v. Delta Air Lines, Inc.,*
 277 F.3d 128 (2d Cir. 2001) .....................................................................................27

*Fornah v. Cargo Airport Servs., LLC,*
 No. 12-CV-3638, 2014 U.S. Dist. LEXIS 230 (E.D.N.Y. Jan. 2, 2014) ......................26 n.3

*Goenaga v. Mar. of Dimes Birth Defects Found.,*
 51 F.3d 14 (2d Cir. 1995) .........................................................................................18

*Gostanian v. Bendel,*
 No. 96 Civ. 178 (LAP), 1997 U.S. Dist. LEXIS 5620
 (S.D.N.Y. Apr. 25, 1997)..........................................................................................25

*Graham v. Long Island R.R.,*
 230 F.3d 34 (2d Cir. 2000) .......................................................................................19

*Hernandez v. Jackson, Lewis, Schnitzler & Krupman,*
 997 F. Supp. 412 (S.D.N.Y. 1998) .......................................................................23, 25

*Hicks v. Baines,*
 593 F.3d 159 (2d Cir. 2010) .....................................................................................29

*Hughes v. Twenty-First Century Fox, Inc.,*
 304 F. Supp. 3d 429 (S.D.N.Y. 2018) ...............................................................20, 29, 30

*Mejia v. City of New York,*
    17-CV-2696 (NGG)(JO), 2020 U.S. Dist. LEXIS 95659
    (S.D.N.Y. May 30, 2020) ......................................................................................26 n.3

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
    715 F.3d 102 (2d Cir. 2013) ..........................................................................................29

*Parham v. City of New York*,
    84 Misc. 3d 1204(A), 218 N.Y.S.3d 798 (N.Y. Sup. Ct. 2024)...................................19, 29

*Parrish v. Sollecito*,
    249 F. Supp. 2d 342 (S.D.N.Y. 2003*)* ..............................................................................27

*Poolt v. Brooks*,
    38 Misc. 3d 1216(A), 967 N.Y.S.2d 869 (Sup. Ct. N.Y. Cnty. 2013) ..........................22, 25

*Russell v. New York University*,
    42 N.Y.3d 377 (2024).....................................................................................................19

*Socorro-Prospero v. M. Booth & Assocs.*,
    No. 23-cv-11319 (AS), 2025 U.S. Dist. LEXIS 186012
    (S.D.N.Y. Sept. 22, 2025) ...........................................................................................26 n.3

*Tomka v. Seiler Corp.*,
    66 F.3d 1295 (2d Cir. 1995) ..........................................................................................27

*Travis v. City of Chi.*,
    No. 10-CV-3011, 2014 U.S. Dist. LEXIS 138563
    (N.D. Ill. Sept. 30, 2014) ...........................................................................................26 n.3

*Vance v. Ball State Univ.*,
    570 U.S. 421 (2013)......................................................................................................19

*Vivenzio v. City of Syracuse*,
611 F.3d 98 (2d Cir. 2010) ........................................................................................18

*Ward v. Shaddock*,
No. 14-cv-7660 (KMK), 2016 U.S. Dist. LEXIS 106438
(S.D.N.Y. Aug. 11, 2016) ......................................................................................26 n.3

*Whipple v. Reed Eye Assocs.*,
524 F. Supp. 3d 76 (W.D.N.Y. 2021) .......................................................................27 n.3

*Williams v. New York City Hous. Auth.*,
61 A.D.3d 62, 872 N.Y.S.2d 27 (1st Dep't 2009)................................................................19

*Zakrzewska v. New School*,
598 F. Supp. 2d 426 (S.D.N.Y. 2009) .................................................................................30

**Statutes and Rules**

Fed. R. Civ. P. 50(a) .................................................................................................................18

Fed. R. Evid. 807(a) .................................................................................................................34

N.Y.C. Admin. Code § 8-107(13)(b) ....................................................................................20, 30

New York City Human Rights Law (NYCHRL) ........................................9, 19, 25, 26, 27, 29, 30

New York State Human Rights Law (NYSHRL) ........................................9, 19, 25, 26, 27, 29, 30

Title VII of the Civil Rights Act of 1964 .......................................................................9, 19, 26, 27

8

Plaintiff Andrew Delancey hereby submits this memorandum of law in opposition to the motion for summary judgment filed by Defendant Fox News Network, LLC ("Fox News"). For the foregoing reasons, Defendant's motion should be denied.

## I.    <u>INTRODUCTION</u>

"When I see a bird that walks like a duck and swims like a duck and quacks like a duck, I call that bird a duck."
- Children's Poet James Whitcomb Riley (1849-1916)

Defendant's entire argument for why Plaintiff should be denied his day in court rests on the contention that the man who violently sexually assaulted him under the false pretenses of wanting to introduce newly hired Plaintiff to fellow Fox News colleagues, Justin Wells, was not his formal manager or supervisor, and thus Fox News is automatically absolved of all culpability. But while Wells was never Plaintiff's nominal manager or supervisor, Fox News entirely ignores well-established precedent that makes clear that if an employee who engages in conduct barred by the New York City Human Rights Law ("NYCHRL") or New York State Human Rights Law ("NYSHRL") "walks like" a manager, "swims like" a manager, and "quacks like" a manager, that person will be deemed to have been a manager/supervisor such that the employer may be strictly liable for their unlawful conduct.  Rather, Fox News hopes that the Court applies the incorrect, extremely narrow definition of supervisor or manager that the United States Supreme Court held applies to Title VII claims, but which courts in New York and this Circuit interpreting who qualified as a manager or supervisor under the NYCHRL and NYSHRL have resoundingly rejected.

Here, the record evidence establishes that, at the time he sexually assaulted Plaintiff, Wells acted like he was Plaintiff's supervisor, talked like he was Plaintiff's supervisor, assigned work like he was Plaintiff's supervisors, offered (and even acted) to advance Plaintiff's career like he

was Plaintiff's supervisor, and took Plaintiff under his wings at an extremely vulnerable time full of transition and uncertainty in Plaintiff's life like he was Plaintiff's supervisor. The record evidence establishes that Wells was unquestionably Plaintiff's de facto manager/supervisor when he sexually assaulted Plaintiff, made it clear to Plaintiff that he had the actual and apparent authority to significantly impact the terms and conditions of Plaintiff's work, and that it was reasonable for Plaintiff to consider Wells as a manager or supervisor under the circumstances.

Accordingly, for the foregoing reasons, Fox News' motion should be denied as Fox News is unquestionably liable for Wells's heinous actions against Plaintiff, who deserves his day in court.

## II.    FACTUAL ALLEGATIONS[1]

### A.    Wells Uses His Position and Status at Fox to Target and Groom Plaintiff Before Even Joining Fox News

In 2007, Plaintiff was a weekend morning producer for a Fox affiliate television station in Tampa, WTVT (¶¶144; **Exhibit ("Ex.") I**[2] (Delancey New Hire Record); **Ex. A** (Delancey Dep.), 40:13-17), while Wells worked at WNYW Fox5 New York. ¶146; **Ex. F** (Wells Dep.), 26:13-14. Both men are gay and were members of a Facebook group for employees of Fox television stations. ¶147; **Ex. H** (Plaintiff and Wells Facebook Messages); **Ex. A**, 36:13-37:5; **Ex. F**, 77:18-78:6. On August 3, 2007, after Plaintiff "caught [his] eye," Wells sent Plaintiff a Facebook message introducing himself as *the* Producer of the Fox5 10p.m. news program. ¶148; **Ex. H**. Wells also told Plaintiff that he personally knew Scott Jones, the Assistant News Director at WTVT, who was Plaintiff's boss's boss and the second highest ranking person at the station. ¶¶153-54; **Ex. H; Ex.**

---

[1]    For a more fulsome recitation of the material facts in this case, Plaintiff respectfully refers the Court to his Response to Defendant's 56.1 Statement and Counter Statement of Additional Facts, paragraphs to which are cited as "¶ 144-259]".

[2]    Exhibits cited herein refer to those appended to the Declaration of Tanvir H. Rahman in Support of Plaintiff's Opposition to Fox News' Motion for Summary Judgment ("Rahman Decl.").

**A,** 40:13-41:8; 125:7-23; **Ex. B** (Declaration of Andrew Delancey), at ¶4.  Wells also told Plaintiff that he knew one of his fellow WTVT producers. ¶158; **Ex. H**. As such, Plaintiff got the impression that Wells was well-connected into the power structure within Fox's television stations, wielded influence, and could find out more about Plaintiff through his personal contacts if he so wanted. ¶156; **Ex. B,** at ¶ 4.  For his part, Plaintiff told Wells that he aspired to move to and work for Fox in NYC and was happy to meet someone who was already there.  ¶157; **Ex. H; Ex. A**, 40:4-9.

A few months later, Wells and Plaintiff messaged each other again over Facebook, with Wells telling Plaintiff that he could live in NYC with his "killer hot" friend who was a "PAGE [at] NBC" (¶159; **Ex. H),** which only further reinforced to Plaintiff how well-connected to the NYC television industry Wells was. ¶159; **Ex. B** at ¶6.

### B.      Wells Joins Fox News Channel and Continues to Groom Plaintiff

In July 2008, Fox News hired Wells away from Fox5 to be a Producer on *On the Record with Greta Van Susteren* ("*On the Record"*) on the Fox News Channel ("FNC"). ¶160; **Ex. F,** 26:11-12; **Ex. U** (Wells's Employment Letter). After joining Fox News, Wells "pass[ed Mr. Delancey's] resume around." ¶161, Ex. F, 104:20-24.

Then, in September 2008, Fox News hired Mr. Delancey as a Regional Producer in its Fox News Edge ("Edge") department. ¶162; **Ex. A,** 16:6-10; **Ex. I**. Prior to Plaintiff's first day, Wells used a Fox News internal ordering portal to arrange for a box of Fox-branded gifts, including monogrammed pencils and stationery, to be delivered to Plaintiff. ¶163; **Ex. A,** 42:22-43:3; **Ex. F,** 121:15-122:3. Plaintiff's Edge colleagues had never seen an employee receive monogrammed items like those Wells ordered for him and found it odd. ¶166; **Ex. A**, 44:22-25; 205:25-206:6; **Ex. D** (Hare Johnson Dep.), at 24:22-25. Mykel MacCarthy, Plaintiff's direct supervisor, said that he had never received similar monogrammed stationery in all his many years there, and remarked,

11

"Oh, somebody likes you." ¶169; **Ex. A**, 205:17-24; **Ex. B** at ¶10. Plaintiff interpreted MacCarthy's comments to mean that such a personalized welcome gift was both unusual and something an employee only receives when someone was trying to flatter or ingratiate themself to them. ¶169; **Ex. B** at ¶10. Plaintiff thought that Wells had to "pull strings" to obtain the monogrammed stationery and other gifts given the reactions of his colleagues and manager and the scarcity of similar items in the workplace. ¶170; **Ex. A**, 44:9-12; **Ex. B** at ¶11. Wells also checked in on Plaintiff that evening to check on how his first day went. ¶171; **Ex. M** (Emails Between Wells and Plaintiff), at FNN168.

Edge was located in the basement of 1211 Avenue of the Americas, whereas Wells worked on the 18th floor, where all FNC employees worked. ¶172; **Ex. A**, 137:12-21; **Ex. F**, 43:22-44:23; 278:23-279:2; 328:10-329:4. Though they worked on different floors, Wells regularly communicated with Mr. Delancey at work via email and Top Line, Fox News' internal messaging system. ¶173; **Ex. A**, 68:11-16; 173:6-23; **Ex. N** (Collins 30(b)(6) Dep.), at 98:11-99:6; **Ex. M**.

Soon after starting his position, Plaintiff confided in Wells that he worried about living in NYC on his salary, and Wells sent Plaintiff some job listings. ¶175; **Ex. F**, 129:2-24. On September 22, 2008, Wells emailed Mr. Delancey a posting for a Fox News Radio "freelance newscaster" and offered to "try and get [him] a name" of someone at Fox News Radio whom Plaintiff could contact about the role. ¶176; **Ex. M.** Around the same time, Wells forwarded Plaintiff's resume and an accompanying "endorsement" to a former colleague and hiring manager at WNBC and arranged for Plaintiff to interview for a producer position that paid more than Plaintiff's current role. ¶177; **Ex. F**, 180:2-7; 187:8-23; **Ex. A**, 53:15-17.

C.    **Wells Regularly Assigns Work to Plaintiff**

Plaintiff worked primarily with west coast Fox affiliate stations but also completed work

assigned to him by FNC producers. ¶180; **Ex. A**, at 18:14-16; 20:16-23. FNC producers would often bypass the Assignment Desk and work directly with Edge employees on specific assignments. ¶181; **Ex. A**, 20:19-21:10; 48:22-49:18; 136:9-22; **Ex. D**, 41:19-42:2. Plaintiff received and completed assignments from FNC producers on a regular basis. ¶183; **Ex. A**, 21:6-22:15. Plaintiff was never told that it was improper for FNC producers to give assignments directly to Edge producers. **Ex. A**, 136:19-22.

The *On the Record* show would air on FNC in the evening, and often at the coveted time slot of 10:00p.m. EST. ¶186; **Ex. A**, 50:9-16. Plaintiff would often work when the show would air. ¶186; **Ex. A**, 16:9-10; 136:12-18. Wells regularly reached out to Plaintiff with assignments, about twice a week, "when he needed things that [Mr. Delancey] could possibl[y] get from other affiliates or elsewhere," and assigned more work to Plaintiff than to any of his Edge colleagues. ¶188-89; **Ex. A**, 48:10-51:4; 172:25-173:5; **Ex. B** at ¶16. Whenever Wells needed "a piece of video," or "a package from a local affiliate that Greta [Van Susteren] planned to use or [the show] wanted," Plaintiff would ensure that Wells and the show "get whatever they needed." ¶192; **Ex. A**, 50:19-25. Anytime Wells gave Plaintiff an assignment, the assignment would be time sensitive and often required an immediate turnaround, since Plaintiff's shift began at 4p.m. and Wells's assignments typically had to be completed by 8p.m. to be ready for airtime. ¶193; **Ex. B** at ¶17. Because of this urgency, any assignment Wells gave Plaintiff took priority over all his other work, which would take anywhere from half an hour to an hour to complete. ¶194; **Ex. B** at ¶18.

Wells was not "shy" to tell Plaintiff that he "had power within the Company" and was very clear that he had "significant influence within Fox News." ¶196; **Ex. A**, 180:11-183:2. Plaintiff believed that Wells was "above" MacCarthy in the chain of command since Wells worked at the revenue-generating FNC and Edge was a mere "affiliate feed service" that served Fox News. ¶195;

**Ex. A**, 52:5-11; 183:17-184:10; **Ex. F**, 234:16-236:19. Given the inherent power dynamics between Edge and FNC, Plaintiff was "very much the low person on the totem pole." ¶196; **Ex. A**, at 185:14-186:10.   For all these reasons, Plaintiff believed that Wells could influence his employment, impact his career advancement, and cause changes to his role and even compensation. ¶196-200; **Ex. B** at ¶19; **Ex. A**, 183:7-187:24. Wells also earned nearly three times what Plaintiff was earning (approximately $135,000 to $50,000), and notably, in Wells's July 2009 performance review, his evaluator stated that Wells "ha[d] a senior title." ¶201; **Ex. P** (Wells's 2019 Review); **Ex. O** (Delancey's 2019 Review).

   **D.**  **The Pervasive Drinking Culture at Fox News**

  Soon after starting at Fox News, Plaintiff learned that it was very common for Fox News employees to go out drinking together after work. ¶202; **Ex. A**, 151:20-152:19; **Ex. L**, 98:7-100:23; **Ex. F**, 133:21-134:13; **Ex. D**, 37:23-39:2; **Ex. G** (Collins Fact Dep.), 78:23-79:6; **Ex. B** at ¶25.   In fact, MacCarthy often invited Plaintiff and other subordinates to a bar called Rosie's for drinks. ¶205; **Ex. A**, 151:20-152:9; **Ex. L**, 98:24-100:12; **Ex. D**, 38:19-23.   At Rosie's, MacCarthy would openly discuss his "favorites" at Edge, and about the work product, performance, and attractiveness of Edge staff. ¶206; **Ex. A**, 151:20-152:25; 156:5-19. There was no limit to the number of drinks Edge employees could order, as MacCarthy routinely picked up the "large" tab. ¶207; **Ex. A**, 151:20-153:11; **Ex. L**, 100:13-23.

   **E.**  **Wells Sexually Assaults Plaintiff During a Fox News Networking Event**

  About a month after Plaintiff joined Fox News, in or around October 2008, Wells invited Mr. Delancey out to Barracuda, a bar in Chelsea, and said that it would "benefit [him] to go" as other people from work would be there and it would be a good way for Plaintiff to "get to know them." ¶¶208-09; **Ex. A**, 58:14-23; 61:6-12; **Ex. F**, 155:19-25. Given the pervasive drinking

culture at Fox News, where supervisors routinely invited subordinates out to bars, paid for their drinks, and socialized after work hours, Plaintiff regarded Wells's invitation as another Fox News-related outing. ¶210; **Ex**. **B** at ¶24. Plaintiff was still a brand-new employee who had not met many people and felt this would be a good opportunity to meet his colleagues. ¶211; **Ex. B** at ¶24; **Ex. A**, 58:14-23; 61:13-22.

When Plaintiff met Wells at his apartment to go to Barracuda together, Wells claimed that other people were on their way and invited Plaintiff in for a "pregame cocktail." ¶212; **Ex. A**, 58:24-59:1. Once inside the apartment, Wells made Plaintiff a drink, and shortly thereafter, threw Plaintiff onto his bed and sexually assaulted him. ¶213; **Ex. A**, 59:2-12; **Ex. F**, at 159:10-14. Plaintiff tried to stop Wells, and said, "I thought we were going to Barracuda, plus you have a boyfriend." ¶214; **Ex. A**, 59:13-18; 64:25-8. When Wells stopped attacking Plaintiff after he resisted, he said, "Okay, we can go out, but I would like to show you the rooftop." ¶215; **Ex. A**, 59:19-25. As Wells and Plaintiff walked up a stairwell leading to the building's rooftop, Wells suddenly grabbed Mr. Delancey from behind and sexually assaulted him again. ¶216; **Ex. A**, 60:1-14. Plaintiff resisted Wells's advances more forcefully and told him that he had "no interest" in engaging sexually with him. ¶217; **Ex. A**, 60:1-14. This is when Wells's mood changed, and he told Plaintiff he no longer wanted to go out anymore. ¶217; **Ex. A**, 60:1-14; 67:7-12.

### F.    Mr. Delancey is Discouraged from Reporting Wells's Assault to HR

During Plaintiff's tenure, Fox News fostered a culture in which interactions with Human Resources ("HR") was actively and widely discouraged. ¶219; **Ex. A**, at 88:11-17; 162:2-9. Beginning very shortly after Plaintiff began his position, MacCarthy repeatedly warned him not to go to HR because there was "no point" and HR was "not to be trusted." ¶220; **Ex. A**, 148:151:11; **Ex. B**, at ¶22. Based on these repeated admonitions from his supervisor, Plaintiff believed he

15

would be labeled a "problem" and any complaint he reported would be turned against him if he went to HR. ¶221; **Ex. A**, at 149:11-14.; **Ex. B**, at ¶ 23.

G.     **Wells Wields His Influence Over Plaintiff's Employment and Career For Refusing His Advances and No Longer Has Any Interest in or Acts in <u>Furtherance of Advancing Plaintiff's Career</u>**

Prior to the assault, in addition to inviting him to Barracuda, Wells offered to connect Plaintiff to people he knew within Fox News and other media outlets who could provide him with opportunities to advance his career, knowing that Plaintiff worried about surviving in NYC on his salary, and even arranged for him to interview for a higher paying producer role at NBC.  ¶177; **Ex. A**, 53:8-54:24.  However, the interview took place *after* the assault and was suddenly moved to a Starbucks on the ground floor of NBC's building after it was supposed to be in the NBC newsroom.  ¶232; **Ex. A**, 53:21-54:6.  Worse, the people interviewing Plaintiff did not appear to take the interview seriously or view him as a legitimate candidate, which made it feel as if someone had "put a chill on hiring [him]." ¶233; **Ex. A**, 54:2-10; 56:5-7.

After the doomed interview, Wells learned from his NBC contact that Plaintiff did not get the position, and when he spoke to Plaintiff, told him that he was "not thinking straight" and was "screwing himself." ¶235; **Ex. F**, 190:11-18; **Ex. A**, at 158:1-8; 199:10-200:17. Plaintiff interpreted Wells's remarks to mean that Plaintiff was "screwing [himself] over as a result" of rejecting his advances, which cost him the NBC job, i.e., because Wells thwarted it, and possibly other opportunities to advance his career within or outside of Fox. ¶236; **Ex. A**, 200:8-201:4; **Ex. B** at ¶25.

Wells continued to give Plaintiff assignments on a regular basis after the assault, which meant that Plaintiff had to continue to routinely encounter and work with Wells in the workplace. ¶237; **Ex. A**, 67:22-10; **Ex. R** (October 2008 Emails Between Wells and Plaintiff), at FNN 186-

16

88. However, Wells's tone toward Plaintiff changed markedly following Plaintiff's rejection of his advances, as he was no longer friendly and would communicate with Plaintiff only about work assignments, and completely stopped offering to help Plaintiff find new jobs, network, or connect with other Fox News employees who could help advance his career. ¶238; **Ex. B** at ¶ 26. Still, Wells continued to keep tabs on Plaintiff, letting him know that he noticed that Plaintiff never "logged in" and wanted to know his work schedule (¶239; **Ex. R),** emailing him to ask whether he was "working tonight" (¶239; **Ex. Q** (July 2009 Emails)), and emailing him to say "nice work Delancey :)". ¶239; **Ex. S** (December 2009 Emails)**.** Plaintiff still understood that Wells wielded significant influence over his career and felt he had to keep their interactions cordial (and not report his conduct) to prevent further harassment or retaliation, before resigning in 2010 after his career at Fox News stalled. ¶¶240; **Ex. A**, 204:7-13.

## H.    Wells's History of Workplace Harassment

Years later, on October 22, 2017, right as the #metoo movement began to spread, Plaintiff posted a Facebook message in which he described the sexual assault without identifying his attacker. ¶241; **Ex. T** (October 22, 2017, Facebook Post). Shortly thereafter, Kathleen Wells, a former Fox News employee and colleague of Plaintiff's, reached out and told Plaintiff that MacCarthy was "overly flirtatious verbally and physically" when they worked together at WNYW, and that Wells had called her a "fucking bitch" when she refused to do a live shoot with him. ¶242; **Ex. C** (Plaintiff's Facebook Messages with Kathleen Wells), at CONFIDENTIAL PLAINTIFF 51, 53. Ms. Wells further stated that after she reported Wells to her manager, Wells had to write an apology, which was sent to his boss, her boss, and HR. ¶243; **Ex. C**.

### III.    ARGUMENT

#### A.    Summary Judgment Standard

The careful standard for granting summary judgement mirrors that for granting judgment notwithstanding a verdict, as both actions deprive the jury of its central role as the arbiter of facts. *See Eastman Mach. Co. v. U.S.*, 841 F.2d 469 (1988) (if presentation by nonmoving party in support of its version of facts is such that court could not properly direct verdict against it in a jury trial, or enter judgment in favor of moving party notwithstanding a verdict favorable to the nonmoving party, the motion for summary judgment may not properly be granted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (summary judgment standard "mirrors the standard for a directed verdict under [Fed. R. Civ. R. 50(a)]").

The "party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Goenaga v. Mar. of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). A court "cannot *try* issues of fact, but can only determine whether there *are* issues of fact to be tried." *Empire Electronics Co. v. United States*, 311 F.2d 175, 179 (2d Cir. 1962) (emphasis in original). "It is not the province of the court itself to decide what inferences should be drawn . . . ; if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Vivenzio v City of Syracuse*, 611 F.3d 98, 106 (2d Cir 2010) (internal quotation marks omitted).

In discrimination cases, where an inquiry into individuals' motivations and states of mind is required, courts must "sparing[ly]" grant summary judgment because of juries' "special advantages over judges in this area," *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001), and because "careful scrutiny of the factual allegations may reveal circumstantial evidence to support

18

the required inference of discrimination." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

**B.      Fox News Is Strictly Liable For Wells's Sexual Harassment of Plaintiff**

**i.      NYCHRL and NYSHRL Standards Should Be Construed Liberally**

Under the NYCHRL, "*any* ability to dictate or administer the compensation, terms, conditions, *or* privileges of the plaintiff's employment" is sufficient to deem an employer a manager or supervisor.  *See Russell v. New York University*, 42 N.Y.3d 377, 389-90 (2024) (emphasis added).

To that end, courts have explicitly rejected any attempt to apply the Supreme Court's narrow definition of "manager or supervisor" in the Title VII context to the NYCHRL. *See Cajamarca v. Regal Entm't Grp.,* 2013 N.Y. Misc. LEXIS 4851, at *20-21 (Sup. Ct. N.Y. Cnty. Oct. 17, 2013) (finding "no basis for applying" the "narrow[.. ] definition of 'supervisor' under Title VII" articulated in *Vance v. Ball State Univ.*, 570 U.S. 421 (2013) to NYCHRL, as "federal precedent" was "not binding in light of the remedial purposes of the City [HRL] statute"); *Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 66-67, 872 N.Y.S.2d 27 (1st Dept 2009) (interpretations of similar federal provisions should be viewed "as a floor below which the [NYCHRL] cannot fall, rather than a ceiling above which the local law cannot rise").

Instead, the "broader definition" of "an employee who has authority to direct the employee's daily work activities" is "more compatible with the City law's formulation [of] managerial or supervisory responsibility." *Cajamarca*, 2013 N.Y. Misc. LEXIS 4851, at 20-21 (citation omitted); *see also Parham v. City of New York*, 84 Misc.3d 1204(A), 218 N.Y.S.3d 798, 2024 N.Y. Slip Op. 51360(U), at *6 (N.Y. Sup. Ct. 2024) (allegation that two coworkers "assigned tasks to Plaintiff," one coworker "assigned [] Plaintiff's mentor," and four coworkers "received

19

Plaintiff's internal complaints and effectuated his transfer" held sufficient to "demonstrate that these individuals had the power to do more than carry out personnel decisions and held a supervisory role over the conditions of Plaintiff's employment").

ii.  <u>**Wells Exercised Managerial/Supervisory Authority Over Plaintiff**</u>

The record evidence overwhelmingly supports the finding that Wells "exercised managerial responsibility or supervisory responsibility" over Plaintiff.  *See* N.Y.C. Administrative Code §8-107(13)(b)(1)). It is irrelevant whether Wells was Plaintiff's formal supervisor. Rather, the way Wells held himself out to Plaintiff as a powerful, well-connected FNC producer, the stark hierarchy between FNC and Edge, and Wells's repeated practice of assigning and monitoring Plaintiff's work would permit a reasonable jury to conclude that Wells functioned as Plaintiff's de facto or apparent supervisor, and that Plaintiff reasonably believed Wells had "supervisory responsibility" over him. *See EEOC v. Draper Dev. LLC*, 2018 U.S. Dist. LEXIS 115124, at *16 (N.D.N.Y. July 11, 2018) ("Whether a plaintiff is reasonable in believing that a purported supervisor had the apparent authority to do what he promised 'is a question best left for a jury.'") (quoting *DeWitt v. Lieberman*, 48 F. Supp. 2d 280 (S.D.N.Y. 1999)).

1.  **Wells Groomed Plaintiff and Leveraged His Connections to <u>Gain Influence Over Him</u>**

Wells repeatedly presented himself to Plaintiff as a powerful and well-connected insider, whose favor, or disfavor, could directly affect Plaintiff's career at Fox News. ¶¶196,198-200; **Ex. A**, at 180:11-187:23. *See Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 451(holding that "Payne exercised supervisory authority over [plaintiff] Hughes" as he "told Hughes that he could provide her with a full-time contributor position" and "exercised his influence to give her regular appearances on his show."). From the very outset, when Plaintiff first "caught his eye," Wells made it a point to signal to Plaintiff that he was *the* producer on the

acclaimed Fox5 News at 10p.m. program, and that he was personal acquaintances with those in positions of authority and influence where Plaintiff worked, namedropping Scott Jones, Assistant News Director, and Hannah Corsa, a fellow producer with whom Plaintiff worked.  ¶¶148, 153-156, 158; **Ex. H**; **Ex. A** at 40:13-17; **Ex. B** at ¶3-5.

Based on Wells's own statements, Plaintiff understood that Wells was deeply embedded in the power structure across Fox's television stations and programs and was clearly not someone operating at Plaintiff's same level. ¶158; **Ex. B**, at ¶5. Wells was making it known that he was not merely a Fox colleague, but an "influential producer" with real pull inside the organization. ¶159; **Ex. B, at** ¶6. That perception only intensified when Wells became Producer on one of FNC's most prominent shows, *On the Record,* further confirming to Plaintiff that Wells was indeed an "influential producer" with real pull inside the organization who occupied a powerful and prestigious role within Fox News. ¶¶160, 186-187; **Ex. U; Ex. A**, at 16:9-10, 136:12-18, 172:7-8. Plaintiff understood *On the Record* to be one of the most lauded programs on FNC and, given the steep power dynamics between FNC and Edge (i.e., Edge was a feeder service housed in the basement while FNC was a highly profitable cable news channel and content creator whose offices were on the upper floors0, and Wells's own words (i.e., telling Plaintiff that "he had power within the Company," that he had "significant influence within Fox News"), Plaintiff reasonably believed that Wells could influence the terms and conditions of his employment at Fox News. ¶¶196-197; **Ex. A**, 180:11-186:10; **Ex. B** at ¶19.

Crucially, this belief was not speculative but reinforced by how Wells repeatedly singled Plaintiff out, leveraged his own status, and inserted himself into Plaintiff's career opportunities. On Plaintiff's first day, Wells arranged for him to receive a package of personalized Fox-branded gifts, which Plaintiff's colleagues, including his supervisor, were shocked by and had never

received anything similar throughout their tenures at Fox News. ¶¶163-169; **Ex. A**, 43:12-13, 46:16-47:8, 205:17-206:12; **Ex. D**, 24:22-25:15; **Ex. F**, 121:15-122:3: **Ex. L**, 63:25-64:7. This unusual but aggressive and forward gesture, reserved for Plaintiff alone, reinforced that Wells had the status within Fox News to "pull strings." ¶170; **Ex. A**, 44:9-12; **Ex. B**, at ¶11. Then, within Plaintiff's first few weeks at Fox News (but prior to the sexual assault), Wells went even further. True to his prior words, Wells sent Plaintiff a job posting for a Fox News Radio "freelance newscaster" position. ¶176; **Ex. M**. Wells even offered to put Plaintiff in touch with Fox News Radio personnel who may be able to help Plaintiff pursue this opportunity. *Id.* These actions, taken together, coupled with Wells's own words and representations, cemented Plaintiff's reasonable belief that Wells wielded real power and influence within Fox News and could materially impact Plaintiff's career.

### 2. Wells Acted Like Plaintiff's Supervisor

Moreover, the record shows that Wells did not interact with Plaintiff as a peer but instead exercised direct, managerial-type control over Plaintiff's daily workload and tracked his schedule and whereabouts. Like any manager or supervisor, Wells directly assigned Plaintiff work regularly (approximately two times a week), and more frequently than he assigned work to Plaintiff's Edge colleagues, giving Plaintiff specific and important tasks to complete with quick turnaround times. ¶¶191, 193; **Ex. A**, at 48:10-21; 51:1-4: 172:25-173:5; **Ex. B**, at ¶17. If Wells gave Plaintiff an assignment, Plaintiff understood that it was a priority because the content requested by Wells needed to air on *On the Record* that night. *See Poolt v Brooks*, 38 Misc. 3d 1216(A), 967 N.Y.S.2d 869, 2013 N.Y. Slip. Op. 50116(U), 2013 WL 323253, at *7 (Sup. Ct. N.Y. Cnty. Jan 18, 2013) (finding plaintiff's testimony that defendant "supervised her work" by "going over [her] work or assigning work to her" sufficient to establish that defendant was her supervisor, despite admission

that plaintiff knew when she started working that her "supervisor" and "boss" was someone else, and there was no evidence that defendant interviewed, hired or paid plaintiff, or had "power to do anything in that company," concluding that the "rationality of plaintiff's belief, being a question of fact rather than law, must be determined by the jury").

Even if there was an Assignment Desk that was supposed to filter assignments down to Edge producers, its existence does not negate the reality that Wells directly assigned critical, high priority projects multiple times a week that Plaintiff could not turn down and needed to urgently complete.  ¶¶191, 193; **Ex. A**, at 48:10-21; 51:1-4: 172:25-173:5; **Ex. B**, at ¶17. By not doing anything to ensure that its assignment procedures were being followed, Fox News enabled an environment in which Wells was able to exercise managerial and supervisory responsibilities over Plaintiff, which he then manipulated to sexually harass and assault Plaintiff.

Wells, just as any manager and supervisor would, also consistently checked in on Plaintiff, asking about his work schedule and questioning why he never "logged in," thereby monitoring when Plaintiff was working in a way characteristic of a supervisor, not a peer. ¶239; **Ex. R; Ex. Q**. This type of conduct, in which a higher-ranking employee regularly assigns work, trains, and oversees a subordinate's day-to-day activities, is precisely the type of evidence courts find sufficient to create a triable issue as to supervisory status. *See Hernandez v. Jackson, Lewis, Schnitzler & Krupman*, 997 F. Supp. 412, 417 (S.D.N.Y. 1998) (finding triable issue as to de facto supervisory status where alleged harasser, higher-ranking billing coordinator, assigned plaintiff work, trained her, and management instructed others to follow his directions). Further, given Wells's role at FNC, Plaintiff reasonably believed that Wells was "above" MacCarthy, Plaintiff's direct supervisor, and that Wells's view would carry greater weight within Fox News. ¶¶195; **Ex. A**, 54:5-11. *See DeWitt*, 48 F. Supp. 2d 280, 287-89 (treating alleged harasser as plaintiff's de facto

23

supervisor where, although not her nominal supervisor, he actually assigned her work and, as an attorney, occupied a higher position than her designated supervisor, a secretary).

> ### 3. The Clear Hierarchy Between FNC and Edge Further Solidified Plaintiff's Belief That Wells Had Supervisory Authority Over Him

Defendant argues that, because Plaintiff did not independently "verify" that Wells was powerful, his belief was somehow unfounded. That contention badly mischaracterizes the record. Plaintiff's belief was grounded in, and repeatedly confirmed by, the stark hierarchy between FNC and Edge, and by Wells's own conduct within that hierarchy. Fox News' own SEC filings describe Edge not as a stand-alone network, but as a "FOX News Edge service" to Fox News that "licenses news feeds to FOX Affiliates and other subscribers to use as part of local news broadcasts," while separately identifying FNC and Fox Business Network as Fox News's cable networks that generate affiliate-fee and advertising revenue. ¶¶145, 178; **Ex. K**, at 10. In short, Fox News itself characterizes FNC as the flagship, revenue-generating network and Edge as a supporting news-feed service, not a stand-alone profit center, the same hierarchy that Plaintiff, Wells, and other Fox News employees recognized as the operative power structure between the two divisions.

Moreover, testimony from both Wells and Plaintiff likewise confirms that this hierarchy was not abstract but the day-to-day power structure that governed their working relationship. Wells admitted that Edge was an affiliate "feed service" and "one of the weaker divisions at Fox [News]," in contrast to FNC. ¶195; **Ex. F**, 234:23-236:19. Wells explained that "there was certainly a hierarchy," agreeing that FNC is "obviously" higher than Edge in that hierarchy. *Id.* It is clear from Plaintiff's testimony that he held the same belief. Plaintiff testified that Edge was "very much the low person on the totem pole" within Fox News, and that Edge was at the bottom of the Fox News ladder while Wells and other FNC producers stood several rungs above him. ¶196; **Ex. A**, 185:14-

186:10. Given Wells's role at FNC within this hierarchy, Plaintiff understood that Wells was "above" MacCarthy, his direct supervisor, and that Wells had the ability to influence Plaintiff's employment and compensation. ¶¶195-197, 200; **Ex. A**, 52:5-11, 182:19-184:3, 187:20-24; **Ex. B** at ¶19.

That hierarchy was not only in practice, but literal as well. Edge employees worked in the basement of 1211 Avenue of the Americas, while FNC producers like Wells worked on the higher floors (Wells worked on the 18th floor), accessible by a different elevator bank, underscoring that Edge was physically and symbolically beneath FNC. ¶172; **Ex. A**, at 137:12-21; **Ex. F**, 44:17-23; 278:23-279:2, 328:1-329:4.

Here, the facts are more than sufficient to create, at a minimum, a triable issue as to whether Wells functioned as Plaintiff's de facto or apparent supervisor under the lenient NYCHRL and NYSHRL standards. Courts in the Second Circuit and New York have held that where a higher-ranking employee in the organizational hierarchy assigns the plaintiff work, oversees day-to-day tasks, works with the plaintiff, and is perceived by the plaintiff and others as having greater authority than the nominal supervisor, questions of supervisory status are for the jury, not the court, to resolve. *See DeWitt,* 48 F. Supp. 2d 280, 287–89; *Hernandez*, 997 F. Supp. 412, 417; *Draper Dev. LLC*, 2018 U.S. Dist. LEXIS 115124, at *16; *Poolt*, 2013 WL 323253, at *7; *Gostanian v. Bendel*, No. 96 Civ. 178 (LAP). 1997 U.S. Dist. LEXIS 5620, at *19 (S.D.N.Y. Apr. 25, 1997) (holding that non-supervisor who influenced managing director's decisions could be found to possess de facto authority over plaintiff's employment); *Dougherty v. Ferrari Express, Inc.*, 19-CV-3961 (JMA)(ARL), 2024 U.S. Dist. LEXIS 146038, at *27–28 (E.D.N.Y. Aug. 15, 2024) (recognizing liability where harasser treated as supervisor under apparent-authority or de facto decisionmaker principles); *see also Eckhart v. Fox News Network, LLC*, 20-CV-5593 (RA), 2021

25

U.S. Dist. LEXIS 171219, at *55-56; 61 (S.D.N.Y. Sept. 9, 2021) (finding that defendant who lacked authority to hire or fire plaintiff was not plaintiff's supervisor where there was no "alleg[ation] that the [plaintiff and defendant] ever worked together," but merely that defendant "promised to bring her on his show but did not claim that his ability to do so was dependent on the approval of others").[3]

---

[3]     Not a single case on which Defendant relies in support of its argument that Wells cannot be considered Plaintiff's manager or supervisor under the NYCHRL and NYSHRL are on point. In *Mejia v. City of New York*, 17-CV-2696 (NGG)(JO), 2020 U.S. Dist. LEXIS 95659 *47-48, 2020 WL 2837008 (S.D.N.Y. May 30, 2020), the court rightly held that an HR counselor/union delegee who played no role with respect to the plaintiff during her tenure as a probationary officer, and a gym instructor who led workouts and "provid[ed] suggestions to recruits who may be struggling," did not exercise managerial or supervisory authority over the plaintiff.  In *Castillo v. Isakov*, 22-cv-6888 (LJL), 2023 U.S. Dist. LEXIS 183640, *4, 19, 2023 WL 6664552 (S.D.N.Y. Oct. 12, 2023), the court correctly held that the defendant was a manager/supervisor as he co-owned the business that employed the plaintiff, in which he served as a manager and supervisor, and had even fired one plaintiff and replaced him with a straight man. *Ward v. Shaddock*, No. 14-cv-7660 (KMK), 2016 U.S. Dist. LEXIS 106438 (S.D.N.Y. Aug. 11, 2016) is also not on point not only because it was decided at the pleadings stage and involved Title VII and not NYCHRL or NYSHRL claims, but the court rightly found that the plaintiff's mere allegation that the defendant used his "higher authority" to perpetuate a racist hostile environment, pre-screened applicants in a "racially discriminatory manner and thereby contribute[d] to the racially hostile environment," and assigned minority employees to less desirable shifts, was insufficient to render him a manager or supervisor. Notably, there was no allegation that the defendant ever assigned plaintiff to complete specific assignments or held himself out as having the authority to impact the terms and conditions of the plaintiff's employment, unlike Wells did here. *Fornah v. Cargo Airport Servs., LLC*, No. 12-CV-3638, 2014 U.S. Dist. LEXIS 230, 2014 WL 25570, at *6 (E.D.N.Y. Jan. 2, 2014) also misses the mark as the court declined to analyze whether the defendant was a supervisor pursuant to the NYCHRL or NYSHRL, and there was no allegation that the defendant assigned tasks to the plaintiff that were part of her job description. *Travis v. City of Chi.*, No. 10-CV-3011, 2014 U.S. Dist. LEXIS 138563, 2014 WL 4909060, at *12 (N.D. Ill. Sept. 30, 2014) and *Bentley v. AutoZoners, LLC*, 935 F.3d 76 (2d Cir. 2019) are also inapplicable as they did not concern or address NYCHRL or NYSHRL claims at all. And while the court in *Socorro-Prospero v. M. Booth & Assocs.*, No. 23-cv-11319 (AS), 2025 U.S. Dist. LEXIS 186012 (S.D.N.Y. Sept. 22, 2025) correctly acknowledged that the standard of liability was "materially different under the NYCHRL from that under Title VII," the case is nonetheless unhelpful as the court limited its analysis to Title

C.    **Fox News Can, And Should, Still Be Liable Even If the Assault Happened Outside of the Workplace**

When sexual harassing acts occur outside the workplace, the plaintiff must identify sufficient facts from which to infer a connection between the misconduct and the employment. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1306 (2d Cir.1995) (holding sufficient connection between plaintiff's employment and sexual assault by supervisors after business dinner to establish material issue whether rape occurred in "work environment"); *see also*, *e.g.*, *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 135 (2d Cir.2001) (question of fact whether flight attendant's hotel room was "work environment" when plaintiff was raped there by coworker during lay-over even though she went there to have drink with him), *cert. denied*, 537 U.S. 824, 123 S.Ct. 110, 154 L.Ed.2d 34 (2002). "[A]ttendance at particular social functions outside the office or after hours, while not necessarily mandatory, nonetheless may be customary and beneficial to safeguard the employment relationship and enhance the employee's standing in the workplace." *Parrish v. Sollecito*, 249 F. Supp. 2d 342, 351 (S.D.N.Y. 2003) (attendance at employer's father's funeral reception where assault occurred "arose uniquely in the context of [plaintiff's] employment relationship" as an "ordinary and necessary social obligation[] and unstated expectation[] that [was a] common adjunct[] of various events and interactions associated with the normal course of business").

_____

VII after declining to exercise jurisdiction over NYSHRL and NYCHRL claims, and there was "no evidence in the record" that the defendant was plaintiff's supervisor, much less any evidence that he directed the plaintiff's work or gave him assignments to complete. Lastly, *Whipple v. Reed Eye Assocs.*, 524 F. Supp. 3d 76, 93 (W.D.N.Y. 2021) is off point as it not only does not analyze the NYCHRL, but the harasser was *not even employed by the same employer as the plaintiff*, on which basis the court found the plaintiff's belief that he was her supervisor not reasonable

Here, Wells invited Plaintiff, who had just joined Fox News a month earlier, to a social outing at Barracuda bar that he presented as a good opportunity for a brand-new employee like him to meet coworkers. ¶212; **Ex. A**, 58:24-59:1. Wells framed having a drink at his apartment as a brief stop before attending the event. ¶213; **Ex. A**, 59:2-12. By then, Wells had repeatedly stressed the importance of his influence in the field and the need for Plaintiff to network within the Fox sphere. ¶¶196, 198-200; **Ex. A** (Delancey Dep.), 180:11-15, 182:12-184:10; 185:14-18; 186:6-187:23. Further, by this time, Plaintiff was aware about how his own manager, MacCarthy, often took his subordinates out for drinks after work at a nearby bar, during which topics including work and other colleagues would be discussed. ¶204; **Ex. A**, 151:20-152:5; **Ex. L**, 98:24-100:2. In other words, Plaintiff was aware of a culture at Fox News that encouraged employees, especially gay employees, to socialize and convene at bars, and Wells's invitation to the Barracuda fell right within that custom and was an opportunity to enhance his standing with his new employer.

While Wells assaulted Plaintiff at Wells's apartment and not on Fox premises, the assault nevertheless fundamentally altered Plaintiff's workplace experience: immediately after Plaintiff rejected Wells's advances, Wells told him he was "not thinking straight" and "screwing [himself] over," the NBC interview and job opportunity collapsed, and Wells iced Plaintiff out after repeatedly promising to help him advance within Fox, stalling his career at Fox and culminating in his resignation. ¶235; **Ex. A**, 199:10-13; 200:8-17. Under these facts, the location of the assault is irrelevant—what matters is that the assault created workplace consequences, which it indisputably did for Plaintiff, and as such, a reasonable jury can easily conclude that Wells's sexual assault of Plaintiff arose in the course of Plaintiff's employment in a work-related, albeit off-site and after work hours, event, such that Fox News can be held liable for Wells's conduct.

**D.**     **Plaintiff Suffered Tangible, Adverse Actions**

Fox News' contention that Plaintiff's *quid pro quo* claim is deficient because he continued to work at Fox News after Wells sexually assaulted him, received annual raises and one promotion, and later resigned, completely misses the mark.

The Second Circuit has held that the "NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct." *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 114 (2d Cir. 2013) (conduct "unrelated to [plaintiff's] discharge and [] neither severe or pervasive," such as, *inter alia*, when harasser "stopped sitting next to [plaintiff] at the trading desk" and "began to exclude her from meetings," held actionable under NYCHRL). In fact, the Second Circuit has emphasized that context transforms seemingly minor acts into materially adverse ones by examining the "constellation of surrounding circumstances, expectations, and relationships" rather than just the surface-level description of what occurred. *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

In *Hughes*, 304 F. Supp. 3d at 449, the court held that a change in professional opportunities occurring immediately after the plaintiff rejected a sexual relationship with her coworker established temporal proximity necessary for *quid pro quo* liability. *See also Parham*, 2024 N.Y. Slip Op. 51360(U), at *7 (denying letters of recommendation and ceasing to communicate with plaintiff constituted adverse activity under NYCHRL and NYSHRL). Here, before the sexual assault, Wells was keenly attentive to advancing Plaintiff's professional development, including arranging an interview for a higher paying producer position at NBC and informing him about freelance opportunities within Fox News.  ¶177; **Ex. F**, 180:2-7; 187:8-23; **Ex. A,** 53:15-17.  In fact, Wells invited Plaintiff to his apartment under the pretense of a professional networking opportunity that a new employee who knew barely anyone at Fox News should attend. ¶¶212; **Ex.**

**A**, 58:24-59:1. But when Plaintiff rejected Wells's sexual advances, Wells immediately told him he was "not thinking straight" and "screwing [himself] over"—an explicit threat that rejection would have professional consequences. ¶235; **Ex. A**, 199:10-13; 200:8-17. And in fact, after he rejected Wells's sexual advances, the NBC producer opportunity collapsed, Wells made no further effort whatsoever to help Plaintiff advance his career at Fox or elsewhere or even network within Fox News, and Plaintiff's career at Fox did in fact stall to the point that he ultimately quit. ¶240; *See* **Ex. A**, at 204:7-13.   This is the exact sequence—work opportunity → sexual solicitation → refusal → immediate career harm—that the *Hughes* court held created a triable *quid pro quo* claim.

### E.    Fox News Knew or Should Have Known of Wells's Discriminatory Conduct

Under the NYCHRL, an employer will be held liable for the unlawful discriminatory practice of an employee or agent if "'the employer knew or should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.'" *See Zakrzewska v. New Sch.*, 598 F. Supp. 2d 426, 433-34 (S.D.N.Y. 2009) (quoting N.Y.C. Admin. Code § 8-107(13)(b)). The "knew or should have known" language squarely encompasses employers who chose to ignore obvious risks and failed to implement even basic safeguards against foreseeable misconduct. Fox News was, at best, reckless in structuring and policing the relationship between FNC producers and low-level Edge employees, and that recklessness is precisely what enabled Wells's abuse. Although Fox News' official policy was for assignments to be routed through the Assignment Desk, that clearly did not always happen in practice. ¶181; **Ex. A**, 20:19-21:10; 48:22-49:18; 136:9-22; **Ex. D**, 41:19-42:2. Plaintiff worked until 1 a.m., a time when the Assignment Desk was not covered; thus, if a Producer of a Fox News

Channel show needed something at that time, Plaintiff would be contacted directly via Top Line.[4]

¶189; **Ex. B**, at ¶16. Plaintiff was never told not to accept assignments directly from Fox News

Channel producers, and in fact, believed that if he was asked to do something, he was expected to

complete it. ¶¶193-195; **Ex. B**, at ¶17-18. Despite touting the Assignment Desk as a safeguard,

Fox News did nothing meaningful to prevent someone like Wells from exploiting his higher

position within Fox News to gain unsupervised control over Plaintiff's work. The record evidence

is clear:

- There was no formal prohibition or discipline policy preventing Fox News Channel producers from assigning work directly to Fox News Edge workers. **Ex. F**, 142:14–20

- There was no formal prohibition or guidance instructing Fox News Edge workers not to accept work from Fox News Channel producers. **Ex. A**, 134:21-135:22.

- Fox News could have, and should have, tracked where assignments originated, but chose not to do so.

- Fox News took no steps to monitor or enforce compliance with the supposed Assignment Desk policy.

Fox News, through its own supervisors, was also on notice of Wells's unusual, grooming-

type behavior toward Plaintiff. When MacCarthy saw the monogrammed stationery that Wells

ordered for Plaintiff through Fox News' internal portal, he (adroitly) remarked, "Oh, somebody

likes you." ¶169; **Ex. B** at ¶10. MacCarthy's reaction underscores that he recognized Wells's

conduct as out of the ordinary and personally directed at Plaintiff; behavior that, given the stark

hierarchy between an FNC producer and a new, low-level Edge employee, carried an obvious risk

---

[4]    Notably, Fox News admittedly has not preserved any Top Line messages from this period, and there is no Fox News policy requiring those messages to be retained. ¶¶174; **Ex. N**, 99:8-102:10.

of abuse of power. Nevertheless, despite the clear notice, Fox News management took no steps to intervene, investigate, or otherwise protect Plaintiff.

Instead of taking any steps to protect Plaintiff from Wells's misconduct, MacCarthy did the opposite; he not only took his subordinates out for drinks and had inappropriate discussions with them about colleagues and their attractiveness – i.e., endorsed an atmosphere that was ripe for improper conduct to blossom – but he affirmatively warned Plaintiff *not* to report anything to HR. ¶220; **Ex. A**, at 148:1-150:-24; **Ex. B**, at ¶ 22.

As a threshold matter, an employee's failure to complain internally does not insulate an employer where the employer, through its own supervisors and systems, effectively blocks or discourages reporting. *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63-64 (2d Cir. 1998) (denying summary judgment and holding that employer not insulated from liability where reasonable jury could find plaintiff's failure to report caused by agent's warning that "if you say something, you can't work here no more."). The record evidence is clear that MacCarthy repeatedly warned Plaintiff *not* to speak to HR about any problems or concerns he had, for the simple reason that HR was "not to be trusted." ¶220; **Ex. A**, at 148:1-151:11; **Ex. B**, at ¶ 22. MacCarthy's comments sent a clear message to Plaintiff that if he went to HR, he would be labeled a "problem." ¶221; **Ex. A**, 149:11-14. At the same time, Fox News's purported complaint procedures were ineffective and illusory. Fox News has produced no written records showing who attended anti-harassment, anti-discrimination, and anti-retaliation trainings during Plaintiff's employment, nor has it produced the content of any training. ¶223. Plaintiff does not recall ever receiving meaningful training on how to report harassment. ¶222; **Ex. B**, at ¶¶7-8.

Moreover, during Plaintiff's employment, ***and even now***, Fox News' record-keeping "policies" are structured in a way that, incredibly, allows complaints to ***disappear*** rather than be

preserved, tracked, or taken seriously. Indeed, the only systematic step Fox News takes to record complaints is to print *select* complaint-related emails and place those loose pages in a physical "complaint file," after which the underlying emails are automatically deleted pursuant to Fox News' 13-month email retention policy. ¶¶249-250; **Ex. G**, 66:19-68:17. There is no policy requiring that every complaint of sexual harassment, assault, or retaliation be documented and placed in the complaint file, leaving it entirely to the discretion of Fox News personnel to decide which complaints are worth recording and keeping and which can be allowed to vanish. ¶252; **Ex. G**, 68:13-18. Further, in this day and age, Fox News chooses to have no digital system or tracking mechanism that would allow it to know, in any reliable way, what complaints were made, how they were handled, or whether patterns of misconduct emerged over time, and it has made no effort to digitize or back up its paper complaint files. ¶253; **Ex. G**, 68:12-69:2. For a global media conglomerate of Fox News' size and sophistication, a reasonable jury could conclude that maintaining cherry-picked complaint records as unlogged paper printouts subject to automatic electronic deletion falls egregiously short of the reasonable diligence required to prevent and respond to discriminatory conduct.

i.      **Fox News Knew or Should Have Known of Wells's History of Sex-Based Harassment**

Wells had a history of harassment that Fox News knew about or should have known about. After learning about the assault, Ms. Wells wrote to Plaintiff from her Facebook account, describing how Wells had previously screamed at her and called her a ***"fucking bitch,"*** how she complained to her boss, and how her complaint was escalated to Wells's manager, resulting in a written apology that management required Wells to deliver. ¶¶ 243; **Ex. C**. For his part, Wells does not squarely deny the incident. *See* **Ex. F**, 247:19-25, 275:15-276:4, 282:12-283:3. Wells acknowledged that there was "shouting" laced with profanity in the newsroom and that he may

33

have "shout[ed]" or been "aggressive." *See* **Ex**. **F**, 282:12-283:3. A reasonable jury could credit Ms. Wells's detailed account, discredit Wells's equivocal testimony, and determine that management knew or should have known that Wells had engaged in serious, gender-based verbal harassment. The fact that Fox News now claims they cannot locate the documentation of Ms. Wells's complaint merely reflects its deficient recordkeeping, not that the incident never occurred.

Lastly, Defendant is wrong to contend that Ms. Wells's messages cannot be considered by the Court simply because she is deceased and they are "hearsay."[5] First, Plaintiff will testify that he received the Facebook messages directly from Ms. Wells's Facebook account, that he understood he was communicating with the same Kathleen Wells who worked at Fox News, and that the profile and content contains objective evidence confirming her identity. **Ex. B**, ¶27. A statement is admissible if "(1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(1)-(2). Here, given the totality of the circumstances, including that the messages were sent privately, contemporaneously, from Ms. Wells's own account, contain specific detail about her experience with Wells, and are corroborated by other record evidence (namely Wells's own testimony), they bear sufficient guarantees of trustworthiness. And because Ms. Wells is now deceased through no fault of Plaintiff, and Fox News and WNYW claim to have no documentation of her complaint, these messages are more probative than any other evidence reasonably obtainable on what she reported and how Fox News/WNYW responded.

---

[5]    In any event, this sort of evidentiary objection is properly resolved, if at all, on a motion *in limine*, not used at the summary judgment stage to disregard evidence that can plainly be presented in admissible form at trial.

III.    **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Fox News'

motion for summary judgment in its entirety.

Dated: November 21, 2025                    Respectfully Submitted,
       White Plains, New York

                                            **FILIPPATOS PLLC**

                                            By: _____
                                            Tanvir H. Rahman
                                            Gabrielle Rosen Harvey
                                            199 Main Street, Suite 800
                                            White Plains, New York 10601
                                            T/F: 914.984.1111
                                            TRahman@filippatoslaw.com
                                            Grosenharvey@filippatoslaw.com

                                            ***Counsel for Plaintiff Andrew Delancey***

**CERTIFICATE OF SERVICE**

I, Tanvir H. Rahman, hereby certify that a true and correct copy of Plaintiff Andrew Delancey's

Memorandum of Law in Opposition to Defendant Fox News Network, LLC's Motion for

Summary Judgment was served via ECF on November 21, 2025 upon the following:

Paul C. Evans
200 Park Avenue
New York, NY 10166
Tel: (212) 318-6009
Fax: (212) 303-7009
paulevans@paulhastings.com

Sara J. Hoult (*admitted pro hac vice*)
71 S. Wacker Drive, Forty-Fifth Floor
Chicago, Illinois 60606
Tel: (312) 499-6037
Fax: (312) 499-6137
sarahoult@paulhastings.com

***Attorneys for Defendant Fox News Network, LLC***

Jason H. Sunshine
Freedman Taitelman + Cooley, LLP
1801 Century Park West, 5th Floor
Los Angeles, California 90067
Telephone: (310) 201-4285

***Attorney for Defendant Wells***

36

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ANDREW DELANCEY,

                    *Plaintiff,*

   – against –                                 Case No.: 1:23-CV-10357 (AT) (KHP)

JUSTIN WELLS, FOX CORPORATION, and
FOX NEWS NETWORK, LLC.

                    *Defendants.*

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to the Your Honor's Individual Practice Rule III.D regarding word count limitations for memoranda of law, I hereby certify that Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment contains 8,590 words, excluding the cover page, the table of contents, the table of authorities, and the signature block. This certification is based on the word count function of the word-processing system used to prepare the document (Microsoft Word).

Dated: November 21, 2025
      White Plains, New York

                                    Respectfully submitted,

                                    Tanvir H. Rahman
                                    **FILIPPATOS PLLC**
                                    199 Main Street, Suite 800
                                    White Plains, NY 10601
                                    T/F: (914) 984-1111
                                    Trahman@filippatoslaw.com
                                    *Attorney for Plaintiff*

37