USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/14/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDREW DELANCEY,

Plaintiff,

-against-

JUSTIN WELLS, FOX CORPORATION, and FOX NEWS NETWORK, LLC,

Defendants.

23 Civ. 10357

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Andrew Delancey, brings this action against Defendants, Justin Wells, Fox Corporation, and Fox News Network, LLC ("FNN"), asserting claims for assault and battery against Wells, and violations of the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") against Fox Corporation and FNN (collectively, "Fox Defendants"). *See generally* Am. Compl., ECF No. 24. Delancey alleges that while he was employed by the Fox Defendants, Wells, another employee of the Fox Defendants, sexually assaulted him in a Manhattan apartment building. *Id.*

FNN moves for summary judgment on the claims brought against it, arguing that it is not liable for Wells' conduct. *See* Mot., ECF No. 122; Mem., ECF No. 123; Opp. ECF No. 132; Reply, ECF No. 133. For the reasons stated below, FNN's motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND[1]

### I. Delancey's Employment at FNN

Andrew Delancey worked for FNN from September 2008 through September 2010. 56.1 ¶ 2, ECF No. 115. Prior to his employment at FNN, Delancey worked for WTVT, a local

[1] The facts in this section are taken from the parties' Rule 56.1 statements, responses, and declarations, unless otherwise noted. Disputed facts are so noted. Citations to a paragraph in a Rule 56.1 statement also include the opposing party's

television station in Florida operated by Fox Television Stations, LLC ("FTS"), a separate company that is not a party to this case. *Id.* ¶¶ 19–21.

In 2007, when Delancey was working at WTVT, he received a Facebook message from Justin Wells, who was at the time an employee of a television station in New York City also owned by FTS. *Id.* ¶¶ 3, 22–26; *see* Ex. 15 to 56.1, Facebook Messages, ECF No. 124-16. Wells told Delancey that he saw Delancey in a Facebook group for FTS employees, that "it caught my eye," and that Wells was the "the 10p[m] producer at [F]ox 5 [NYC] now." Ex. 15 to 56.1 at 2. Wells indicated that he knew two other employees working at WTVT, and Delancey responded, "I envision my next step to be New York City or Chicago. So it's nice to have someone I already know in NYC." Ex. 15 to 56.1 at 4. Over the next year, the two continued to communicate periodically over Facebook. 56.1 ¶ 28.

In July 2008, FNN hired Wells to be a producer for its program *On the Record with Greta Van Susteren* ("*On the Record*"). *Id.* ¶ 29. Wells did not supervise any direct reports while working on *On the Record*. *Id.* Two months later, FNN hired Delancey as a "[r]egional [p]roducer" in the Fox News Edge department of FNN. *Id.* ¶ 31. Wells did not interview Delancey for this role, and FNN claims that he played no part in FNN's decision to hire Delancey. *Id.* ¶¶ 31–33.[2]

Delancey relocated to New York City and began working for Fox News Edge in the same building where Wells worked. *Id.* ¶ 34. Fox News Edge "licenses news feeds to local stations owned and operated by Fox Television Stations, affiliates and other subscribers for them to use as

---

response. "[W]here there are no citations[,] or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (alteration omitted). On a motion for summary judgment, the facts must be read in the light most favorable to the non-moving party. *Id.* at 69.

[2] Although Delancey does not concede that Wells played no role in FNN's decision to hire Delancey, Delancey cites no record evidence which would undermine FNN's assertion. *See* 56.1 ¶ 33.

part of local news broadcasts throughout the United States and abroad." *Id.* ¶ 35. Its primary purpose is to license content to television stations owned by FTS rather than FNN. *Id.* ¶ 36; Delancey Dep. 133:24–134:16, ECF No 124-7. Nonetheless, producers working for FNN, like Wells, would regularly request content from Fox News Edge. *See* Delancey Dep. 135:16–21.

When shows operated by FNN required content, producers would either make requests to Fox News Edge producers directly or send their requests to a central assignment desk. *See* Delancey Dep. 134:19–136:22; MacCarthy Dep. 40:18–41:17, ECF No. 124-19; 56.1 ¶¶ 40–44. Delancey started as a regional producer at Fox News Edge, 56.1 ¶ 45, and would "sometimes [be] the only person that was working for [his region]" on any particular night, Delancey Dep. 136:9–18. As a result, Delancey testified that producers sent him direct requests for content on a "[d]aily" basis. *Id.* 20:16–22:10, 136:9–22.

Wells was one such producer. Delancey Decl. ¶ 16, ECF No. 131-10. Wells "regularly bypassed the [a]ssignment [d]esk and assigned work to [Delancey] directly," "a couple of times a week." *Id.*; Delancey Dep. 48:22–49:18, 51:1–4. Delancey understood such assignments to be "time sensitive[,] requir[ing] an immediate turnaround given that . . . the assignment from Wells had to be completed before his show aired that evening." Delancey Decl. ¶ 17. As a result, "Wells's assignments took precedence over my other work and could take anywhere between a half an hour to an hour to complete." *Id.* ¶ 18.

Although Wells was not Delancey's direct supervisor, and Delancey's colleagues "would not have considered Wells to be his supervisor," 56.1 ¶¶ 52–55, Delancey considered Wells "indirectly" to be his supervisor, Delancey Dep. 180:7–9. Wells told Delancey "that he had power within the company" several times, and Delancey received the impression that Wells was both well connected and had significant influence at FNN—influence that could even get Delancey fired. *Id.* 180:11–183:16. One of Wells' coworkers agreed that producers like Wells were "above"

producers on Fox News Edge "[i]n the hierarchy of things" at FNN. Johnson Dep. 30:2–18, ECF No. 124-20.

On Delancey's first day at Fox News Edge, Wells used an FNN internal ordering portal to "arrange for a box of Fox-branded gifts, including monogrammed pencils and stationery, to be delivered to [Delancey]." Opp. at 11. Delancey thought that the gift was "weird" and that Wells had had to "pull strings" to order the stationery. Delancey Dep. 43:25–45:25. Multiple employees testified that they had not seen monogrammed stationery before. MacCarthy Dep. 63:25–64:7; Hare Johnson Dep. 24:14–25:11, ECF No. 124-20; *but see* Collins Fact Dep. 75:9–77:5, ECF No. 124-15 (stating that she had seen "notepads" with employees' names). During subsequent discussions with Wells, Wells sent Delancey some job listings and forwarded Delancey's resume to a contact at WNBC, who then arranged for an interview for Delancey. Wells Dep. 128:07–130:21, 180:2–7, 187:5–23, ECF No. 124-9.

II. The Alleged Assault[3]

In October 2008, about a month after Delancey started working for FNN, Wells invited Delancey to go to Barracuda Lounge, a gay bar in Chelsea, for drinks with other FNN employees. Delancey Dep. 57:25–58:23, 60:24–61:5. Wells told Delancey that it would be "be a good thing for [Delancey] to get to know" Wells' colleagues, and that it would "benefit" Delancey to go. *Id* 57:14–23. Wells then invited Delancey for a "pre-drink, a pregame cocktail" at Wells' apartment in Chelsea. *Id.* 57:24–25,

At Wells' apartment, Wells made Delancey a drink and then "threw [Delancey] onto [his] bed" and "put his tongue down [Delancey's] throat. *Id.* 59:2–12. Delancey tried to stop Wells, who then invited Delancey up to his apartment's rooftop; but while the two were walking up the

[3] Factual recitations made in this section should be understood only as a recounting of the evidence and testimony already in the record, and not as any factual findings.

stairs to the rooftop, Wells grabbed Delancey again, attempted to "pull down [Delancey's] pants," and "trie[d] to make out with" Delancey. *Id.* 59:19–60:14. When Delancey again told Wells that he "had no interest in that," Wells' "mood changed and he said he didn't want to go out anymore." *Id.* 60:1–14. Delancey left and returned home. *Id.* During his deposition, Wells largely stated that he did not remember these events. *See* Wells Dep. 155:14–163:10.

The following day, Delancey told one coworker that he had been "sexually assaulted by someone higher up at [FNN]." Delancey Dep. 222:6–223:19, 224:20–225:5; 56.1 ¶ 75. Fearing that reporting the assault could result in his being labeled as a "problem," Delancey did not report the assault to his direct manager, Mykel MacCarthy, or human resources ("HR"). 56.1 ¶¶ 69–71; Delancey Decl. ¶ 23. This was in part because throughout Delancey's employment at Fox News Edge, MacCarthy had frequently told him to not "go to" HR. Delancey Dep. 148:8–149:14 (stating he would "estimate" that he was told this "a dozen" times, and that he believed "if I went to HR, I would be labeled a problem"); *see also id.* 150:14–24 ("[H]e told me that he had been treated unfairly, that their accusations were not right, and that it got turned around on him. It just seemed to me he told me many times not to go to HR because there was no point in doing so.").

After the assault, Delancey claims that his opportunities for career advancement suddenly dried up. *See* Opp. at 16–17; Delancey Dep. 157:2–24. Delancey's interview with WNBC, which was scheduled before the assault but took place afterwards, was moved from the NBC newsroom to a "Starbucks on the ground floor," and it became "clear" to Delancey that he did not have a serious prospect of succeeding at the interview. Delancey Dep. 53:18–54:24. Wells then commented to Delancey that the interview with WNBC had gone poorly and suggested that Delancey was "screwing [himself] over" and "not thinking straight." Delancey Dep. 158:1–8, 199:10–200:21. Delancey began to receive the impression that there was a "chill over" him at FNN, in part because he felt that Wells had clearly sunk his interview with WNBC. *Id.*

Nonetheless, Delancey continued to receive regular assignments from Wells, although the tone of Wells' communications "was no longer friendly." Delancey Dep. 67:22–68:16; Opp. at 17; Delancey Decl. ¶ 26.

Over the following two years, Delancey was promoted by FNN and received modest pay increases twice. *See* Mem. at 8. However, in September 2010, feeling that his "career had . . . stagnated" at Fox News Edge, Delancey resigned. Delancey Dep. 145:8–25; *see also id.* 30:23–31:3. Delancey also felt that he was not "supported in terms of being able to go to HR if there were any issue" and that "it was a toxic environment." *Id.* 147:22–148:6.

In 2017, inspired by the #metoo movement, Delancey published a Facebook post on his profile describing his sexual assault without naming Wells. *See* Opp. at 17; ECF No. 131-20 at 2. Shortly thereafter, Kathleen Wells, a former FNN employee with no relation to Justin Wells, messaged Delancey and told him that Wells had called her a "fucking bitch" during a workplace dispute. *See* Opp. at 17. Kathleen Wells stated that her boss "had a talk with [Wells'] boss about how he treated me, . . . and [Wells] wrote a letter to [Kathleen Wells] apologizing." ECF No. 131-3 at 4; 56.1 ¶ 243; *see also* Wells Dep. at 282:4–283:14 (denying that the incident occurred). At the time that FNN hired Wells, it had no knowledge of any claims of sexual assault or harassment made against him. 56.1 ¶ 81.

## III. Procedural History

Delancey commenced this action in New York state court in November 2023, and FNN removed the action on the basis of diversity jurisdiction. *See* ECF No. 1. In April 2024, FNN moved to dismiss Delancey's claims under the NYSHRL and NYCHRL under Federal Rule of Civil Procedure 12(b)(6). *See* ECF No. 36. The Court refused to dismiss the complaint, holding that Delancey had sufficiently alleged (1) that the sexual assault was connected to the workplace, (2) that Wells was his supervisor, and (3) *quid pro quo* sexual harassment. *See generally Delancey*

*v. Wells*, No. 23 Civ. 10357, 2025 WL 579971, at *3–6. FNN now seeks summary judgment along similar bases that the Court considered in its decision on the motion to dismiss: (1) that Delancy's sexual assault claim cannot be imputed against FNN, *see* Mem. at 9–19; (2) that the conduct occurred outside the workplace and did not impact Delancey's work environment, *id.* at 20–23; (3) and that there is no evidence supporting a claim for *quid pro quo* sexual harassment, *id.* at 23–25.

**LEGAL STANDARD**

A party is entitled to summary judgment if it can establish that there "is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). In making this showing, the party may rely on "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). If the moving party meets its initial burden, the burden shifts to the opposing party to establish a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006). The Court views all facts "in the light most favorable to the non-movant, resolving all ambiguities in [his] favor." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

## ANALYSIS

### I. NYSHRL

FNN argues that, as a matter of law, it cannot be held liable for Wells' actions under the NYSHRL unless Delancey shows that FNN had actual notice of the misconduct and "encourag[ed], condon[ed], or approv[ed] it." *Eckhart v. Fox News Network, LLC*, No. 20 Civ. 5593, 2025 WL 786536, at *21 (S.D.N.Y. Mar. 12, 2025) (quotation omitted), *aff'd*, No. 25-1538, 2026 WL 1113472 (2d Cir. Apr. 24, 2026); *see Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007) (holding that NYSHRL liability requires "a showing that the employer became a party to the discriminatory conduct"); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 311 (2004); *Swiderski v. Urban Outfitters, Inc.*, No. 14 Civ. 6307, 2017 WL 6502221 (S.D.N.Y. Dec. 18, 2017). Delancey does not respond to this argument, instead suggesting that FNN is liable under the NYSHRL because the NYSHRL imposes strict liability on employers in an identical manner to the NYCHRL. *See* Opp. at 9–10; *see also id.* at 19 (discussing only the NYCHRL). Delancey cites to no legal authority supporting this proposition,[4] and the Court deems Delancey's NYSHRL claim abandoned. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

### II. NYCHRL

Under the NYCHRL, an employer:

> shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent . . . only where:
> (1) [t]he employee or agent exercised managerial or supervisory responsibility; . . . or

[4] Notably, although the provision imposing strict vicarious liability on employers for discriminatory actions of supervisors is expressly codified in the NYCHRL, *see* N.Y.C. Admin. Code § 8-107(13)(b)(1), no express provision exists in the NYSHRL, *see* N.Y. Exec. L. § 290 *et seq.* *See Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450, 455–57 (2021) (explaining that the NYSHRL does not impose strict vicarious liability on employers but the NYCHRL does).

> (2) the employer knew of the . . . discriminatory conduct and acquiesced in such conduct or failed to take immediate and appropriate corrective action; . . . or
> (3) [t]he employer should have known of the . . . discriminatory conduct.

N.Y.C. Admin. Code § 8-107(13)(b).

A. Managerial or Supervisory Authority Under Subsection (b)(1)

There is a triable issue of fact concerning whether Wells exercised "managerial or supervisory responsibility" over Delancey under subsection (b)(1) of the NYCHRL. This prong functions like a strict liability provision, imposing liability on employers for the actions of their employees regardless of whether the employer knew or should have known of the assault.

Courts are divided as to what is required to show that an employee "exercised managerial or supervisory authority" over another employee for purposes of the NYCHRL. In the Title VII context, the Supreme Court has held that employers are only strictly liable for the actions of employees if those employees are empowered to "take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see* ECF No. 54 at 11–12 (applying this standard for a Title VII claim). FNN argues, correctly, that several courts have applied this standard to subsection (b)(1) of the NYCHRL: At least two district courts in this Circuit have quoted and applied *Vance* to deny claims under the NYCHRL where a plaintiff sought to hold an employer liable for another employee's discrimination. *See Mejia v. City of New York*, No. 17 Civ. 2696, 2020 WL 2837008, at *16 (E.D.N.Y. May 30, 2020) ("While the term 'managerial or supervisory authority,' is not defined in NYCHRL, this concept is broadly understood in the context of employment discrimination claims to refer to an individual employee's authority to 'take tangible employment actions against the victim . . . .'" (quoting *Vance*, 570 U.S. at 431)); *Castillo*

*v. Isakov*, No. 22 Civ. 6888, 2023 WL 6664552, at *7 (S.D.N.Y. Oct. 12, 2013) (same); Mem. at 10.

But the NYCHRL's text does not explicitly require this standard, and Title VII caselaw does not bind the Court's interpretation of the NYCHRL "in light of [its] remedial purposes." *Fornuto v. Nisi*, 84 A.D.3d 617, 617 (N.Y. App. Div. 2011); *see also Williams v. N.Y.C. Housing Auth.*, 61 A.D.3d 62, 66 (N.Y. App. Div. 2009). Given that the NYCHRL provides that "[t]he provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal . . . human rights laws, . . . have been so construed," N.Y.C. Admin. Code. § 8-130(a), some New York courts have interpreted subsection (b)(1) to render employers liable for the conduct of offending employees who have "authority to direct the [victim's] daily work activities." *Cajamarca v. Regal Entm't Grp.*, No. 103027/12, 2013 WL 5717119 (Sup. Ct. Oct. 17, 2013) (slip op.) (citation omitted); *see also O'Neil v. Roman Catholic Diocese of Brooklyn*, No. 6189/07, 31 Misc. 3d 1219(A), 2011 WL 1587753, at *9 (Sup. Ct. Kings Cnty. Apr. 27, 2011).

The Court finds *Cajamarca*'s standard more appropriate.[5] The "authority to direct the employee's daily work activities" standard better accomplishes the "broad" and "remedial" purpose of the NYCHRL than the more restrictive Title VII standard, which is merely "a floor below which the [NYCHRL] cannot fall." *Williams*, 61 A.D.3d at 66. The standard also comports with the NYCHRL's text, which imposes liability when employees exercise "managerial or supervisory responsibility" over other employees. N.Y.C. Admin. Code § 8-107(13)(b)(1). Authority to direct an employee's daily work activities is a classic example of

[5] FNN claims that the Court has previously applied the *Vance* standard in this case. Reply at 2–4. This is true. The Court noted, however, that the stricter *Vance* standard was derived from Title VII law, and ultimately held that the amended complaint met that standard. *See* ECF No. 54 at 11–12. The Court, accordingly, is not bound to follow *Vance* in this decision.

"managerial . . . responsibility." This textual hook renders the NYCHRL different from Title VII, where courts have derived vicarious liability not from Title VII's statutory text, but from agency principles. *See Burlington*, 524 U.S. at 755–65; *see also Vance*, 570 U.S. at 436–42. Last, although the standard is broader than the federal standard, it is familiar to courts in this Circuit, as courts routinely applied this standard to vicarious liability claims under Title VII law prior to the Supreme Court's decision in *Vance*. *See, e.g.*, *Mack v. Otis Elevator Co.*, 326 F.3d 116, 127 (2d Cir. 2003).

Applying this standard, Delancey has shown that there is at least a triable issue of fact as to whether Wells had authority to direct his "daily work activities." When Delancey worked for Fox News Edge, he testified that he had "[d]aily" contact with individual producers on FNN shows who would directly request content from him. Delancey Dep. 20:16–22:10. Wells, as one of these producers, contacted Delancey "about two times a week with assignments for him to complete." 56.1 ¶ 191; Delancey Dep. 48:10–21, 51:1–4, 172:25–175:3. Furthermore, Delancey has stated that Wells' assignments would be "time sensitive" and often "require[] an immediate turnaround." Delancey Decl. ¶ 17; 56.1 ¶ 193. Wells' assignments thus "took priority over all of [Delancey's] other work and could take anywhere between [] half an hour and an hour to complete." Delancey Decl. ¶ 18. Taken together, and viewed in the light most favorable to Delancey, a reasonable juror could conclude that Wells had actual authority to direct Delancey's daily work activities.

To be sure, the evidence is not unequivocal. As FNN highlights, Delancey's formal duties did not include "helping Fox News Channel television shows" like Wells', 56.1 ¶ 43, and the record does not show that Wells had the authority to promote, reassign, or significantly alter the scope of Delancey's work responsibilities—or, for that matter, to fire him, *see* Reply at 3–4; 56.1 ¶ 56(e). But the relative weight of this evidence and the ultimate question of whether assigning high-priority work to Delancey a "couple of times a week" constitutes the "exercise[]" of

"managerial or supervisory responsibility" over Delancey is a question of fact for the jury. *See* N.Y.C. Admin. Code § 8-107(13)(b)(1).

B. Liability Under Subsections (b)(2) and (b)(3)

Although there is a triable issue of fact as to whether FNN is liable for Wells' conduct under § 8-107(13)(b)(1) of the NYCHRL, there is no triable issue of fact as to FNN's liability under subsections (b)(2) or (b)(3), which impose liability on an employer when the employer knew or should have known of the sexual harassment.

First, Delancey points to no evidence that FNN knew of the sexual harassment, let alone "acquiesced in such conduct or failed to take" immediate corrective action, as the NYCHRL requires under subsection (b)(2). *See* N.Y.C. Admin. Code. § 8-107(13)(b)(2); *see also* 56.1 ¶¶ 69–80; Reply at 7; Opp. at 30–34. As a result, the Court finds that FNN is entitled to summary judgment as to Delancey's claim under § 8-107(13)(b)(2).

Subsection (b)(3), on the other hand, would impose liability on FNN if Delancey could show that FNN "should have known" of the sexual harassment and "failed to exercise reasonable diligence to prevent it." N.Y.C. Admin. Code § 8-107(13)(b)(3). The standard essentially functions as a negligence standard. *See Williams v. N.Y.C. Dep't of Educ.*, No. 19 Civ. 1353, 2021 WL 1178118, at *11 (S.D.N.Y. Mar. 29, 2021) (analyzing whether plaintiff had shown the defendant "had any knowledge, or was negligent in not knowing").

On this record, the Court concludes that no reasonable jury could conclude that FNN should have known of Wells' sexual harassment. First, at the time that FNN hired Wells, there is no evidence that FNN had knowledge of any sexual harassment complaints made against Wells, and there is no evidence of sexual harassment complaints prior to Delancey's assault. 56.1 ¶¶ 81–83. The strongest evidence Delancey cites are Facebook messages he received from Kathleen Wells in

October 2017.[6] *See* 56.1 ¶¶ 241–44; Opp. at 33–34. The messages state that Justin Wells called Kathleen Wells a "'fucking bitch' because she refused to do a live shoot with [Justin Wells]," 56.1 ¶ 243; *see* ECF No. 131-3 at 3 (Facebook messages), and that Kathleen Wells' boss "had a talk with [Justin Wells'] boss about how he treated me," after which Justin Wells "wrote a letter to [Kathleen Wells] apologizing." ECF No. 131-3 at 4; 56.1 ¶ 243; *see also* Wells Dep. at 282:4–283:14 (denying that the incident occurred).

FNN argues that the messages should not be considered as they are not admissible, *see* Mem. at 17, but the Court holds that, even considering the messages, they do not show that Fox "should have known" about Delancey's sexual assault. Nothing about Wells' conduct towards Kathleen Wells suggests sexual misconduct, and even Kathleen Wells' messages do not suggest that she viewed or reported the issue as sexual harassment. *See generally* ECF No. 131-3. Although Wells' conduct towards Kathleen Wells amounts to unprofessional behavior, and might constitute evidence of a propensity to engage in unlawful gender discrimination, the Court agrees with FNN that Kathleen Wells' complaint "could hardly be found to put FNN on notice that Wells had a propensity to sexually assault a coworker." Mem. at 18.

This is consistent with existing law: In examining whether employers "should have known" of an employee's propensity to engage in misconduct in a negligent supervision claim, New York "courts have required plaintiffs to show that the employer was aware of 'prior misconduct' by the employee that was 'of the same kind that caused the injury.'" *Eckhart*, 2025 WL 786536, at *20 (citation omitted). In those circumstances, Courts have held that even actual evidence that an employee sexually harassed other employees was insufficient to put an employer on notice that an employee would sexually assault a coworker. *See Doe v. Alsaud*, 12 F. Supp. 3d

[6] Kathleen Wells has no relation to Justin Wells. *See* Mem. at 17.

674, 681 (S.D.N.Y. 2014); *O'Rear v. Diaz*, No. 24 Civ. 1669, 2025 WL 283169, at *11 (S.D.N.Y. Jan. 23, 2025).

Delancey's remaining arguments that FNN should have known of his sexual assault, or should have known that Wells would sexually assault him, all fail. Delancey argues: (1) that there was an "obvious risk" of sexual harassment from Wells because Wells could issue assignments to Delancey without using the assignment desk, Opp. at 30–31; (2) FNN should have known of the risk of sexual harassment when MacCarthy, Delancey's direct supervisor, saw the monogrammed stationery that Wells had ordered for Plaintiff, *id.*; (3) MacCarthy told Delancey that HR was "not to be trusted," Delancey Dep. 148:7–149:14; and (4) FNN maintains lax recordkeeping policies, Opp. at 32–33.

As for the first argument, whether Wells issued assignments to Delancey does not bear on whether FNN should have known of the potential for a sexual assault. With respect to the second argument, Delancey has shown that his supervisor was aware that Wells purchased him unique stationery, but the record does not support Delancey's assertions that monogrammed stationery was considered by his all of his coworkers to be odd or unusual, or a sign of the potential for sexual assault. *Compare* 56.1 ¶¶ 163–67, *with* MacCarthy Dep. 62:17–64:14 (refusing to describe the gift as "unusual"), Collins Fact Dep. 73:14–77:13, *and* Hare Johnson Dep. 24:14–25:11 (stating that she had never seen "personalized" stationery with "someone's name on [it]," but stating that "I could see" a Fox employee gifting another FNN employee "branded coffee cups or pencil[s]"). Moreover, even assuming that the gift was odd, this incident is not enough to put FNN on notice of Wells' propensity for sexual assault specifically. *See Eckhart*, 2025 WL 786536, at *20.

As to the third and fourth arguments, the only caselaw Delancey cites, *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63–64 (2d Cir. 1998), does not support his claims. In that case, the Second Circuit held that an employer may be vicariously liable for an employee's conduct, even if

that conduct is not reported to the employer when "the failure to report is attributable to the conduct of the employer or its agent." *Id.* at 64. There, the plaintiff had raised an allegation of sexual harassment to her direct supervisor who then told her that "if you say something, you cannot work here no more." *Id.* at 60. Although Delancey claims that MacCarthy discouraged him from going to HR in general, there is no evidence that MacCarthy instructed Delancey not to report the specific assault at issue. *See also Mejia*, 2020 WL 2837008, at *16–17 (granting summary judgment where a plaintiff had not reported offensive comments or made a formal complaint).[7]

C. Whether the Assault Occurred Outside the Workplace

FNN claims that "[a]s a general rule, 'employers are not responsible . . . for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-employees,' because those actions are not part of the work environment." Mem. at 20 (quoting *Devlin v. Teachers Ins. & Annuity Assoc. of Am.*, No. 02 Civ. 3228, 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003)). The Cout notes that none of the cases FNN cites for this proposition analyze claims brought under the NYCHRL—in fact, when FNN quotes *Devlin* to supply this rule in its brief, its quotation omits the language "in Title VII." *Devlin*, 2003 WL 1738969, at *2;[8] *see also Feliciano v. Alpha Sector, Inc.*, No. 00 Civ. 9309, 2002 WL 1492139, at *2 (S.D.N.Y. July 12, 2002); *Clarke v. Pacifica Foundation*, No. 07 Civ. 4605, 2011 WL 4356085, at *19–20 (E.D.N.Y. Sep. 16, 2011) (citing *Feliciano* and applying the rule in its analysis of a Title VII claim).

---

[7] Furthermore, the Court notes that, in its prior order on the Fox Defendants' motion to dismiss, it held that allegations that Wells had sexually harassed a female employee were sufficient to put FNN on notice of the potential for sexual assault. *See* ECF No. 54 at 10–12. However, the allegations in the amended complaint differ from the evidentiary record that has now developed; although the complaint alleged that Wells had previously "subjected" a female employee to "sexual harassment," Am. Compl. ¶¶ 41–42, the evidence does not show that Wells engaged in the kind of sexual conduct toward Kathleen Wells that Delancey later experienced, nor that Kathleen Wells reported that he did so. *See, e.g.*, Opp. at 16 & n.4.

[8] *Devlin* states that "[t]he standards for liability under the federal, state, and city provisions are essentially equivalent" for purposes of its decision, 2003 WL 1738969 at *2 n.1, but the Second Circuit case that *Devlin* cites for this proposition, *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000), was later superseded by language codified at N.Y.C. Admin. Code § 8-130, which provides that the NYCHRL shall be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof." *See Zeng v. N.Y.C. Housing Auth.*, No. 22-138, 2023 WL 4553416 (2d Cir. July 17, 2023) (summary order).

In any event, Delancey does not substantially dispute this premise, stating that a plaintiff "must identify sufficient facts from which to infer a connection between the [sexual harassment] and the employment" to hold an employer liable when harassment occurs outside the workplace. Opp. at 27 (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1306 (2d Cir. 1995)). The Court concludes that, even accepting FNN's standard, Delancey has adduced sufficient evidence to create a triable issue of fact as to whether the sexual assault occurred in a work environment.

The Court has already held that there is a triable issue of fact as to whether Wells had the exercised "managerial or supervisory authority" for purposes of the NYCHRL. *See* N.Y.C. Admin. Code § 8-107(13)(b)(1); *supra* at 9–11. Viewing the rest of the evidence in the light most favorable to Delancey, a reasonable jury could also conclude that the sexual assault occurred in a work environment. For one, Delancey's supervisor, MacCarthy, who is also gay, would frequently invite "the gay guys in the newsroom" to go to a bar to have drinks and work-related conversations after work. *See* Delancey Dep. 150:17–152:13, 152:23–153:6, 155:17–22. It would, therefore, be reasonable for Wells to assume that FNN had a "culture" of social drinking events among employees. *See* Opp. at 14. Furthermore, when Wells invited Delancey to go to Barracuda, he had already, in discussions with Delancey, repeatedly held himself out as someone with power at FNN. *See* Delancey Dep. 180:11–15, 182:12–184:10. Wells then told Delancey that it would "be a good thing for [Delancey] to get to know" other FNN employees who would be attending the drinks event at Barracuda and that attending could "benefit" Delancey. *Id.* 58:10–23. A jury could reasonably infer, therefore, that FNN had a "culture . . . that encouraged employees, especially gay employees," to network at bars, and that, given this culture and Wells' and Delancey's employment relationship, the alleged assault occurred in a work environment. Opp. at 28.

In similar cases, courts have held that conduct occurring outside the physical workplace and outside of normal working hours was sufficiently connected to the workplace to support a sexual

harassment claim. In *Ferris v. Delta Airlines*, for example, the plaintiff, a flight attendant, alleged that she was drugged and raped by a coworker while staying at a hotel booked by her employer during a layover between flights. *See* 277 F.3d 128, 130, 135 (2d Cir. 2003). In view of the "special set of circumstances that surround" a layover, the court held that the "rape could be found to have occurred in a work environment within the meaning of Title VII." *Id.* In *Parrish v. Sollecito*, the court denied a defendant's motion for summary judgment where an alleged sexual assault occurred at a funeral reception for the employer's father, in part because the assault "involved conduct by a manager" and in part because the reception was "an aspect of the ordinary and necessary social obligations and unstated expectations that are common adjuncts of . . . interactions associated with the normal course of business." 249 F. Supp. 2d 342, 351–52 (S.D.N.Y. 2003). As *Parrish* noted, employees often "interact outside the office at business-related meals and social events . . . not strictly stemming from or compelled by a business purpose, but to which the employment relationship may necessarily carry over by reason of circumstances that may have their origins in the workplace itself." *Id.* at 351; *see also Echevarria v. Utite, Inc.*, No. 15 Civ. 1840, 2017 WL 4316390, at *7 (D. Conn. Sep. 28, 2017) (denying summary judgment in favor of employer where alleged harassment occurred during "an event planned and attended by a sizable group of co-workers, including two supervisors"). A jury could thus reasonably infer that Wells' invitation to drinks at Barracuda constituted an invitation to a business-related social event, necessarily related to Wells' and Delancey's employment relationship.

III. *Quid Pro Quo* Sexual Harassment

The Court has concluded that Delancey's causes of action under the NYSHRL fail because he has not shown a basis for imputing Wells' conduct to FNN. *See supra* at 8. Therefore, his state law claims based on a *quid pro* quo theory of sexual harassment also fail. As to Delancey's NYCHRL claim, the issue is irrelevant, as FNN acknowledges that the NYCHRL "does not

distinguish *quid pro quo* claims from hostile work environment claims, focusing instead on 'unequal treatment based on gender.'" Mem. at 23 n.6 (citing *Friederick v. Passfeed, Inc.*, No. 21 Civ. 2066, 2022 WL 992798, at *7 (S.D.N.Y. Mar. 31, 2022)). Other courts in this Circuit agree. *See Garrigan v. Ruby Tuesday, Inc.*, No. 14 Civ. 155, 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014) (rejecting application of the *quid pro quo* standard to an NYCHRL claim); *Lenart v. Coach Inc.*, 131 F. Supp. 3d 61, 69 (S.D.N.Y. 2015) ("[A] focus on unequal treatment based on gender . . . is in fact the approach that is most faithful to the uniquely broad and remedial purposes of the [NYCHRL]." (quoting *Mihalik*, 715 F.3d at 114)); *Villalta v. JS Barkats, P.L.L.C.*, No. 16 Civ. 2722, 2021 WL 2458699, at *10 (S.D.N.Y. Apr. 16, 2021) ("The NYCHRL does not distinguish *quid pro quo* claims from hostile work environment ones . . . . Nonetheless, a *quid pro quo* claim is actionable under the NYCHRL as long as the plaintiff has received unequal treatment based on [his] gender."). Delancey need only show that he suffered "[d]ifferential treatment in the workplace based on gender" to succeed on his NYCHRL claim. *Garrigan*, 2014 WL 2134613, at *5; *Villalta*, 2021 WL 2458699, at *10. For the reasons discussed above, there are triable issues of fact on this question.

**CONCLUSION**

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART FNN's motion for summary judgment. Summary judgment is granted in favor of FNN on Count Three (NYSHRL) and on Count Four to the extent that Count Four seeks to hold FNN liable under N.Y.C. Admin. Code § 8-107(13)(b)(2) and (b)(3). Summary judgment is denied on Count Four as to Delancey's claim against FNN under N.Y.C. Admin. Code § 8-107(13)(b)(1).

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 122.

SO ORDERED.

Dated: September 14, 2026
New York, New York

ANALISA TORRES
United States District Judge